**No. 25-1054(L)**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,

*Defendants-Appellants*.

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00271 (Johnston, T.)

**No. 25-1055**

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation; PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs-Appellees*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy.

*Defendants-Appellants*.

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00272 (Johnston, T.)

---

**No. 25-1056**

---

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his

official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy.

*Defendants-Appellants.*

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00298 (Johnston, T.)

---

**APPELLANTS' OPENING BRIEF**

---


JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*
*Counsel of Record*

CALEB A. SECKMAN
SPENCER J. DAVENPORT
*Assistant Solicitors General*

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS


Table of Authorities ........ iii

Jurisdictional Statement ........ 1

Statement Of The Issues ........ 2

Introduction ........ 4

Statement Of The Case ........ 8

- I. The 340B Program ........ 8
  - A. Background ........ 8
  - B. 340B's Framework ........ 11
- II. 340B Contract Pharmacy Guidance ........ 13
  - A. 1994 Guidance ........ 13
  - B. 1996 Guidance ........ 14
  - C. 2010 Guidance ........ 15
- III. 2020 Withdrawn Advisory Opinion And Ensuing Litigation ........ 16
- IV. State Responses ........ 20
- V. West Virginia's Law And This Litigation ........ 23

Summary Of The Argument ........ 25

Standard Of Review ........ 28

Argument ........ 29

- I. Plaintiffs' Preemption Claims Are Not Likely To Succeed ........ 29
  - A. The Presumption Against Preemption Applies Here ........ 30
  - B. The Act Is Not Field-Preempted ........ 33

1. 340B Regulates Price, Not Delivery ..............................34

2. The Act Regulates Only Delivery...................................37

C. The Act Is Not Conflict-Preempted ........................................50

1. The Act Does Not Directly Conflict With Federal Law ..................................................................51

2. The District Court Erred By Finding Obstacle Preemption .......................................................................56

3. None Of Plaintiffs' Other Conflict-Preemption Claims Succeed ................................................................66

II. Neither Of Plaintiffs' Other Claims Are Likely To Succeed.............73

A. The Act Does Not Effectuate A Taking...................................73

1. The Act Does Not Effectuate A Per Se Physical Taking...............................................................74

2. The Act Does Not Effectuate A Regulatory Taking .........................................................................79

3. Even If There Is A Taking, The Act Serves A Public Purpose ..........................................................84

B. The Act Does Not Impose Excessive Fines .............................85

III. The Equities Strongly Weigh Against Injunctive Relief ..................89

IV. The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries ...............................................92

Conclusion.................................................................................................95

Certificate Of Compliance.........................................................................97

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 90

*AIDS Healthcare Found. v. Douglas*,
457 F. App'x 676 (9th Cir. 2011) .......... 35

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) .......... 57

*Am. Hosp. Ass'n v. DHHS*,
No. 4:20-cv-08806-YGR, 2021 WL 616323
(N.D. Cal. Feb. 17, 2021) .......... 57, 85

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) .......... 70

*Andrus v. Allard*,
444 U.S. 51 (1979) .......... 80

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 30, 33, 35, 36, 37, 39, 40, 50, 69

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .......... 82

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .......... 32

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .......... 8, 11, 12, 13, 49, 64, 65, 66

*AstraZeneca Pharms. LP v. Beccera*,
543 F. Supp. 3d 47 (D. Del. 2021) .......... 16, 17, 18, 43, 67, 72

*Austin v. United States*,
509 U.S. 602 (1993) .......... 86

*Ayotte v. Planned Parenthood of N. New Eng.*,
546 U.S. 320 (2006) .......... 92

**Page(s)**

*Baker Cnty. Med. Servs., Inc. v. U.S. Att'y Gen.*,
763 F.3d 1274 (11th Cir. 2014)....77

*Bauer v. Elrich*,
8 F.4th 291 (4th Cir. 2021)....50

*Berman v. Parker*,
348 U.S. 26 (1954)....84, 85

*Biotechnology Indus. Org. v. District of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007)....72, 73

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
No. 3:23-cv-01103 (MPS), 2024 WL 3292657
(D. Conn. July 3, 2024)....74

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989)....86

*Buffalo Tchrs. Fed. v. Tobe*,
464 F.3d 362 (2d Cir. 2006)....83

*Burditt v. U.S. Dep't of Health & Hum. Servs.*,
934 F.2d 1362 (5th Cir. 1991)....78

*California v. Texas*,
593 U.S. 659 (2021)....94

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)....74, 75

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)....41, 51, 57

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995)....87

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)....31

*Clayland Farm Enters., LLC v. Talbot County*,
987 F.3d 346 (4th Cir. 2021)....81

**Page(s)**

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993)....................81

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986)....................83

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................56

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997)....................32

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991)....................28, 29

*Eli Lilly & Co. v. US. Dep't of Health & Hum. Servs.*,
No. 121-cv-00081-SEB-MJD, 2021 WL 5039566
(S.D. Ind. Oct. 29, 2021) ....................18, 44, 45

*Emps. Res. Mgmt. Co. v. James*,
62 F.3d 627 (4th Cir. 1995)....................46

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)....................31, 48, 50

*Env't Tech. Council v. Sierra Club*,
98 F.3d 774 (4th Cir. 1996)....................92

*FEC v. Cruz*,
596 U.S. 289 (2022)....................41

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)....................47

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963)....................43

*Fox v. Washington*,
236 U.S. 273 (1915)....................62

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)....................92

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**


*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)....57

*Garelick v. Sullivan*,
987 F.2d 913 (2d Cir. 1993)....79

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)....51

*Genesis Health Care, Inc. v. Becerra*,
No. 4:19-cv-01531-RBH, 2023 WL 7549156
(D.S.C. Nov. 3, 2023)....57

*Gonzales v. Oregon*,
546 U.S. 243 (2006)....8

*Gore v. United States*,
357 U.S. 386 (1958)....88

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....31

*Guthrie v. PHH Mortg. Corp.*,
79 F.4th 328 (4th Cir. 2023)....56

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915)....81

*Haw. Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984)....77, 79, 82, 84, 85

*Henry v. Jefferson Cnty. Comm'n*,
637 F.3d 269 (4th Cir. 2011)....83

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985)....8, 32, 36, 37, 55, 85

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)....74, 78

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)....46

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**


*J.R. v. Walgreens Boots All., Inc.*,
No. 20-1767, 2021 WL 4859603 (4th Cir. Oct. 19, 2021)................................45

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ........................................................................33

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979)........................................................................................80

*Kelo v. City of New London*,
545 U.S. 469 (2005)..........................................................................76, 84, 85

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974)........................................................................................71

*Lingle v. Chevron USA Inc.*,
544 U.S. 528 (2005)...................................................................................79, 80

*Louk v. Cormier*,
622 S.E.2d 788 (W. Va. 2005)........................................................................93

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)..................................................................................80, 82

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......................................................................39

*Mead Corp. v. Tilley*,
490 U.S. 714 (1989)........................................................................................67

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019)........................................................................................53

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
742 F.2d 442 (8th Cir. 1984)....................................................................78, 79

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ..........................................................................28

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
No. 6:21-cv-06507 EAW, 2022 WL 4017895
(W.D.N.Y. Sept. 2, 2022) ...............................................................................23

**Page(s)**

*Mt. Valley Pipeline, LLC, v. W. Pocahontas Props., Ltd. P'ship*,
918 F.3d 353 (4th Cir. 2019) ....................................................... 29

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) ....................................................... 53

*N. Va. Hemp & Agric., LLC v. Virginia*,
125 F.4th 472 (4th Cir. 2025) ....................................................... 34, 51

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ....................................................... 31

*Nat'l Pharmacies, Inc. v. De Melecio*,
51 F. Supp. 2d 45 (D.P.R. 1999) ....................................................... 37

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................... 29

*Novartis Pharms. Corp. v. Bailey*,
No. 2:24-cv-04131-MDH, 2025 WL 489881
(W.D. Mo. Feb. 13, 2025) ....................................................... 22

*Novartis Pharms. Corp. v. Brown*,
No. 1:24-cv-01557 (D. Md. May 29, 2024) ....................................................... 20

*Novartis Pharms. Corp. v. Espinosa*,
No. 21-cv-1479 (DLF), 2021 WL 5161783 (D.D.C. Nov. 5, 2021) .......... 69, 70

*Novartis Pharms. Corp. v. Fitch*,
738 F. Supp. 3d 737 (S.D. Miss. 2024) ....................................................... 71

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .................. 19, 35, 40, 42, 43, 55, 63, 66, 67, 68

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) ....................................................... 30, 51, 63

*Pace Res., Inc. v. Shrewsbury Twp.*,
808 F.2d 1023 (3d Cir. 1987) ....................................................... 82

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ....................................................... 80

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**


*Penn. Coal Co. v. Mahon*,
260 U.S. 393 (1922)....74, 80

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
18 F.4th 956 (8th Cir. 2021)....37

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
645 F. Supp. 3d 890 (E.D. Ark. 2022)....45

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136
(8th Cir. 2024).... 9, 20, 22, 23, 32, 33, 34, 36, 37, 44, 48, 58, 62, 72, 75, 77

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*,
No. 6:23-cv-00997, 2024 WL 4361597
(W.D. La. Sept. 30, 2024)....20, 21, 22, 44, 73

*Pharm. Rsch. & Mfrs. v. Fitch*,
No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365
(S.D. Miss. July 1, 2024)....21, 62

*Pierce v. N.C. State Bd. of Elections*,
97 F.4th 194 (4th Cir. 2024)....28

*Pinney v. Nokia, Inc.*,
402 F.3d 430 (4th Cir. 2005)....32

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014)....31, 34, 46, 47

*Q Int'l Courier Inc. v. Smoak*,
441 F.3d 214 (4th Cir. 2006)....29

*Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*,
862 F.3d 433 (4th Cir. 2017)....81

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)....33, 55

*Rummel v. Estelle*,
445 U.S. 263 (1980)....89

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*,
58 F.4th 696
(3d Cir. 2023) ............ 9, 11, 12, 18, 19, 20, 35, 36, 37, 40, 42, 43, 55, 63, 64, 68

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
570 F. Supp. 3d 129 (D.N.J. 2021) ........................................................ 18, 81

*Satellite Broad. & Commc'ns Ass'n v. FCC*,
275 F.3d 337 (4th Cir. 2001) ........................................................................ 78

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) ........................................................................ 28

*Solem v. Helm*,
463 U.S. 277 (1983) ........................................................................ 89

*Sprietsma v. Mercury Marine*,
537 U.S. 51 (2002) ........................................................................ 41

*Star Sci., Inc. v. Beales*,
278 F.3d 339 (4th Cir. 2002) ........................................................................ 84

*State v. Tennant*,
732 S.E.2d 507 (W. Va. 2012) ........................................................................ 93

*Stoddard v. W. Carolina Reg'l Sewer Auth.*,
784 F.2d 1200 (4th Cir. 1986) ........................................................ 56, 67

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ........................................................................ 74

*Thomas v. County of Humboldt, Cal.*,
124 F.4th 1179 (9th Cir. 2024) ........................................................................ 87

*Timbs v. Indiana*,
586 U.S. 146 (2019) ........................................................................ 86

*United States ex rel. Adventist Health Sys. W. v. AbbVie, Inc.*,
723 F. Supp. 3d 882 (C.D. Cal. 2024) ........................................................ 71

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*United States v. Ahmad*,
213 F.3d 805 (4th Cir. 2000)....................86

*United States v. Bajakajian*,
524 U.S. 321 (1998)....................86, 89

*United States v. Bennett*,
986 F.3d 389 (4th Cir. 2021)....................88

*United States v. Blackman*,
746 F.3d 137 (4th Cir. 2014)....................87

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
83 F.3d 660 (4th Cir. 1996)....................61

*United States v. Salerno*,
481 U.S. 739 (1987)....................87

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013)....................40

*United States v. Talebnejad*,
460 F.3d 563 (4th Cir. 2006)....................87

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019)....................51

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023)....................78

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011)....................41, 43, 68

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................29

**Constitutional Provisions**

U.S. CONST. amend. V....................74

U.S. CONST. amend. VIII....................86

**Page(s)**

U.S. CONST. amend. X ....................................................................................55
U.S. CONST. art. VI, cl. 2 ..............................................................................30

**Statutes**

4 U.S.C. § 8 ....................................................................................................94
22 U.S.C. § 7674 .............................................................................................94
28 U.S.C. § 1292 ...............................................................................................1
28 U.S.C. § 1331 ...............................................................................................1
42 U.S.C. § 256b ..... 4, 8, 9, 11, 12, 13, 22, 34, 38, 52, 53, 54, 55, 60, 61, 65, 66, 71
42 U.S.C. § 1395j ..............................................................................................9
42 U.S.C. § 1396r-8 .........................................................................................11
42 U.S.C. § 1751 .............................................................................................94
H.B. 1881, 93rd Gen Assemb., Act 1103 (Ark. 2021)..........................................20
H.B. 728, 2024 Leg., Reg. Sess. (Miss. 2024).......................................................20
W. VA. CODE § 60A-8-6a...... 6, 23, 24, 35, 38, 53, 54, 58, 59, 61, 62, 71, 76, 92, 94

**Regulations**

59 Fed. Reg. 25,110 (May 13, 1994) ..........................................................13, 14
61 Fed. Reg. 43,549 (Aug. 23, 1996)..........................................14, 15, 58, 82
61 Fed. Reg. 65,406 (Dec. 12, 1996) ................................................................60
75 Fed. Reg. 10,272 (Mar. 5, 2010)...........................................................15, 16

**Rules**

FED. R. APP. P. 4 ..............................................................................................1

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

**Other Authorities**


Alaa Ziad Haidar,
*Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 HEALTH LAW. 34 (2020) ....................................................... 90

Brendan Pierson,
*Judge blocks West Virginia's 340B contract pharmacy law*, REUTERS (Dec. 19, 2024, 3:09 PM), https://tinyurl.com/4sz72a94 ....................................................... 25

CONG. BUDGET OFF.,
*Prescription Drugs: Spending, Use, and Prices* (2022) ............................... 9

Craig Blair,
*'Big Pharma' is Using West Virginia to Scare GOP Supporters of 340B Pharmacies*, WVNEWS (June 10, 2024), https://tinyurl.com/2tdb4z7r ....................................................... 91

DEP'T OF HEALTH AND HUM. SERVS.,
HHSOIG 20-06, ADVISORY OPINION 20-06 ON CONTRACT PHARMACIES UNDER THE 340B PROGRAM, 2020 WL 11422965 (2020) ....................................................... 17

Dobson DaVanzo Health Economics Consulting,
*West Virginia 340B Hospitals Serve More Patients with Low Incomes and Provide the Majority of Hospital Care to Medicaid Patients*, https://tinyurl.com/48u6nute (last visited Feb. 10, 2025) ....................................................... 90

H.R. REP. NO. 102-384, pt. 2 (1992) ....................................................... 10

Health Res. & Servs. Admin, Off. of Pharmacy Affairs,
340B OPAIS, https://tinyurl.com/24sebw6m (last visited Feb. 10, 2025) ....................................................... 90

Joel M. Hamme, *et al.*,
2 Health L. Prac. Guide (2024) ....................................................... 45

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

Nicholas C. Fisher,
*The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25 (2019) .......... 9, 10

S. REP. NO. 102-259 (1992) .......... 12, 67

U.S. GOV'T ACCOUNTABILITY OFF.,
DRUG DISCOUNT PROGRAM: FEDERAL OVERSIGHT OF COMPLIANCE AT 340B CONTRACT PHARMACIES NEEDS IMPROVEMENT (June 2018), https://tinyurl.com/3bkubmfe .......... 16

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring federal constitutional challenges to a West Virginia law. Under 28 U.S.C. § 1292(a)(1), this Court has appellate jurisdiction over the district court's order granting Plaintiffs' motions for a preliminary injunction. The State timely filed its notice of appeal on January 16, 2025, within 30 days of the district court's December 17, 2024 order. FED. R. APP. P. 4.

## STATEMENT OF THE ISSUES

Section 340B of the Public Health Service Act requires drug manufacturers participating in Medicare Part B and Medicaid to sell certain drugs to eligible healthcare providers at discounted prices. These providers in turn provide healthcare to some of West Virginia's poorest and most underserved populations.

Section 340B is silent on where drug manufacturers must deliver the federally discounted drugs, and the providers often choose to have them delivered to pharmacies with whom they contract. Contract pharmacies help providers reduce costs so that they can serve more people in need. But in recent years, drug manufacturers began using the statute's silence on delivery as a justification for refusing to deliver drugs to contract pharmacies.

Fearing that the manufacturers' newly restrictive practices would obstruct patient access to medications and undermine the providers' ability to meet West Virginia's medical needs, West Virginia enacted Senate Bill 325 (the Act). The Act requires manufacturers to honor hospitals and others' requested place of delivery.

The issues presented are:

**I.** Does Section 340B, which is silent on delivery, preempt a state law that regulates delivery terms in contracts between drug manufacturers and purchasers of 340B-discounted drugs?

**II.A.** Does the Act effect an unconstitutional taking when the Act sets restrictions on certain actions Plaintiffs voluntarily take, leaves most of Plaintiffs' value intact, impacts a highly regulated field, and serves a public purpose?

**II.B.** Does the Act impose an unconstitutionally excessive fine where no fine exists and Plaintiffs cannot meet the excessive-fines factors?

**III.** Do the equities weigh in favor of injunctive relief where, among other things, blocking the Act will prevent poor West Virginians from accessing discounted medications they need while weakening critical healthcare providers?

**IV.** Should the whole Act be enjoined when it includes lawful provisions that operate independently from the rest and the chapter code includes a severability clause?

## INTRODUCTION

Congress enacted Section 340B of the Public Health Service Act to lower the cost of drugs for medical providers in vulnerable communities across the country. Section 340B advances that aim by requiring drug manufacturers participating in Medicare Part B and Medicaid to sell certain drugs to eligible healthcare providers at no more than a statutorily determined ceiling price. The providers (often called "covered entities") can then reach more patients and provide more services. Because covered entities serve many uninsured, low-income, and indigent patients, the program has proved to be critical to providing healthcare in rural States like West Virginia.

Section 340B adopts a comprehensive framework when it comes to drug *prices*, but it's a different story when it comes to drug *delivery*. The Secretary of Health and Human Services (HHS) enforces drug manufacturers' duty to sell discounted drugs, enforces covered entities' duties not to seek improper discounts or make improper resales, and oversees a process to resolve claims that drug manufacturers or covered entities have violated those duties. *See* 42 U.S.C. § 256b(d). All these measures speak to price. In contrast, neither Section 340B nor its implementing regulations regulate how manufacturers deliver drugs or how covered entities distribute them to patients.

This case concerns one way in which covered entities deliver covered medications to patients: contract pharmacies. Most covered entities cannot afford to establish and operate their own "in-house" pharmacies. Instead, they contract with independent, private pharmacies to ensure that the covered entities' patients receive their drugs safely and conveniently. Covered entities using contract pharmacies pay for and take title to the drugs. But manufacturers deliver the drugs directly to the contract pharmacy, where they are dispensed on the covered entity's behalf. Contract pharmacies enable covered entities to provide more Section 340B drugs to more patients—and the savings from the program in turn allow the covered entities to provide more services.

Contract pharmacies were an accepted part of the system for decades. But trouble arose in 2020 when many pharmaceutical manufacturers—Plaintiffs included—began limiting the use of contract pharmacies in various ways. This reversal threatened to undermine the program's effectiveness in providing crucial discounted medications to vulnerable patients while contravening years of established practice.

Concerned that the drug manufacturers' restrictive practice would obstruct patient access to needed medication and weaken the healthcare

providers serving the most vulnerable populations, West Virginia joined a growing number of States in forbidding drug manufacturers from limiting the use of contract pharmacies. Like laws in Arkansas, Louisiana, Maryland, Mississippi, and elsewhere, West Virginia's law prohibits drug manufacturers from "deny[ing], restrict[ing], or prohibit[ing]" the "acquisition" of a covered drug by, or "delivery" of a covered drug to, a covered entity's contract pharmacy. W. VA. CODE § 60A-8-6a(b)(1). The law also says drug manufacturers can't require covered entities "to submit any claims or utilization data as a condition" of their 340B drug offer to that entity. *Id.* § 60A-8-6a(b)(2). The law imposes penalties for violations. *See id.* § 60A-8-6a(c).

AbbVie, Novartis Pharmaceuticals Corporation, and Pharmaceutical Research and Manufacturers of America (Plaintiffs) sought to preliminarily enjoin West Virginia's law. All argued that the law is field- and conflict-preempted because it intrudes upon the federal field of 340B pricing. Novartis argued that it was also preempted by federal patent law. And AbbVie argued that West Virginia's law works as an unconstitutional physical taking and imposes an excessive fine.

Every court to consider a similar law had concluded that those laws regulate only delivery and not pricing, but the U.S. District Court for the Southern District of West Virginia blazed a new trail. It found that the Act "stands as an obstacle to achieving the federal objective of preventing fraud in the 340B Program." JA052. It also found that the Act regulates price (not delivery), treading on federal ground; further, the Act could "lead to a substantial risk of conflicting adjudications absent centralized enforcement." JA787 (cleaned up).

But the decision is wrong. The Act does not change anything about fraud prevention; drug manufacturers can still acquire claims and utilization data consistent with federal law. And just as every other court has said, Section 340B never speaks to delivery. The court also failed to deploy the "presumption against preemption," which applies in traditional areas of state regulation—like protecting health and safety, as the Act does.

This Court should vacate the preliminary injunction. Doing so would allow West Virginia to continue ensuring that the State's poorest citizens have access to the medication and services they need.

## STATEMENT OF THE CASE

### I. The 340B Program.

The 340B Program is a drug pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specific health-care facilities." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). Those facilities—referred to as 340B facilities or covered entities—"include public hospitals and community health centers, many of them providers of safety-net services to the poor." *Id.* The statute lists 15 types of entities that qualify for the 340B Program such as "black lung clinic[s]," "children's hospital[s]," "critical access hospital[s], "rural referral center[s]," and other federal grantees. *See* 42 U.S.C. § 256b(a)(4).

#### A. Background.

States have "primar[y]" authority over matters of "health and safety." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). That "structure" gives States "great latitude" in protecting the "lives" and "health" of their citizens, and honors the States' historic "police powers" over healthcare providers, services, and transactions. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (cleaned up). Among the health-and-safety areas "traditionally left to state regulation" is "the practice of pharmacy"—including the

"distribution" of prescription drugs. *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), *cert. denied*, No. 24-118.

Congress, of course, has sometimes stepped in and acted in the healthcare realm. Most relevant here, it enacted Medicaid and Medicare to provide health-insurance coverage to the nation's most vulnerable populations. Medicare Part B covers services and equipment that primarily benefit elderly adults. 42 U.S.C. § 1395j. And Medicaid programs are federal-state programs administered by States to aid low-income adults and children. *See id.* § 1396. Each program includes drug coverage, which creates a vast market for drug manufacturers to sell their products. *See* CONG. BUDGET OFF., *Prescription Drugs: Spending, Use, and Prices* 8 (2022).

In 1992, Congress established the 340B Program as part of the Veterans Health Care Act and amended it in 2010 as part of the Affordable Care Act. *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); 42 U.S.C. § 256b(a)(1). It was initially meant to address an "unintended consequence" of the Medicaid Drug Rebate Program passed in 1990, which was itself intended "to restrain drug price increases for state Medicaid programs." Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of*

*Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25, 28-30 (2019). Before the 1990 law's passage, manufacturers "regularly offered discounts to … hospitals and other safety-net providers" voluntarily. *Id.* at 29. But the 1990 law "required the manufacturers to provide rebates to Medicaid for the lowest price they offered in the rest of the drug marketplace," and it "failed to exempt" the previously provided voluntary discounts from this calculation. *Id.* at 29-30. Thus, "drug manufacturers were disincentivized to continue giving discounts" because any discount now resulted in "larger rebates to Medicaid." *Id.* at 30. This disincentive led to greatly increased drug costs for hospitals and safety-net providers. *Id.*; *see also* H.R. REP. NO. 102-384, pt. 2, at 11 (1992).

But Congress was unwilling to "continue to allow" these vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. 102-384, at 11. So in response, it created the 340B Program as a means "to stretch scarce Federal resources as far as possible." *Id.* at 12. This program would allow covered entities to access Section 340B pricing discounts to "reach[] more eligible patients and provid[e] more comprehensive services." *Id.* The program thus represented Congress's deliberate intervention to restore and protect the longstanding practice of providing discounted drugs to safety-net providers serving the nation's most vulnerable populations.

### B. 340B's Framework.

The 340B Program is voluntary and "employs a form contract as an opt-in mechanism." *Astra*, 563 U.S. at 115. Congress incentivized manufacturers to participate by requiring them to enroll in the 340B Program if they wished to participate in Medicaid or Medicare Part B drug programs. *See* 42 U.S.C. § 1396r-8(b)(4)(B)(v).

"Section 340B's substantive requirements and restrictions" on participants "are few." *Sanofi*, 58 F.4th at 700. Manufacturers who choose to participate "agree to charge covered entities no more than predetermined ceiling prices." *Astra*, 563 U.S. at 115. Those prices are "derived from the 'average' and 'best' prices and rebates calculated under the Medicaid Drug Rebate Program." *Id.* (citing 42 U.S.C. § 256b(a)(1)). This pricing mechanism constitutes the program's core. Meanwhile, covered entities have their own requirements under the 340B Program. First, the program bans duplicate discounts, such that the entities cannot get the 340B price on drugs already subject to a Medicaid rebate. 42 U.S.C. § 256b(a)(5)(A)(i). And second, it bans diversion, meaning covered entities can sell the 340B drugs to only their patients. *Id.* § 256b(a)(5)(B). If a covered entity violates either of these obligations, Section 340B provides that the covered entity is liable to the

manufacturer in an amount equal to the price reduction it received on the affected purchased drug.

Beyond these relatively few pricing and purchasing obligations, the statute otherwise leaves much open to the covered entities. For instance, the statute does not place restraints on the actual delivery of 340B drugs. And this silence is seemingly intentional, as Congress specifically rejected a proposal that would have limited discounts to drugs dispensed through the "on-site pharmacy services" of covered entities. *See* S. REP. NO. 102-259, at 2 (1992).

The statute also provides for an enforcement scheme. *First*, the Secretary of HHS administers the 340B Program. *See* 42 U.S.C. § 256b. And it "is superintended by the Health Resources and Services Administration (HRSA), a unit of [HHS]." *Astra*, 563 U.S. at 113. Together, they implement and enforce the pricing and purchasing obligations under the 340B Program. Compliance mechanisms under the program include audits, fines, and even expulsion from the program. *Sanofi*, 58 F.4th at 700. And *second*, when a dispute arises between covered entities and drug manufacturers about pricing, payment, diversion, or double-discounting, Section 340B requires those parties to go through an "[a]dministrative dispute resolution process." 42

U.S.C. § 256b(d)(3). To use ADR, manufacturers must first audit a covered entity, which federal law allows them to do. *Id.* § 256b(a)(5)(C). The "administrative resolution of a claim" constitutes "a final agency decision." *Id.* § 256b(d)(3)(C). It is binding, subject to review in federal courts. *Id.* The statute doesn't provide a "private right to enforce the statutory ceiling-price obligation[]" against drug manufacturers. *Astra*, 563 U.S. at 118. Congress thus created a unified "framework … for covered entities complaining of overcharges and other violations of the discounted pricing requirements" to pursue relief, *id.* at 122 (cleaned up), while pointedly leaving delivery methods *out* of that process.

## II. 340B Contract Pharmacy Guidance.

The Secretary of HHS has only narrow rulemaking authority as to the Section 340B Program. So over the years, HHS (through HRSA) has issued guidance. Three of these documents dealt with distribution of 340B drugs to covered entities and the use of contract pharmacies.

### A. 1994 Guidance.

HRSA issued its first guidance document in 1994. *See* Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110 (May 13, 1994). It confirmed that "[a] covered

entity is permitted to use a purchasing agent without forfeiting its right to the section 340B drug discounts." *Id.* at 25,113. Thus, if a purchasing agent is used, manufacturers may ship 340B drugs to the purchasing agent, which in turn must ship them to the covered entity for dispensing to patients. *See id.*

Beyond purchasing agents, the 1994 Guidance addressed manufacturer restrictions. It informed manufacturers that they may not "single out covered entities" for "restrictive conditions" such as "minimum purchase amounts." 59 Fed. Reg. at 25,113. But it also said that manufacturers who contract with covered entities may "include provisions that address customary business practice, request standard information, or include other appropriate contract provisions." *Id.* at 25,114.

**B. 1996 Guidance.**

HRSA's 1996 Guidance began by acknowledging that Section 340B "is silent as to permissible drug distribution systems." Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549 (Aug. 23, 1996). After recognizing these "gaps in the legislation," HRSA argued that "some form of program structure was necessary to move the program forward." *Id.* at 43,550. What's more, because "only a very small number" of covered entities "used in-house pharmacies,"

most "rel[ied] on outside pharmacies to fill the need." *Id.* HRSA thus agreed that a covered entity without an in-house pharmacy could contract with an outside pharmacy to dispense drugs at a single location. *Id.* at 43,555. At least one commenter objected that "[c]overed entities should be permitted to contract with more than one site and contractor." 61 Fed. Reg. at 43,551. But HRSA supposed that "[c]overed entities are unlikely to select a contract pharmacy that is not convenient for their patients"; based on this non sequitur, it maintained its one-pharmacy-per-entity guidance. *Id.*

**C. 2010 Guidance.**

In its 2010 Guidance, HRSA described how patients who "face transportation barriers or other obstacles" had difficulty in "their ability to fill their prescriptions" under the 1996 Guidance. Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010). Seeking to correct that problem, the 2010 Guidance allowed covered entities "to use multiple pharmacy arrangements as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." *Id.* This express endorsement of multiple contract pharmacies encompassed covered entities with in-house pharmacies that needed to use outside pharmacies to

"supplement" the in-house services. *Id.* at 10,277. HRSA expected this change "would be a significant benefit to patients," "permit covered entities to more effectively utilize the 340B program[,] and create wider patient access." *Id.* at 10,273.

### III. 2020 Withdrawn Advisory Opinion And Ensuing Litigation.

The 2010 Guidance marked a significant shift toward expanding patient access through contract pharmacies. Over the next decade, this expansion would lead to both increased participation and increased conflicts. On the one hand, in response to the 2010 Guidance's express endorsement of them, covered entities began using substantially more contract pharmacies. *See* U.S. GOV'T ACCOUNTABILITY OFF., DRUG DISCOUNT PROGRAM: FEDERAL OVERSIGHT OF COMPLIANCE AT 340B CONTRACT PHARMACIES NEEDS IMPROVEMENT 2 (June 2018), https://tinyurl.com/3bkubmfe (noting an increase from around 1,300 contract pharmacies in 2010 to around 20,000 in 2017). On the other hand, "[e]vidently in response to the proliferation of contract pharmacies," drug companies started insisting that they would deliver 340B drugs only to covered entities who used a single pharmacy, whether in-house or outside. *AstraZeneca Pharms. LP v. Beccera*, 543 F. Supp. 3d 47, 52 (D. Del. 2021).

HHS responded to this collective tightening from the manufacturers by issuing an advisory opinion in December 2020. *See* DEP'T OF HEALTH AND HUM. SERVS., HHSOIG 20-06, ADVISORY OPINION 20-06 ON CONTRACT PHARMACIES UNDER THE 340B PROGRAM 2020 WL 11422965 (2020). The opinion stressed that "covered entities under the 340B Program are entitled to purchase covered outpatient drugs at no more than the 340B ceiling price." *Id.* at *6. Conversely, "manufacturers are required to offer covered outpatient drugs at no more than the 340B ceiling price." *Id.* This basic bargain holds "even if those covered entities use contract pharmacies to aid in distributing those drugs to their patients." *Id.* This approach tracked Section 340B's "plain meaning" and past interpretations. *Id.* at *1, *4.

The advisory opinion spawned a variety of litigation that, while presenting varying procedural postures and leading to slightly different outcomes, *all* confirmed that the statute is silent on drug-delivery methods.

Pharmaceutical manufacturer AstraZeneca challenged the advisory opinion in the District of Delaware. *AstraZeneca*, 543 F. Supp. 3d at 53. That court held that HHS had "wrongly determine[d] that purportedly *unambiguous* statutory language mandate[d] its conclusion regarding covered entities' permissible use of an unlimited number of contract

pharmacies." *Id.* at 58-59 (emphasis added). Although HHS had by that point "rescinded the advisory opinion," the district court "vacated" it anyway. *Sanofi*, 58 F.4th at 702-03. Meanwhile, in a separate and parallel challenge, the U.S. District Court for the District of New Jersey partly sided with HHS's view "that contract pharmacy arrangements as a dispensing mechanism are consistent with § 340B." *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 201 (D.N.J. 2021), *aff'd in part, rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023). But that court deemed the issue of the advisory opinion's legality ultimately moot. *Id.* at 159 n.31; *see also Eli Lilly & Co. v. US. Dep't of Health & Hum. Servs.*, No. 121-cv-00081-SEB-MJD, 2021 WL 5039566, at *19 (S.D. Ind. Oct. 29, 2021) ("Congress's use of broad language in enacting this statute and specifically omitting any mention of where 340B drugs are to be delivered does not leave room for drug manufacturers to unilaterally condition or control the availability of their 340B pricing to a particular delivery location of their choosing.").

The challenge to the advisory opinion reached the Third Circuit in 2023. *Sanofi*, 58 F.4th at 703. That court noted that "[n]owhere does Section 340B mention contract pharmacies." *Id.* Further, the "text is silent about delivery." *Id.* (cleaned up). And because "[l]egal duties do not spring from silence," the

Third Circuit reasoned that Section 340B does not say "drug makers must deliver discounted Section 340B drugs to an unlimited number of contract pharmacies." *Id.* at 707. So HHS's attempts to "enforce that supposed requirement … overstepped the statute's bounds." *Id.* For that reason alone—lack of a specific statutory delivery mandate in Section 340B—the Third Circuit disagreed with the advisory opinion. After all, "Congress … knew how to impose delivery-related requirements" when it enacted the 340B Program, but it did not unambiguously do so here. *Id.* at 704 (citing to other places in both Section 340B and related legislation that include language related to delivery). Thus, the court left undisturbed the "[s]tatutory silence[]" on drug delivery. *Id.* at 699.

A year later, the D.C. Circuit considered the same issue concerning delivery requirements under Section 340B. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024). That court's decision mirrored the Third Circuit's, and it too ruled that "Section 340B is … silent about delivery conditions." *Id.* at 460. Thus, once again, the court's decision was driven by the lack of *federal* requirements on delivery under the 340B Program.

Altogether, the evolution of 340B contract pharmacy guidance—from HRSA's initial acknowledgment of statutory silence in 1996 to the consistent

judicial recognition of that silence in the years that followed—reveals a clear pattern: Congress created a comprehensive framework for drug pricing, but it left significant flexibility in drug-delivery methods.

## IV. State Responses.

In response to the "[d]rug makers rebell[ing]," *Sanofi*, 58 F.4th at 700, against contract pharmacies in 2020, many States—including West Virginia—slotted legislation into Congress's intentionally preserved "silent" space to protect vulnerable patients' access to necessary medications. These state laws aimed to restore and protect the broad access to discounted drugs that Congress had originally envisioned. *See*, *e.g.*, H.B. 728, 2024 Leg., Reg. Sess. (Miss. 2024) (Drug manufacturers cannot "deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to," contract pharmacies.); H.B. 1881, 93rd Gen Assemb., Act 1103 of the Reg. Sess. (Ark. 2021) (similar).

Unsurprisingly, these statutes have drawn litigation from pharmaceutical manufacturers. *See McClain*, 95 F.4th 1136; *Novartis Pharms. Corp. v. Brown*, No. 1:24-cv-01557 (D. Md. May 29, 2024), *appeal pending*, No. 24-1939 (4th Cir. Sept. 30, 2024), *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-cv-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024),

*appeal pending*, No. 24-30673 (5th Cir. Oct. 21, 2024); *Pharm. Rsch. & Mfrs. v. Fitch* (*Fitch I*), No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024), *appeal pending*, No. 24-60340 (5th Cir. July 5, 2024). The plaintiffs in those cases are largely the same and include the parties involved here.

Despite the drugmakers' many challenges, other States have universally succeeded in defending their laws, with courts emphasizing Congress's deliberate silence on delivery methods.

For instance, the U.S. District Court for the Southern District of Mississippi denied a preliminary injunction against Mississippi's delivery law. That court found that Mississippi's law was likely not preempted because the federal 340B statute is "silent about delivery." *Fitch I*, 2024 WL 3277365, at *10. Because "Congress was presumably aware of the" subject, the court reasoned that this silence was telling—no preemption arose. *Id.*

Many others followed suit using the same reasoning. The U.S. District Court for the Western District of Louisiana, for instance, upheld that State's law, granting summary judgment against plaintiffs on all their claims (including preemption and takings claims). *Murrill*, 2024 WL 4361597, at *15. In doing so, the court found that "Section 340B is silent" on contract

pharmacies and delivery—leaving room for Louisiana's law. *Id.* at *5. And it ruled that the takings claim failed because Louisiana's law did not "compel[] direct, confiscatory sales," involve an "[in]voluntary exchange," or "constitute a regulatory taking." *Id.* at *14-15. Likewise, the U.S. District Court for the District of Maryland denied a preliminary injunction. Order Den. Pl.'s Mots. Prelim. Inj., *Novartis Pharms. Corp.*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), ECF No. 57. The U.S. District Court for the Western District of Missouri has recently dismissed similar claims at the pleading stage. *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881, at *2-4 (W.D. Mo. Feb. 13, 2025).

Although Plaintiffs are appealing those decisions, the Eighth Circuit has already given them a preview of what to expect on preemption. *See McClain*, 95 F.4th at 1146. Echoing every other court, the Eighth Circuit too saw that "the text of 340B is silent about delivery." *Id.* at 1143 (cleaned up). "This silence," the Court observed, "contrasts with 340B's provisions that directly address distribution by third-party wholesalers." *Id.* (citing 42 U.S.C. § 256b(a)(8)). Considering how "the 340B program is not so pervasive … that Congress left no room for the States to supplement it," the court was confident

that Arkansas's delivery law was not preempted. *McClain*, 95 F.4th at 1143 (cleaned up).

### V. West Virginia's Law And This Litigation.

In 2024, West Virginia joined the growing national movement to preserve patient access to 340B drugs by enacting Senate Bill 325, codified at West Virginia Code Section 60A-8-6a.

Like similar laws in other States, the Act does two principal things. First, it prohibits manufacturers from "deny[ing], restrict[ing], or prohibit[ing]" 340B drugs from being sent to locations authorized by covered entities. W. VA. CODE § 60A-8-6a(b)(1). The restriction prohibits manufacturers from conditioning their 340B drug sales on a covered entity's agreement to use only one contract pharmacy. Second, it bars manufacturers from requiring covered entities "to submit any claims or utilization data as a condition" of their 340B drug offer to that entity. *Id.* § 60A-8-6a(b)(2); *see, e.g.*, *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, No. 6:21-cv-06507 EAW, 2022 WL 4017895, at *2 (W.D.N.Y. Sept. 2, 2022) (cleaned up) (describing allegations that a drugmaker had threatened to "cut off all Contract Pharmacy 340B Drug Discounts, which had been in place for a decade, unless covered entities provided new consideration" in the form of "sensitive prescription

claims data" to the drugmaker "on commercially unreasonable terms"). The Act incorporates enforcement provisions, including a civil penalty of $50,000 for violations (consistent with the State's consumer-protection law). *Id.* § 60A-8-6a(c).

The West Virginia Legislature designed the Act to complement, not conflict with, the federal Section 340B system. For example, the Act's prohibitions include internal "savings clauses" to allow manufacturers to comply with any demands from HHS. *See* W. VA. CODE § 60A-8-6a(b)(1) ("… unless the receipt of the 340B drug is prohibited by [HHS]"), *id.* § 60A-8-6a(b)(2) ("… unless the claims or utilization data sharing is required by [HHS]"). And on preemption, the Act instructs that "[n]othing in this section is to be construed or applied to be in conflict with any … [a]pplicable federal law and related regulations." *Id.* § 60A-8-6a(d).

In May 2024, Plaintiffs challenged the Act in the Southern District of West Virginia. They sought preliminary injunctions on preemption, takings, and excessive fines grounds.

Breaking from every other court to consider similar laws, the district court found that the Act was likely preempted. It focused on the Act's claims-data and enforcement provisions. On the claims data, the district court

believed the Act's data-collection provision stood as an "obstacle to achieving" Section 340B's objective of prohibiting "fraud." The district court thought the drug manufacturers needed data to start the federal audit process. JA779. And on the enforcement provisions, the district court concluded that the Act regulates prices and not delivery, finding it was "likely that a drug manufacturer could both restrict distribution at the 340B price because of diversion concerns and be subject to sanction under" the Act. JA788. Without addressing Plaintiffs' remaining arguments, the court found the Act's provisions were inseverable and issued a preliminary injunction. The decision "marks the first time that a court has blocked enforcement of such a law." Brendan Pierson, *Judge blocks West Virginia's 340B contract pharmacy law*, REUTERS (Dec. 19, 2024, 3:09 PM), https://tinyurl.com/4sz72a94.

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs are not likely to succeed on their preemption claims. Neither field preemption nor conflict preemption principles support the district court's ruling. Courts traditionally apply a presumption against preemption, and Plaintiffs failed to overcome that presumption here.

*First*, field preemption requires Congress to regulate so pervasively that States are excluded from involvement. So Plaintiffs must show that

Congress intended to bar States from playing any role in the 340B Program. They can't. The 340B Program is deeply intertwined with Medicare and Medicaid—programs that rely heavily on state involvement. And none of these healthcare programs could function effectively without state participation to address implementation gaps.

*Second*, conflict preemption arises only when state law impedes federal objectives. The Act carefully avoids that result by regulating drug *delivery*, an area where the 340B Program is silent. Rather than conflicting with federal law, the Act complements the 340B Program's goals. Although the federal statute doesn't specify delivery methods, ensuring covered entities can effectively maintain access to and dispense covered drugs to their patients is crucial to the 340B Program's success. The Act fills this gap by implementing delivery requirements that align with both the 340B Program's text and purpose.

In short, the Act does not conflict with any federal law, nor does it operate in a field preempted by Congress, whether it be healthcare law, patent law, or any other area Plaintiffs might conjure up.

**II.** Plaintiff AbbVie advanced two alternative bases for injunctive relief. They are not likely to succeed, either.

**A.** In characterizing the Act as a per se physical taking, AbbVie misunderstands both the Act's text and effect. The Act does not compel direct property transfers to contract pharmacies. Instead, it establishes conditions for manufacturers who choose to sell 340B drugs in West Virginia. This voluntary participation—where manufacturers receive benefits in exchange for program enrollment—defeats any takings claim.

Any regulatory takings argument similarly fails. The Act neither significantly depletes property value nor resembles traditional takings. As participants in a heavily regulated industry, AbbVie should anticipate reasonable regulatory changes. Standard business impacts from legislation do not trigger compensation requirements.

Even if a taking existed, AbbVie would only be entitled to just compensation claims given the Act's clear public purpose.

**B.** AbbVie's excessive-fines challenge fails because it targets hypothetical rather than actual fines. What's more, AbbVie's arguments against potential fines amount to policy disagreements rather than constitutional violations. Courts consistently hold that excessive-fines claims can't be used to allow policy preferences to override legislative judgment.

**III.** Likelihood of success (or lack thereof) aside, the remaining preliminary injunction factors support vacating the lower court's order, too. The State's interest in enforcing its laws is both substantial and irreparable. Blocking enforcement would harm the public interest. In contrast, Plaintiffs assert only speculative financial harms that do not to justify injunctive relief.

**IV.** Finally, should the Court find that any portion of the Act is invalid, severability principles support preserving the remainder. The entire statute should not fall based on limited challenges to specific provisions.

## STANDARD OF REVIEW

The Court reviews the district court's grant of a preliminary injunction "for abuse of discretion." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002). "An error of law is an abuse of discretion and thus grounds for reversal." *Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022) (cleaned up). The Court "review[s] legal conclusions de novo and factual findings for clear error." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024).

As for the underlying legal standard, a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). So it is "to be applied only in [the] limited circumstances which clearly

demand it," *id.* (cleaned up), and "never … as of right," *Mt. Valley Pipeline, LLC, v. W. Pocahontas Props., Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Plaintiffs bear the burden of establishing such circumstances by showing that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Finally, because the State is the defendant, factors three and four "merge" here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs' Preemption Claims Are Not Likely To Succeed.

Plaintiffs primarily argue that the Act is preempted by the federal 340B Program.[*] Lacking any express preemption provision on which they can rely, all Plaintiffs insist that the Act is impliedly preempted—that is, it is both field-

[*] The district court addressed only two specific aspects of Plaintiffs' preemption claims. This Court could reverse on those two grounds, vacate the injunction, and remand. *See Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 220 n.3 (4th Cir. 2006) (acknowledging the Court is "not precluded from addressing" alternative arguments but "deem[ing] it more appropriate to allow the district court to consider them, if necessary, in the first instance on remand"). Out of an abundance of caution, the State Defendants address all the arguments Plaintiffs raised below in support of their preliminary-injunction motions.

and conflict-preempted. They are wrong. 340B is silent on delivery, and the Act regulates only delivery terms.

### A. The Presumption Against Preemption Applies Here.

The Supremacy Clause says federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress can do so in a few ways. Most obviously, "[i]t may do so through express language in a statute." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). But Congress can also impliedly preempt state laws "either through 'field' pre-emption or 'conflict' preemption." *Id.* at 377. Field preemption exists where "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Conflict preemption occurs "where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (cleaned up).

Courts are cautious about finding preemption, as the federal government's ability to supplant state law is "an extraordinary power in a federalist system" that radically alters the balance of state and federal authority. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). So in preemption cases, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by … Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (cleaned up); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) (explaining that the Supreme Court has "never assumed lightly that Congress has derogated state regulation, but instead ha[s] addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law").

This "presumption militates against findings of federal preemption, especially in areas of traditional state authority." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) ("Where … the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be 'clear and manifest.'" (cleaned up)). So "a strong presumption against preemption" exists "when the

federal government regulates in areas traditionally left to the states, such as health and safety." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 457 (4th Cir. 2005); *see also Hillsborough County*, 471 U.S. at 715 (noting the "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause").

The Act triggers the presumption against preemption by exercising the State's "historic" power on "matters of health and safety." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). More specifically, it exercises West Virginia's "traditional[]" power over "the practice of pharmacy" by regulating drug distribution. *McClain*, 95 F.4th at 1143. And by protecting vulnerable patients from harmful business practices, the Act also exercises the State's "traditional[]" power over "consumer protection." *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 687 (4th Cir. 2018) (Wynn, J., dissenting); *see also McClain*, 95 F.4th at 1143 (finding that the federal government has "long maintained that state law offers an additional, and important, layer of consumer protection that complements federal regulation" (cleaned up)). States, as "independent sovereigns in our federal system … do not need Congress's permission to exercise the[se]

historic police powers." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024).

It's no surprise, then, that courts have applied the presumption against preemption to similar statutes. *McClain*, 95 F.4th at 1143; *AbbVie Inc. v. Fitch* (*Fitch II*), No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024). This Court should do the same. Plaintiffs must show that "the clear and manifest purpose of Congress" was to supersede State law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

**B. The Act Is Not Field-Preempted.**

The district court declined to address field preemption. For good reason: the Act does not intrude on an exclusive federal field.

A state law regulating conduct in a "field" is preempted when Congress has "exclusive[ly]" occupied that field and thus "foreclose[d] any state regulation in the area." *Arizona*, 567 U.S. at 399, 401. "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* at 399 (cleaned up). But "rarely does Congress legislate so comprehensively in a particular

field that there is no room for supplementary state legislation." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025) (cleaned up). So Plaintiffs face a high hurdle.

"Statutory text and structure provide the most reliable guideposts in this inquiry." *PPL EnergyPlus*, 753 F.3d at 474. Here, both show that the Act does not intrude on an exclusive federal field.

**1. 340B Regulates Price, Not Delivery.**

Section 340B does not occupy the field on the delivery of Section 340B drugs. In fact, it does not speak to the issue at all: although "[p]harmacies have always been an essential part of the 340B Program," "the text of 340B is silent about delivery of drugs to patients." *McClain*, 95 F.4th at 1143 (cleaned up).

Start with the text of the two state and federal laws here. Section 340B regulates drug prices paid by healthcare providers who serve needy patients by capping the prices that drug manufacturers must "offer" to those covered entities, 42 U.S.C. § 256b(a)(1). The statute bars the entities from claiming duplicate discounts and from engaging in diversion, *id.* §§ 256b(a)(5)(A)-(B), and it enforces compliance with those caps and bars, *id.* §§ 256b(a)(5)(D), (d)(1)-(3). So Section 340B addresses part of the drug-

*pricing* "field," at least as to specific entities, manufacturers, and drugs. In contrast, West Virginia's Act does not touch on, let alone entirely control, pricing matters. Instead, it regulates only the delivery and distribution of drugs. It does that by blocking drug manufacturers from "deny[ing], restrict[ing], or prohibit[ing]" the "acquisition" of a covered drug by, or "delivery" of a covered drug to, a covered entity's contract pharmacy. W. VA. CODE § 60A-8-6a(b)(1). With no mention of price setting, the Act does not intrude on Section 340B at all.

Next consider Congress's "framework of regulation." *Arizona*, 567 U.S. at 399. Section 340B's framework does not regulate—let alone "pervasive[ly]" regulate—drug delivery or contract-pharmacy distribution. *Id.* Again, the opposite is true: Section 340B's text is "silent about delivery." *Sanofi*, 58 F.4th at 703 (emphasis omitted); *see Novartis*, 102 F.4th at 460 (Section 340B is "silent about delivery conditions"). And "[n]owhere does Section 340B mention contract pharmacies." *Sanofi*, 58 F.4th at 703; *see also*, *e.g.*, *AIDS Healthcare Found. v. Douglas*, 457 F. App'x 676, 678 (9th Cir. 2011) (referring to 340B: "there is no indication that Congress intended to occupy the whole field in this part of the cooperative Medicaid program.").

340B's compliance framework does not address delivery or contract-pharmacy distribution, either. We know that Congress "knew how to impose delivery-related requirements" and regulate "distribution" by "contract pharmacies," as a subsection elsewhere in Section 340B authorizes a program for "distribution" of drugs by certain "prime vendors." *Sanofi*, 58 F.4th at 704. Yet Congress "chose not to" require drug manufacturers to deliver their drugs to contract pharmacies. *Id.* This silence shows that Section 340B's regulatory framework "does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" but rather "contemplates concurrent state regulation." *Fitch II*, 2024 WL 3503965, at *15; *see also McClain*, 95 F.4th at 1143 (finding that "the 340B Program is not so pervasive … that Congress left no room for the States to supplement it" (cleaned up)). Indeed, drugmakers have argued for years now that the federal statute leaves *them* free to imposes conditions on delivery—so it makes little sense to assume that States cannot place conditions of their own on the same.

Finally, consider the "federal interest" in drug delivery. *Arizona*, 567 U.S. at 399. That interest is not "dominant," *id.*, and it does not have "special features," such as the federal government's constitutional "power" over "foreign affairs." *Hillsborough County*, 471 U.S. at 719. Rather, Congress

declined to regulate delivery or contract-pharmacy distribution at all in Section 340B. *See Sanofi*, 58 F.4th at 703-06. And because States "primarily, and historically" regulate "health and safety matters," it's safe to presume that Congress intended to greenlight concurrent state regulation. *Hillsborough County*, 471 U.S. at 719; *see McClain*, 95 F.4th at 1143 ("[T]he practice of pharmacy is an area traditionally left to state regulation.") (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)); *cf. Nat'l Pharmacies, Inc. v. De Melecio*, 51 F. Supp. 2d 45, 54 (D.P.R. 1999) (rejecting an argument that "federal law was intended to occupy the entire field of regulation of pharmacists").

Taken together, these features show that Congress did not "reserve[] for itself" the authority to regulate the delivery and distribution of drugs. *Arizona*, 567 U.S. at 402. States may regulate in that area, and the Act is not field-preempted.

**2. The Act Regulates Only Delivery.**

In arguing that the Act invades a federally occupied field, Plaintiffs raised two central arguments at the district court (and in this Court in a related case involving a parallel Maryland law, *see* Appellants' Opening Br., *AbbVie Inc. v. Brown*, No. 24-1939 (4th Cir. Dec. 18, 2024), ECF No. 34). First,

they insist that the Act invades a federal field by defining the scope of drug manufacturers' 340B obligations. Second, they maintain that the Act invades a federal field by creating its own scheme of oversight and enforcement. Both fail.

*First*, the Act does not define the scope of the drug manufacturers' 340B obligations. *Contra* Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 10, *AbbVie Inc. v. Morrisey*, No. 2:24-cv-00298 (S.D. W. Va. June 24, 2024), ECF No. 8. The Act bars drug manufacturers from "deny[ing], restrict[ing], or prohibit[ing] … the acquisition of a 340B drug by, or delivery of a 340B drug to" a pharmacy that has agreed with a covered entity to receive and dispense the drug. W. VA. CODE § 60A-8-6a(b)(1). And a 340B drug is a drug "purchased by a covered entity" at a reduced price. *Id.* § 60A-8-6a(a)(1)(C). West Virginia's Act thus does not expand the list of covered entities or change the prices to be paid. Quite the opposite: it tracks Section 340B's directive that only a "covered entity" may buy drugs at or below "ceiling price[s]." 42 U.S.C. § 256b(a)(1).

None of the cases Plaintiffs cited in their preliminary injunction motions below (or in other briefing at this Court) cut against the Act's plain text.

Start with *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), which invalidated a Maryland law "imposing a tax on the Bank of the United States" because "states have no power" to "control … the operations of [federal] laws enacted … to carry into execution the powers vested in the general government." *Id.* at 436. Plaintiffs say the Act is like the Maryland law—a ploy to recast themselves as federal instrumentalities. *See* Appellants' Opening Br. at 58, *Brown* (No. 24-1939), ECF No. 34. But the Act isn't anything like the Maryland tax, as the Act does not "control" anything in Section 340B's drug-pricing framework. It does not, for example, set prices lower than 340B prices or impose a 10% tax on each fine that HHS levies against a drug maker. So *McCulloch* doesn't apply.

*Arizona v. United States* doesn't help Plaintiffs, either. *See* Appellants' Opening Br. at 60, *Brown* (No. 24-1939), ECF No. 34. In *Arizona*, the Supreme Court held that an Arizona law imposing a penalty for not carrying an alien-registration document intruded on the federally occupied "field of alien registration." 567 U.S. at 401; *see id.* at 400-03. It reasoned that Congress's "comprehensive" "regime" fully governed "alien registration" and punishments—showing that Congress "occupie[d]" that "entire field" and "foreclose[d] any state regulation." *Id.* at 401. But unlike the Arizona law, the

Act does not invade the field of 340B pricing and eligibility because it only regulates drug delivery and distribution—neither of which is addressed in the 340B statute. What's more, *Arizona* involved a state law penalty for conduct proscribed by federal law. *Id.* at 400. But as explained above, Section 340B's silence leaves this field of law empty. And *Arizona* arose in the unique area of immigration, one of the longest recognized areas of substantial federal interest. *See United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013).

Plaintiffs also misread *Sanofi* and *Novartis*, in which the Third Circuit and D.C. Circuit found that Congress had not in Section 340B required drug manufacturers to provide drugs to an unlimited number of contract pharmacies. Both courts considered an HHS action resting on the agency's (mis)reading of the express statutory text. And both courts ruled only that Section 340B is silent on delivery conditions. HHS was thus wrong in thinking that statute compelled it to prevent participating pharmaceutical companies from placing restrictions on their deliveries of discounted drugs to contract pharmacies. *See Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 464. The decisions applied the ordinary principle that "[a]n agency … literally has no

power to act … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up).

Plaintiffs argue that these decisions gave drug manufacturers complete discretion about the scope of contract pharmacy use. Appellants' Opening Br. at 60, *Brown* (No. 24-1939), ECF No. 34. To them, Congress's choice *not* to regulate delivery itself in turn preempts States from doing so themselves. *Id.* at 60-61. But Plaintiffs' position runs headlong into the conventional wisdom that a federal decision not to regulate doesn't preempt state law that does. *See, e.g.*, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 608-09 (2011) (holding States could mandate participation in a voluntary federal program); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011) (holding a federal regulation that gave carmakers a choice between two kinds of seat belts didn't preempt state tort suits that would require one); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65-68 (2002) (holding the Coast Guard's decision to not require propeller guards on motorboats didn't preempt States from requiring propeller guards). And unlike federal administrative agencies, States don't derive their powers exclusively from statutes, especially in traditional fields like healthcare.

Far from supporting Plaintiffs' argument, *Sanofi* and *Novartis* confirm that States may regulate delivery. Both decisions observe that the 340B statute is silent about drug distribution and delivery mechanisms. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703-04. The Third Circuit in *Sanofi* didn't speculate on why Congress left this field blank, only noting that a neighboring provision "contemplate[d] drug makers selling discounted drugs through contract pharmacies," and "presume[d]" that Congress didn't include similar language in 340B "intentionally." *Sanofi*, 58 F.4th at 705. And the D.C. Circuit in *Novartis* "agree[d] entirely" with the Third Circuit that Section 340B is "silent about delivery conditions." 102 F.4th at 460-61. These two cases then leave no doubt that delivery is not regulated by Section 340B itself.

In citing the Uniform Commercial Code, *Novartis* also acknowledged that state contract law plays a role in regulating delivery. *See* 102 F.4th at 460. The Uniform Commercial Code, after all, is positive state law. So with 340B "silent about delivery conditions," *id.*, state law is left to address those conditions' enforcement, interpretation, and validity.

What's more, both decisions acknowledge that a rejected version of Section 340B "would have categorically prohibited the use of any contract pharmacies." *Novartis*, 102 F.4th at 462; *see also Sanofi*, 58

F.4th at 705. Congress's choice to forgo that route suggests it was *not* a "significant objective" of the legislation to empower manufacturers to refuse delivery to contract pharmacies. *Williamson*, 562 U.S. at 330. And neither decision seriously disputes that "letting drug makers limit the use of contract pharmacies would thwart Congress's purpose in enacting Section 340B." *Sanofi*, 58 F.4th at 706. Instead, each reasoned only that an "appeal to statutory purpose" could not defeat "the most natural reading of [340B's] terms," which left the question open. *Novartis*, 102 F.4th at 462. So Section 340B doesn't restrict limitations on delivery.

While HHS might lack the federal statutory authority to mandate unlimited deliveries to contract pharmacies under Section 340B, that separate question of authority says nothing about whether Congress intended to affirmatively preclude state regulation pertaining to contract pharmacies or otherwise "occupy the field." If Section 340B "does not compel any particular outcome with respect to covered entities' use of pharmacies," *AstraZeneca*, 543 F. Supp. 3d at 59, then Plaintiffs cannot insist that "Congress has unmistakably so ordained" that Section 340B displaces state law regulations on contract pharmacies, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

And West Virginia isn't alone in reading *Sanofi* and *Novartis* this way; other courts take those cases' statements on silence to be critical evidence *against* preemption—rejecting preemption attacks on similar state laws. *See McClain*, 95 F.4th at 1142-45; *Murrill*, 2024 WL 4361597, at *7; *Fitch II*, 2024 WL 3503965, at *10. While "[p]harmacies have always been an essential part of the 340B Program," Congress has time and again chosen "not to legislate the issue of pharmacy distribution." *McClain*, 95 F.4th at 1143. So "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *Id.*

Hoping to avoid the consensus of other courts, Plaintiffs have tried to ignore the Act's plain text and recast it as a law that "regulates pricing, not delivery." Appellants' Opening Br. at 64, *Brown* (No. 24-1939), ECF No. 34. To do so, they take aim at the replenishment model—one way (among many) that pharmacies stock drugs. In this model, "a contract pharmacy dispenses the drug to a patient, [and] assuming the patient has been identified as eligible for 340B savings," "the covered entity receives notice that it is allowed to place a 340B order with the manufacturer to 'replenish' the contract pharmacy's supply of the previously dispensed drug." *Eli Lilly*, 2021 WL 5039566, at *11. The "manufacturer then ships to the contract pharmacy for retention in its

neutral inventory." *Id.*; *see also*, *e.g.*, *J.R. v. Walgreens Boots All., Inc.*, No. 20-1767, 2021 WL 4859603, at *2 (4th Cir. Oct. 19, 2021) (describing Walgreens's replenishment model). This model avoids the challenges of "[p]hysically segregated inventories," which "are very burdensome for many covered entities." Joel M. Hamme, *et al.*, 2 Health L. Prac. Guide § 26A:20 (2024).

Pharmacies' choice to employ this model doesn't change a delivery question into a price one. The Act speaks to delivery alone no matter whether the delivery happens before or after a particular drug is dispensed to a particular patient. *See Fitch II*, 2024 WL 3503965, at *13-14 (holding that state law's intersection with the replenishment model did not give rise to preemption); *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890, 900 (E.D. Ark. 2022) (same). In concluding otherwise, the district court said the Act could not be about delivery "[b]ecause the drug is already in the hands of the contract pharmacy" at the time a patient presents a prescription. JA783.

But no evidence shows that a pharmacy will dispense the drug on behalf of a covered entity under the 340B Program if the pharmacy knows that the manufacturer will refuse to replenish—especially when a pharmacy knows a drugmaker refuses to engage with contract pharmacies altogether. *See*, *e.g.*,

JA286. In other words, the district court forgot that the replenishment process itself is a separate delivery transaction that the manufacturers are refusing to complete. And even if one were to (mistakenly) embrace the district court's view, its "price" observation would still be describing an incidental, downstream effect from the Act. These effects don't give rise to preemption. *See*, *e.g.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016) ("States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain."); *Emps. Res. Mgmt. Co. v. James*, 62 F.3d 627, 632-33 (4th Cir. 1995) (similar in ERISA context).

Plaintiffs' reliance on this Court's decision in *PPL EnergyPlus* doesn't help them, either. *See* Appellants' Opening Br. at 65-67, *Brown* (No. 24-1939), ECF No. 34. There, Maryland tried to incentivize operators to build a power plant by subsidizing the plant's participation in the federally regulated wholesale energy market; Maryland offered them a fixed, twenty-year revenue stream. *PPL EnergyPlus*, 753 F.3d at 473-74. This Court held that the program was "field preempted because it functionally sets the rate that [the plant operator] receives for its sales," and "the contract price guaranteed by the [program] supersedes the … rates that [the plant operator] would

otherwise earn—rates established through a FERC-approved market mechanism … regardless of the market price." *Id.* at 476-77. Thus, the State had "impinge[d] on FERC's exclusive power to specify wholesale rates," *id.* at 477, a power reflecting another uniquely strong federal interest, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-66 (2016) (describing the longstanding federal interest in interstate electricity transactions).

But this Court emphasized that "the limited scope" of its holding in *PPL EnergyPlus* was confined to "the specific program at issue"—leaving the door open to other state efforts to encourage new generation, "such as direct subsidies or tax rebates." 753 F.3d at 478. And the Maryland program failed because its "effect … on matters within FERC's exclusive jurisdiction is neither indirect nor incidental." *Id.* Rather, it struck "at the heart of the agency's statutory power to establish rates for the sale of electric energy in interstate commerce by adopting terms and prices set by Maryland, not those sanctioned by FERC." *Id.*

In contrast, West Virginia's Act regulates only the delivery and distribution of drugs, not drug prices. The Act does not intrude on Section 340B's drug-price caps, step on the duties that Section 340B imposes on

covered entities, or invade Section 340B's enforcement framework. So *PPL EnergyPlus* is not relevant here.

*Second*, the Act does not create its own oversight and enforcement scheme for Section 340B. Plaintiffs argue that the Act improperly allows a State agency to exact penalties on manufacturers who refuse to distribute to contract pharmacies. Appellants' Opening Br. at 77, *Brown* (No. 24-1939), ECF No. 34. But again, Plaintiffs conflate the Act with the 340B Program itself. The 340B Program addresses discount pricing. So HHS has jurisdiction over disputes "between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *McClain*, 95 F.4th at 1144. Conversely, the Act ensures that covered entities can use contract pharmacies for their distribution needs. The Act does not overlap with HHS's jurisdiction. It allows the State "to exact penalties and equitable relief" only "if manufacturers deny 340B drugs to covered entities' contract pharmacies." *Id.* And "ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *English*, 496 U.S. at 89.

Plaintiffs misread the Supreme Court's holding in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), when they say federal law preempts the Act's enforcement scheme. *See* Appellants' Opening Br. at 76-78, *Brown* (No. 24-1939), ECF No. 34. In *Astra*, Santa Clara County, which operated several 340B entities, sued pharmaceutical companies participating in the Section 340B Program for overcharges on covered drugs. The county claimed that "[w]hen the Government uses a contract to secure a benefit, … the intended recipient acquires a right to the benefit enforceable under federal common law"—essentially a third-party beneficiary claim. *Astra*, 563 U.S. at 118. The Supreme Court rejected that argument. It thought the lack a private right of action in Section 340B meant that HHS's enforcement mechanism was the exclusive means for policing the pricing requirements of Section 340B. *Id.* at 120. Allowing a third-party suit would "undermine [HHS'] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.*

But unlike Santa Clara's suit in *Astra*, the Act does not concern drug prices or duties under Section 340B. Rather, it creates an enforcement mechanism aimed solely at pharmaceutical companies' delivery of drugs, bought by covered entities, to the contract pharmacies with whom covered

entities work. So *Astra*'s rejection of a right of action for covered entities under a contract has "minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs." *Fitch II*, 2024 WL 3503965, at *16.

Were all that not enough, *Astra* did not even involve preemption. While *Astra* arguably "evoked the legal concepts underlying federal preemption," *Bauer v. Elrich*, 8 F.4th 291, 306 (4th Cir. 2021) (Quattlebaum, J., dissenting), it did not apply any presumption analogous to the presumption against preemption applicable here, *see Fitch II*, 2024 WL 3503965, at *16. So even if *Astra* were somehow relevant here, its applicability would be limited. Because the State has traditionally occupied health, safety, and pharmacy fields, the "congressional intent to supersede state laws must be clear and manifest." *English*, 496 U.S. at 79 (cleaned up). Lacking such a clear and manifest intent here, the Act is not field-preempted.

**C. The Act Is Not Conflict-Preempted.**

The Act is not conflict-preempted, either. Under that doctrine, a state law is preempted if it "conflict[s] with federal law." *Arizona*, 567 U.S. at 399. Put another way, "conflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 573 U.S. at 377 (cleaned up). In evaluating a law for conflict preemption, courts may not conduct "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607. "No more than in field preemption can the Supremacy Clause be deployed here to elevate abstract and unenacted legislative desires above state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019).

For similar reasons to field preemption, the Act does not conflict with 340B. This Court should reverse the district court on this claim.

#### 1. The Act Does Not Directly Conflict With Federal Law.

"Assessing a conflict preemption claim requires a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question of whether they are in conflict." *N. Va. Hemp & Agric.*, 125 F.4th at 493 (cleaned up). "[A] court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). But no "clear evidence" of actual conflict can be found here.

Start once more with the federal law. As explained above, Section 340B has three main features. First, Section 340B caps the prices that drug manufacturers can charge for certain drugs. *See* 42 U.S.C. § 256b(a)(1) (A drug maker "shall … offer … covered outpatient drugs for purchase at or below" a "ceiling price."). Second, Section 340B places restrictions on the healthcare providers that can buy drugs under the price caps. The caps apply only to drugs "purchased by a covered entity" and thus only to certain providers, *id.* §§ 256b(a)(1), (4); the statute bars covered entities from seeking "duplicate discounts," *id.* § 256b(a)(5)(A); the statute bars "diversion" by covered entities (sales to non-patients), *id.* § 256b(d)(2)(A); and the statute requires covered entities to permit the Secretary and drug manufacturers "to audit" covered entities' records to assess compliance with the duplicate-discount and diversion bans, *id.* § 256b(a)(5)(C). Third, Section 340B adopts a compliance framework to enforce the price caps placed on drug manufacturers and the restrictions placed on providers. That framework includes program-integrity features, *id.* §§ 256b(d)(1)-(2); provides for liability and sanctions, *id.* §§ 256b(a)(5)(D), (d)(1)-(2); and contemplates an administrative dispute-resolution process for "claims by covered entities that they have been

overcharged" and "claims by" drug manufacturers of diversion and duplicate discounts, *id.* § 256b(d)(3).

Now take again the state law. The Act prohibits drug manufacturers from "deny[ing], restrict[ing], or prohibit[ing], either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug unless the receipt of the 340B drug is prohibited by" HHS. W. VA. CODE § 60A-8-6a(b)(1). So when a covered entity buys discounted drugs from a drug maker, the Act prohibits the drug manufacturer from conditioning that sale on the entity's agreement not to contract with multiple pharmacies. For violations of that prohibition, the Act adopts the standard consumer-protection remedies. *Id.* § 60A-8-6a(c)(1)(A).

This straightforward summary of the two provisions shows that the two laws don't directly conflict. It is not "impossible for a private party to comply with both state and federal requirements." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019). "[F]ederal law [does not] forbid[] an action that state law requires" or vice versa. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

First, the Act does not alter or affect the price caps that Section 340B imposes. For instance, the Act does not require drug manufacturers to *offer* 340B drugs below the ceiling prices; it only makes certain conditions impermissible if they choose to do so.

Second, the Act does not alter the restrictions that Section 340B imposes on the covered entities who can buy drugs under the price caps. It does not change the definition of "340B entity." W. VA. CODE § 60A-8-6a(a)(2). It does not authorize duplicate discounts. It does not authorize diversion. It does not touch auditing.

Third, the Act does not affect Section 340B's compliance framework because the Act does not enforce any rights or duties under the 340B Program. Instead, the Act imposes penalties for "[t]he commission of any act prohibited by" its own terms: refusing to furnish discounted drugs, bought by a covered entity, to a contract pharmacy that delivers those drugs to patients on the covered entity's behalf. W. VA. CODE § 60A-8-6a(c). The Act does not impose penalties on drug manufacturers for "overcharges and other violations of" Section 340B's "discounted pricing requirements." 42 U.S.C. § 256b(d)(1)(A). Nor does the Act impose penalties on covered entities for "diversion and violations of the duplicate discount provision and other requirements specified

under subsection (a)(5) [like the audit requirement].” *Id.* § 256b(d)(2)(A). All these matters are left to Section 340B’s compliance regime.

Rather than conflict with Section 340B then, the Act regulates what Section 340B does not: the delivery of drugs to contract pharmacies. Again, the Act prohibits drug manufacturers from refusing to furnish discounted drugs, bought by a covered entity, to a contract pharmacy that delivers those drugs to patients on the covered entity’s behalf. That mandate does not conflict with Section 340B. Nothing in Section 340B blocks States from regulating the delivery and distribution of drugs to contract pharmacies. Section 340B “is silent about delivery.” *Sanofi*, 58 F.4th at 703 (emphasis omitted); *see Novartis*, 102 F.4th at 460 (“Section 340B is … silent about delivery conditions.”). And “[n]owhere does Section 340B mention contract pharmacies.” *Sanofi*, 58 F.4th at 703.

So once again, basic preemption principles kick into play: the statutory silence leaves States with authority to regulate. After all, States have broad authority to “regulat[e]” matters of “health and safety.” *Hillsborough County*, 471 U.S. at 719. So when federal law does not regulate a matter of health or safety, States can do so. *See Rice*, 331 U.S. at 230; U.S. CONST. amend. X. Regulating the distribution and delivery of drugs—to ensure that

patients in need receive them—is a matter of health and safety over which States have power. And at minimum, Congress's silence on delivery does not show "clear and manifest congressional purpose" to preempt state laws like the Act. *Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1207 (4th Cir. 1986). Without that showing, the Act does not fall under "direct conflict" (or "impossibility") preemption—as even the district court seemed to recognize. *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023).

**2. The District Court Erred By Finding Obstacle Preemption.**

The district court found that the Act is an obstacle to Section 340B. What qualifies as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). After having determined "Congress's 'significant objectives' in passing the federal law," the Court looks "to whether the state law stands as an obstacle to the accomplishment of a significant federal regulatory objective." *Guthrie*, 79 F.4th at 338 (cleaned up). "[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Whiting*, 563 U.S. at 607 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in judgment)).

Congress's purposes and objectives are easy to spot here. Under the express terms, Congress wanted covered entities to have broad access to discounted drugs. These discounts might "subsidize other services provided by 340B hospitals" that "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730, 738 (2022); *see also Fitch II*, 2024 WL 3503965, at *2 (surveying legislative history that shows how "Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress … created the Medicaid Drug Rebate Program"); *Genesis Health Care, Inc. v. Becerra*, No. 4:19-cv-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023) ("[T]he purpose of the 340B program was to provide a means to make 340B entities profitable."). But they also help patients "to afford costly medications" while providing the convenience of outpatient access. *Am. Hosp. Ass'n v. DHHS*, No. 4:20-cv-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021). In contrast, as HRSA has recognized, "[i]t would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate in the 340B program." 61 Fed. Reg. at 43,549. "Otherwise, they would be faced with the untenable dilemma of having either to expend

precious resources to develop their own in-house pharmacies (which for many would be impossible) or forego participation in the program altogether." *Id.* So the West Virginia Act serves Section 340B's purposes by ensuring this broad access remains in place despite drugmakers' resistance, guaranteeing the benefits to patients and providers remain. *See McClain*, 95 F.4th at 1145 (finding that a similar law "assists in … the purpose of 340B").

Yet the district court homed in on two parts of the Act and found differently. The first is a provision that prevents drug companies from demanding providers' claims data as a condition of providing 340B drugs—what the district court pejoratively labelled the "No-Audits Provision." W. VA. CODE § 60A-8-6a(b)(2). The second was a set of enforcement provisions including civil fines and criminal liability. *Id.* § 60A-8-6a(c). The district court was mistaken in the thinking that either stood as an obstacle to Congress's purposes or objectives in Section 340B.

*First*, the data-demand provision is no obstacle. The district court found that it was an obstacle to Section 340B's "twin federal purposes—providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts." JA777. It's not obvious how the first purported purpose is implicated at all. Covered entities are always the purchasers—taking title to

the drugs even when they go to the contract pharmacies—and nothing in the West Virginia Act changes that. So really, the concern seems to be with "double-dipping"; "[b]y restricting the very method by which data collection is made," the district court said, "[the Act] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the alternative dispute resolution system." JA778.

But the Act doesn't prevent drug manufacturers from conducting the audits needed to start Section 340B's dispute-resolution process. Nothing in the Act blocks a drug maker from seeking or requiring from covered entities the claims data to which federal law entitles them. The Act says that drug manufacturers "shall not … require a 340B entity to submit any claims or utilization data *as a condition* for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is *required* by" HHS. W. VA. CODE § 60A-8-6a(b)(2) (emphasis added). But it still allows drug manufacturers to get claims data when tied to an HHS-related audit.

The district court erred by finding that the Act restricts drug manufacturers from collecting data, reasoning that drug manufacturers cannot use the dispute resolution system except after the conduct of audits.

JA778-779. "A covered entity *shall* permit the Secretary and the manufacturer of a covered outpatient drug … to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with" Section 340B's requirements. 42 U.S.C. § 256b(a)(5)(C) (emphasis added). The district court ignored this provision, which cuts against its finding that the Act creates "a system where the fox guards the hen house." JA779. Instead, the district court imagined that manufacturers needed the data to conduct an extra-statutory pre-audit audit, as HHS guidance says manufacturers should show "reasonable cause" before conducting an audit. *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,406 (Dec. 12, 1996). But broad swathes of claims data on demand aren't necessary to show reasonable cause; even a minimal showing like "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." *Id.* In short, the Act expressly honors the manufacturers' entitlement and doesn't interfere with manufacturers' ability to collect data necessary to access the audit process.

Apparently aware that the Act allows drug manufacturers to obtain data from covered entities (just through means other than a condition precedent to delivery), the district court took issue with the hypothetical that a covered entity declines a request to share data. JA779. "The existence of a hypothetical or potential conflict is insufficient to warrant pre-emption." *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 669 (4th Cir. 1996) (cleaned up). And Section 340B provides a mechanism for when a covered entity is noncompliant with an audit request. *See* 42 U.S.C. § 256b(a)(5)(D). The West Virginia Act does not touch that process—it only affects potential private-party-to-private-party agreements that manufacturers might try to strong-arm covered entities into separate and apart from Section 340B's structure. And anyway, the district court's complaint about Section 340B's self-policing is a complaint with 340B itself. The Act does not change Section 340B's auditing process in any way.

Finally, the district court erred by failing to consider the Act's preemption section, which declares that "[n]othing" in it "is to be construed or applied to be in conflict with" "[a]pplicable federal law." W. VA. CODE § 60A-8-6a(d)(1). If the plain text wasn't enough, the district court should have applied the presumption against preemption to construe the Act so as not to

conflict with Section 340B. *See Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." (citation omitted)). "And conflict preemption is not triggered by ordinary incongruities or minor annoyances that upset any federal-state balance to some extent," which is why other courts have refused to find obstacle preemption on this data-collection issue. *Fitch I*, 2024 WL 3277365, at *10 (cleaned up).

*Second*, the Act's enforcement provisions are no genuine obstacle to Section 340B, either. These provisions merely allow state officials to impose civil penalties for noncompliance with the Act. W. VA. CODE § 60A-8-6a(c). The district court found them problematic because enforcement could require state actors to determine questions of federal law if a manufacturer were to decline to deliver a covered drug because of diversion concerns. JA789-790. But the Act's enforcement concerns "activity"—delivery—that "falls" beyond Section 340B's "purview." *McClain*, 95 F.4th at 1145. The Act does not require manufacturers to provide 340B pricing discounts to contract pharmacies. Nor does it set or enforce discount pricing. Whether the drug manufacturers

decline to offer the 340B prices on a particular transaction does not matter so long as the drug is delivered.

Nor does it matter that the State "*may* be called upon to interpret and apply federal law." JA781 (emphasis added). The district court does not cite anything to suggest that state actors would overstep by policing diversion. It wouldn't be a problem, standing alone, if the Act were to require officials to interpret federal law (especially seeing as how state entities address federal questions of law every day). Plaintiffs have to show that the Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 573 U.S. at 377 (cleaned up). And given the Act specifically disclaims conflicts with federal law, the district court should have read the obstacle with the statutorily prescribed dose of skepticism.

The district court's reading of the Act to be about both pricing and delivery also collides with *Sanofi* and *Novartis*. Remember: the Third and D.C. Circuits held that Section 340B is "silent about delivery" and does not "mention contract pharmacies." *Sanofi*, 58 F.4th at 703 (emphasis omitted); *see Novartis*, 102 F.4th at 460 (finding that Section 340B "merely requires" drug manufacturers to offer drugs at discounted prices and is "silent about delivery conditions"). So a federal regulation requiring drug manufacturers

to deliver 340B drugs to any number of contract pharmacies serving a covered entity was unlawful as it "overstepped the statute's bounds." *Sanofi*, 58 F.4th at 707. Yet under the district court's logic, the regulation should have been permissible because it was actually about "delivery *at a given price*, not delivery *per se*." JA783. The district court didn't consider either case and thus missed that the Act merely fills the gap that Congress chose not to fill.

Properly understanding the Act as a delivery regulation—as every other court to consider a parallel statute has—the rest of the district court's analysis falls apart. It relies on *Astra*, but as explained above, *Astra* held that third-party beneficiaries of 340B covered entities lacked a cause of action for "overcharging" against manufacturers outside of HHS's required procedure for handling such claims. 563 U.S. at 117-19. That has "minimal bearing" on whether 340B preempts state laws that impose regulatory conditions on the delivery of 340B drugs. *Fitch II*, 2024 WL 3503965, at *16. The State isn't trying to wrestle with the manufacturers over the prices of given drugs; it is only insisting that the drugs be made available to the agents of the covered entities that are concededly entitled to receive and dispense them.

The district court's finding that the Act may create "differing state and federal adjudications" also fails on close inspection. JA787. The district court

leaned largely on *Astra* (which, again, is not a preemption case), reading it to hold that all decisions about the 340B Program are to be made by HHS. But *Astra* held no such thing—it recognized only that Congress had contemplated an "administrative framework … for covered entities complaining of '*overcharges* and other violations of the discounted *pricing requirements*.'" 563 U.S. at 122 (quoting 42 U.S.C. § 256b(d)(1)(A)) (emphasis added).

West Virginia courts applying the Act will have nothing to say about "pricing requirements." *Astra*, 563 U.S. at 122. They will only be asked to decide whether (1) manufacturers delivered the drugs to where covered entities (who are listed in a federal database) wanted them delivered (that is, contract pharmacies that are also listed in a federal database) or (2) manufacturers demanded certain information as a condition precedent to delivery. Only those two acts—*not* pricing questions—create independent liability under the Act. And even *Astra* seems to recognize that there can be room for assertions that drugmakers "violated a[] substantive obligation arising only from" some obligation arising independent of the "340B ceiling price." *Id.* at 118-19.

So while it's true that "Congress vested authority to oversee compliance with the 340B Program in HHS" to avoid inconsistent applications of the

federal statute, *Astra*, 563 U.S. at 117, suits under the Act are concededly *not* trying to force drugmakers to "comply" with the federal program. Meanwhile, HHS's dispute-resolution process will have nothing to say about delivery, as federal law doesn't speak to delivery one way or another. *See*, *e.g.*, *Novartis*, 102 F.4th at 460. And drugmakers can continue to avail themselves of the HHS process "to prevent diversion" and "duplicate discount[ing]" even under the Act. 42 U.S.C. § 256b(d)(3)(B)(iv).

**3. None Of Plaintiffs' Other Conflict-Preemption Claims Succeed.**

Plaintiffs assert two other grounds to support their obstacle-preemption claims. Neither have merit.

*First*, Plaintiffs insist that the Act broadens drug manufacturers' obligations under Section 340B, as Congress chose not to include delivery to contract pharmacies in the statute. Appellants' Opening Br. at 70-71, *Brown*, (No. 24-1939), ECF No. 34. Plaintiffs err. It is one thing to say that Congress chose not to regulate delivery itself; it is another thing altogether to say that Congress's silence on an issue forecloses state regulation. For one, a federal decision not to regulate often is just a decision that federal law shouldn't regulate and doesn't preempt state law that does. *See supra* I.B.2 (listing cases where Supreme Court declined to find preemption where Congress

chose not to act); *see also AstraZeneca*, 543 F. Supp. 3d at 59 (recognizing that Section 340B's "silen[ce]" on "contract pharmacies" indicates that the statute "does not compel any particular outcome with respect to [their] use"). For another, state regulation in a traditional state area is proper absent "clear and manifest congressional purpose" to preempt state laws like the Act. *Stoddard*, 784 F.2d at 1207.

Plaintiffs also point to a rejected bill that "would have required 340B-priced drugs to be distributed under a contract entered into for on-site pharmacy services." Appellants' Opening Br. at 71, *Brown*, (No. 24-1939), ECF No. 34 (quoting S. Rep. No. 102-259 (1992)). Set aside that failed legislation is not a "reliable indicator[] of congressional intent." *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989). This rejected bill cuts against Plaintiffs because it would have "categorically prohibited" off-site "contract pharmacies." *Novartis*, 102 F.4th at 462. If anything, then, the law's rejection implies that States may protect off-site pharmacy services. At minimum, the bill's failure suggests that allowing manufacturers to decline to deliver to contract pharmacies was not a "significant objective." *Williamson*, 562 U.S. at 330 (cleaned up).

Plaintiffs also say that the Act is preempted by Section 340B because "Section 340B requires only that a manufacturer 'offer' certain drugs to covered entities at the applicable ceiling price." Appellants' Opening Br. at 71, *Brown*, (No. 24-1939), ECF No. 34. According to Plaintiffs, the Act strips drug manufacturers' ability to impose conditions on 340B offers, which undermines "Congress's judgment." *Id.* at 72. Again, Section 340B is "silent about delivery conditions," so it does not *standing alone* "abrogate[]" the default rule that a seller can impose "some delivery conditions" in an offer—so long as those conditions are "otherwise lawful." *Novartis*, 102 F.4th at 460; *see Sanofi*, 58 F.4th at 706 (holding that Section 340B does not itself "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies"). West Virginia agrees that Section 340B "does not" by its own force "categorically prohibit" drug manufacturers "from imposing conditions on the distribution of covered drugs," nor does it grant an affirmative right to impose conditions. *Novartis*, 102 F.4th at 464. But that position of federal neutrality still doesn't speak to whether States can act against certain conditions or declare certain conditions to be "otherwise [un]lawful." *Id.* at 460.

Plaintiffs also think the Act "involves a conflict in the method of enforcement," Appellants' Opening Br. at 73, *Brown*, (No. 24-1939), ECF No.

34, but it's unclear what Plaintiffs mean by "method of enforcement." They reference *Arizona*, where Congress considered how to address the hiring of illegal aliens and made "a deliberate choice not to" criminally punish aliens themselves; given that deliberate choice, a state law going further "would interfere with the careful balance struck by Congress." 567 U.S. at 405-06. But at the risk of belaboring the point, Congress did not make a considered decision to address delivery conditions. So unlike *Arizona*, Section 340B does not present a pull-up-and-stop situation, where the States would affirmatively undermine any congressional balancing. In much the same way, while Plaintiffs also complain at other points about the Act's penalties, the Act does not enforce Section 340B or impose penalties for violating Section 340B—only violations of the Act.

Finally, Plaintiffs have said that Section 340B aims to incentivize manufacturers to participate in the Program "without becoming so exploitive as to encourage their withdrawal." Appellants' Opening Br. at 74, *Brown*, (No. 24-1939), ECF No. 34. Yet the case Plaintiffs cite for that proposition, *Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479 (DLF), 2021 WL 5161783 (D.D.C. Nov. 5, 2021), was talking about the statutory provision prohibiting diversion and other anti-fraud provisions. *See id.* at *7. Those provisions

remain on the table. Even *Novartis* recognizes that Section 340B is "silent as to what distribution requests *manufacturers* must accept." *Id.* at *6. So Plaintiffs' claim that the Act undermines Section 340B is unsupported. If Plaintiffs believe that the congressional silence has produced unanticipated policy outcomes, then those questions are for Congress—not a federal court evaluating a duly enacted state law.

*Second*, Novartis claims that the Act is preempted by federal law governing drug regulatory exclusivity and patent protection periods. Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 1, *Novartis Pharms. Corp. v. Morrisey*, No. 2:24-cv-00272 (S.D. W. Va. May 31, 2024), ECF No. 7. Novartis is wrong.

Novartis cites several patent laws and other regulatory exclusivities that provide that "[i]n exchange for bringing new designs and technologies into the public domain through disclosure … an inventor receives a limited term of protection from competitive exploitation." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 604 (2023) (cleaned up). It's true that "[i]n considering preemption of state laws which potentially conflict with federal patent law, courts look to whether a state law 'clashes with the objectives of the federal patent laws.'" *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 752 (S.D. Miss. 2024) (quoting

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974)). But there's no "clash" here.

Novartis says that the Act conflicts with federal patent law because it "places a ceiling … on the prices at which Novartis may sell drugs … thus artificially reduc[ing] drug prices on a broad set of transactions not contemplated by federal 340B law, reducing the incentives Congress provided for brand name manufacturers to invest in new therapies." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 31, *Novartis Pharms. Corp.*, (No. 2:24-cv-00272), ECF No. 7. Yet it's unclear which provision of the Act Novartis believes creates a price ceiling, considering that "price" appears only once in the statute (in referring to a drug that "[h]as been subject to any offer for reduced [340B] prices"). W. VA. CODE § 60A-8-6a(a)(1)(B). The sole prices involved here are those set under Section 340B. *See United States ex rel. Adventist Health Sys. W. v. AbbVie, Inc.*, 723 F. Supp. 3d 882, 884 (C.D. Cal. 2024) ("The price ceiling applicable to the 340B Program is set by statute in 42 U.S.C. § 256b(a)(1)."). So the federal government—through Congress's enactment of the 340B statute and through HHS's negotiation of a pricing agreement with manufacturers—retains exclusive say on the price of the drugs. *See AstraZeneca*, 2024 WL 5345507, at *5 (rejecting claim that parallel Mississippi

law was preempted by federal patent law). The Act "simply deter[s] pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements" for distribution. *McClain*, 95 F.4th at 1145.

*Biotechnology Indus. Org. v. District of Columbia* (*BIO*), 496 F.3d 1362 (Fed. Cir. 2007), doesn't support *Novartis*'s claim, either. *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 30-31, *Novartis Pharms. Corp.*, (No. 2:24-cv-00272), ECF No. 7. *BIO* involved a District of Columbia law prohibiting "any patented drug from being sold in the district for an excessive price." 496 F.3d at 1365. The Federal Circuit recognized that the Constitution's Patent Clause, along with federal patent statutory provisions, aims to strike a balance between "reward[ing] innovators with higher profits and [] keep[ing] prices reasonable for consumers." *Id.* at 1373. And D.C.'s law—by expressly targeting the price of patented drugs—fell directly "within the scope of the patent laws, and its effect [was] to shift the benefits of a patented innovation from inventors to consumers." *Id.* at 1373-74. So the court concluded that the law "re-balance[d] the statutory framework of rewards and incentives" and conflicted with "the goals established by Congress in the patent laws" because the D.C. Council's legislation was expressly "targeted at the patent right" and "applie[d] only to patented drugs." *Id.* at 1374.

But the Act here does not "target patent rights or … apply only to patented drugs or the price of patented drugs." *Murrill*, 2024 WL 4361597, at *9. As a condition of participating in Medicare Part B and Medicaid, pharmaceutical companies agree to provide discounted drugs in the Section 340B Program. The federal government sets these discounts, not the Act. So *BIO* does not support Plaintiffs' conflict claim here. *See id.* (rejecting *BIO*'s relevancy to a patent law claim on a parallel law).

## II. Neither Of Plaintiffs' Other Claims Are Likely To Succeed.

Though the district court addressed only preemption, it noted that Plaintiffs' motions for preliminary injunction included "a host of arguments of various, and at times dubious, merit." JA790. Namely, Plaintiff AbbVie brought a takings claim and an excessive fines claim. *See* JA237-239, JA244-245. The court was right that these claims were "dubious." Neither tacked-on ground changes the outcome here.

### A. The Act Does Not Effectuate A Taking.

AbbVie is wrong to label the Act a taking. The Fifth Amendment's Takings Clause (applicable to the States through the Fourteenth Amendment) directs that no "private property be taken for public use, without just compensation." U.S. CONST. amend. V. This restriction applies to both real

and personal property. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015). Further, a taking may occur in the form of either a "per se physical taking" or a "regulatory taking." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021) (cleaned up). A per se taking involves a situation where "the government physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). A regulatory taking occurs when a restriction on the use of property "goes too far." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

"Courts in other circuits have also rejected Takings Clause challenges to the 340B Drug Price Program," *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 3:23-cv-01103 (MPS), 2024 WL 3292657, at *13 (D. Conn. July 3, 2024), and their logic drives the same result here. AbbVie is unlikely to succeed on this claim.

**1. The Act Does Not Effectuate A Per Se Physical Taking.**

A per se taking occurs only "[w]hen the government physically acquires private property for a public use." *Cedar Point*, 594 U.S. at 147. The government commits a physical taking when it "uses its power of eminent domain to formally condemn property" or "occupies property—say, by

recurring flooding as a result of building a dam." *Id.* at 147-48. There must be some kind of "physical appropriation[]." *Id.* at 148. When a physical appropriation occurs, "[t]he government must pay for what it takes." *Id.*

According to AbbVie, the Act effectuates a physical taking because it "compels [them] and other manufacturers to sell their products at 340B-discounted prices." Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 8, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8. They try to explain the Legislature's supposed rationale for the Act's allegedly compelled transfer: it is designed "so the contract pharmacies and covered entities can reap windfall profits." *Id.*

Putting aside their speculation about what the Legislature was thinking, AbbVie is wrong about what *the Act* does. Much like a parallel Arkansas law, the Act "does not require manufacturers to provide 340B pricing discounts to contract pharmacies," and it "does not set or enforce discount pricing." *McClain*, 95 F.4th at 1145. In fact, nothing in the Act compels anything, let alone mandates specific transactions. Instead, the Act merely restricts manufacturers from "deny[ing], restrict[ing], or prohibit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug," or "requir[ing] a 340B entity to submit

any claims or utilization data as a condition" of doing business with the manufacturer. W. VA. CODE §§ 60A-8-6A(b)(1)-(2) (noting both limitations also have exceptions for compliance with HHS's requirements). The Act is a negative statute, not an affirmative one. In other words, under the Act, a manufacturer who engages in the Medicare/Medicaid program and in turn chooses to do business with a 340B-covered entity does not have to do anything new. It just cannot do two things in its offers to covered entities: (1) tell the covered entity it is not allowed to contract with pharmacies to dispense the 340B drugs to their patients, or (2) demand the covered entity provide claims or utilization data.

This situation is not one in which the State is "tak[ing] the property of *A* for the sole purpose of transferring it to another private party *B*." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). In fact, the State never takes any property or mandates a sale at all. It prohibits certain kinds of restrictions on sales that manufacturers were already making—that is, sales between themselves and 340B covered entities. The Act does not change 340B's scheme—"[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *McClain*, 95 F.4th at 1144.

And the 340B Program is voluntary, so Plaintiffs' participation "can hardly be called a taking." *Monsanto*, 467 U.S. at 1007. After all, "a long line of cases instructs that no taking occurs where a person or entity voluntarily participates in a regulated program or activity." *Baker Cnty. Med. Servs., Inc. v. U.S. Att'y Gen.*, 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases). Plaintiffs did not dispute this below, either. They conceded that their "participation in federal Medicare and Medicaid programs" was voluntary and so "extinguish[ed] a takings claim" against the federal government. Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 10, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8.

Plaintiffs' only rebuttal to their admittedly voluntary participation was that their "bargained-for benefit" was from the federal government and not West Virginia, meaning that "the voluntary-participation doctrine is altogether inapplicable." Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 10, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8.

But nothing supports that novel idea. State laws addressing requirements for Medicare and Medicaid participants don't change the parties' initial choice to participate in the programs in the first place. And it's *that* choice that "forecloses the possibility that the [state] statute could result

in an imposed taking of private property." *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984); *see also Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991) (favorably citing *Minn. Ass'n* for the proposition that no taking occurs "where the regulated group is not required to participate in the regulated industry" and noting that case dealt with a "state law" (cleaned up)). Even the chief case Plaintiffs relied on below to escape their voluntary participation held only that a voluntary exchange does not exist when the "purported 'benefit' is illusory." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023). That's not this case where Plaintiffs receive a "valuable [g]overnment benefit" from participation in the 340B Program. *Horne*, 576 U.S. at 366 (cleaned up). It doesn't matter that the benefit comes from the federal government, not the State.

At its core, the Act "merely places conditions on the[] use of a benefit … the government need not have conferred." *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 368 (4th Cir. 2001). Yet to be a per se taking, "voluntar[y] participat[ion]" is not enough: an action must "legally compel[]" an obligation affecting property or else "there can be no taking." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993). Even if "business realities" or "strong financial

inducement[s]" encourage participation in a program, it doesn't amount to a taking. *Minn. Ass'n*, 742 F.2d at 446.

Ultimately, AbbVie chose to voluntarily participate in the 340B Program and so must be "willing to bear th[e] burden" of doing so, *Monsanto*, 467 U.S. at 1007, including costs arising from the Act. Nothing about the Act imposes a per se taking.

**2. The Act Does Not Effectuate A Regulatory Taking.**

Because the Act does not fit into the category of "paradigmatic taking[s]" involving "direct government appropriation or physical invasion of private property," *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 537 (2005), AbbVie briefly alluded to the "regulatory takings" doctrine below. But that claim fails for the same reason as the physical-taking claim: AbbVie voluntarily participates in the highly regulated marketplace of 340B drugs and cannot complain about normal regulations.

The Act does not effect a regulatory taking. A regulatory taking expands the Takings Clause beyond its text to include regulations that are "so onerous that [their] effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028 n.15 (1992) (noting the expansion of the Takings Clause and explaining

that "early constitutional theorists did not believe the Takings Clause embraced regulations of property at all"). The analysis is "essentially [an] ad hoc, factual inquir[y]." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979). Still, courts consider "several factors that have particular significance," including (1) "[t]he economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Additionally, determining when a regulation goes "too far" requires a measure of restraint. *Lingle*, 544 U.S. at 538. During the process, courts must be cognizant that "government regulation—by definition—involves the adjustment of rights for the public good." *Andrus v. Allard*, 444 U.S. 51, 65 (1979). Indeed, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Mahon*, 260 U.S. at 413.

Here, the *Penn Central* factors weigh against a finding that the Act effectuates a regulatory taking.

*First*, the Act's economic impact is unlikely to be drastic. Even if the dispensation of 340B drugs to contract pharmacies increases the number of

medications Plaintiffs must provide, "[c]overed entities pay for what they buy to the tune of billions of dollars per year, and the average discount rate appears to be between 25 and 50 percent." *Sanofi-Aventis*, 570 F. Supp. 3d at 208. And 340B drug sales "represent about 5% of the prescription drug market and 14% of the branded drug market," *id.*, leaving most of AbbVie's sales untouched.

But more importantly, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). "A regulation is not a taking merely because it prohibits the most beneficial use of the property." *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, 862 F.3d 433, 442 (4th Cir. 2017) (cleaned up). For instance, even "a hypothetical 83 percent diminution in value was insufficient to establish a regulatory taking." *Clayland Farm Enters., LLC v. Talbot County*, 987 F.3d 346, 354 (4th Cir. 2021) (noting that the Sixth and Eighth Circuits reached the same conclusion "when presented with diminutions in value of 75 percent and 92.5 percent"); *see also Hadacheck v. Sebastian*, 239 U.S. 394, 405, 409-10 (1915) (upholding a zoning regulation which reduced a landowner's property value from $800,000 to $60,000). And it is undisputed that the Act will not force Plaintiffs to "sacrifice *all* economically beneficial

uses" of their property. *Lucas*, 505 U.S. at 1019. Thus, this first factor weighs against AbbVie.

*Second*, AbbVie should have included laws like the Act in their investment expectations as it "is the foreseeable result of authorized government action." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 39 (2012). The pharmaceutical industry "long has been the focus of great public concern and significant government regulation." *Monsanto*, 467 U.S. at 1008. And because Section 340B does not preempt state laws requiring delivery of 340B drugs to contract pharmacies, *see supra* I, Plaintiffs should have known that states might enact their own policies to enable covered entities to provide more services and reach more patients. *See Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987) ("[I]nvestment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest."). AbbVie's expectations should have been even further tempered here given that 340B's "gap" on delivery has been well-known since Congress enacted the program. *See* 61 Fed. Reg. at 43,549-50 (1996 Guidance discussing "gaps" in Section 340B including that it "is silent as to permissible drug distribution systems"). That "gap" in turn has led

covered entities to use contract pharmacies for years—in exactly the way the Act contemplates. Thus, the second factor also weighs against Plaintiffs.

*Third*, and finally, the Act is a regulation that "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986). It "does not physically invade or permanently appropriate any of [AbbVie's] assets for [the State's] use." *Id.* Yet the "[r]egulatory takings doctrine seeks to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011) (cleaned up). The Act does nothing of the kind. Under its provisions "[n]othing is affirmatively taken by the government," but rather "the government annuls something"—Plaintiffs' ability to place certain conditions on 340B agreements. *Buffalo Tchrs. Fed. v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006). As a result, this factor weighs against AbbVie as well.

All three regulatory-taking factors cut against AbbVie. Just as the Act does not physically take anything from AbbVie, neither does it deprive AbbVie so severely of its property that it amounts to a regulatory taking.

### 3. Even If There Is A Taking, The Act Serves A Public Purpose.

Even assuming AbbVie had suffered a taking, their request for an injunction faces another problem: the Act "serves a public purpose," *Kelo*, 545 U.S. at 484, by "promot[ing] the public health," *Star Sci., Inc. v. Beales*, 278 F.3d 339, 349 (4th Cir. 2002). "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Monsanto*, 467 U.S. at 1016.

In claiming the Act does not serve a public purpose, AbbVie faces a high hurdle: "[w]ithout exception, the [Supreme] Court has defined that concept broadly, reflecting [its] longstanding policy of deference to legislative judgments." *Kelo*, 545 U.S. at 469. Although AbbVie might disagree with the Act's wisdom, courts "do not sit to determine whether a particular" legislative goal "is or is not desirable." *Berman v. Parker*, 348 U.S. 26, 33 (1954) (finding a public purpose where land was taken to make a community "beautiful as well as sanitary"). In truth, "when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." *Id.* at 32. The "role of the judiciary in determining whether [a legislative act] is being exercised for a public purpose is an extremely narrow one." *Id.*

It makes no difference if some private parties (like covered entities and their patients) are the "most direct beneficiaries." *Monsanto*, 467 U.S. at 1014. "Quite simply, the government's pursuit of a public purpose will often benefit individual private parties." *Kelo*, 545 U.S. at 485. What matters is that the Act is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). And that purpose—public health and the provision of necessary health services to underserved populations—is one that "is primarily, and historically, a matter of local concern," thus further emphasizing the permissibility of the legislature's decision. *Hillsborough County*, 471 U.S. at 719; *cf. Am. Hosp. Ass'n*, 2021 WL 616323, at *1 (noting how the Section 340B is "a part of the statutory framework forming the backbone of this nation's healthcare system").

Ultimately, even if AbbVie had shown there was a taking—which it did not—its recourse would be to seek just compensation, not an injunction.

### B. The Act Does Not Impose Excessive Fines.

AbbVie also errs in saying the Act imposes an excessive fine. The Eighth Amendment prohibits States from imposing "excessive fines." U.S. CONST. amend. VIII; *see also Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (holding the Excessive Fines Clause is "incorporated by the Due Process

Clause of the Fourteenth Amendment”). Thus, the Eighth Amendment “limits the government’s power to extract payments, whether in cash or in kind, as punishment for some offense.” *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998) (cleaned up). Practically speaking, this limitation means that fines must “be proportioned to the wrong” and “not be so large as to deprive [an offender] of his livelihood.” *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271 (1989). And the Eighth Amendment’s protections apply to civil fines as well, provided they are punitive. *See Austin v. United States*, 509 U.S. 602, 610 (1993).

“[A]s the party challenging the constitutionality of the” Act’s (supposed) fines, “the burden” is on AbbVie “to demonstrate excessiveness.” *United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000). To succeed, they must show that the fines here are “grossly disproportional to the gravity of” the proscribed offense. *Bajakajian*, 524 U.S. at 334. Were that not hard enough, AbbVie’s burden is amplified by their choice to mount a “facial challenge” against the Act. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Facial challenges are “the most difficult challenge[s] to mount successfully.” *Id.* To do so, AbbVie “must establish that no set of circumstances exists under which the Act would be valid.” *Id.*

Yet AbbVie faces a threshold issue: the Act *itself* does not impose a levy, tax, or anything else that could be called a fine. That would come through an enforcement action down the road. Contrary to AbbVie's anticipatory claim, "Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995); *see also Thomas v. County of Humboldt, Cal.*, 124 F.4th 1179, 1188 (9th Cir. 2024) (describing *Cheffer* as "[t]he leading case" on "constitutional ripeness under the Excessive Fines Clause"). So "[w]here no final forfeiture order or judgment has been entered, ruling on such a question would be premature." *United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014). Indeed, this Court has held that even a preliminary forfeiture order "is not yet ripe." *United States v. Talebnejad*, 460 F.3d 563, 573 (4th Cir. 2006). For this reason alone, AbbVie's excessive-fines claim could not support a preliminary injunction.

Even if the Court were to consider this unripe claim, the Act does not violate the Eighth Amendment, as its levies are not grossly disproportional. Typically, this analysis would involve looking to four factors: "(1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the charged

crime and other crimes; and (4) the harm caused by the charged crime." *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021). AbbVie necessarily avoids those usual factors because no fine is actually in place to be analyzed.

Instead, though AbbVie purported to engage with the excessive-fines factors below, they ended up with a series of policy disagreements with the Legislature's choice to fine anyone under the Act. For instance, AbbVie claimed below that "[t]he regulated conduct is not inherently evil or malicious" and "violates no other law" so should not be subject to fines. Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 17, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8. But moral judgments like these ones are "peculiarly questions of legislative policy." *Gore v. United States*, 357 U.S. 386, 393 (1958). And while AbbVie might believe there is "no harm" here, Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 23, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8, the Legislature disagreed. It concluded that efforts to undermine the financial position of covered entities or limit the availability of medications to West Virginia's neediest persons warranted a serious response. The "line-drawing process" involved in such decisions "is pre-eminently the province of the legislature." *Rummel v. Estelle*, 445 U.S. 263, 275 (1980).

Likewise, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336. And "[r]eviewing courts … should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments." *Solem v. Helm*, 463 U.S. 277, 290 (1983). AbbVie's arguments below highlight its displeasure with the Legislature's choice here and its belief that West Virginians have broad access to 340B medications constitutes an "abuse" of the system. They do not demonstrate a constitutionally disproportionate fine.

Thus, AbbVie's excessive fines claim is neither ripe nor appropriate.

## III. The Equities Strongly Weigh Against Injunctive Relief.

Plaintiffs' failure to establish a likelihood of success is reason enough to deny them an injunction. But the equities also weigh against relief.

A preliminary injunction against the Act would irreparably harm the State, its citizens, and would hurt the public interest. Blocking a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe here because the Act serves compelling public interests in protecting health, safety, and vulnerable consumers—areas that fall in the heartland of the State's sovereign interests.

Enjoining the Act also irreparably harms the State's vulnerable populations and hospitals. *See* Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 HEALTH LAW. 34, 34 (2020) (describing the benefits of the use of contract pharmacies). Thousands of low-income, elderly, and disabled West Virginians rely on the State Medicaid Program for their medical care. Many more use Medicare Part B. And of the 37 West Virginia hospitals participating in the 340B drug discount program, 36 contract with at least one contract pharmacy. *See* Amici Curiae Br. by The Am. Hosp. Ass'n at 8, *Morrisey*, No. 2:24-cv-00298 (S.D. W. Va. Aug. 21, 2024), ECF No. 25 (citing Health Res. & Servs. Admin, Off. of Pharmacy Affairs, 340B OPAIS, https://tinyurl.com/24sebw6m (last visited Feb. 10, 2025)). These hospitals provide 86% of all hospital care that is provided to Medicaid patients. Dobson DaVanzo Health Economics Consulting, *West Virginia 340B Hospitals Serve More Patients with Low Incomes and Provide the Majority of Hospital Care to Medicaid Patients*, https://tinyurl.com/48u6nute (last visited Feb. 10, 2025). 340B savings allow hospitals to "pass that discount on to patients in the form of free or low-cost prescriptions and care for conditions ranging from diabetes to black lung." Craig Blair, *'Big Pharma' is Using West Virginia to Scare GOP Supporters*

*of 340B Pharmacies*, WVNEWS (June 10, 2024), https://tinyurl.com/2tdb4z7r. So blocking the Act would mean that these hospitals could no longer pass those savings on to their already underserved patients and could result in the reduction or elimination of services across West Virginia. *See* JA646-650.

For their part, Plaintiffs say that the Act would subject them to a state regime that federal law preempts. *See* Pl.'s Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 23-35, *Morrisey*, (No. 2:24-cv-00298), ECF No. 8. But that argument falls with Plaintiffs' merits case. As does Plaintiffs' claim that the State has no interest in enforcing a supposedly unconstitutional law. *See id.* at 26. Plaintiffs also complain that the Act will impose "millions of dollars" in discounts and compliance costs. *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 11, *Novartis Pharms. Corp.*, (No. 2:24-cv-00272), ECF No. 7. But the Act does not require Plaintiffs to provide discounted prices. So any harm from the discounts would come from Section 340B. And whatever unrecoverable compliance costs Plaintiffs allege will result from the Act are outweighed by the benefits they receive from the 340B Program. In any case, the harms to the State and the public from an injunction outweigh Plaintiffs' purely financial—and hypothetical—costs.

## IV. The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries.

Even if the district court were right that Plaintiffs were likely to succeed, the district court went too far in striking down the rest of the Act.

"[T]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (cleaned up). The Court must decide whether to sever the "problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006).

"State law governs the severability of a state statute." *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 788 n.21 (4th Cir. 1996). Chapter 60A of the West Virginia code, where the Act is codified, has a general severability clause. *See* W. VA. CODE § 60A-6-605. West Virginia's supreme court also applies a presumption in favor of partial invalidation—"the remaining provisions … shall remain valid" unless the remaining portion does not "reflect[] the legislative will," is incomplete, cannot be executed independently, or is in all other respects invalid. *State v. Tennant*, 732 S.E.2d 507, 519 (W. Va. 2012) (cleaned up). "The most critical aspect of severability analysis involves the degree of dependency of statutes." *Louk v. Cormier*, 622

S.E.2d 788, 804 (W. Va. 2005). "[W]here the valid and the invalid provisions of a statute are so connected and interdependent in subject matter, meaning, or purpose as to preclude the belief, presumption or conclusion that the Legislature would have passed the one without the other, the whole statute will be declared invalid." *Id.* (cleaned up).

The district court erred by finding the Act inseverable and preliminarily enjoining the whole Act. Key to its analysis is that it interpreted the "No-Restrictions Provision," which tells manufacturers not to limit covered entities' ability to contract with outside pharmacies, as "interdependent" on the Enforcement Provisions of the Act. JA792. "Without the Enforcement Provisions, the No-Restrictions Provision has essentially no operation because it depends on the former to be executed." JA792.

But even without an enforcement provision, the Act still operates as an encouragement or exhortation to drug manufacturers not to limit covered entities' ability to contract with outside pharmacies. For instance, Congress routinely adopts provisions that urge actions without including any enforceable requirement or mandatory duty. *See*, *e.g.*, 4 U.S.C. § 8 ("No disrespect should be shown to the flag of the United States"); 42 U.S.C. § 1751 ("encourag[ing] the domestic consumption of nutritious agricultural

commodities"); 22 U.S.C. § 7674 (directing that "United States businesses should be encouraged to provide assistance to sub-Saharan African countries").

Interpreting the no-restrictions provision to function as an encouragement to drug manufacturers is consistent with the statutory text. The no-restrictions provision provides that a drug maker "shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug." W. VA. CODE § 60A-8-6a(b)(1). The district court found interdependence because the no-restrictions provisions "depends" on the enforcement provision, JA792, but the court got the statute backwards. The enforcement provisions *depend* on the no-restrictions provision, and they cannot operate without it being in effect. But the no-restrictions provision can still exist as a constitutional enactment. *Cf. California v. Texas*, 593 U.S. 659, 672-73 (2021) (finding that an individual-care mandate of the Affordable Care Act was an "unenforceable statutory provision" but refusing to reach the question of whether the statute was unconstitutional).

Nothing about the no-restrictions provision prevents it from operating on its own as an encouragement or exhortation to drug manufacturers not to

limit covered entities' ability to contract with outside pharmacies. And certainly, if this Court were to find that the enforcement provisions were likely lawful while the data-related provisions were not, then it makes even more sense to sever the provisions of the statute. There's no obvious reason why the contract-pharmacy provision depends on the data-related provision, or vice versa.

The district court erred by adopting an interpretation that renders the whole Act unconstitutional.

## CONCLUSION

The Court should vacate the preliminary injunction.

Respectfully submitted,

JOHN B. MCCUSKEY
ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams
*Solicitor General*
*Counsel of Record*

Caleb A. Seckman
Spencer J. Davenport
*Assistant Solicitors General*

OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov

Dated: February 25, 2025

C*ounsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1. This response brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 19,465 words.

2. This response brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams

## STATUTORY ADDENDUM

42 U.S.C. § 256b ........................................................................................ A-1

W. VA. CODE § 60A-8-6a ........................................................................ A-16

**42 U.S.C. § 256b – Limitation on prices of drugs purchased by covered entities**

**(a) Requirements for agreement with Secretary**

**(1) In general**

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs (other than drugs described in paragraph (3)) purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2). Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

**(2) "Rebate percentage" defined**

**(A) In general**

For a covered outpatient drug purchased in a calendar quarter, the "rebate percentage" is the amount (expressed as a percentage) equal to—

**(i)** the average total rebate required under section 1927(c) of the Social Security Act [42 U.S.C. 1396r–8(c)] with respect

to the drug (for a unit of the dosage form and strength involved) during the preceding calendar quarter; divided by

**(ii)** the average manufacturer price for such a unit of the drug during such quarter.

**(B) Over the counter drugs**

**(i) In general**

For purposes of subparagraph (A), in the case of over the counter drugs, the "rebate percentage" shall be determined as if the rebate required under section 1927(c) of the Social Security Act [42 U.S.C. 1396r–8(c)] is based on the applicable percentage provided under section 1927(c)(3) of such Act.

**(ii) "Over the counter drug" defined**

The term "over the counter drug" means a drug that may be sold without a prescription and which is prescribed by a physician (or other persons authorized to prescribe such drug under State law).

**(3) Drugs provided under State medicaid plans**

Drugs described in this paragraph are drugs purchased by the entity for which payment is made by the State under the State plan for medical assistance under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.].

**(4) "Covered entity" defined**

In this section, the term "covered entity" means an entity that meets the requirements described in paragraph (5) and is one of the following:

**(A)** A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act [42 U.S.C. 1396d(l)(2)(B)]).

**(B)** An entity receiving a grant under section 256a [1] of this title.

**(C)** A family planning project receiving a grant or contract under section 300 of this title.

**(D)** An entity receiving a grant under subpart II 1 of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

**(E)** A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

**(F)** A black lung clinic receiving funds under section 937(a) of title 30.

**(G)** A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act [42 U.S.C. 701(a)(2)].

**(H)** A Native Hawaiian Health Center receiving funds under the Native Hawaiian Health Care Act of 1988.

**(I)** An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act [25 U.S.C. 1651 et seq.].

**(J)** Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(K)** An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) 1 of this title (relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(L)** A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act [42 U.S.C. 1395ww(d)(1)(B)]) that—

**(i)** is owned or operated by a unit of State or local government, is a public or private non-profit corporation

which is formally granted governmental powers by a unit of State or local government, or is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act [42 U.S.C. 1395 et seq.] or eligible for assistance under the State plan under this subchapter;

**(ii)** for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social Security Act [42 U.S.C. 1395ww(d)(5)(F)]) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act [42 U.S.C. 1395ww(d)(5)(F)(i)(II)]; and

**(iii)** does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

**(M)** A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act [42 U.S.C. 1395ww(d)(1)(B)(iii)], or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii) of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

**(N)** An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act [42 U.S.C. 1395i–4(c)(2)]), and that meets the requirements of subparagraph (L)(i).

**(O)** An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act [42 U.S.C. 1395ww(d)(5)(C)(i)], or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

**(5) Requirements for covered entities**

**(A) Prohibiting duplicate discounts or rebates**

**(i) In general**

A covered entity shall not request payment under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] for medical assistance described in section 1905(a)(12) of such Act [42 U.S.C. 1396d(a)(12)] with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under section 1927 of such Act [42 U.S.C. 1396r–8].

**(ii) Establishment of mechanism**

The Secretary shall establish a mechanism to ensure that covered entities comply with clause (i). If the Secretary does not establish a mechanism within 12 months under the previous sentence, the requirements of section 1927(a)(5)(C) of the Social Security Act [42 U.S.C. 1396r–8(a)(5)(C)] shall apply.

**(B) Prohibiting resale of drugs**

With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

**(C) Auditing**

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs [2] (A) or (B) with respect to drugs of the manufacturer.

**(D) Additional sanction for noncompliance**

If the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing, that a covered entity is in violation of a requirement described in subparagraphs 2 (A) or (B), the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug (as described in subparagraph (A)) provided under the agreement between the entity and the manufacturer under this paragraph.

**(6) Treatment of distinct units of hospitals**

In the case of a covered entity that is a distinct part of a hospital, the hospital shall not be considered a covered entity under this paragraph unless the hospital is otherwise a covered entity under this subsection.

**(7) Certification of certain covered entities**

**(A) Development of process**

Not later than 60 days after November 4, 1992, the Secretary shall develop and implement a process for the certification of entities described in subparagraphs (J) and (K) of paragraph (4).

**(B) Inclusion of purchase information**

The process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices.

**(C) Criteria**

The Secretary shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification under this paragraph.

**(D) List of purchasers and dispensers**

The certification process developed by the Secretary under subparagraph (A) shall include procedures under which each State shall, not later than 30 days after the submission of the descriptions under subparagraph (C), prepare and submit a report to the Secretary that contains a list of entities described in subparagraphs (J) and (K) of paragraph (4) that are located in the State.

**(E) Recertification**

The Secretary shall require the recertification of entities certified pursuant to this paragraph on a not more frequent than annual basis, and shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph (B).

**(8) Development of prime vendor program**

The Secretary shall establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs. If a covered entity obtains

drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution.

**(9) Notice to manufacturers**

The Secretary shall notify manufacturers of covered outpatient drugs and single State agencies under section 1902(a)(5) of the Social Security Act [42 U.S.C. 1396a(a)(5)] of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements of paragraph (5) or that are no longer certified pursuant to paragraph (7).

**(10) No prohibition on larger discount**

Nothing in this subsection shall prohibit a manufacturer from charging a price for a drug that is lower than the maximum price that may be charged under paragraph (1).

**(b) Other definitions**

**(1) In general**

In this section, the terms "average manufacturer price", "covered outpatient drug", and "manufacturer" have the meaning given such terms in section 1927(k) of the Social Security Act [42 U.S.C. 1396r–8(k)].

**(2) Covered drug**

In this section, the term "covered drug"—

**(A)** means a covered outpatient drug (as defined in section 1927(k)(2) of the Social Security Act [42 U.S.C. 1396r–8(k)(2)]); and

**(B)** includes, notwithstanding paragraph (3)(A) of section 1927(k) of such Act [42 U.S.C. 1396r–8(k)(3)(A)], a drug used in connection with an inpatient or outpatient service provided by a hospital described in subparagraph (L), (M), (N), or (O) of subsection (a)(4)

that is enrolled to participate in the drug discount program under this section.

**(c) Repealed. Pub. L. 111–152, title II, § 2302(2), Mar. 30, 2010, 124 Stat. 1083**

**(d) Improvements in program integrity**

**(1) Manufacturer compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by manufacturers with the requirements of this section in order to prevent overcharges and other violations of the discounted pricing requirements specified in this section.

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of a system to enable the Secretary to verify the accuracy of ceiling prices calculated by manufacturers under subsection (a)(1) and charged to covered entities, which shall include the following:

**(I)** Developing and publishing through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices under such subsection.

**(II)** Comparing regularly the ceiling prices calculated by the Secretary with the quarterly pricing data that is reported by manufacturers to the Secretary.

**(III)** Performing spot checks of sales transactions by covered entities.

**(IV)** Inquiring into the cause of any pricing discrepancies that may be identified and either taking, or requiring manufacturers to take, such corrective action as is appropriate in response to such price discrepancies.

**(ii)** The establishment of procedures for manufacturers to issue refunds to covered entities in the event that there is an overcharge by the manufacturers, including the following:

**(I)** Providing the Secretary with an explanation of why and how the overcharge occurred, how the refunds will be calculated, and to whom the refunds will be issued.

**(II)** Oversight by the Secretary to ensure that the refunds are issued accurately and within a reasonable period of time, both in routine instances of retroactive adjustment to relevant pricing data and exceptional circumstances such as erroneous or intentional overcharging for covered outpatient drugs.

**(iii)** The provision of access through the Internet website of the Department of Health and Human Services to the applicable ceiling prices for covered outpatient drugs as calculated and verified by the Secretary in accordance with this section, in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security and protection of privileged pricing data from unauthorized re-disclosure.

**(iv)** The development of a mechanism by which—

**(I)** rebates and other discounts provided by manufacturers to other purchasers subsequent to the

sale of covered outpatient drugs to covered entities are reported to the Secretary; and

**(II)** appropriate credits and refunds are issued to covered entities if such discounts or rebates have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved.

**(v)** Selective auditing of manufacturers and wholesalers to ensure the integrity of the drug discount program under this section.

**(vi)** The imposition of sanctions in the form of civil monetary penalties, which—

**(I)** shall be assessed according to standards established in regulations to be promulgated by the Secretary not later than 180 days after March 23, 2010;

**(II)** shall not exceed $5,000 for each instance of overcharging a covered entity that may have occurred; and

**(III)** shall apply to any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1).

**(2) Covered entity compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion

and violations of the duplicate discount provision and other requirements specified under subsection (a)(5).

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the Department of Health and Human Services relating to this section.

**(ii)** The development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website described in clause (i).

**(iii)** The development of more detailed guidance describing methodologies and options available to covered entities for billing covered outpatient drugs to State Medicaid agencies in a manner that avoids duplicate discounts pursuant to subsection (a)(5)(A).

**(iv)** The establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section, including the processing of chargebacks for such drugs.

**(v)** The imposition of sanctions, in appropriate cases as determined by the Secretary, additional to those to which covered entities are subject under subsection (a)(5)(D), through one or more of the following actions:

**(I)** Where a covered entity knowingly and intentionally violates subsection (a)(5)(B), the covered entity shall be required to pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under subsection (a)(5)(D), such interest to be compounded monthly and equal to the current short term interest rate as determined by the Federal Reserve for the time period for which the covered entity is liable.

**(II)** Where the Secretary determines a violation of subsection (a)(5)(B) was systematic and egregious as well as knowing and intentional, removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary.

**(III)** Referring matters to appropriate Federal authorities within the Food and Drug Administration, the Office of Inspector General of Department of Health and Human Services, or other Federal agencies for consideration of appropriate action under other Federal statutes, such as the Prescription Drug Marketing Act (21 U.S.C. 353).1

**(3) Administrative dispute resolution process**

**(A) In general**

Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under this section, and claims by manufacturers, after the conduct

of audits as authorized by subsection (a)(5)(C), of violations of subsections [3] (a)(5)(A) or (a)(5)(B), including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described in paragraphs (1)(B) and (2)(B).

**(B)** Deadlines and procedures

Regulations promulgated by the Secretary under subparagraph (A) shall—

**(i)** designate or establish a decision-making official or decision-making body within the Department of Health and Human Services to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price described in subsection (a)(1), and claims by manufacturers that violations of subsection (a)(5)(A) or (a)(5)(B) have occurred;

**(ii)** establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously;

**(iii)** establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim that charges for a manufacturer's product have exceeded the applicable ceiling price under this section, and may submit such documents and information to the administrative official or body responsible for adjudicating such claim;

**(iv)** require that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a

prerequisite to initiating administrative dispute resolution proceedings against a covered entity;

**(v)** permit the official or body designated under clause (i), at the request of a manufacturer or manufacturers, to consolidate claims brought by more than one manufacturer against the same covered entity where, in the judgment of such official or body, consolidation is appropriate and consistent with the goals of fairness and economy of resources; and

**(vi)** include provisions and procedures to permit multiple covered entities to jointly assert claims of overcharges by the same manufacturer for the same drug or drugs in one administrative proceeding, and permit such claims to be asserted on behalf of covered entities by associations or organizations representing the interests of such covered entities and of which the covered entities are members.

**(C) Finality of administrative resolution**

The administrative resolution of a claim or claims under the regulations promulgated under subparagraph (A) shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction.

**(4) Authorization of appropriations**

There are authorized to be appropriated to carry out this subsection, such sums as may be necessary for fiscal year 2010 and each succeeding fiscal year.

**(e) Exclusion of orphan drugs for certain covered entities**

For covered entities described in subparagraph (M) (other than a children's hospital described in subparagraph (M)), (N), or (O) of subsection (a)(4), the term "covered outpatient drug" shall not include a drug designated by the Secretary under section 360bb of title 21 for a rare disease or condition.

**West Virginia Code § 60A-8-6a. Distribution of safety net drugs to contract pharmacies; penalties; and preemption.**

(a) Definitions. — As used in this section:

(1) "340B drug" means a drug that:

(A) Is a covered outpatient drug within the meaning of 42 U.S.C. §256b;

(B) Has been subject to any offer for reduced prices by a manufacturer under 42 U.S.C. §256b(a)(1); and

(C) Is purchased by a covered entity within the meaning of 42 U.S.C. §256b.

(2) "340B entity" has the same meaning as that term is defined in §33-51-3 of this code.

(3) "Biological product" has the same meaning as that term is defined in 42 U.S.C. §262.

(4) "Board of Pharmacy" means the West Virginia Board of Pharmacy, which is the agency of this state authorized to issue and condition licensure and permitting of wholesale drug distributors, third-party logistics providers, and manufacturers.

(5) "Commissioner" means the West Virginia Insurance Commissioner, his or her deputies, or the West Virginia Offices of the Insurance Commissioner.

(6) "Manufacturer" has the same meaning as that term is defined in §60A-8-5 of this code, except that such definition shall include manufacturers of biological products.

(7) "Package" has the same meaning as that term is defined in 21 U.S.C. §360eee(11)(A).

(8) "Pharmacy" has the same meaning as that term is defined in §30-5-4 of this code.

(b) Distribution of drugs to safety net providers and contract pharmacies. —

(1) A manufacturer, agent, or affiliate of such manufacturer shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug, unless the receipt of the 340B drug is prohibited by the United States Department of Health and Human Services.

(2) A manufacturer, agent, or affiliate of such manufacturer shall not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

(c) Penalties and investigations. —

(1) The commission of any act prohibited by subsection (b) of this section constitutes:

(A) A violation of §46A-6-104 of this code and shall subject the violator to a civil penalty of $50,000 per each violation, as well as any and all actions, including investigative demands, remedies, and penalties provided for in §46A-7-101 *et seq*. of this code, except that there shall be no right to bring a private cause of action; and

(B) A violation of §33-11-1 *et seq*. of this code and shall subject the violator to any and all actions, including cease and desist orders, civil penalties, and restitution provided for in §33-11-6 of this code, except that there shall be no right to bring a private cause of action.

(2) Each package of 340B drugs determined to be subject to a prohibited act under subsection (b) of this section constitutes a separate violation under this section.

(3) Upon receipt by the Board of Pharmacy of a complaint that a manufacturer has violated subsection (b) of this section, the Board of Pharmacy:

(A) May investigate the complaint, including by investigating the manufacturer or any agent, affiliate, or contractor thereof, including any wholesaler or third-party logistics provider that may possess evidence supporting such complaint; and

(B) Shall consider appropriate penalties, including imposing discipline, or suspending, or revoking the license or permit of any manufacturer; and

(C) Shall share the results of the investigation with the Attorney General and commissioner if an investigation is conducted.

(3) The Board of Pharmacy and commissioner may promulgate rules to implement the provisions of subsection (b) of this section.

(d) Preemption. —

(1) Nothing in this section is to be construed or applied to be less restrictive than any federal law as to any person or other entity regulated by this section. Nothing in this section is to be construed or applied to be in conflict with any of the following:

(A) Applicable federal law and related regulations.

(B) Other laws of this state, if the state law is compatible with applicable federal law.

(2) Limited distribution of a drug required under 21 U.S.C. §355-1 is not to be construed as a violation of this section.