# United States Court of Appeals

## for the Fourth Circuit

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia, et al.,

*Defendants-Appellants*,

v.

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellee*,

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellee*,

ABBVIE INC. et al.,

*Plaintiffs-Appellees*.

On Appeal from the United States District Court
for the Southern District of West Virginia

Civil Action Nos: 2:24-cv-00271, 2:24-cv-00272, 2:24-cv-00298

**BRIEF OF *AMICI CURIAE* WEST VIRGINIA HOSPITAL ASSOCIATION
AND WEST VIRGINIA PRIMARY CARE ASSOCIATION
IN SUPPORT OF APPELLANTS FOR REVERSAL**

Ronald S. Connelly
Powers Pyles Sutter & Verville, PC
1250 Connecticut Ave., NW,
Eighth Floor
Washington, DC 20036
(202) 466-6550
Ron.Connelly@PowersLaw.com
*Counsel for Amici Curiae, West Virginia
Hospital Association and West Virginia
Primary Care Association*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1054</u>       Caption: <u>McCuskey, et al. v. Pharm. Res. & Manuf. of Am. et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>West Virginia Hospital Association</u>
(name of party/amicus)

who is <u>            amicus            </u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ronald S. Connelly                    Date:    March 4, 2025

Counsel for: West Virginia Hospital Association

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1054</u>       Caption: <u>McCuskey, et al. v. Pharm. Res. & Manuf. of Am. et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>West Virginia Primary Care Association</u>
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?       ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ronald S. Connelly                    Date:    March 4, 2025

Counsel for: West Virginia Primary Care Ass'n

Print to PDF for Filing

# **TABLE OF CONTENTS**

INTERESTS OF AMICI CURIAE ........................................................... 1

INTRODUCTION .................................................................................. 2

BACKGROUND ..................................................................................... 4

    I.     The 340B Program and 340B Drug Distribution ................................... 4

    II.    340B Audits and ADR ................................................................ 9

    III.   West Virginia S.B. 325 ............................................................. 11

SUMMARY OF ARGUMENT ............................................................. 12

ARGUMENT ....................................................................................... 13

    I.     Drug Companies Are Not Likely to Succeed on the Merits ............... 13

        A.    The Data Demand Provision Is Not an Obstacle to the 340B Statute ........................................................................ 14

        B.    The Enforcement Provision is Not an Obstacle to the 340B Statute ........................................................................ 17

            1.    The District Court Fundamentally Misunderstood the Replenishment Model ................................................ 17

            2.    *Astra USA v. Santa Clara County* is Inapplicable .......... 22

            3.    The Enforcement Provision Does Not Conflict With the 340B Statute and Will Not Result in Conflicting Adjudications ................................................................ 23

            4.    The Cases the District Court Found Distinguishable Are Applicable ................................................................ 25

    II.    Drug Companies Will Not Suffer Irreparable Harm ........................... 26

III.    The Balance of Equities and Public Interest Favor Denial of a Preliminary Inunction.............................................................................29

CONCLUSION ......................................................................................30

CERTIFICATE OF COMPLIANCE ......................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)..................................................29

*AbbVie Inc. v. Fitch*, 2024 WL 3503965 (S.D. Miss. 2024) ......................25, 26, 27

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011).........................*passim*

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ............................................28

*Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312 (D.S.C. 2023) ..............5

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ..............13

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
    17 F.3d 691 (4th Cir. 1994) ..................................................................................28

*Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862
    (S.D. W. Va. 2014) ..............................................................................................26

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024).......................8

*Novartis v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024) ..............................27

*Novartis v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) ......................................27

*Novartis v. Morrisey*, Case No. 2:24-cv-00272 (S.D. W. Va. May 31, 2024) ........25

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024),
    *cert denied* No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024)...............*passim*

*PhRMA v. Fitch*, No. 1:24-cv-00160, 2024 WL 3277365
    (S.D. Miss. July 1, 2024) ....................................................................................27

*PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) ...................................27

*PhRMA v. Morrisey*, Case No. 2:24-cv-00271 (S.D. W. Va. Aug. 30, 2024).........16

*PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597
    (W.D. La. Sept. 30, 2024).............................................................................*passim*

*Sampson v. Murray*, 415 U.S. 61 (1974) .................................................28

*Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) ...............8

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
 570 F. Supp. 3d 129 (D.N.J. June 24, 2021) ........................................6

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..........12, 28, 30

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
 553 F.3d 292 (4th Cir. 2009) ...............................................................29

**Federal Statutes**

42 U.S.C. § 256b .......................................................................................2

42 U.S.C. § 256b(a)(1) ..............................................................................4

42 U.S.C. § 256b(a)(1), (4) .......................................................................6

42 U.S.C. § 256b(a)(4) ..............................................................................4

42 U.S.C. § 256b(a)(5)(A) .........................................................................9

42 U.S.C. § 256b(a)(5)(A)-(B), (d)(3) .....................................................24

42 U.S.C. § 256b(a)(5)(B) ....................................................................9, 18

42 U.S.C. § 256b(a)(5)(C) .........................................................................9

42 U.S.C. § 256b(d)(3) .............................................................................10

42 U.S.C. § 256b(d)(3)(B)(iv) .................................................................10

42 U.S.C. § 1396r-8(a)(1) pt. B. ................................................................4

**State Statutes**

W. Va. Code § 33-11-1 *et seq.* ...............................................................11

W. Va. Code § 46A-6-104 .......................................................................11

W. Va. Code § 60A-8-6a ..........................................................................11

W. Va. Code § 60A-8-6a(b)(1) ................................................................11

W. Va. Code § 60A-8-6a(b)(1) and (2) .................................................11

W. Va. Code § 60A-8-6a(b)(2) ....................................................11, 14, 15

**Regulations**

21 C.F.R. § 207.33(a) (2024) ..........................................................19

42 C.F.R. § 10.21(c)(2) ..................................................................10

**Federal Registers**

Manufacturer Audit Guidelines and Dispute Resolution Process, 61
    Fed. Reg. 65,406 (Dec. 12, 1996) ("1996 Audit Guidelines") ...................*passim*

Notice Regarding Section 602 of the Veterans Health Care Act of
    1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550
    (Aug. 23, 1996) ("1996 Guidance") .................................................5

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy
    Services, 75 Fed. Reg. 10,272 (Mar. 5, 2010) .....................................20

**Other Authorities**

AbbVie, 340B Contract Pharmacy Pricing (Feb. 27, 2025),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/EbkhUnQEJlNIrCA5
    SeBVEZkBDsGPCoX5a1ftnh8aiWm9Yg?e=i9vbmq .......................................7

American Hospital Association, The 340B Drug Pricing Program,
    Healthsperian (2024),
    https://www.aha.org/system/files/media/file/2024/03/The-340B-
    Drug-Pricing-Program.pdf ...........................................................28

Biogen, 340B Contract Pharmacy Pricing (Dec. 19, 2024),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/Ecv95Mtfu9tBkju8G
    N-7sy0BJVB_9dq6WqACPEs3_y8cmg?e=tWlGup ..........................................8

Biogen, Notice to 340B Covered Entities (Dec. 19, 2024),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/Ecv95Mtfu9tBkju8G
    N-7sy0BJVB_9dq6WqACPEs3_y8cmg .....................................................29

*FAQs*, APEXUS (Jan. 24, 2020),
    https://www.340bpvp.com/search#q=1450&tab=faq .................................20

*FAQs*, HRSA, https://www.hrsa.gov/opa/faqs .................................................6, 8

H.R. Rep. No. 102-384, pt. 2 (1992) .................................................4, 5

Letter from AstraZeneca to Valued Partner (Aug. 17, 2020),
    https://www.340bhealth.org/files/AstraZeneca_Retail_Communica
    tion_-_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27 .............................................7

Letter from Diana Espinosa, Acting Adm'r, HRSA, to Dan Lupock,
    Managed Market Finance, Novartis Pharms. Corp. (May 17, 2021),
    https://www.hrsa.gov/sites/default/files/hrsa/opa/hrsa-letter-
    novartis-pharmaceuticals-covered-entities.pdf.................................................7

Letter from Markus Meier, Assistant Dir., FTC, to Dykema Gossett PLLC
    (Apr. 9, 2010), https://www.ftc.gov/sites/default/files/documents/advisory-
    opinions/university-michigan/100409univmichiganopinion.pdf ........................7

Merck & Co., Notice to 340B Covered Entities (August 1, 2024),
    ppsv.sharepoint.com/:b:/s/Healthcare/EaCuE1-
    H_kRKivfmAJVOJ7IBNh3ffQNlg0eU2za9SjHBNw?e=JQmJv2 ...............8, 29

Merck & Co., Notice to 340B Covered Entities (August 1, 2024),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/EaCuE1-
    H_kRKivfmAJVOJ7IBNh3ffQNlg0eU2za9SjHBNw .......................................29

Novartis, 340B Contract Pharmacy Pricing (Dec. 18, 2024),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/EVURxCEAOtFOiTk
    -l-cQ6_4BthpHttxczGzB8l-N7Jxu_w?e=ubZnEH.................................................8

Rich Daly, *Providers Try a Range of Responses to Manufacturer
    340B Contract Pharmacy Restrictions,* 340B Report (Sept. 26,
    2023), https://340breport.com/providers-try-a-range-of-responses-
    to-manufacturer-340b-contract-pharmacy-restrictions.....................................21

Sanofi (Oct. 1, 2020),
    https://ppsv.sharepoint.com/:b:/s/Healthcare/EYWmM0u8CxhGjD
    RPqZsZlLgBRiHhVBMi4311wUn_8rJquA?e=h5poG4 ..................................16

<u>INTERESTS OF *AMICI CURIAE*</u>

The West Virginia Hospital Association ("WVHA") is a not-for-profit statewide organization representing hospitals and health systems. Nearly all of WVHA's acute-care hospital members participate in the 340B Drug Pricing Program ("340B Program"). The 340B Program is critically important for WVHA members, particularly in rural West Virginia. For over thirty years, the 340B program has successfully enabled WVHA members to stretch scarce resources to better serve West Virginians. As a primarily rural state with countless health care challenges, the savings that 340B provides WVHA members ensures access to care for numerous programs and services, including infusion services, medication therapy management, diabetes education, mental and behavioral health services, opioid treatment services, cardiac/pulmonary rehabilitation, community-based clinics, and other programs to serve the uninsured and underinsured.

The West Virginia Primary Care Association ("WVPCA") represents thirty-three Community Health Centers ("CHCs") and serves as the voice for the 30% of the state's population that receives care from these non-profit organizations. CHCs provide medical, behavioral health, oral health, school-based health, 340B pharmacy services, and other medical and non-medical services at 550 locations to over 570,000 West Virginians, of which nearly 83% are low income. CHCs serve everyone, regardless of ability to pay. CHCs use their 340B resources to ensure

patient access to medications as well as to provide services in the their respective communities. Many CHCs depend on 340B savings and revenue to keep their doors open. The future of the S.B. 325 will affect WVPCA's members' ability to provide critical services and discounted drugs to vulnerable patients.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amici state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund or prepare the brief; and no person—other than amici—contributed money that was intended to fund preparing or submitting the brief.

## **INTRODUCTION**

The district court misunderstood both West Virginia S.B. 325 and the federal 340B program. The 340B statute, 42 U.S.C. § 256b, requires drug companies to offer discounts on outpatient drugs purchased by certain safety-net health care providers, known as "covered entities." S.B. 325 regulates delivery of drugs that have been priced under the 340B statute and prohibits drug companies from requiring health care providers to turn over their claims and utilization data as a condition for delivery of 340B drugs. The two statutes operate in separate spheres, pricing (340B) and delivery (S.B. 325). The district court was mistaken that the data demand provision of S.B. 325 interferes with the federal 340B administrative

dispute resolution ("ADR") process.  S.B. 325 will not impede the 340B program, and S.B. 325 is not preempted by the 340B statute.

The district court's foundational error was to conclude that the prohibition on data collection in S.B. 325 prevents drug companies from auditing covered entities or pursuing 340B ADR claims after conducting an audit.  The federal Department of Health and Human Services ("HHS") established a process to allow manufacturers to audit covered entities in 1996.  It has also issued regulations to establish an ADR process to adjudicate manufacturer allegations that the covered entity has not complied with 340B Program requirements.  S.B. 325 does not impede 340B audits or ADR because claims data is not a necessary precondition for drug companies to initiate a 340B audit or ADR.

S.B. 325 simply states that a drug company may not demand that a covered entity provide drug claims and utilization data as a condition of shipping drugs to a contract pharmacy.  S.B. 325 addresses claims data demands  prior to an order for 340B drugs, while the 340B ADR process applies to orders that have already been filled.  S.B. 325 is consistent with the 340B ADR process because S.B. 325 prevents drug companies from circumventing the ADR process.  S.B. 325 is not preempted by the 340B statute, and the Appellees are not likely to succeed on the merits of their claims.

# BACKGROUND

## I.    The 340B Program and 340B Drug Distribution

The 340B Program is named for Section 340B of the Public Health Service Act and requires drug companies to offer discounts on "covered outpatient drugs" to specified safety-net health care providers as a condition of the manufacturers' drugs being reimbursed by Medicaid and Medicare Part B.  42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).  Safety-net hospitals and clinics that participate in the 340B Program are known as "covered entities" and provide critical health care services to the neediest individuals, regardless of ability to pay.  *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024), *cert denied* No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024) ("*PhRMA*").  Covered entities must meet strict eligibility criteria to enroll in the 340B Program.  42 U.S.C. § 256b(a)(4).  Each category of covered entity receives some form of federal assistance to treat the nation's most vulnerable patients.  *Id.*  The 340B Program is administered by the Health Resources and Services Administration ("HRSA"), which is a component of HHS.

The 340B Program makes drugs more affordable for covered entities, which allows them to "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."  H.R. Rep. No. 102-384, pt. 2, at 12 (1992).  Covered entities provide significant levels of

uncompensated care, and the discounts available through the 340B Program help relieve these financial burdens. Covered entities lose less money on purchases of prescription drugs under the 340B Program for their uninsured and underinsured patients than they otherwise would. By mitigating losses, they can reduce or waive patient copayments for needy individuals. The 340B Program also generates revenue for covered entities so that they are less dependent on taxpayer support. If a covered entity patient has prescription coverage, the difference between the insurer's payment and the discounted drug price is income to the covered entity to supplement federal funds to treat more patients and to provide more services. *Id.*; *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023).

To treat most illnesses or injuries, a health care provider must ensure that patients have access to a pharmacy to fill prescriptions at affordable prices. Because the construction and management of a pharmacy is expensive and requires special expertise, many covered entities cannot afford to operate "in-house" pharmacies and instead contract with independently-owned pharmacies to meet the pharmacy needs of their patients. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance"). Covered entities with large service areas also contract with pharmacies that are convenient to the covered entity's patients. In addition, some medications require special storage and handling and

can only be dispensed by a specialty pharmacy, through a mail order program, or are subject to a limited distribution network. These arrangements between covered entities and pharmacies are known as "contract pharmacy arrangements," and the pharmacies are referred to as "contract pharmacies."

Contract pharmacies are not permitted to purchase 340B drugs. 42 U.S.C. § 256b(a)(1), (4); Decl. of Krista M. Pedley, *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129 (D.N.J. June 24, 2021), ECF No. 93-2 (Attachment A). Drugs dispensed by contract pharmacies are purchased by the covered entity using a "bill to/ship to" procedure—the drugs are purchased by, and billed to, the covered entity but shipped to the contract pharmacy. *See FAQs*, HRSA, https://www.hrsa.gov/opa/faqs ("What is a 'ship to bill to' arrangement?"). After receiving the 340B drugs, the contract pharmacy dispenses the drugs to the covered entity's patients, collects reimbursement for the drugs from the patient's third party payer (if any) and any applicable copayments from the patient, and remits the reimbursement to the covered entity. The covered entity pays the pharmacy a fee for its dispensing and billing services. While contract pharmacy arrangements are common in the 340B Program, they are not unique to the 340B

Program.  *See, e.g.*, Letter from Markus Meier, Assistant Dir., FTC, to Dykema

Gossett PLLC (Apr. 9, 2010).[1]

For nearly three decades, every drug company participating in the 340B

Program honored contract pharmacy arrangements and treated contract pharmacies

the same as in-house pharmacies.  Manufacturers honored these arrangements

without requiring covered entities to submit claims data prior to shipping drugs to

contract pharmacies.  That changed in July 2020 when several manufacturers either

eliminated or significantly restricted distribution of 340B drugs ordered through

bill to/ship to arrangements.  *See, e.g.*, Letter from AstraZeneca to Valued Partner

(Aug. 17, 2020);[2] *see also* Letter from Diana Espinosa, Acting Adm'r, HRSA, to

Dan Lupock, Managed Market Finance, Novartis Pharms. Corp. (May 17, 2021).[3]

AbbVie, Novartis, and most of PhRMA's members currently maintain and

enforce contract pharmacy restrictions.  AbbVie's policy states that hospitals with

an in-house pharmacy may not use contract pharmacies.  AbbVie, 340B Contract

Pharmacy Pricing (Feb. 27, 2025).[4]  It allows hospitals without an in-house

---

[1] https://www.ftc.gov/sites/default/files/documents/advisory-opinions/university-michigan/100409univmichiganopinion.pdf.

[2] https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27.

[3] https://www.hrsa.gov/sites/default/files/hrsa/opa/hrsa-letter-novartis-pharmaceuticals-covered-entities.pdf.

[4] https://ppsv.sharepoint.com/:b:/s/Healthcare/EbkhUnQEJlNIrCA5SeBVEZkBDsGPCoX5a1ftnh8aiWm9Yg?e=i9vbmq.

pharmacy to use one contract pharmacy if, among other requirements, the hospital submits claims data to AbbVie's third-party data collection agent prior to delivery of 340B drugs. *Id.* For grantees, AbbVie honors an unlimited number of contract pharmacy arrangements, but only if the grantee submits claims data. Novartis' policy does not apply to grantee covered entities, but its policy for hospitals is the same as the AbbVie's. *See* Novartis, 340B Contract Pharmacy Pricing (Dec. 18, 2024).[5] Most PhRMA members have similar restrictive contract pharmacy policies. A few PhRMA members have explicitly exempted West Virginia covered entities from their policies to comply with S.B. 325. *See, e.g.*, Biogen, 340B Contract Pharmacy Pricing (Dec. 19, 2024);[6] Merck & Co., 340B Contract Pharmacy Pricing (August 1, 2024).[7]

The D.C. Circuit and Third Circuit have held that the 340B statute is "silent" regarding delivery of 340B drugs. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023). These decisions apply to HHS, which is not charged with administering

---

[5] https://ppsv.sharepoint.com/:b:/s/Healthcare/EVURxCEAOtFOiTk-l-cQ6_4BthpHttxczGzB8l-N7Jxu_w?e=ubZnEH.
[6] https://ppsv.sharepoint.com/:b:/s/Healthcare/Ecv95Mtfu9tBkju8GN-7sy0BJVB_9dq6WqACPEs3_y8cmg?e=tWlGup.
[7] https://ppsv.sharepoint.com/:b:/s/Healthcare/EaCuE1-H_kRKivfmAJVOJ7IBNh3ffQNlg0eU2za9SjHBNw?e=JQmJv2.

S.B. 325, and apply only to the requirements of the 340B statute—not the requirements of S.B. 325.

## II.     340B Audits and ADR

The 340B statute prohibits a covered entity from obtaining a 340B discount if the state received a Medicaid rebate on the same drug.  42 U.S.C. § 256b(a)(5)(A).  This is known as the "duplicate discount" prohibition.  The 340B statute also prohibits a covered entity from reselling or otherwise transferring a 340B "drug to a person who is not a patient of the entity."  *Id.* § 256b(a)(5)(B). This is known as the "diversion" prohibition.

The 340B statute permits a drug company, "acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits," to audit the records of the covered entity that pertain to its compliance with the 340B statute's prohibitions on diversion and duplicate discounts.  42 U.S.C. § 256b(a)(5)(C).  HRSA issued audit guidelines in 1996 to implement this statutory provision.  Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406 (Dec. 12, 1996) ("1996 Audit Guidelines").

The 1996 Audit Guidelines include clear steps that a manufacturer must take before HRSA will grant it authority to audit a covered entity.  First, "[t]he manufacturer shall notify the covered entity in writing when it believes the covered entity has violated provisions of section 340B."  *Id.* at 65,410.  The manufacturer

9

and covered entity then have at least thirty days to attempt to resolve the matter in good faith. *Id.* If the matter is not resolved, the manufacturer may file an audit work plan with HRSA that "must set forth a clear description of why it has reasonable cause to believe that a violation of section 340B(a)(5)(A) or (B) has occurred, along with sufficient facts and evidence in support of the belief." *Id.* "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5)(A) or (B) of the [Public Health Service] Act." *Id.* at 65,409. Manufacturers may obtain documentation to demonstrate such reasonable cause during the 30-day good faith resolution period. Additionally, a covered entity's refusal to comply with a manufacturer's good faith written notification is sufficient to demonstrate that "a reasonable person could believe that a covered entity" may be in violation. *Id.* In that case, manufacturers can provide such refusal to HRSA as documentation to establish reasonable cause.

The 340B statute authorizes ADR to adjudicate 340B disputes between manufacturers and covered entities, including manufacturer allegations that a covered entity violated the duplicate discount or diversion prohibitions. 42 U.S.C. § 256b(d)(3). The statute requires a manufacturer to audit a covered entity prior to submitting an ADR petition. *Id.* § 256b(d)(3)(B)(iv); 42 C.F.R. § 10.21(c)(2).

### III.     West Virginia S.B. 325

S.B. 325 (codified at W. Va. Code § 60A-8-6a) includes W. Va. Code § 60A-8-6a(b)(1) and (2), which requires manufacturers to deliver 340B-priced drugs purchased by West Virginia covered entities under 340B bill to/ship to arrangements.  The statute regulates 340B drug distribution through two provisions.  First, W. Va. Code § 60A-8-6a(b)(1) prohibits a drug company from denying a covered entity access to 340B drugs if the covered entity uses contract pharmacy arrangements to participate in the 340B Program.  Second, W. Va. Code § 60A-8-6a(b)(2) prohibits a manufacturer from obtaining claims and utilization data as a condition for allowing 340B covered entities to access 340B drugs ("Data Demand" provision):

> A manufacturer, agent, or affiliate of such manufacturer shall not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

W. Va. Code § 60A-8-6a(b)(2).  Subsection (c) states that a violation of S.B. 325 is a violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-104, and West Virginia's unfair trade practices, W. Va. Code § 33-11-1 *et seq.*

## SUMMARY OF ARGUMENT

The district court improperly preliminarily enjoined enforcement of S.B. 325. To grant a preliminary injunction, the moving party must show that (1) it is likely to succeed on the merits of its claim; (2) it will suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tip in its favor; and (4) the preliminary injunction is in the public's interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). AbbVie, Novartis, and PhRMA failed all these factors.

First, Appellees are not likely to succeed on the merits of their claims. Neither the Data Demand nor the enforcement provisions of S.B. 325 stand as an obstacle to Appellees' obligations under the 340B statute. Appellees may use the ADR process to conduct audits of covered entities, and S.B. 325's enforcement scheme concerns its delivery requirements only, which operate completely outside the scope of the 340B Program. Second, for 28 years, AbbVie, Novartis and all of PhRMA's members *already did* what S.B. 325 is now requiring them to *continue to do* without experiencing irreparable harm. Finally, the balance of equities and public interest do not support a preliminary injunction because covered entities will suffer significantly more harm than Appellees if this Court upholds the district court's decision, and denying a preliminary injunction will preserve the status quo.

**ARGUMENT**

**I.      Drug Companies Are Not Likely to Succeed on the Merits**

S.B. 325 is not preempted.  The Data Demand provision is not an obstacle to

the 340B statute because it will not interfere with a manufacturer's rights under the

340B ADR process.  The district court also misunderstood the replenishment

model used by covered entities and contract pharmacies.  Under the replenishment

system, S.B. 325 does not mandate delivery of drugs at a particular price.  The

district court was also incorrect that *Astra USA v. Santa Clara County* is

controlling because S.B. 325 regulates drug distribution, while *Astra* solely

addressed private rights of action to enforce 340B pricing requirements.

Furthermore, the district court failed to apply a presumption against

preemption when state laws or regulations concern "matters related to health and

safety."  *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715

(1985).  S.B. 325 fits squarely into this category.  In *PhRMA*, the Eighth Circuit

addressed this very issue in a similar preemption challenge to Arkansas Act 1103.

The Eighth Circuit held that "when it comes to pharmaceuticals, the federal

government has traditionally regarded state law as a complementary form of drug

regulation and has long maintained that state law offers an additional, and

important, layer of consumer protection that complements federal regulation."

*PhRMA*, 95 F.4th at 1143 (cleaned up); *see also PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 at *13 (W.D. La. Sept. 30, 2024) (same).

A.    **The Data Demand Provision Is Not an Obstacle to the 340B Statute**

The district court erred in concluding that the Data Demand provision, which it inaccurately called the "No-Audits Provision," is likely conflict preempted. Order at 7. This provision, W. Va. Code § 60A-8-6a(b)(2), does not prevent drug companies from conducting audits under the federal 340B Program. In fact, manufacturer requirements to submit claims data serve as an end run around the 1996 Audit Guidelines and ADR because these policies demand data without establishing "reasonable cause." The district court believed, incorrectly, that drug companies must be permitted to examine claims and utilization data in order to establish "reasonable cause" under the 1996 Audit Guidelines to audit the covered entity. Order at 11. But a data demand *is* a manufacturer audit. The district court, in effect, interpreted the 340B Program as requiring a manufacturer to conduct an audit before HRSA will permit the manufacturer to conduct an audit. The district court's interpretation is nonsensical and wholly at odds with HRSA's 1996 Audit Guidelines, which define "reasonable cause" for an audit based on a "reasonable person" standard, which does not require an examination of claims or utilization data.

As a threshold matter, S.B. 325 and the 340B audit provisions address entirely different stages of 340B claims. S.B. 325 operates *before* acquisition of a drug—it prohibits a drug company from requiring claims data as "a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity . . . ." W. Va. Code § 60A-8-6a(b)(2). The 1996 guidelines, in contrast, apply *after* acquisition of a 340B drug. The 1996 guidelines permit a drug company to audit records of past transactions of "drugs purchased at the discount price." 1996 Audit Guidelines, 61 Fed. Reg. at 65,407.

The 1996 Audit Guidelines do not permit or contemplate the mandating of claims or utilization data to establish reasonable cause to conduct an audit. The audit itself would include a review of claims or utilization data, and prior to receiving permission from HRSA to conduct an audit of claims or utilization data, the drug company must establish reasonable cause. Collecting claims data is not necessary for manufacturers to establish "reasonable cause" to conduct an audit under the 1996 Guidelines. Rather, if at any time a manufacturer suspects that a covered entity is not complying with 340B Program requirements, HRSA permits the manufacturer to contact the covered entity to make a "good faith inquiry" into the covered entity's 340B compliance. If the covered entity refuses to cooperate, such refusal is grounds for reasonable cause to conduct an audit. 1996 Audit Guidelines, 61 Fed. Reg. at 65,410. The "good faith inquiry" requirements of the

1996 Audit Guidelines place less burden on the covered entity while still allowing a manufacturer to conduct the audits necessary for 340B ADR. It balances the "twin federal purposes—providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts." Order at 13.

The district court claimed, inaccurately, that requiring claims data as a condition of delivering 340B-priced drugs is "industry practice." Order at 11 (citing Combined Memo. at 30–31, *PhRMA v. Morrisey,* Case No. 2:24-cv-00271 (S.D. W. Va. Aug. 30, 2024), ECF No. 47). In reality, however, this burdensome practice began only five years ago when Sanofi became the first drug company to require claims data submission as a condition of delivery. Sanofi (Oct. 1, 2020).[8] If requiring claims and utilization data is really "necessary" to establish reasonable cause for conducting an audit under the 340B statute, how could manufacturers have established reasonable cause for the first 28 years of the 340B program? The answer is that they did so through alternative means, such as the "good faith inquiry" method that HRSA described in its 1996 Audit Guidelines.

---

[8] https://ppsv.sharepoint.com/:b:/s/Healthcare/EYWmM0u8CxhGjDRPqZsZlLgBRiHhVBMi4311wUn_8rJquA?e=h5poG4.

**B.**     **The Enforcement Provision is Not an Obstacle to the 340B Statute**

    **1.**     **The District Court Fundamentally Misunderstood the Replenishment Model**

The district court mistakenly reasoned that S.B. 325 is conflict preempted because, according to the court, most 340B contract pharmacy arrangements in West Virginia rely on the replenishment model and, under this model, S.B. 325 governs "delivery [of drugs] at a given price, not delivery per say." Order at 19. The court asserted incorrectly that because the drug is already in the hands of the contract pharmacy before the patient arrives at the pharmacy, the replenishment system "is about delivery *at a given price*, not delivery *per se.*" Order at 19. The court's analysis is flawed because, although pricing is a component of replenishment arrangements, the model operates outside the scope of S.B. 325 and therefore does not impact the question of S.B. 325's alleged preemption.

As an initial matter, while most covered entities use the replenishment model to dispense drugs through contract pharmacies, some require their contract pharmacies to keep a physically separate inventory of the covered entity's 340B drugs. The manufacturer restrictions on delivery of 340B drugs apply to those pharmacies as well as to those that use the replenishment model. Therefore, the district court's conclusion that the replenishment model demonstrates that pricing, not delivery, is the primary issue in this case is flawed.

Covered entities enter into replenishment arrangements with contract pharmacies because they are more efficient. The replenishment model allows a pharmacy to dispense a drug from its inventory to the covered entity's patient instead of having to rely on advance orders of 340B drugs to arrive. Pedley Decl. ¶¶ 3, 5. In the physical inventory model, pharmacies must keep duplicate inventories—one for the covered entity's 340B drugs and the other for its own non-340B drugs. Not only does the model demand more space, it inevitably leads to the pharmacy carrying too much 340B inventory, or not enough, because the covered entity is faced with the impossible task of having to predict how much of a particular drug its patients will need at a particular pharmacy. The replenishment model avoids these problems and, in so doing, benefits covered entities, patients, and drug companies.

The replenishment model complies with the 340B statute's prohibition against diversion, which states, "With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). The "agreement under this subsection" is the pharmaceutical pricing agreement ("PPA") that a manufacturer executes with HHS, committing the manufacturer to offer 340B discounted pricing on covered outpatient drugs purchased by covered entities. *Id.* § 256b(a)(1). The 340B statute

is silent as to when and how a covered outpatient drug is determined to be "subject to a PPA," and HHS allows covered entities to address those details in their contract pharmacy agreements. *See* Pedley Decl. ¶¶ 3-12.

A covered outpatient drug is clearly "subject to a PPA" when ordered and purchased under the covered entity's 340B wholesaler account. But in the replenishment model, the purchased product ("replenishment drug") is only "subject to a PPA" until it arrives at the contract pharmacy, at which point the parties agree to recharacterize both the replenishment drug and the drug dispensed by the contract pharmacy that triggered the replenishment order ("dispensed drug"). Again, this arrangement has been blessed by HRSA as complying with 340B statutory requirements. *See* Pedley Decl. The replenishment drug is recharacterized from a covered outpatient drug subject to a PPA to an outpatient drug not subject to a PPA. The dispensed drug is recharacterized at the exact same time, but in the opposite direction—from not being subject to a PPA to being subject to a PPA.

Recharacterization is possible because each unique drug in the U.S. is assigned a National Drug Code ("NDC"), which identifies its "labeler, product, and package size and type." 21 C.F.R. § 207.33(a) (2024). All drugs with the same NDC will have the same name, active ingredient, strength, dosage form, prescription/non-prescription status, intended use, and other "distinguishing

characteristics such as size, shape, color, code imprint, flavor, and scoring (if any)." *Id.* § 207.35(b)(6) (2024). Thus, all drugs with a designated NDC are indistinguishable from each other, allowing replenishment of one drug with another when they share the exact 11-digit NDC. Pedley Decl. ¶ 7.

The number of 340B Dispensed Drugs is always equal to the number of 340B Replenished Drugs, so the impact of the replenishment model on manufacturers is the same as when the model is not being used. The only potential exception is if over-replenishment occurs. Such discrepancies are quickly resolved, however, because diversion occurs if they are left unresolved. Covered entities are required by HRSA to protect against diversion by performing regular true-ups of 340B purchasing and dispensing within their contract pharmacy arrangements. *See, e.g.*, *FAQs*, APEXUS (Jan. 24, 2020) ("What are the record-keeping requirements for contract pharmacies?").[9] This ongoing obligation, which is generally supported by specialized software programs, actually reduces the risk of errors when compared to the manual process used in physical inventory systems. 1996 Guidance, 61 Fed. Reg. at 43,554; Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272 (Mar. 5, 2010); Pedley Decl. ¶¶ 5-9, 12.

---

[9] https://www.340bpvp.com/search#q=1450&tab=faq.

Because the transactions in the replenishment model are only between covered entities and contract pharmacies and do not involve manufacturers, use of the model has no bearing on S.B. 325. Indeed, a covered entity and pharmacy can implement the replenishment model in the absence of the bill to/ship to arrangement which is the sole focus of S.B. 325. Instead of wholesalers shipping 340B drugs to contract pharmacies, many covered entities ship 340B drugs to contract pharmacies themselves, a practice commonly referred to as the alternative distribution model ("ADM"). Rich Daly, *Providers Try a Range of Responses to Manufacturer 340B Contract Pharmacy Restrictions*, 340B Report (Sept. 26, 2023).[10] Nothing in the 340B statute prohibits covered entities from dispensing 340B drugs through ADM arrangements if properly designed to avoid diversion and, for this reason, HRSA's technical assistance contractor, Apexus, has stated that ADM arrangements are permissible under the statute. Telephone Interview with Michelle Fox, 340B Policy and Compliance Dir., Apexus (June 5, 2023). The replenishment model commonly used in contract pharmacy arrangements can just as easily be used in ADM arrangements.

Indeed, the replenishment model can also be used outside the 340B program. All that is required is for the purchaser to have access to better pricing than the

---

[10] https://340breport.com/providers-try-a-range-of-responses-to-manufacturer-340b-contract-pharmacy-restrictions.

pharmacy dispensing the drugs.  For example, the drugs could be purchased at a discount as a result of the negotiation leverage of a group purchasing organization. The non-discounted drug dispensed by the pharmacy is replenished with the discounted drug acquired by the purchaser and, through the same recharacterization process described above, the discount applicable to the replenished drug is transferred to the dispensed drug.  Therefore, use of the replenishment model falls completely outside the scope of S.B. 325, which is directed at manufacturers, not covered entities or contract pharmacies.

S.B. 325 prohibits manufacturers from blocking delivery of 340B drugs to contract pharmacies.  These deliveries would occur regardless of whether the replenishment model is used.  And if the model is used, the damage caused by the manufacturers' restrictive policies has already been done.  The manufacturers' policies govern the delivery of 340B drugs from manufacturers to covered entities, a process that always precedes and never overlaps the replenishment model.

## 2.   *Astra USA v. Santa Clara County* **is Inapplicable**

The district court's preemption analysis was "guided" by *Astra USA v. Santa Clara County* because the court (mistakenly) found that "S.B. 325 operates as a means to enforce the 340B ceiling price."  Order at 20 (citing *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011)).  As explained above, and as held by several other federal courts, neither S.B. 325 nor other state laws similar to S.B.

325 enforces the 340B ceiling price. *See, e.g.*, *PhRMA*, 95 F.4th at 1145 ("Act 1103 does not set or enforce discount pricing.").

*Astra* focused solely on whether 340B covered entities are third-party beneficiaries of a drug company's PPA with HHS, and the Court held that the 340B statute does not permit covered entities to bring lawsuits against drug companies to enforce PPAs. *Astra USA, Inc.*, 563 U.S. at 113, 116. *Astra* did not address the distribution of 340B-priced drugs, nor did it consider state laws regulating contract pharmacy distribution. *Astra* is inapplicable because state enforcement of distribution is not "essentially operating as the covered entity in *Astra*." Order at 21. Enforcement of S.B. 325 will not result in the state "claim[ing] that it [can] sue on the issue of whether a drug was delivered at the 340B price . . . ." Order at 20. Because S.B. 325 regulates distribution, not pricing, enforcement of S.B. 325 will not amount to "a suit to enforce the [340B] statute itself," and S.B. 325 does not "impermissibly venture[] into the federal government's enforcement of the 340B Program." Order at 20.

### 3. The Enforcement Provision Does Not Conflict With the 340B Statute and Will Not Result in Conflicting Adjudications

The district court incorrectly concluded that enforcement of S.B. 325 will result in inconsistent adjudications and require state decisionmakers to answer questions of federal law. The district court cites *Ingersoll-Rand Co. v. McClendon*

to draw parallels between S.B. 325's enforcement mechanisms and ERISA enforcement. Order at 22 (citing 498 U.S. 133, 142 (1990)). *Ingersoll-Rand Co.* is inapposite because it reviewed state laws that imposed sanctions on conduct that is also directly penalized or explicitly exempted under a federal statute. Moreover, as the district court conceded, ERISA has an express preemption provision while the 340B statute does not. Order at 22. The district court's only remaining tether to *Ingersoll-Rand* is that "*Astra* would directly prevent such" enforcement mechanisms and "[p]rice regulation is exclusively controlled by the federal statute." Order at 23. However, as explained above, the district court's reliance on *Astra* is misplaced because S.B. 325 addresses delivery, not pricing.

The district court also incorrectly relied on *Astra* in finding that enforcement of S.B. 325 will result in "differing state and federal adjudications . . . ." Order at 23-24 (quoting *Astra*, 563 U.S. at 120). The court mistakenly concluded that potential diversion could conflict with enforcement of S.B. 325. Order at 24. But diversion, along with duplicate discounts, are strictly pricing issues regulated under the 340B statute that manufacturers may address through the ADR process. 42 U.S.C. § 256b(a)(5)(A)-(B), (d)(3).

Further, the court incorrectly accepted Novartis' allegations that West Virginia decisionmakers would need to make "determinations of federal law" to enforce S.B. 325. Order at 16-17, 23. Novartis alleged that the state would need to

assess "how to implement HRSA's opaque requirement that a covered entity retain title to a drug dispensed through a contract pharmacy to warrant the discount, and how to interpret and apply the definition of the statutory term 'patient.'"  Mem. Supp. Mot. Prelim. Inj. at 20, *Novartis v. Morrisey*, Case No. 2:24-cv-00272 (S.D. W. Va. May 31, 2024), ECF No. 7.  S.B. 325 presumes that covered entities are complying with the 340B statute and, again, 340B compliance requirements must be addressed through the ADR process.  S.B.325 would not require state decisionmakers to delve into these questions because the proper 340B pricing enforcement mechanisms would be determined at the federal level.

### 4.  The Cases the District Court Found Distinguishable Are Applicable

The district court mistakenly found that the decisions in *AbbVie Inc. v. Fitch* and *PhRMA* distinguishable from this case.  Order at 24.  In *AbbVie*, the court correctly did not discuss "*Astra*'s potential impact" because the narrow *Astra* holding relates to enforcing the 340B ceiling price only.  Order at 24 (citing *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *12 (S.D. Miss. 2024)).  Other courts have found that state laws similar to S.B. 325 regulate delivery, not pricing.  *See PhRMA*, 95 F.4th at 1145.  The *AbbVie* court also correctly understood a fundamental aspect of the replenishment model: that "Section 340B presumably contemplates that efficient distribution of *fungible* drugs to covered-entity patients might utilize a replenishment model."  *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-

HSO-BWR, 2024 WL 3503965, at *14 (S.D. Miss. July 22, 2024) (emphasis added). Moreover, *AbbVie*'s finding that Congress had not demonstrated "a clear purpose to preempt state laws" regarding drug distribution is correct. Order at 24 (quoting *AbbVie*, 2024 WL 3503965, at *10).

*PhRMA* is also applicable because Appellees similarly "present[ed] no evidence of an obstacle." Order at 25 (quoting *PhRMA*, 95 F.4th at 1145). Here, because S.B. 325 does not regulate pricing, but rather distribution, it similarly "does not require manufacturers to provide 340B pricing discounts to contract pharmacies." Order at 25 (quoting *PhRMA*, 95 F.4th at 1145). Furthermore, as shown above, the state would not be "called upon to determine certain federal questions in administering S.B. 325." Order at 25. Therefore, the district court's conclusion that the "concern for differing adjudications by differing sovereigns looms larger here than in [*PhRMA*]" is misguided and *PhRMA* is applicable and persuasive. Order at 25.

## II.     Drug Companies Will Not Suffer Irreparable Harm

The district court erred in finding that Appellees demonstrated a "clear showing" that they will suffer irreparable harm in the absence of injunctive relief. Order at 9 (quoting *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D. W. Va. 2014)). Appellees will not suffer irreparable harm either

from the monetary penalties that S.B. 325 imposes or the cost of complying with S.B. 325.

Of course, Appellees will not suffer irreparable harm because S.B. 325 is constitutional as explained above. Every other court that has issued an opinion on comparable state laws (each of which impose monetary penalties for noncompliance) has upheld those laws as constitutional or held that the manufacturer has little likelihood of success on the merits of its constitutional claims. *See PhRMA*, 95 F.4th 1136 (8th Cir. 2024); *PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022); *PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024); Order, *Novartis v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), ECF No. 57; *AbbVie v. Fitch*, No. 1:24-cv-00184, 2024 WL 3503965 (S.D. Miss. July 22, 2024); *Novartis v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024); *PhRMA v. Fitch*, No. 1:24-cv-00160, 2024 WL 3277365 (S.D. Miss. July 1, 2024). Another district court within the Fourth Circuit *denied* manufacturers' motions for preliminary injunction. *See* Order, *Novartis v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), ECF No. 57. Likewise, the Supreme Court denied a petition for *certiorari* to reconsider the Eighth Circuit decision. *PhRMA*, 95 F.4th at 1145, *cert. denied*, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024).

The fines and compliance costs of S.B. 325 are not an irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to demonstrate irreparable harm.). The possibility for adequate relief at a later time "weighs heavily against a claim of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson*, 415 U.S. at 90).

Until 2020, all manufacturers honored unlimited contract pharmacy arrangements. For 28 years, Appellees *already did* what S.B. 325 requires without experiencing harm, let alone "insolvency." *See, e.g.*, *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 696 (4th Cir. 1994). Honoring contract pharmacy agreements is not a "new type of activity with completely unknown effects. . . ." *Winter*, 555 U.S. at 23. In fact, 340B discounts account for only a "small share of drug company revenue." American Hospital Association, The 340B Drug Pricing Program 1, Healthsperian (2024).[11] Any losses associated with compliance with S.B. 325 are minimal.

---

[11] https://www.aha.org/system/files/media/file/2024/03/The-340B-Drug-Pricing-Program.pdf.

### III. The Balance of Equities and Public Interest Favor Denial of a Preliminary Injunction

The district court's decision that an injunction preserves the status quo, Order at 34, is a "clear error." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). The status quo is for drug companies to permit shipments of 340B drugs to contract pharmacies, which they did for 28 years. Some of PhRMA's members have reversed their restrictive contract pharmacy policies in response to S.B. 325. *See* Biogen, Notice to 340B Covered Entities (Dec. 19, 2024)[12]; Merck & Co., Notice to 340B Covered Entities (August 1, 2024).[13] The district court's decision does not preserve the status quo and instead upends distribution of 340B drugs to contract pharmacies.

The district court failed to give adequate weight to the harm that drug companies are inflicting on covered entities and their patients, stating that "[a] preliminary injunction does nothing to upset the federal program." Order at 33-34. But the preliminary injunction authorizes drug companies to unilaterally impose restrictions that were not in place before 2020, thereby upending access to 340B drugs at contract pharmacies and threatening the very existence of health care programs that are supported by 340B savings, especially in rural areas. *See Aamer*

---

[12] https://ppsv.sharepoint.com/:b:/s/Healthcare/Ecv95Mtfu9tBkju8GN-7sy0BJVB_9dq6WqACPEs3_y8cmg.
[13] https://ppsv.sharepoint.com/:b:/s/Healthcare/EaCuE1-H_kRKivfmAJVOJ7IBNh3ffQNlg0eU2za9SjHBNw.

*v. Obama*, 742 F.3d 1023, 1044 (D.C. Cir. 2014) (denying a preliminary injunction when the "risk of error" in granting an injunction could lead to the petitioner ceasing to exist). Such drastic and irreversible harm outweighs the slight harm drug companies—which make billions in profit—might endure. In granting a preliminary injunction, the court miscalculated the "effect on each party of the granting or withholding of the" injunction and failed to "pay particular regard for the *public consequences* in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (emphasis added). Therefore, both the equities and public interest favor denial of the preliminary injunction to preserve the status quo.

## CONCLUSION

For the foregoing reasons, WVHA and WVPCA respectfully asks this Court to reverse the district court's grant of a preliminary injunction.

Dated: March 4, 2025        Respectfully submitted,

*/s/Ronald S. Connelly*
Ronald S. Connelly
D.C. Bar No. 488298
POWERS PYLES SUTTER &
VERVILLE, PC
1250 Connecticut Ave NW, Eighth Floor
Washington, DC 20036
T: (202) 466-6550
Ron.Connelly@PowersLaw.com
*Counsel for WVHA and WVPCA*

# CERTIFICATE OF COMPLIANCE

1.   This document complies with the type-volume limit of Fed. R. App. P.

     29(a)(5) because, excluding the parts of the document exempted by Fed.

     R. App. P. 32(f), this document contains 6,443 words.

2.   This document also complies with the typeface requirements of Fed. R.

     App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P.

     32(a)(6) because this document has been prepared in a proportionally

     spaced typeface using Microsoft Office 365 in Times New Roman 14-

     point font.


Dated:  March 4, 2025                    Respectfully submitted,

                                         */s/ Ronald S. Connelly*
                                         Ronald S. Connelly

**CERTIFICATE OF SERVICE**

I certify that on March 4, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/Ronald S. Connelly*
Ronald S. Connelly