## UNITED STATES COURT OF
## APPEALS FOR THE FOURTH CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*Plaintiff-Appellee,*

*v.*

JOHN B. MCCUSKEY, *ET AL.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Southern District of West Virginia
No. 2:24-cv-00271,
District Judge Thomas E. Johnston

## BRIEF OF AMERICAN HOSPITAL ASSOCIATION AND 340B HEALTH AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

William B. Schultz
Margaret M. Dotzel
Alyssa Howard Card
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com

*Attorneys for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 25-1054    Caption: Pharmaceutical Research & Manufacturers of America v. McCuskey

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Hospital Association
(name of party/amicus)


who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Alyssa Howard Card                    Date:        3/4/25

Counsel for: American Hospital Association

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1054     Caption: Pharmaceutical Research & Manufacturers of America v. McCuskey

Pursuant to FRAP 26.1 and Local Rule 26.1,

340B Health
(name of party/amicus)


who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☐NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Alyssa Howard Card                       Date:          3/4/25

Counsel for: 340B Health

Print to PDF for Filing

# TABLE OF CONTENTS

**DISCLOSURE STATEMENTS**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICI CURIAE* .............................................................. 1

BACKGROUND AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT .............................................................................................. 8

I.     APPELLEES ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR PREEMPTION CLAIMS. .......................... 10

     A.    The District Court's Ruling Was Based on Flawed Legal Analysis and a Misunderstanding of the 340B Statute and Program. .......................................................................... 11

     B.    S.B. 325 Does Not Regulate Drug Pricing and Would Not Be Preempted Even If It Did.. ................................................. 21

II.    S.B. 325 DOES NOT VIOLATE THE TAKINGS CLAUSE. ...................... 23

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*AbbVie Inc. v. Fitch*,
No. 1:24-cv-00184-HSO-BWR, 2024 WL 3503965
(S.D. Miss. July 22, 2024) ................................................................ 11, 12, 24

*Am. Hosp. Ass'n v. Azar*,
967 F.3d 818 (D.C. Cir. 2020) .................................................................. 17

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) ............................................................................. 9, 17

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................................ 13

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .................................................................... 26

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ........................................................................... 15, 16

*AstraZeneca Pharms. LP v. Fitch*,
No. 1:24-cv-196-LG-BWR, 2024 WL 5345507
(S.D. Miss. Dec. 23, 2024) ................................................................... 11, 17

*Baker Cnty. Med. Servs., Inc. v. U.S. Atty. Gen.*,
763 F.3d 1274 (11th Cir. 2014) ................................................................. 23

*Biotech. Indus. Org. v. District of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007) ............................................................ 17, 18

*Biotech. Indus. Org. v. Dist. of Columbia*,
505 F.3d 1343 (Fed. Cir. 2007) ............................................................ 17, 18

*Burditt v. U.S. Dep't of Health & Hum. Servs.*,
934 F.2d 1362 (5th Cir. 1991) ............................................................. 12, 23

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ................................................................................ 16

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) ...........................................................................13

*Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002) ...........................................................................13

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ...........................................................................13

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) .............................................................................17

*Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.*,
  No. 1:21-cv-00081-SEB-MJD, 2021 WL 5039566
  (S.D. Ind. Oct. 29, 2021) ............................................................. 23, 24

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) .............................................................................15

*Garelick v. Sullivan*,
  987 F.2d 913 (2d Cir. 1993) ............................................................23

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ...........................................................................27

*Hoyt v. Sprague*,
  103 U. S. 613 (1880) ..........................................................................25

*Loper Bright v. Raimondo*,
  144 S. Ct. 2244 (2024) .......................................................................19

*MacDonald v. Monsanto Co.*,
  27 F.3d 1021 (5th Cir. 1994) ...........................................................10

*Malone v. White Motor Corp.*,
  435 U.S. 497 (1978) ...........................................................................13

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ..................................................................... 13, 17

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
  742 F.2d 442 (8th Cir. 1984) ...........................................................23

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) ...................................................................14

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ...................................................................14

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023) ......................................................... 12, 25, 26

*Novartis Pharms. Corp. v. Bailey*,
   No. 2:24-cv-04131-MDH, 2025 WL 489881 (E.D. Mo. Feb. 13, 2025)...... 11, 27

*Novartis Pharms. Corp. v. Fitch*,
   738 F. Supp. 3d 737 (S.D. Miss. July 1, 2024) ..................................11

*Novartis Pharms. Corp. v. Bailey*,
   No. 2:24-cv-04131-MDH, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) ..........25

*Paul's Industrial Garage, Inc. v. Goodhue Cnty.*,
   35 F.4th 1097 (8th Cir. 2022) .....................................................27

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
   18 F.4th 956 (8th Cir. 2021) ......................................................10

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*,
   No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365
   (S.D. Miss. July 1, 2024)....................................................... 11, 25, 26

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
   95 F.4th 1136 (8th Cir. 2024)................................................. 3, 10. 17

*Pharm. Rsch. & Mfrs. of Am. v. Morrissey*,
   Nos. 2:24-cv-00271, 2:24-cv-00272, 2:24-cv-00298,
   2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024) ............................ 11, 18, 20, 21

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*,
   No. 6:23-cv-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ....... 11, 12, 24

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
   538 U.S. 644 (2003) ...................................................................13

*S.E. Ark. Hospice, Inc. v. Burwell*,
   815 F.3d 448 (8th Cir. 2016)........................................................24

*Sanofi-Aventis U.S., LLC v. U.S. Dept. of Health & Hum. Servs.*,
  570 F. Supp. 3d 129 (D.N.J. 2021)................................................................24

*St. Francis Hosp. Ctr. v. Heckler*,
  714 F.2d 872 (7th Cir. 1983).........................................................................23

*United States v. Salerno*,
  481 U.S. 739 (1987) ......................................................................................21

*Whitney v. Heckler*,
  780 F.2d 963 (11th Cir. 1986)........................................................................23

**STATUTES**

21 U.S.C. § 355-1.............................................................................................9

42 U.S.C. § 256b.........................................................................................3, 20

W. Va. Code § 60A-8-6a ..................................8, 11, 12, 13, 16, 17, 20, 25, 26, 27

**OTHER AUTHORITIES**

340B Health,
  *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals: More
  Expected as Growing Number Impose or Tighten 340B Restrictions*
  (July 2023)......................................................................................................8

340B Informed,
  *Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*
  (updated Jan. 13, 2023) .................................................................................4

Am. Hosp. Ass'n,
  *340B Drug Pricing Program: Fact vs. Fiction* (Apr. 2023) ...........................8, 9

Allen Dobson, *et al.*,
  *The Role of 340B Hospitals in Serving Medicaid and Low-Income
  Medicare Patients* (July 10, 2020) ................................................................8, 9

Dobson DaVanzo Health Economics Consulting,
  *West Virginia 340B Hospitals Serve More Patients with Low Incomes,
  Who Live with Disabilities and/or Identify As Black or Hispanic* ......................5

H.R. Rep. No. 102-384(II) (1992) ....................................................................3

Health Res. & Servs. Admin, Off. of Pharmacy Affairs,
   *340B OPA Info. Sys.* (last visited Feb. 27, 2025)....................................................4

Health Res. & Servs. Admin., Release No. 2011 – 1.1,
   Clarification of Non-Discrimination Policy (2012) .............................................19

L&M Policy Research, LLC,
   *Analysis of 340B Disproportionate Share Hospital Services to*
   *Low-Income Patients* (Mar. 12, 2018)...................................................................8

Maya Goldman,
   *Hospital Groups Worry As More Drugmakers Limit 340B*
   *Discounts*, Modern Healthcare (Mar. 25, 2022)....................................................4

Nat'l Ass'n of Cmty. Health Ctrs.,
   *340B: A Critical Program for Health Centers* (June 13, 2022)............................8

**REGULATIONS**

340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary
   Penalties Regulation, 82 Fed. Reg. 1,210 (Jan. 5, 2017)………………………...3

Final Notice Regarding Section 602 of the Veterans Health Care
   Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,113 (May 13, 1994)................19

Health Res. & Servs. Admin.,
   Manufacturer Audit Guidelines and Dispute Resolution Process
   0905–ZA– 19, 61 Fed. Reg, 65,406 (Dec. 12, 1996)................................... 18, 19

Notice Regarding Section 602 of the Veterans Health Care Act of 1992
   Contracted Pharmacy Services, 60 Fed. Reg. 55, 586 (Nov. 1, 1995)..................8

Notice Regarding Section 602 of the Veterans Health Care Act of 1992;
   Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996) .................15

*Amici* include two non-profits with members in West Virginia that receive 340B discounts for drugs that they purchase, many of which are dispensed through contract pharmacies. *Amici* and their members are committed to improving the health of the communities they serve through the delivery of high-quality, efficient, and accessible health care and the discounts provided by the 340B program are essential to achieving this goal. *Amici* therefore have a strong interest in the success of West Virginia legislative efforts to protect the 340B program.

The **American Hospital Association** (AHA) represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations nationwide. AHA members are committed to helping ensure that healthcare is available to and affordable for all Americans. AHA promotes the interests of its members by participating as *amicus curiae* in cases with important and far-ranging consequences for their members, including cases related to the 340B program.

**340B Health** is a national, not-for-profit organization founded in 1993 to advocate for 340B hospitals—a vital part of the nation's healthcare safety net. 340B Health represents over 1,600 public and private nonprofit hospitals and health systems participating in the 340B program.

---

[1]    No party's counsel authored this brief in whole or in part. No one other than *Amici* or their counsel contributed any money to fund its preparation or submission.

## BACKGROUND AND SUMMARY OF ARGUMENT

Almost five years ago, amid a devastating pandemic, multiple drug companies broke with decades of precedent and began to undermine the 340B drug discount program. Under that program, drug companies that participate in Medicaid and Medicare Part B must provide discounts on drugs sold to patients of certain nonprofit or public hospitals and community health centers. *See* 42 U.S.C. § 256b(a)(1)–(4). These discounts, which are based on similar discounts that states receive when purchasing Medicaid drugs, are approximately 23.1% of the average manufacturing price, although the discount can be greater due to an inflation penalty exacted by the federal statute. *See* 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210 (Jan. 5, 2017). Through 340B, Congress sought to allow hospitals and other covered entities "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384(II), at 12 (1992). Without costing the government a dime, these discounts are designed to help hospitals serve more vulnerable patients with more comprehensive care.

Before 2020, drug companies had provided drug pricing discounts to eligible 340B providers for drugs dispensed *both* through in-house pharmacies and community pharmacies with which the providers had contracts. *See Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024) (*PhRMA v. McClain*),

*cert. denied*, ___ S. Ct. ___, No. 24-118, 2024 WL 5011712 (Dec. 9, 2024) ("For 25 years, drug manufacturers . . . distributed 340B drugs to covered entities' contract pharmacies."). But in July 2020, one drug company made an about-face and refused to provide these discounts for drugs if dispensed to 340B patients at community pharmacies (or contract pharmacies).[2] Recognizing an opportunity to boost their own bottom lines, 38 other major drug companies followed suit.[3]

The contract pharmacy arrangements that drug companies honored for almost 30 years have helped sustain 340B providers and their patients. There are two aspects of the 340B program that cannot reasonably be disputed. *First*, the 340B discounted price is established by federal law—not West Virginia's statute. The 340B price of a drug is exactly the same if it is sold to a 340B hospital for delivery to its in-house pharmacy or for delivery to a contract pharmacy. *Second*, pharmaceutical companies must sell 340B drugs to 340B hospitals if the drugs are dispensed to patients by in-hospital pharmacies.

---

[2] *See* Maya Goldman, *Hospital Groups Worry As More Drugmakers Limit 340B Discounts*, Modern Healthcare (Mar. 25, 2022), https://www.modernhealthcare.com/safety-net-hospitals/hospitals-worry-more-drugmakers-limit-340b-discounts.

[3] Collectively, 19 of these companies made more than $660 billion in profits in 2021. *See* 340B Informed, *Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021* (updated Jan. 13, 2023), https://340binformed.org/2023/01/updated-drugmakers-cutting-340b-discounts-reported-record-revenues-in-2021/.

The issue here is whether West Virginia can prohibit pharmaceutical companies from refusing to deliver drugs to pharmacies with which 340B hospitals and other 340B providers have contracts to dispense 340B drugs to 340B patients. The West Virginia statute does not affect the federally-established 340B price, but instead *only* affects where the 340B drugs purchased by the 340B hospital are dispensed to patients. The purchaser of those drugs (typically a 340B hospital) remains the same; the price of those drugs (the 340B price) remains the same; the only difference is the delivery address (*i.e.*, a contract pharmacy or an in-house pharmacy). Put simply, the West Virginia law's only requirement is that drug companies deliver 340B discounted drugs to pharmacies *outside* a 340B hospital for dispensing to 340B patients, under the same terms as they sell those drugs to 340B hospitals with *in-house* pharmacies. Prior to 2020, this same arrangement had been in place for almost 30 years.

Prior to the implementation of contract pharmacy restrictions, discounts on drugs dispensed at community and specialty contract pharmacies made up about one-quarter of overall 340B savings for hospitals participating in 340B. For rural Critical Access Hospitals, savings from partnerships with these pharmacies represented an average of 52% of overall 340B savings.[4] Of the 37 West Virginia

---

[4]    340B Health, *Restrictions on 340B Contract Pharmacy Increase Drug Company Profits but Lead to Lost Savings, Patient Harm, and Substantial Burden for Safety-*

hospitals participating in the 340B drug discount program, 36 contract with at least one community pharmacy.[5]

The drug company restrictions have substantially cut the savings from the 340B program, which is devasting for the very hospitals in West Virginia that provide 86% of all hospital care that is provided to Medicaid patients. As one West Virginia legislator explained, the 340B program "provides a lifeline to rural hospitals and clinics in our state by allowing them to . . . pass that discount on to patients in the form of free or low-cost prescriptions and care for conditions ranging from diabetes to black lung." Several hospitals, including West Virginia University (WVU) Summersville Regional Medical Center, WVU St. Joseph's Hospital, and Boone Memorial Hospital use their 340B savings to provide prescriptions at no cost for those unable to pay.

In addition, hospitals within the WVU system use 340B savings to fund numerous activities, including bedside prescription counseling; a mobile mammography unit; diabetes support groups; and a mobile lung cancer screening unit. But the restrictive drug company policies put these patient-friendly programs at risk. They have caused a whopping $39 million in annual losses to the WVU

_Net Hospitals_ 8, https://www.340bhealth.org/files/Contract_Pharmacy_Survey_Re port_March_2023.pdf.

[5]  Health Res. & Servs. Admin, Off. of Pharmacy Affairs, 340B OPAIS, https://340bopais.hrsa.gov/coveredentitysearch.

hospital system—threatening the viability of its rural hospitals, which rely on community and specialty pharmacies to provide essential medications to patients. These losses will force the reduction or elimination of services across West Virginia, and rural patients will bear the consequences of drug company greed.

Plaintiffs' restrictive policies also threaten hospitals in the Marshall Health Network, like Cabell Huntington Hospital (CHH). As a disproportionate share hospital, CHH predominantly serves low-income patients and provided $149 million in uncompensated care last year—more than double its 340B savings. CHH uses 340B savings for critical programs supporting patients who cannot afford their prescriptions; medication adherence; mothers with substance use disorders; and babies of mothers with substance use disorders.

Contract pharmacy arrangements are especially important because fewer than half of 340B hospitals operate in-house pharmacies. This is why they have relied on contract pharmacies since the beginning of the program. Even fewer—only one in five—have in-house "specialty" pharmacies, which many payers require for the dispensing of "specialty" drugs. These drugs are typically used to treat chronic, serious, or life-threatening conditions, and are generally priced much higher than non-specialty drugs. Thus, 340B hospitals typically must contract with at least one specialty pharmacy to receive the 340B discount for their patients' high-priced specialty drugs.

Savings from contract pharmacy relationships are especially important for another reason: the fragile state of 340B covered entity finances. In stark contrast to the pharmaceutical industry, 340B providers typically operate with razor-thin (and often negative) margins.[6] This is not surprising: 340B covered entities provide a disproportionate amount of uncompensated care to the country's most vulnerable patients.[7] As the Supreme Court recognized, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

Faced with the drug industry's unprecedented assault on West Virginia's health care safety net, the West Virginia legislature responded. By an overwhelming 127/1 vote, it passed a new law, which added a new section to the statute entitled: "Distribution of Safety-Net Drugs to Contract Pharmacies; Penalties and

---

[6]   Am. Hosp. Ass'n, *340B Drug Pricing Program: Fact vs. Fiction* 2 (Apr. 2023), https://www.aha.org/system/files/2018-04/340BFactvsFiction.pdf; Allen Dobson *et al.*, *The Role of 340B Hospitals in Serving Medicaid and Low-Income Medicare Patients* 12–13 (July 10, 2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.10.2020_FINAL_.pdf; Nat'l Ass'n of Cmty. Health Ctrs., *340B: A Critical Program for Health Centers* (June 13, 2022), https://www.nachc.org/wp-content/uploads/2022/06/NACHC-340B-Health-Center-Report_-June-2022-.pdf.

[7]   *See* L&M Policy Research, LLC, *Analysis of 340B Disproportionate Share Hospital Services to Low-Income Patients* 1 (Mar. 12, 2018), https://www.340bhealth.org/files/340B_Report_03132018_FY2015_final.pdf; AHA, *supra* note 11, at 2; Dobson et al., *supra* note 11, at 13–17.

Preemption." *See* W. Va. Code § 60A-8-6a (S.B. 325).[8] This law prohibits manufacturers, wholesale drug distributors, and third-party logistics providers from directly or indirectly denying, restricting, or prohibiting the acquisition of 340B drugs by 340B covered entities for delivery to pharmacies that are authorized by covered entities to receive 340B drugs on their behalf, unless prohibited by the United States Department of Health and Human Services (HHS). *Id.* The act further prohibits manufacturers, wholesale drug distributors, and third-party logistics providers from requiring 340B entities to submit claims or utilization data, unless required by HHS. *Id.* Any violation of this provision is considered an unfair, abusive, or deceptive trade practice, subject to enforcement and penalties under the West Virginia Consumer Protection Act. *Id.*

## ARGUMENT

Appellees seek to halt West Virginia's lawful exercise of its police power to protect public health and safety. This Court should rebuff that effort and reverse the flawed ruling of the district court. *First*, West Virginia's law is not preempted because Congress did not create or occupy any field through its 340B legislation, nor does it conflict with the 340B statute. The district court ruling was based on a fundamental misunderstanding of the 340B statute and program. This Court should

---

[8] The text of the statute can be found at https://www.wvlegislature.gov/Bill_Text_HTML/2024_SESSIONS/RS/bills/sb325%20sub2%20enr.pdf.

reject the district court's flawed analysis and follow the consistent approach of other courts around the country. At bottom, Appellees take the position that whenever Congress creates a detailed federal program, that comprehensiveness wrests traditional police power from the States. That has never been the rule in our federal system. To the contrary, as the Eighth Circuit explained, "[p]harmacy has traditionally been regulated at the state level, and [courts] must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *PhRMA v. McClain*, 95 F.4th at 1144 (citing *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)); *see MacDonald v. Monsanto Co*., 27 F.3d 1021, 1023 (5th Cir. 1994). For this reason, four out of five courts that have considered the issue, including the Eight Circuit, have rejected Appellees' preemption claims regarding materially similar state laws. *See PhRMA v. McClain*, 95 F.4th at 1143–45; *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 747, (S.D. Miss. July 1, 2024), *appeal docketed*, No. 24-60342 (5th Cir. July 9, 2024); *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365, at *8 (S.D. Miss. July 1, 2024) (*PhRMA v. Fitch*), *appeal docketed*, No. 24-60340 (5th Cir. July 5, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-cv-00184-HSO-BWR, 2024 WL 3503965, at *7 (S.D. Miss. July 22, 2024), *appeal docketed*, No. 24-60375 (5th Cir. July 24, 2024); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-cv-00997, 2024 WL 4361597, at *9 (W.D. La. Sept. 30, 2024) (*PhRMA v. Murrill*),

*appeal docketed*, No. 24-30673 (5th Cir. Oct. 21, 2024); *AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-196-LG-BWR, 2024 WL 5345507, at *4–9 (S.D. Miss. Dec. 23, 2024); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881, at *2–5 (E.D. Mo. Feb. 13, 2025). Further, the West Virginia statute is not preempted by federal patent law.

*Second*, AbbVie is unlikely to succeed on the merits of its claim that S.B. 325 violates the Fifth Amendment. Mississippi and Louisiana district courts have both rejected arguments that analogous State statutes effect an unconstitutional taking under the Fifth Amendment, citing the fundamental principle that "[g]overnmental regulation that affects a group's property interests does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *See AbbVie v. Fitch*, 2024 WL 3503965, at *17 (quoting *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991)); *PhRMA v. Murrill*, 2024 WL 4361597, at *14.[9]

## I.   S.B. 325 IS NOT PREEMPTED BY FEDERAL LAW.

"'The purpose of Congress is the ultimate touchstone' of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). In every preemption case, "and

---

[9] Further, for the reasons set forth in Appellants' brief, *see* Appellants' Br. at 85–89, the West Virginia statute does not impose unconstitutionally excessive fines in violation of the Eighth Amendment.

particularly in those in which Congress has 'legislated in a field which the States have traditionally occupied,'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 432 (2002)). Appellees have the burden to show that Congress intended to preempt S.B. 325. *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 661– 62 (2003). Unlike state laws that intrude into uniquely federal areas such as immigration and foreign relations that Appellees have cited during this litigation, S.B. 325 is presumptively *not* preempted.[10] Appellees therefore must demonstrate Congress's "clear and manifest purpose" to supersede West Virginia's historic authority to regulate in the public health arena, *Lohr*, 518 U.S. at 485 (citation omitted), which they cannot do.

### A.    The District Court's Ruling Was Based on Flawed Legal Analysis and a Misunderstanding of the 340B Statute and Program.

The district court's preliminary injunction ruling is based on a flawed interpretation of the federal 340B statute and how the program operates. In addition, that decision not only ignores the presumption against preemption, *Lohr*, 518 U.S. 470 (1996), but it reads at times as if that presumption is reversed. It is telling that

---

[10]  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

the Southern District of Mississippi explicitly rejected the decision's reasoning just a few days later. *AstraZeneca v. Fitch*, 2024 WL 5345507, at *9 (refusing to "disregard mainstream decisions and the Eighth Circuit's ruling in *McClain* without clear precedential support").

The district court erred in several critical respects. *First*, it incorrectly found obstacle preemption, arguing that the State statute "hampers the ability of drug manufacturers to formulate the 'reasonable cause' necessary to conduct an audit," which the manufacturer must do to "access the administrative dispute resolution process." *PhRMA v. Morrissey*, 2024 WL 5147643, at *6 (S.D. W. Va. Dec. 17, 2024). This conclusion flows from a basic misunderstanding of the federal 340B audit process. Under the federal statute, audits may be initiated by HRSA or manufacturers. When manufacturers wish to conduct an audit of a covered entity, they must demonstrate "reasonable cause," defined broadly to mean that a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B) of the PHS Act. *See* 61 Fed. Reg, 65,406, 65,409 (Dec. 12, 1996).

HRSA's guidance and practice confirm that the "reasonable cause" showing that a drug manufacturer must make to obtain authority to audit a covered entity is a modest one. According to long-standing HRSA guidance, manufacturers can satisfy this standard in various ways, including by pointing to "[s]ignificant changes in

quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." 61 Fed. Reg at 65,406. Critically, we are not aware of an instance when HRSA has *ever* required the claims or utilization data that the pharmaceutical companies now demand to initiate an audit. Nor has HRSA ever expected that a manufacturer would have access to claims data until *after* it conducted an audit. Tellingly, Appellees *cannot point to a single instance* of HRSA rejecting a manufacturer's audit plan due to the absence of claims data, and we are aware of none.[11]

The district court's reasoning turns the audit process upside down. There is no role in the audit process for a drug company to require hospitals to *prospectively* turn

---

[11] The district court also relied on an unsubstantiated hypothetical in which a drug company requests purchase data from a covered entity in order to establish "reasonable cause," but the covered entity declines. *PhRMA v. Morrissey*, 2024 WL 5147643, at *6. The district court wrongly concluded from this hypothetical scenario that "[t]he 340B Program certainly did not establish a system where the fox guards the hen house." *Id.* But the district court overlooked the fact that the statute put the Secretary in charge of developing audit procedures to enforce the statute's prohibitions on diversion and duplicate discounts. 42 U.S.C. § 256b(a)(5)(C). To the extent that the district court's hypothetical ever comes to pass, the Secretary, exercising the discretion set forth in the statute, could amend its procedures to allow for a different standard to permit audits. But it never has had to do so because the "reasonable cause" standard is far more modest than the district court believed—or the drug companies would have this Court believe. What's more, the district court ignored the provisions of the 340B statute that impose serious penalties for engaging in "systematic and egregious" diversion, including "removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary." 42 U.S.C. § 256b(d)(2)(B)(v)(II). These penalties provide significant deterrents to obstructing the initiation or conduct of lawful audits.

13

over massive amounts of data as a precondition to receiving 340B discounts. Instead, the purpose of an audit, as established by the 340B statute, is to *retrospectively* measure a covered entity's compliance *after* 340B transactions have occurred. In fact, longstanding HRSA guidance makes clear that "[a] manufacturer may not condition the offer of statutory discounts upon an entity's assurance of compliance with section 340B provisions." Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. at, 25,113; *see* Health Res. & Servs. Admin., Release No. 2011 − 1.1, Clarification of Non-Discrimination Policy (2012) (same). HRSA also specifically stated that drug companies may *not* require hospitals to submit information about "drug acquisition" and "purchase" as a condition for 340B discounts. *Id*. at 25,113-114.[12] That type of "purchase" data is exactly the kind of information the drug companies claim they need to initiate an

---

[12] Although that guidance did allow manufacturers to request "standard information," Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. at 25,113-114, there is nothing "standard" about the current demands. Most important, the term "standard information" must be understood in light of the rest of HRSA's guidance. By explicitly barring demands for "drug acquisition" and "purchase" information, the term "standard information" *cannot* include exactly the kind of data that the drug companies now demand under as necessary to initiate the HRSA-designed audit process. Another especially powerful clue about the meaning of "standard information" is that the purchase data demanded under the rebate policies was not required in 1994 when HRSA issued its guidance, nor have drug companies required it until the summer of 2024. *Amici* respectfully submit that consistent practice for nearly three decades—including at the time when HRSA's guidance was initially provided—should at least count for something in evaluating what is deemed "standard."

audit, but this guidance makes clear HRSA has never allowed them to demand it, let alone required them to have it in order to initiate an audit.

The U.S. Department of Health and Human Services (HHS)'s analysis is precisely the type of agency interpretation that can assist this Court in construing the 340B statute. As the Supreme Court explained in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024), "courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." Here, that responsibility is born by the HHS. What's more, this particular HHS interpretation was "issued contemporaneously with the statute at issue" and has "remained consistent over time." *Id*. It is therefore "especially useful in determining the statute's meaning." *Id*. And, last but not least, the 340B statute "empowers" HHS "to prescribe rules to 'fill up the details'" of the 340B statute's oversight scheme. *Id*. at 395 (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)). Thus, as this Court "exercise[s] independent judgment in determining the meaning of statutory provisions," *id*. at 394, HRSA's well-established position that drug companies cannot condition or withhold 340B discounts on the handover of drug acquisition or purchase data should be given "great weight," *id*. at 388 (internal quotation marks omitted), and "due respect," *id*. at 403; *see id*. at 430 (Gorsuch, J., concurring) ("[T]his Court has also long extended great respect to the contemporaneous and

consistent views of the coordinate branches about the meaning of a statute's term." (quotation marks omitted).[13]

At bottom, for more than thirty years, the same agency that established and oversees the "reasonable cause" standard has taken the position that manufacturers *cannot* condition discounts on 340B compliance and *cannot* demand purchase data from 340B hospitals—exactly what Appellees admit they wish to do in this litigation. It is therefore difficult to understand how the district court concluded that the West Virginia law—which bars such preconditions—is an obstacle to the HRSA's compliance and audit processes.

*Second*, the court below also erred by ruling that the enforcement provision in the state statute is likely preempted. In its view, the West Virginia law would require State actors to determine questions of federal law if a drug manufacturer refuses delivery of a drug to a contract pharmacy when it believes that drug is being diverted

---

[13] *Accord Nat'l Lead Co. v. United States*, 252 U.S. 140, 145–146 (1920) ("[G]reat weight will be given to the contemporaneous construction by department officials, who were called upon to act under the law and to carry its provisions into effect, especially where such construction has been long continued, as it was in this case for almost 40 years before the petition was filed."); *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 549 (1940) ("The Commission and the Wage and Hour Division, as we have said, have both interpreted Section 204(a) as relating solely to safety of operation. In any case such interpretations are entitled to great weight. This is particularly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'") (quoting *Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 315 (1933)).

within the meaning of the federal 340B statute. *PhRMA v. Morrissey*, 2024 WL 5147643, at *7. But under the federal statute, 340B's anti-diversion provisions are enforced either by HRSA directly or in the *post hoc* Alternative Dispute Resolution (ADR) process. 42 U.S.C. §§ 256b(d)(2)(B)(vi) & (3). This is true for delivery of 340B drugs in contract pharmacies *or* in-house hospital pharmacies—any claims of diversion are addressed *after-the-fact* by HRSA or in the ADR process. As such, state laws that require drug companies to deliver drugs to contract pharmacies (on the same terms as they deliver to in-house hospital pharmacies) will never raise questions of diversion since those will be addressed, per the 340B statute, in the federal processes *after* the drugs have been delivered to those contract pharmacies.[14] There is simply no risk of conflicting determinations about diversion because that determination will be made long after 340B drugs are delivered to contract

---

[14] As a factual matter, moreover, the hypothetical posed by the district court whereby a drug company would decline delivery would never come to pass. At the time 340B drugs are delivered (whether to an in-house pharmacy or to a contract pharmacy), drug companies do not have contemporaneous information about the patients who receive the drugs. Thus, manufacturers have no practical ability to deny the 340B discount based on some in-the-moment belief that diversion is occurring. This is true under the replenishment model discussed by the district court because the 340B discount is provided when the pharmacy's stock is replenished with 340B discounted drugs to replace the drugs already distributed to 340B patients. There is no patient information involved in this transaction other than the covered entity's representation that the discount is being provided for drugs distributed to 340B patients.

pharmacies and the narrow legal force of S.B. 325 (*i.e.*, a delivery mandate) has ceased.

*Third*, the district court wrongly concluded that the State statute regulates 340B drug price and not delivery. The court stated that under the replenishment model, "[b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about the delivery of the drug." *PhRMA v. Morrissey*, 2024 WL 5147643, at *8. But this puts form over substance. If a contract pharmacy received each 340B drug at the 340B price and then dispensed the drug, one-by-one, directly to the patient at the contract pharmacy, the court would logically have to conclude that the law does not regulate price because the price was set by the 340B statute. The only difference with the replenishment model is that the drug is dispensed at a contract pharmacy and the pharmacy's inventory is replenished. In both cases, the price is set by federal statute and in neither case is the State law establishing the price.

Put differently, all the West Virginia law is doing is ensuring that drug companies continue to deliver drugs to contract pharmacies, where those drugs can be dispensed to 340B patients on equal terms as if they were delivered to and dispensed at in-house hospital pharmacies. There is no question that 340B drugs may be shipped to hospital pharmacies using the replenishment model. Appellees have never disputed this. All the State law allows for is the hospital to warehouse the drug

at a contract pharmacy using the replenishment model as an inventory management system. Nothing about the price changes; the only thing that changes is the literal delivery address for where the 340B drugs are stored. Thus, by refusing to ship to those contract pharmacies, the drug companies are imposing *delivery* restrictions—namely, they are saying, "We will deliver to your hospital but not your functional warehouse, *i.e.*, the contract pharmacy, where it is easier to get those drugs into the hands of needy patients."

Ultimately, the only impact of state laws like West Virginia's is to ensure that manufacturers deliver 340B drugs purchased by the 340B covered entity at the federally-mandated price, regardless of whether the covered entity is using an in-house pharmacy or an outside pharmacy. This is undoubtedly a question of delivery rather than price. The court below failed to understand this important fact. It is yet another reason why this Court should follow the overwhelming number of courts that have upheld similar State statutes as regulations of drug delivery and reverse that erroneous decision.

*Fourth*, the district court correctly observed that "the Court must identify the federal purpose of the 340B Program" to conduct a proper preemption analysis. *PhRMA v. Morrissey*, 2024 WL 5147643, at *6. But the district court misapprehended the true purpose of the statute. Drawing on language from a congressional report, numerous courts have held that the "program was intended to

19

enable certain hospitals and clinics 'to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" *Am. Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 47 (D.D.C. 2017) (quoting H.R. Rep. No. 102–384(II) at 12 (1992)); *see Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 822 (D.C. Cir. 2020), *rev'd sub nom. Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022) (quoting same language from the House Report); *Genesis Healthcare v. Becerra*, 701 F.Supp.3d 312, 316 (D.S.C. 2023) (same). Thus, while the statute's provisions regarding diversion and duplicate discounts indicate that Congress did not want covered entities to obtain 340B discounts at all costs, those provisions do not create "twin" statutory purposes, as the district court wrongly held. *PhRMA v. Morrissey*, 2024 WL 5147643, at *6. In fact, the same congressional report that so many courts have relied on also makes clear that "in developing [audit] procedures, the Secretary will make every effort to *minimize* the administrative and financial burdens that these audits impose on 'covered entities.'" H.R. Rep. No. 102–384(II) at 17 (1992) (emphasis added). Putting all of this together, these statements make clear that Congress wanted any anti-fraud efforts to interfere *as little as possible* with the statute's true purpose of allowing 340B hospitals to stretch their limited financial resources as far as possible to better serve patients. By failing to understand the actual purpose of the 340B statute, the district court erred as a matter

of law. Indeed, its entire preemption analysis was the fruit of this poisonous misapprehension.

**B.    S.B. 325 Does Not Regulate Drug Pricing and Would Not Be Preempted Even If It Did.**

Further, Novartis is unlikely to succeed in its claim that S.B. 325 is preempted by federal drug laws governing regulatory exclusivity and patent protection periods. The Federal Circuit panel explicitly stated that its holding in *Biotech. Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007) (*BIO I*) did not apply to state regulation that "did not only target patent drugs or did not as significantly or directly undermine the balance of the federal patent right." *See Biotech. Indus. Org. v. Dist. of Columbia*, 505 F.3d 1343, 1348 (Fed. Cir. 2007) (*BIO II*) (Gajarsa, J., concurring in the denial of the petition for rehearing en banc). Here, S.B. 325 is *not* "targeted at the patent [or exclusivity] right," and it does not "appl[y] only to patented drugs" or drugs subject to market exclusivity. *BIO I*, 496 F.3d at 1374. That distinction alone defeats Novartis's patent/exclusivity preemption argument.

*BIO I* also did not hold that States are barred from enacting laws that touch upon patented drugs. *See BIO II*, 505 F.3d at 1346 n.1 (Gajarsa, J., concurring) ("It is well established that states can generally regulate patented products as part of their general exercise of police powers without preemption, even if this regulation incidentally affects the profits a patentee gains from its patent."); *see also Webber v. Virginia*, 103 U.S. 344, 347–48 (1880) ("Congress never intended that the patent

laws should displace the police powers of the States, meaning by that term those powers by which the health, good order, peace, and general welfare of the community are promoted."). Instead, *BIO I* narrowly held that the D.C. penalties for excessive drug prices on patented drugs threatened the "proper balance between innovators' profit and consumer access to medication." 496 F.3d at 1374; *see also BIO II*, 505 F.3d at 1348 (Gajarsa, J., concurring). Here, Congress *already* concluded that 340B pricing appropriately balances "rewards and incentives" for drug companies. *BIO I*, 496 F.3d at 1374.

On its face and in effect, S.B. 325 addresses the "acquisition" by and "delivery" of prescription drugs to contract pharmacies, not their prices. It only requires drug companies to deliver 340B drugs at congressionally-determined 340B prices to contract pharmacies chosen by West Virginia's 340B hospitals. Far from regulating pricing, S.B. 325 merely "incorporates by reference" the independent federal scheme, which West Virginia is free to do. *See Hillsborough Cnty. v. Auto. Med. Labs.*, 471 U.S. 707, 710 (1985); *PhRMA v. McClain*, 95 F.4th at 1145.

Even if Novartis's characterization of S.B. 325 as a pricing statute were correct, federal law still would not preempt West Virginia from imposing its own indirect pricing conditions. There is nothing in the 340B statute to indicate that Congress meant for it to be a regulatory ceiling. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147–48 (1963). In 340B, Congress expressed

*no view whatsoever* on whether States can supplement federal pricing standards through separate regulatory requirements that may indirectly impact drug pricing. *See Hillsborough*, 471 U.S. at 717 ("[M]erely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the field.").

## II. S.B. 325 DOES NOT VIOLATE THE TAKINGS CLAUSE.

AbbVie's claim under the Fifth Amendment's Takings Clause likewise fails because the challenged provision does not constitute a taking. To our knowledge, no court has ever found that there is a property interest subject to Fifth Amendment protection where a healthcare provider or pharmaceutical company is *voluntarily participating* in the government program that it claims is taking its property. In fact, at least ten courts that have considered the issue have found that there is no taking. *Baker Cnty. Med. Servs., Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274, 1276 (11th Cir. 2014), *cert. denied*, 575 U.S. 1008 (2015); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984), *cert. denied*, 469 U.S. 1215 (1985); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993), *cert. denied*, 510 U.S. 821 (1993); *Burditt*, 934 F.2d at 1376; *Whitney v. Heckler*, 780 F.2d 963, 968–73 (11th Cir. 1986), *cert. denied*, 479 U.S. 813 (1986); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983), *cert. denied*, 465 U.S. 1022

(1984); *Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:21-cv-00081-SEB-MJD, 2021 WL 5039566, at \*21 (S.D. Ind. Oct. 29, 2021); *Sanofi-Aventis U.S., LLC v. U.S. Dept. of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 207–10 (D.N.J. 2021), *rev'd on other grounds*, 58 F.4th 696 (3d Cir. 2023); *AbbVie v. Fitch*, 2024 WL 3503965, at \*16–20; *PhRMA v. Murrill*, 2024 WL 4361597, at \*13–15.

This includes four courts that have considered this issue in the 340B context. *Eli Lilly*, 2021 WL 5039566, at \*21; *Sanofi-Aventis*, 570 F. Supp. 3d at 207–10; *AbbVie v. Fitch*, 2024 WL 3503965, at \*16–20; *PhRMA v. Murrill*, 2024 WL 4361597, at \*13–15. In *Eli Lilly*, the court found that the plaintiff's voluntary participation in the 340B Drug Program "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." 2021 WL 5039566, at \*21 (quoting *S.E. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016)). Although withdrawing from the 340B program—and therefore, necessarily, Medicaid and Medicare Part B (because 340B participation is required to participate in these markets)—would "result in a significant financial impact for" Eli Lilly, this consequence was insufficient to find legal compulsion for the purposes of the court's takings analysis. *Id.* Of course, nothing in the West Virginia law prohibits AbbVie from selling drugs to West Virginia hospitals. It simply says that if AbbVie chooses to participate in the federal 340B program, in addition to offering 340B prices to

covered entities with in-house pharmacies, AbbVie must offer 340B prices to covered entities where the covered entities' patients purchase drugs at community pharmacies with which the entities have contracts, as it did for more than 20 years.

## <u>CONCLUSION</u>

For the foregoing reasons and for the reasons set forth in Appellants' Brief, this Court should reverse the judgment of the district court.

Dated: March 4, 2025                Respectfully submitted,

                               */s/ William B. Schultz*
                               William B. Schultz
                               Margaret M. Dotzel
                               Alyssa Howard Card
                               ZUCKERMAN SPAEDER LLP
                               1800 M Street NW, Suite 1000
                               Washington, DC 20036
                               Tel: (202) 778-1800
                               Fax: (202) 822-8106
                               wschultz@zuckerman.com
                               mdotzel@zuckerman.com
                               acard@zuckerman.com

                               *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 4, 2025, the foregoing Brief of American Hospital Association and 340B Health as *Amici Curiae* in Support of Defendants-Appellants was filed electronically and has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure on all registered counsel of record.

*/s/ William B. Schultz*
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(b) because it contains 6,116 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font.

*/s/ William B. Schultz*
William B. Schultz