**No. 25-1054 (L)**

United States Court of Appeals
for the Fourth Circuit

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*Plaintiff - Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,
*Defendants - Appellants*.

On Appeal From The United States District Court
For The Southern District Of West Virginia
CASE NO. 2:24-CV-00271 (Johnston, T.)

**No. 25-1055**

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation; PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,
*Plaintiffs - Appellees*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants - Appellants.*

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
CASE NO. 2:24-CV-00272 (Johnston, T.)

---

**No. 25-1056**

---

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff - Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of

the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants - Appellants*.

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00298 (Johnston, T.)

---

**APPELLEES' BRIEF**

---

TIMOTHY M. MILLER
BABST, CALLAND, CLEMENTS, ZOMNIR, P.C.
300 Summers Street, Suite 1000
Charleston, WV 25301
(681) 205-8888
tmiller@babstcalland.com

PHILIP J. PERRY
ANDREW D. PRINS
ABID R. QURESHI
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Counsel for Plaintiff – Appellee*
*Pharmaceutical Research and Manufacturers of America*

STEVEN R. RUBY
CAREY DOUGLAS KESSLER & RUBY PLLC
707 Virginia Street
901 Chase Tower
Charleston, WV 25301
(304) 345-1234
sruby@cdrklaw.com

MATTHEW S. OWEN, P.C.
MEREDITH M. POHL
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

CARTE P. GOODWIN
BLAKE N. HUMPHREY
FROST BROWN TODD
500 Virginia Street East
Charleston, WV 25301
(304) 345-0111
cgoodwin@fbtlaw.com
bhumphrey@fbtlaw.com

CATHERINE E. STETSON
SUSAN M. COOK
ALEKS SVERDLOV*
MARLAN J. GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com
aleks.sverdlov@hoganlovells.com
marlan.golden@hoganlovells.com

*Not Admitted in D.C.

*Counsel for Plaintiff – Appellee Novartis Pharmaceuticals Corporation*

March 27, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1054L Caption: Pharmaceutical Research & Manufacturers of Am. v. John McCuskey

Pursuant to FRAP 26.1 and Local Rule 26.1,

Pharmaceutical Research & Manufacturers of America
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

See Attachment A.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Philip J. Perry Date: 01/23/2025

Counsel for: Pharmaceutical Research and Manufacturers of America



Print to PDF for Filing

**Attachment A**
**Members of Pharmaceutical Research and Manufacturers of America**

Alkermes plc.

Amgen Inc.

Astellas Pharma

Bayer Corporation

Biogen

BioMarin Pharmaceutical Inc.

Boehringer Ingelheim

Pharmaceuticals, Inc.

Bristol Myers Squibb

CSL

Daiichi Sankyo, Inc.

Eisai Inc.

Eli Lilly and Company

EMD Serono

Genentech

Genmab US, Inc.

Gilead Sciences, Inc.

GlaxoSmithKline

Incyte Corporation

Ipsen Biopharmaceuticals, Inc.

Johnson & Johnson

Lundbeck LLC

Merck & Co., Inc.

Neurocrine Biosciences, Inc.

Novartis Pharmaceuticals Corporation

Novo Nordisk Inc.

Otsuka America Pharmaceutical, Inc.

Pfizer Inc.

Sanofi

Takeda Pharmaceuticals USA, Inc.

UCB

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1054L Caption: Pharmaceutical Research & Manufacturers of Am. v. John McCuskey

Pursuant to FRAP 26.1 and Local Rule 26.1,

AbbVie Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.;
(name of party/amicus)

Pharmacyclics LLC; and Allergan Sales LLC

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☑ YES ☐ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:

Please see attached page.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
If yes, identify all such owners:

AbbVie Inc. is a publicly traded Delaware corporation, and no publicly traded corporation owns 10% or more of AbbVie Inc.'s stock.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew S. Owen Date: 1/30/2025

Counsel for: Appellee



Print to PDF for Filing

**2. Does party/amicus have any parent corporations? If yes, identify all parent corporations, including all generations of parent corporations:**

Allergan, Inc. is 100% owned by Allergan Finance, LLC; Durata Therapeutics, Inc. is 100% owned by Allergan W.C. Holding Inc.; AbbVie Products LLC is 100% owned by AbbVie Inc.; Aptalis Pharma US, Inc. is 100% owned by Allergan Sales, LLC; Pharmacyclics LLC is 100% owned by AbbVie Inc.; Allergan Sales, LLC is 51.8% owned by Allergan Holdings, Inc. and 48.2% owned by Allergan Holdco US, Inc.; and AbbVie Inc. is the ultimate parent of each of the other aforementioned entities.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1056 Caption: Novartis Pharmaceuticals Corporation v. McCuskey et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Novartis Pharmaceuticals Corporation
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☑ YES ☐ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:

Novartis Finance Corporation

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
If yes, identify all such owners:
Novartis AG, as Novartis Pharmaceuticals Corporation is its indirect, wholly owned subsidiary.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO

If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO

If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO

If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO

If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Catherine E. Stetson Date: January 30, 2025

Counsel for: Novartis Pharmaceuticals Corp.



Print to PDF for Filing

## TABLE OF CONTENTS

DISCLOSURE STATEMENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iv

JURISDICTIONAL STATEMENT .......... XIIII

ISSUES PRESENTED .......... XIV

INTRODUCTION .......... 1

STATEMENT OF THE CASE .......... 7

A. The Section 340B Pricing Program. .......... 7

B. Background: Contract Pharmacies. .......... 12

1. HRSA's Contract-Pharmacy Guidance. .......... 12

2. The Product Replenishment Model. .......... 16

3. Manufacturers' Policies And Resulting Litigation. .......... 19

C. The West Virginia Law. .......... 23

D. This Litigation. .......... 25

SUMMARY OF ARGUMENT .......... 29

STANDARD OF REVIEW .......... 31

ARGUMENT .......... 32

I. THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS' PREEMPTION CLAIM IS LIKELY TO SUCCEED. .......... 32

A. S.B. 325's No-Audits Provision, Which Bars Collection Of Claims Data, And S.B. 325's Enforcement Provisions Are Conflict Preempted. .......... 33

1. Congress Designed The 340B Program To Be Exclusively Enforced By The Federal Government. .......... 34

2. S.B. 325's No-Audits Provision Impermissibly Impedes The Use Of The Federal Enforcement Regime. .......... 37

3. S.B. 325's Enforcement Provisions Are Preempted. .......... 44

B. S.B. 325 Is Field Preempted And Its No-Restrictions Provision Conflicts With 340B. .......... 56

1. S.B. 325 Is Field Preempted. .......... 57

2. S.B. 325's No-Restrictions Provision Conflicts With The Federal 340B Program. .......... 62

C. No Presumption Against Preemption Applies. .......... 68

D. *McClain* Does Not Control This Case. .......... 71

**II. ABBVIE'S TAKINGS CLAIM IS ALSO LIKELY TO SUCCEED ON THE MERITS. .......... 74**

A. S.B. 325 Effectuates a Physical Taking. .......... 75

B. S.B. 325's Taking is Coercive. .......... 78

C. S.B. 325's Taking Serves No Public Use. .......... 83

D. Regulatory Takings Does Not Apply, But Even if it Does, AbbVie Prevails. .......... 88

**III. ALL OF S.B. 325'S PROVISIONS FALL TOGETHER. .......... 92**

**IV. THE DISTRICT COURT CORRECTLY FOUND THAT APPELLEES SATISFIED THE REMAINING INJUNCTION FACTORS. .......... 95**

A. Enforcement Of S.B. 325 Would Irreparably Harm Appellees. .......... 95

B. Enjoining S.B. 325 Is In The Public Interest........................98

**CONCLUSION ........................................................................................102**

**REQUEST FOR ORAL ARGUMENT...........................................................103**

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ........................................................................ 99

*AbbVie Inc. v. Fitch*,
2024 WL 3503965 (S.D. Miss. Jul. 22, 2024) ...................................... 72

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................ 83

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) ................................................................ 96

*Arizona v. United States*,
567 U.S. 387 (2012) ............................ 33, 44, 49, 57, 58, 59, 61, 62, 63

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011)
...... 2, 4, 9, 10, 11, 27, 34, 37, 44, 45, 46, 47, 48, 49, 55, 56, 58, 59, 100

*AstraZeneca Pharms. LP v. Becerra*,
543 F. Supp. 3d 47 (D. Del. 2021)................................................. 21, 64

*Bankhead v. Brown*,
25 Iowa 540 (1868) ......................................................................... 87

*Bauer v. Elrich*,
8 F.4th 291 (4th Cir. 2021) ............................................................... 58

*Berman v. Parker*,
348 U.S. 26 (1954) .................................................................... 84, 85

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ........................................................................ 69

*Buckman Co. v. Plaintiff's Legal Comm.*,
531 U.S. 341 (2001) ............................................. 44, 50, 58, 66, 69, 70

*Burditt v. HHS*,
934 F.2d 1362 (5th Cir. 1991) .......... 80

*Calder v. Bull*,
3 U.S. 386 (1798) .......... 74, 84

*Cap. Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984) .......... 46

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .......... 75

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) .......... 98

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .......... 90

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973) .......... 50

*Clayland Farm Enters., LLC v. Talbot Cnty.*,
987 F.3d 346 (4th Cir. 2021) .......... 89

*Columbia Venture, LLC v. Dewberry & Davis, LLC*,
604 F.3d 824 (4th Cir. 2010) .......... 34

*D.A. Realestate Inv., LLC v. City of Norfolk*,
126 F.4th 309 (4th Cir. 2025) .......... 85

*U.S. ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015) .......... 56, 74

*Edelman v. Jordan*,
415 U.S. 651 (1974) .......... 97

*Env't Tech. Council v. Sierra Club*,
98 F.3d 774 (4th Cir. 1996) .......... 92

*Fox v. Washington*,
236 U.S. 273 (1915) .......... 43

*Hammons v. W. Va. Off. of Ins. Comm'r*,
775 S.E.2d 458 (W. Va. 2015) .................................................... 93

*Haw. Hous. Auth. V. Midkiff*,
467 U.S. 229 (1984) .................................................................. 84

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ....................................................... 33, 59, 62

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ...................................................... 76, 77, 81

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) .................................................................. 54

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) .................................................................. 33

*Kelo v. City of New London, Conn.*,
545 U.S. 469 (2005) ...................................................... 84, 85, 86

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) .................................................................. 82

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ...................................................... 96, 98

*Lemke v. Farmers' Grain Co.*,
258 U.S. 50 (1922) .................................................................... 93

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .................................................................. 91

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ............................................................. 76, 91

*Louk v. Cormier*,
622 S.E.2d 788 (W. Va. 2005) .................................................... 92

*Mayor of Balt. v. Azar*,
973 F.3d 258 (4th Cir. 2020) ...................................................... 31

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 32, 60

*Memphis Freight Co. v. City of Memphis*,
44 Tenn. 419 (1867) .......... 87

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
756 F.2d 1048 (4th Cir. 1985) .......... 95

*Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*,
742 F.2d 442 (8th Cir. 1984) .......... 80

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 96

*Moshoures v. City of North Myrtle Beach*,
__ F.4th __, 2025 WL 758025 (4th Cir. Mar. 13, 2025) .......... 43

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) .......... 31

*Myrick v. Prime Ins. Syndicate, Inc.*,
395 F.3d 485 (4th Cir. 2005) .......... 73

*N.L.R.B. v. Nash-Finch Co.*,
404 U.S. 138 (1971) .......... 58

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 31, 98

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987) .......... 80

*Novartis Pharms. Corp. v. Espinosa*,
2021 WL 5161783 (D.D.C. Nov. 5, 2021) .......... 3, 38, 39, 67

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)
.......... 1, 3, 5, 8, 13, 14, 15, 18, 20, 21, 22, 23, 39, 55, 60, 62, 63, 65, 91

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) .......... 75

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......... 88

*PhRMA v. Fitch*,
2024 WL 3277365 (S.D. Miss. July 1, 2024) .......... 40

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024) .......... 71, 72, 73, 74

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014) .......... 32, 53, 54, 62

*Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*,
862 F.3d 433 (4th Cir. 2017) .......... 89

*Rapanos v. United States*,
547 U.S. 715 (2006) .......... 68

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 92

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 57, 70

*Robertson v. Hatcher*,
135 S.E.2d 675 (W. Va. 1964) .......... 92, 93

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020) .......... 95

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .......... 22, 62, 63, 64, 65, 68, 91

*Satellite Broad. And Commc'ns Ass'n v. FCC*,
275 F.3d 337 (4th Cir. 2001) .......... 81

*Sheetz v. Cnty. of El Dorado, Cal.*,
601 U.S. 267 (2024) .......... 82, 83, 86

*Star Sci. Inc. v. Beales*,
278 F.3d 339 (4th Cir. 2002) .......... 85

*State v. Tennant*,
732 S.E.2d 507 (W. Va. 2012) .......... 92, 93

*Teltech Sys., Inc. v. Bryant*,
702 F.3d 232 (5th Cir. 2012) .......... 63

*Thompson v. Consol. Gas Utils. Corp.*,
300 U.S. 55 (1937) .......... 96

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 97

*U.S. Fid. & Guar. Co. v. McKeithen*,
226 F.3d 412 (5th Cir. 2000) .......... 89

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .......... 60

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .......... 70

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) .......... 101

*United States v. Young*,
989 F.3d 253 (4th Cir. 2021) .......... 51

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023) .......... 81

*Vanhorne's Lessee v. Dorrance*,
2 U.S. 304 (C.C.D. Pa. 1795) .......... 87

*Virginia Hosp. & Healthcare Ass'n v. Roberts*,
671 F. Supp. 3d 633 (E.D. Va. 2023) .......... 79, 80

*Whole Woman's Health v. Hellerstedt*,
579 U.S. 582 (2016) .......... 92

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011) .................... 67

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................... 31

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986) .................... 44, 50, 60

*Wos v. E.M.A.*,
568 U.S. 627 (2013) .................... 53

**Constitutional Provisions**

U.S. Const. amend. V .................... 74, 83

U.S. Const. art. VI .................... 32

**Statutes**

38 U.S.C. § 8126 .................... 64

42 U.S.C. § 256b .................... 1

42 U.S.C. § 256b(a) .................... 1, 5, 7, 8, 9, 35, 38, 64

42 U.S.C. § 256b(a)(1) .................... 5, 7, 23, 35, 64, 65

42 U.S.C. § 256b(b) .................... 35

42 U.S.C. § 256b(d) .................... 2, 3, 9, 10, 11, 34, 36, 38, 45, 46

42 U.S.C. § 1320f-2(d) .................... 40

42 U.S.C. § 1320f-3(a) .................... 40

42 U.S.C. § 1396r-8(c) .................... 7

W. VA. CODE § 33-11-1 .................... 44

W. VA. CODE § 33-11-6 .................... 49

W. VA. CODE § 46A-7- 101 .................... 44, 49

W. VA. CODE § 46A-7-101 *et seq* .... 24

W. VA. CODE §60A-6-605 .... 92

W. VA. CODE § 60A-8-6a(a) .... 23, 60, 66, 72

W. VA. CODE § 60A-8-6a(b) .... 2, 6, 23, 24, 37, 51, 59, 72, 76, 77, 78

W. VA. CODE § 60A-8-6a(c) .... 24, 25, 44, 49, 59, 97

**Regulations**

42 C.F.R. § 10.10(b) .... 7

42 C.F.R. § 10.20 .... 12

42 C.F.R. § 10.21 .... 11, 46

42 C.F.R. §§ 10.21-24 .... 12

61 Fed. Reg. 43,549 (Aug. 23, 1996) .... 13, 73, 90

61 Fed. Reg. 65,406 (Dec. 12, 1996) .... 8, 9, 38, 39, 41

75 Fed. Reg. 10,272 (Mar. 5, 2010) .... 13

85 Fed. Reg. 80,632 (Dec. 14, 2020) .... 11

89 Fed. Reg. 28,643 (Apr. 19, 2024) .... 11, 12, 34, 36, 38, 55

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .... 76

1 *Corbin on Contracts* § 1.11 (2023) .... 8

H.R. Rep. No. 102-384, pt. 2, 13 (1992) .... 12

Ilya Somin, *The Grasping Hand* (2015) .... 87

John Locke, *Two Treatises of Government and A Letter Concerning Toleration* .......... 87

S. Rep. No. 102-259 § 2141(b) (1992) .......... 65

William Blackstone, *Commentaries on the Laws of England* (Chicago: University of Chicago Press, 1979 [1765]) .......... 88

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Appellees bring federal constitutional challenges to a West Virginia state law. This Court has appellate jurisdiction over these consolidated appeals from the district court's order granting Appellees' motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). The West Virginia Attorney General timely filed its notices of appeal on January 16, 2025. Appellants therefore noticed their appeals within 30 days of the district court's order of December 17, 2024. Fed. R. App. P. 4.

## ISSUES PRESENTED

Under 42 U.S.C. § 256b, drug manufacturers whose products receive federal reimbursement from the Medicaid and Medicare Part B programs must also agree to "offer" certain drugs at significantly reduced prices to a list of 15 enumerated healthcare providers. What exactly is required in such an "offer" is a question of federal law, and two federal Courts of Appeals have addressed specific types of reasonable conditions drug manufacturers *can* include in their federal offers. Disappointed by those rulings, West Virginia's S.B. 325 now attempts to outlaw the same reasonable "offer" conditions that federal courts expressly permitted manufacturers to make. S.B. 325 thereby forces manufacturers to give highly substantial federal price reductions—often pennies per drug unit—in circumstances where federal law does not require it.

Appellees moved to preliminarily enjoin S.B. 325. In a well-reasoned and thoroughly supported order, the district court granted Appellees' motions. The issues presented are:

1. Whether the district court correctly concluded that S.B. 325 is likely preempted by federal law, where the state outlaws certain manufacturer practices essential for the proper functioning of

the federal program and compels drug sales at significantly reduced pricing in circumstances where federal law does not.

2. Whether Appellees are likely to succeed in showing S.B. 325 compels manufacturers to transfer their products at significantly reduced pricing to private pharmacies for no public use, in violation of the Takings Clause.
3. Whether the district court correctly exercised its discretion in concluding that Appellees face irreparable harm and that the equities factors likewise favor an injunction.

## INTRODUCTION

In 1992, Congress enacted Section 340B of the Public Health Service Act (the "340B Program"), creating a unique form of federal subsidy. *See* 42 U.S.C. § 256b. To participate in and have their products receive federal reimbursements from Medicaid and Medicare Part B, drug manufacturers must sign a federal contract obligating them to "offer" certain drugs to a list of specific types of healthcare providers at radically reduced prices, as low as "a penny per unit." *Id.* § 256b(a)(1), (a)(4); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). Those healthcare providers, known as "covered entities," can then resell those drugs at much higher prices to patients and keep the difference. In most cases, this results in little or no savings to patients or their insurers. *Novartis*, 102 F.4th at 457.

By 2010, a number of disputes arose between covered entities and drug manufacturers about the operation of 340B. In one such dispute, covered entities operated by Santa Clara County brought suit to enforce 340B pricing against drug manufacturers directly rather than bringing that issue to the federal agency that runs the 340B Program, the U.S. Health Resources and Services Administration ("HRSA"), a component of

the Department of Health and Human Services ("HHS"). *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 116-17 (2011). Two things happened. First, Congress stepped in and amended the 340B statute to add detailed administrative enforcement mechanisms—all to be overseen by HRSA, subject to federal court review. 42 U.S.C. § 256b(d). Second, the Supreme Court ruled against Santa Clara County, explaining that the new federal agency administrative enforcement mechanisms were the "proper remedy" for disputes about operation of the 340B Program. *Astra*, 563 U.S. at 119-22. The Court also stressed repeatedly that it was essential for the 340B Program to be administered "harmoniously and on a uniform, nationwide basis" through HRSA. *Id.* at 120.

This case involves *Astra*'s application to West Virginia's Senate Bill 325, W. VA. CODE § 60A-8-6a(b)(2). The district court predicated its preliminary injunction on two grounds, both of which closely follow *Astra*'s reasoning.

The court's opinion first addressed a specific issue: certain individual drug manufacturer "claims data" policies, which West Virginia had expressly outlawed in its legislation. *See* W. VA. CODE § 60A-8-6a(b)(2). Under those claims data policies, a covered entity must, as a

precondition to receiving 340B reduced pricing for 340B-priced drugs delivered to contract pharmacies, agree to provide the manufacturer with "standard information" about those prescriptions to help the manufacturer assess whether 340B pricing is applicable under federal law. *Novartis*, 102 F.4th at 463; *Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *8 (D.D.C. Nov. 5, 2021).

As the district court explained, receiving this information is critical for drug manufacturers to exercise their rights under federal law to seek an audit pursuant to Congress's and HRSA's requirements. JA777-779. And in 2010, Congress made that audit process an *express prerequisite* for a drug manufacturer to seek administrative remedies against covered entities under 340B. 42 U.S.C. § 256b(d)(3)(B)(iv). But to secure the audit, manufacturers need claims data. Thus, S.B. 325's outlawing of "claims data" policies would effectively shut the door to the federal enforcement regime for manufacturers. JA777-779; *Novartis*, 102 F.4th at 463.

The district court then focused on a broader overarching problem: by regulating the price of drugs, S.B. 325 creates a competing enforcement mechanism directly in conflict with the federal enforcement

scheme. As the *Astra* Court explained, Congress created one uniform federal administrative mechanism for resolving disputes about overcharges or other issues under the 340B Program. 563 U.S. at 119-22. Although West Virginia argued that it was merely trying to complement the federal mechanism by regulating only drug delivery and not drug pricing, the court saw through that ruse: "[T]he system is about delivery *at a given price*, not delivery *per se*." JA782-784. Indeed, it is undisputed that West Virginia pharmacies can order and receive drugs at market prices. *See infra* at 51-53. The only genuine issue is whether those pharmacies are entitled to receive drugs at severely reduced 340B pricing.

The State also admitted at argument that S.B. 325 would overlap with the federal program and would necessarily cover many of the same issues. JA781, JA787-788. This overlap, of course, poses exactly the problem the Supreme Court identified in *Astra*. JA790. And in line with *Astra*, the court properly concluded that S.B. 325 addresses the same issues as the federal system and would lead to the same "substantial risk of conflicting adjudications." JA786-788 (internal quotations omitted).

The State's opening brief also demonstrates repeatedly that it does not fully understand how the 340B statute operates. Br. 52-54. Under 42 U.S.C. § 256b(a)(1), a drug manufacturer shall "offer" 340B-priced drugs to covered entities but may impose reasonable conditions on that offer. What conditions are appropriate under that federal "shall offer" provision is solely a question of federal law. And, in *Novartis*, involving one of the Appellees here, the D.C. Circuit explained that the claims data policies, as well as manufacturers' "one contract pharmacy" policies, are *permissible* conditions. 102 F.4th at 460, 462-64. Those permissible conditions define the scope of a drug manufacturer's offer. If covered entities do not accept offers with those specific conditions, *there are no 340B purchases*. 42 U.S.C. § 256b(a)(1).

West Virginia is now attempting to radically *enlarge* the federal program and compel drug manufacturers to provide 340B pricing where federal law does not require it. This would substantially change the careful balance Congress created to encourage manufacturer participation in 340B, as well as other linked healthcare programs. The district court correctly concluded Appellees are likely to succeed on their preemption claims.

AbbVie also argues that S.B. 325 affects an unconstitutional taking of its property, in violation of the Takings Clause. While the district court did not address this ground for relief, this Court should make clear that West Virginia's forced property transfer is inconsistent with fundamental constitutional principles. By compelling AbbVie to accede to the "acquisition of" its products by for-profit pharmacies at below-market prices, W. VA. CODE § 60A-8-6a(b)(1), the West Virginia law effects a taking of AbbVie's property for purely private purposes. This Court should find that AbbVie is likely to succeed on this claim as well.

Finally, the district court also properly concluded that Appellees established irreparable harm and met the remaining criteria for preliminary injunctive relief. JA793-798. As the court found, Appellees would suffer irreparable harm absent relief by being required to provide steeply reduced 340B pricing for drugs and to incur unrecoverable compliance costs. Because West Virginia has no state interest in enforcing an unlawful statute and the preliminary injunction merely preserves the status quo of 340B, the equitable factors for injunctive relief are satisfied.

## Statement of the Case

### A. The Section 340B Pricing Program.

In exchange for participation in Medicare Part B and the federal share of the Medicaid program, the federal 340B statute requires manufacturers to "offer" their products to certain specified "covered entit[ies]," such as federally qualified health centers and rural hospitals, for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1), (4). The statutorily enumerated list of covered entities does not include any third-party, commercial pharmacies. *See id.* The "ceiling price" is set by a statutory formula and results in significant price reductions, ranging from 23.1% to more than *99.9%* of the average manufacturer price for a drug—often requiring that manufacturers sell their medicine for as little as one penny per unit. 42 U.S.C. § 1396r-8(c); 42 C.F.R. § 10.10(b).

Should the covered entity accept the terms of the manufacturer's 340B "offer," it can "purchase" the drugs at or below the ceiling price. 42 U.S.C. § 256b(a)(1). But if the covered entity decides to not "assent to the [offered] terms," *i.e.* not to accept the offer, there is no "purchase" to which

the ceiling price applies. *Novartis*, 102 F.4th at 460 (quoting 1 *Corbin on Contracts* § 1.11 (2023)).

The federal statute imposes several substantive rules that define the obligations of manufacturers and covered entities.

***First***, the statute prohibits covered entities from selling or transferring drugs they purchased at the 340B price to anyone who is not a patient of the entity—often referred to as "diversion." 42 U.S.C. § 256b(a)(5)(B).

***Second***, covered entities may not cause state Medicaid programs to demand rebates from manufacturers on a unit of drug purchased at a 340B price—those are forbidden "duplicate discounts." *Id.* § 256b(a)(5)(A)(i). Otherwise, a manufacturer would be required to provide two pricing reductions on the same product.

***Third***, covered entities must permit both HHS's Secretary and manufacturers to audit their records that directly pertain to the entity's compliance with the prohibitions on diversion and duplicate discounting. *Id.* § 256b(a)(5)(C). Congress specifically instructed the agency to issue procedures for manufacturer audits, which the agency did. *Id.*; 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). Among those requirements, to

initiate an audit, HRSA requires that manufacturers "ha[ve] documentation which indicates that there is reasonable cause" to believe a covered entity violated 340B's prohibitions. *Id.* at 65,409-65,410 (defining "reasonable cause" to mean "that a reasonable person could believe that a covered entity may have violated" 340B). Data regarding the specific prescriptions for which 340B pricing is sought is critical to meet that standard, given HRSA requires manufacturers to submit "sufficient facts and evidence in support" of its belief. *Id.*

By 2010, disputes were brewing between covered entities and drug manufacturers about 340B's operation. At that point, Congress chose how to address those issues: it amended the statute to set forth a detailed and comprehensive process for agency enforcement and dispute resolution. *Astra*, 563 U.S. at 120-22.

The agency can impose civil monetary penalties if a manufacturer is found to have knowingly and intentionally charged a covered entity above the ceiling price. 42 U.S.C. § 256b(d)(1)(B)(vi). HHS may also sanction covered entities for diversion and duplicate discounting. *Id.* §§ 256b(a)(5)(D), (d)(2)(B)(v).

HHS's enforcement authority is exclusive, with review only by federal courts. *Astra*, 563 U.S. at 117; 42 U.S.C. § 256b(d)(3)(C). In *Astra*, the Supreme Court held that, by vesting enforcement authority solely in HHS, Congress impliedly withheld from covered entities a private right of action to enforce the 340B Program's requirements against manufacturers. 563 U.S. at 117. "[S]preading the enforcement burden" of the 340B Program "is hardly what Congress contemplated when it 'centralized enforcement in the government,'" the Court explained. *Id.* at 119. Rather, "Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program" because "the interdependent nature of the two programs' requirements means that an adjudication of rights under one program must proceed with an eye towards any implications for the other." *Id.* at 120. Thus, auxiliary enforcement mechanisms beyond those contemplated in the statute would "undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* Congress's 2010 amendments instead set forth the "proper remedy" for resolving disputes regarding the operation of 340B, including disputes

about "overcharges and other violations." *Id.* at 119-22; 42 U.S.C. § 256b(d).

HRSA can, of course, itself initiate enforcement under the statute, but Congress also provided mechanisms for both manufacturers and covered entities to seek relief. To adjudicate disputes between covered entities and manufacturers, the 340B statute required HRSA to create and administer a formal proceeding referred to as Administrative Dispute Resolution ("ADR"). Before initiating ADR, parties must first engage in a "good faith" conferral process. 42 U.S.C. § 256b(d)(1)(B)(i)(IV). If the good-faith conferral process does not work, the next step for a manufacturer or covered entity is to ask HRSA to enforce the statute or proceed through ADR. 85 Fed. Reg. 80,632, 80,638 (Dec. 14, 2020). Covered entities may initiate an ADR proceeding without first performing an audit. But to utilize ADR, manufacturers are required to first audit a covered entity, which requires the evidence discussed above. *See supra* at 2-3.

HRSA recently finalized a new ADR Rule fleshing out the details of the statutory dispute resolution process. 89 Fed. Reg. 28,643 (Apr. 19, 2024). That rule sets out a process for initiating claims, 42 C.F.R.

§§ 10.21(b), (d), describes the types of claims permitted, *id.* § 10.21(a), establishes an "ADR Panel" to adjudicate claims, 42 C.F.R. § 10.20, and lays out specific procedures that the ADR Panel will follow, 42 C.F.R. §§ 10.21-24. This ADR process includes, among other things, "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, *including claims that a manufacturer has limited the covered entity's ability to purchase* [the] drugs at or below the 340B ceiling price." 89 Fed. Reg. at 28,657 (emphasis added). According to HRSA regulations, the ADR process extends to the same types of disputes about manufacturer limits on 340B drug purchases that West Virginia enacted S.B. 325 to address. Indeed, covered entities have used this federal statutory ADR process on multiple occasions to raise the same types of contract pharmacy disputes at issue in this case. *See, e.g.*, JA092-106; JA108-117.

### B. Background: Contract Pharmacies.

#### 1. HRSA's Contract-Pharmacy Guidance.

At its outset, Congress anticipated that 340B would be small in scope, only applying to 90 hospitals and a small range of clinics and health centers. H.R. Rep. No. 102-384, pt. 2, 13 (1992). In 1996, HRSA

began to expand the Program, issuing guidance opining that covered entities lacking an in-house dispensing pharmacy could contract with a *single* outside pharmacy to dispense 340B-priced drugs to their patients. 61 Fed. Reg. 43,549, 43,550-43,555 (Aug. 23, 1996). But to avoid unlawful diversion, HRSA specified that the outside contract pharmacy would operate like an in-house pharmacy for the covered entity's patients: the covered entity would still set the drug prices, maintain title to the drugs, and form an agency relationship with the pharmacy. And, to ensure patient eligibility, the pharmacy would verify, at the time of dispensing, that the patient prescription originated from the covered entity and truly qualified for 340B pricing. *Id.* at 43,555. The 340B Program proceeded in this fashion for nearly a decade and a half. *Novartis*, 102 F.4th at 457.

The status quo changed in 2010. HRSA released new guidance that purported to permit *all* covered entities—even those with their own in-house pharmacy—to contract with an *unlimited* number of contract pharmacies, rather than just one local pharmacy. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010). But HRSA still maintained certain of its anti-diversion requirements—including that the covered entities retain title to the drugs. *Id.* at 10,277-10,278.

Over the following decade, the number of contract pharmacies exploded from about 1,300 to more than 23,000. *Novartis*, 102 F.4th at 457. The monetary value of supposed 340B prescriptions skyrocketed too. Multiple studies by governmental watchdogs have found accompanying abuse. When covered entities' in-house pharmacies dispense 340B-priced drugs, they are almost guaranteed to dispense drugs to their patients. Not so with contract pharmacies, which serve both covered entities' patients and other consumers. *Examining Oversight Reports on the 340B Drug Pricing Program* at 7-13, 115th Cong. 11 (2018) (statement of Assistant Inspector Gen., OIG), available at https://www.govinfo.gov/content/pkg/CHRG-115shrg30195/pdf/CHRG-115shrg30195.pdf. In one government study, contract pharmacies accounted for nearly two-thirds of the violations for unlawful diversion (*i.e.*, unauthorized resales or transfers) of 340B-priced drugs uncovered by HRSA. JA588.

By 2022, two of the nation's largest pharmacy chains publicly reported that revenue from the 340B Program had become material to their multi-billion-dollar bottom lines. *See* CVS Pharmacy 10-K (2022), at 22, available at https://tinyurl.com/mrykrxj8 (explaining that a

reduction in contract pharmacy arrangements "could materially and adversely affect the Company"); Walgreens, Inc. 10-K (2022), at 29, available at https://tinyurl.com/4ks6mf3s (similar). Congress, of course, never intended the 340B Program to help *for-profit pharmacy chains*; but this is what happened. *Novartis*, 102 F.4th at 457-59 (noting that covered entities, contract pharmacies, and third-party administrators "often divvy up the spread" and have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount"); JA674.

Because contract pharmacies are not a part of the 340B Program (because they are not among the statutorily enumerated eligible entities), their relationship to covered entities is governed entirely by contract. These contracts provide that the covered entities will "pay flat fees [to the contract pharmacies] for each eligible 340B prescription." JA569. "[F]lat fees range[] from $0 to $1,750 per eligible 340B prescription." JA570 (n.39). Some contracts also "require[] the covered entity to pay the contract pharmacy a fee based on a percentage of revenue generated for each 340B prescription." JA569.

### 2. The Product Replenishment Model.

Over time, the amount of 340B-priced drug purchases has grown exponentially, by almost $50 billion since 2009, reaching $54 billion in 2022. *See* Adam J. Fein, The 340B Program Reached $54 Billion in 2022 – Up 22% vs. 2021, Drug Channels (Sept. 24, 2023), available at https://tinyurl.com/2nrux6et. One reason for that is the prevailing "product replenishment model." At 340B's beginning, virtually all contract pharmacies maintained a separate, segregated stock of 340B-priced drugs over which the covered entity maintained title, and the pharmacy dispensed to the covered entity's patients on its behalf. Practices have evolved since. Now, in most contract pharmacy arrangements, 340B-priced drugs are mixed with the pharmacy's general inventory and title transfers to the pharmacy. JA259-261 (¶¶ 6-12); JA302 (¶ 11); JA448-452; JA716-717.

Today, most contract pharmacies, including in West Virginia, operate under the product replenishment model. *E.g.*, JA259-260 (¶ 7); JA299-302 (¶¶ 3-11). Under this model, the contract pharmacy fills all prescriptions using its own inventory (which comprises co-mingled drugs purchased at the commercial price and the 340B price) to dispense to all

individuals at the point-of-sale. The pharmacist does not determine at the point-of-purchase whether the individual receiving the drug is a patient of a covered entity or not—meaning that covered-entity patients almost never receive a lower price. Only later does the pharmacy (with the help of its financially interested "third-party vendor or administrator") determine through a black-box algorithm which dispenses *might* have been to patients of the covered entity. JA259-260 (¶ 7); JA300 (¶¶ 4-6); JA632-634 (¶¶ 6a-d); JA769-770 (District Court Order). The covered entity then treats that dispense, retroactively, as a 340B-eligible drug.

The covered entity then engages in an elaborate accounting fiction designed to retroactively claim 340B pricing on the earlier transaction. Once sufficient eligible dispenses for a particular drug accumulate under the algorithm, the covered entity orders additional quantities of that drug at the 340B price and asks that they be delivered to the contract pharmacy. JA259-260 (¶ 7); JA299-302 (¶¶ 3-11). Typically, the contract pharmacy or its third-party administrator attempts to place the order using the covered entity's account, and sometimes without the covered entity's knowledge. JA261 (¶¶ 12-13). Those additional units—

purchased at the 340B price—are then placed on the shelf at the pharmacy along with commercially purchased units, and dispensed to any customer who walks in the door—340B-eligible or not. JA302 (¶ 11).

This black-box product-replenishment practice is responsible for a significant uptick in program abuse. The HHS Office of Inspector General has found that contract-pharmacy arrangements create a greater risk of 340B-priced drugs being dispensed to customers who are not patients of covered entities. HHS Office of Inspector General, OEI-05-13-00431, Mem. Report: *Contract Pharmacy Arrangements in the 340B Program* (2014), at 1-2, available at https://tinyurl.com/y5rz5nxj. That is because the contract pharmacies' 340B criteria used for the algorithm are often materially overinclusive. JA259-260 (¶ 7); JA633 (¶ 6b). This enables the covered entity and its pharmacies to maximize their arbitrage profits. Indeed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate" and thus each actor "has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58. Importantly, contract pharmacies often take title to the 340B drugs, and

do not maintain an agency relationship with covered entities. JA259, JA261-262 (¶¶ 6, 11, 14, 16).

Nor has the contract pharmacy explosion resulted in increased care to low-income or vulnerable patients or lower costs for patients. Among the 340B hospitals surveyed by the U.S. Government Accountability Office, a vast number of covered entities admit that they do not pass on *any* 340B reduced pricing to patients at contract pharmacies—and others admit that they do so only rarely. JA579; JA328. Indeed, industry experts have observed that these patients scarcely benefit from expansions in the 340B Program and many patients see no real benefit at all. JA341; JA441. There is also evidence that a majority of 340B hospitals provide less charity care, on average, than ordinary hospitals. JA385-388; JA415.

### 3. Manufacturers' Policies And Resulting Litigation.

Beginning in 2020, drug manufacturers independently began to adopt contract-pharmacy policies to protect against growing abuses. These policies constitute material terms of the 340B "offer" manufacturers make to covered entities under federal law. For example,

a PhRMA member's offer to sell 340B-priced drugs includes a claims data requirement. JA083. Unless an exception is made, a covered entity must agree to provide that claims data for the member to sell and ship drugs to multiple contract pharmacies. *Id.*

AbbVie's current policy continues to offer covered entities unlimited 340B drugs at or below the ceiling price. JA277-278. But AbbVie will not provide 340B-priced drugs to unlimited, third-party contract pharmacies that serve hospital-type covered entities. JA277. Instead, consistent with HRSA's 1996 Guidelines, AbbVie permits 340B orders from one contract pharmacy location if the hospital covered entity lacks an in-house pharmacy and the contract pharmacy is located within 40 miles of the covered entity. JA277. Federal grantees are excepted from this policy. JA278. If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative. JA277. That policy satisfies AbbVie's statutory obligation to "offer" its drugs to covered entities on reasonable terms. *Novartis*, 102 F.4th at 464.

Under Novartis's current 340B policy, covered entities are allowed to purchase 340B-priced drugs for dispensing at their in-house

pharmacies. If a covered entity lacks an in-house pharmacy, it may select one contract pharmacy where Novartis will deliver drugs at 340B pricing. Novartis also requires covered entities to provide basic claims data relating to their contract pharmacy purchases in order to mitigate instances of duplicative discounts, increase transparency, and help bolster the integrity and sustainability of the 340B program. Federal grantees are exempt from these restrictions, which are fully compliant with federal 340B law. *Id.* at 463-64.

In December 2020, HHS issued an Advisory Opinion declaring that Section 340B requires manufacturers to transfer 340B-priced drugs to an unlimited number of contract pharmacies. HHS, Ofc. of the Gen. Counsel, Advisory Opinion 20-06 on Contract Pharmacies under the 340B Program (Dec. 30, 2020), at 3, available at https://tinyurl.com/kpbjk89a. A few months later, the government began sending violation letters to manufacturers with contract-pharmacy policies, stating such policies resulted in "overcharges." The 2020 Advisory Opinion was ultimately withdrawn after a federal district court held it unlawful. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp.

3d 47 (D. Del. 2021); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).

Since then, both the Third Circuit and the D.C. Circuit have broadly upheld manufacturers' contract-pharmacy policies as lawful and consistent with the 340B statute. *Sanofi*, 58 F.4th at 704, 707 ("Congress never said that drug makers must deliver discounted Section 340B drugs to an unlimited number of contract pharmacies."); *Novartis*, 102 F.4th at 464 ("[S]ection 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities"). These decisions did not recognize, as West Virginia argues, that Section 340B "leave[s] room" for states to impose their own delivery regulations. Br. 18-20. Instead, they concluded that Section 340B's "silence" about delivery conditions "preserves … the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460 ("[S]tatutory silence implies that private parties may act freely."). More importantly, in Section 4 of its opinion, the *Novartis* court analyzed two specific manufacturer conditions, a "claims data" condition and a "one contract pharmacy" condition. *Id.* at 463-64. Both conditions, the court held, were reasonable manufacturer limitations on a federal 340B offer,

consistent with Congress's statutory text. *Id.* (holding that neither condition keeps a manufacturer from making a "'bona fide' offer" and that the restrictions are "consistent with historic practices under the section 340B program"). Thus, as these courts held, a drug manufacturer may properly limit its federal law obligation to offer 340B pricing with either a claims data policy or a one contract pharmacy policy.

**C. The West Virginia Law.**

In March 2024, West Virginia's governor signed into law Senate Bill 325—codified as West Virginia Code Section 60A-8-6a. S.B. 325 has three interrelated features: the No-Restrictions Provision, the No-Audits Provision, and the Enforcement Provisions.

*First*, the No-Restrictions Provision states that manufacturers of 340B-eligible drugs "shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug…." W. VA. CODE § 60A-8-6a(b)(1). The phrase "340B drug" is defined by reference to its price—*i.e.*, whether the drug has been "subject to any offer for reduced prices" under Section 340B. *Id.* § 60A-8-6a(a)(1)(B) (citing 42 U.S.C. § 256b(a)(1)). Thus, the defining feature of the statute is the *price*

at which manufacturers must provide such access. It is undisputed that pharmacies otherwise have access to Appellees' products at commercial prices and that Appellees will deliver their products to pharmacies when ordered at such rates. The question, therefore, is not one of pharmacy or patient access, but solely of the price charged to the covered entity and/or contract pharmacy.

*Second*, under S.B. 325's No-Audits Provision, manufacturers may not "require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by [HHS]." *Id.* § 60A-8-6a(b)(2). Put differently, manufacturers may not require information regarding the dispensing of 340B drugs as a condition of sale, even to enable them to utilize their federal statutory rights to protect against improper duplicate discounts and diversion of 340B drugs.

*Third*, the Enforcement Provisions provide that any violation of the two other provisions constitutes an unfair or deceptive act subject to the full enforcement power of the Attorney General, including investigative demands and civil penalties. Id. §§ 60A-8-6a(c)(1)(A); W. VA. CODE § 46A-

7-101 *et seq*. Manufacturers also face "a civil penalty of **$50,000 *per each violation***." W. VA. CODE § 60A-8-6a(c)(1)(A) (emphasis added). And per Section 60A-8-6a(c)(2), "[e]ach package of 340B drugs determined to be subject to a prohibited act . . . constitutes a separate violation." The law further empowers both the West Virginia Insurance Commissioner and the West Virginia Board of Pharmacy to discipline violators, impose additional penalties, and revoke business licenses. *Id.* §§ 60A-8-6a(c)(1)(B), 60A-8-6a(c)(3).

### D. This Litigation.

AbbVie, Novartis, and PhRMA each filed suit in May and June 2024, challenging S.B. 325's constitutionality on several grounds and separately moving for a preliminary injunction. The district court consolidated the challenges for purposes of its ruling.

Below, Appellees advanced a series of related but distinct theories. All Appellees argued that S.B. 325 is field- and conflict-preempted by the federal 340B Program. AbbVie additionally argued that S.B. 325 effectuates an unconstitutional taking.

In December, the district court issued an opinion and order granting Appellees' motions and enjoining enforcement of S.B. 325

against Appellees. JA766. The district court focused on two aspects of S.B. 325—the No-Audits Provision and the Enforcement Provisions.

The Court first found that the No-Audits Provision created an obstacle to "twin federal purposes" at the heart of Section 340B—"providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts." JA777. While gathering evidence of potential fraud serves as a "condition precedent" before any drug manufacturer can utilize the federal ADR system, S.B. 325 "clearly restricts such a condition from being met" by directly frustrating manufacturers' ability to collect that very data. JA778. While the State suggested that other "lawful means" were available to access the data, the court noted that they could "offer no alternatives" for drug manufacturers to do so, and by extension precluded them from being able to "formulate the 'reasonable cause' necessary to conduct an audit in the first place." JA778-779. By creating a system "where the fox guards the hen house," the court found that S.B. 325 "creates an impermissible obstacle to executing the federal program." JA779.

Next the court considered the S.B. 325's Enforcement Provisions and concluded that they, too, are preempted. The court addressed the

underlying question of whether S.B. 325 regulates price or delivery. Its conclusion was emphatic: S.B. 325 regulates the "price the pharmacy and the covered entity will pay the manufacturer" for replenishment product. JA783. As such, S.B. 325 "operates as a means to enforce the 340B ceiling price." JA783-784. This in turn means that S.B. 325 runs headlong into *Astra*, which found that 340B price regulation is exclusively controlled by federal law and "attempts to enforce" those federal price regulations through other laws "necessarily intrude[s] on the federal scheme." JA787. As one example of conflict, the district court highlighted the real possibility that West Virginia's enforcement of S.B. 325 would result in different state and federal adjudications of Section 340B's requirements, including diversion prohibitions. That prospect "cuts against Congress's vision of 'centralized enforcement'" and "present[s] an obstacle to this centralized purpose." JA787-788.

Having found that Appellees were likely to succeed on the merits of their preemption challenges to the No-Audits and Enforcement Provisions, the court declined to address Appellees' remaining arguments challenging the law's other aspects. JA790-792. Finding the No-Audits

and Enforcement Provisions non-severable, the court concluded that the entire law was likely unconstitutional.

The court found that the remaining equitable factors also weighed in favor of enjoining S.B. 325. As to irreparable harm, the court highlighted the "unrecoverable financial losses" Appellants would face should S.B. 325 be enforced against them. JA793-796. Finally, the court found that the final two factors—balance of the equities and the public interest—also tip in Appellees' favor. JA797-798.

Appellants ask this Court to reverse the reasoned judgment of the district court. This Court should decline the invitation.

## SUMMARY OF ARGUMENT

The district court correctly granted Appellees' motions to preliminarily enjoin S.B. 325. Appellees are likely to succeed on the merits because the law offends the Constitution in multiple ways. And the equitable factors all cut in Appellees' favor, as the district court rightfully concluded.

S.B. 325 offends the Supremacy Clause because it thrusts West Virginia into the middle of a complex and unified federal healthcare regime and meddles with the substantive rules and enforcement mechanisms that Congress created to govern it. S.B. 325 also improperly conflicts with Congress's purposes: It vastly expands the scope of manufacturers' obligations (including by mandating the federal ceiling price under terms and conditions not required under federal law), thus skewing the balance Congress struck, and upending the exclusive enforcement regime Congress designed.

S.B. 325 also works a physical taking because it coerces manufacturers to transfer their drugs to both covered entities and for-profit commercial pharmacies, against their will, under conditions Congress has not prescribed in the 340B Program. A manufacturer's

conscription into West Virginia's law is not rendered voluntary by virtue of that manufacturer's participation in federal healthcare programs. Neither does S.B. 325 accurately aim at any public use or public purpose, as the Fifth Amendment requires. And even if there is no physical taking here, S.B. 325 constitutes an impermissible regulatory taking.

The district court found that Appellees will suffer irreparable constitutional and financial harms if forced to comply with S.B. 325 and that the public interest would not be disserved by enjoining S.B. 325 because an unconstitutional law is never in the interest of the State or the public. These findings are well supported by the record and should be affirmed.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019). Under that "deferential standard," this Court should affirm unless the district court made a "clear error in factual findings or a mistake of law." *Id.*

Plaintiffs are entitled to a preliminary injunction if they can establish that (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) the public interest favors an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the State is the opposing party, factors three and four merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Although the district court did not address all of Appellees' alternative grounds for relief, this Court may affirm on any ground supported by the record. *Mayor of Balt. v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (en banc).

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS' PREEMPTION CLAIM IS LIKELY TO SUCCEED.

Under the Constitution's Supremacy Clause, federal law is "the supreme law of the Land." U.S. Const. art. VI. And because federal law is supreme, Congress must be left to exercise its constitutional power unencumbered by the states. *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819). Federal law thus preempts any state law that intrudes on an exclusively federal field or otherwise obstructs Congress's purposes. *See, e.g.*, *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474, 478 (4th Cir. 2014).

The district court concluded that Appellees are likely to succeed in showing that S.B. 325 is preempted in at least two ways. First, by restricting manufacturers from gathering claims data from covered entities as a condition for obtaining 340B-priced drugs, the No Audits Provision presents an impermissible obstacle to the twin purposes of Section 340B: ensuring covered entities' access to low-cost drugs and guarding against abuse. JA774-779. Second, the law's Enforcement Provisions likewise stand as obstacles to Section 340B's purposes by

usurping HRSA's exclusive enforcement authority and raising the prospect of conflicting state and federal adjudications of manufacturers' obligations under Section 340B. JA780-790. These conclusions are well supported by the text of S.B. 325, the record, and controlling precedent and should be affirmed. In addition to those well-supported bases, there are several other grounds under which S.B. 325 is preempted. *See infra* § I.B.

### A. S.B. 325's No-Audits Provision, Which Bars Collection Of Claims Data, And S.B. 325's Enforcement Provisions Are Conflict Preempted.

The district court correctly held that S.B. 325's No-Audits and Enforcement Provisions are conflict preempted. A state law is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)), or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"). "A decision about [obstacle

preemption] requires the court independently to consider national interests and their putative conflict with state interests." *Columbia Venture, LLC v. Dewberry & Davis, LLC,* 604 F.3d 824, 830 (4th Cir. 2010).

As the district court cogently explained, the Supreme Court has already expounded on the exclusive enforcement authority Congress provided over 340B and *why* that unitary control is necessary. JA780-789. S.B. 325 flies in the face of those conclusions, and the district court rightfully held that its No-Audits and Enforcement Provisions are conflict preempted.

#### 1. Congress Designed The 340B Program To Be Exclusively Enforced By The Federal Government.

In 340B, Congress created a comprehensive federal scheme for delivering a unique federal benefit to certain entities, centralized enforcement of the scheme exclusively in HHS, and made the provisions of 42 U.S.C. § 256b(d) the "proper remedy" for Program disputes. *See Astra*, 563 U.S. at 110, 119-22; *see also* 89 Fed. Reg. at 28,649.

340B works through a carefully calibrated structure. It obligates participating pharmaceutical manufacturers to offer certain drugs to

covered entities at or below the statute's ceiling price and provides that reduced price should covered entities accept the offer. 42 U.S.C. § 256b(a)(1). Congress and HHS have implemented that obligation through a detailed set of statutory provisions, rules, and guidance documents. Together those rules incentivize manufacturers' participation in 340B without becoming so onerous that manufacturers are motivated to withdraw from both 340B and other federal programs. And unlike Medicaid, which expressly invites states to participate in its administration, nowhere does Section 340B authorize supplemental state regulations.

The Program's substantive rules specify what manufacturers must do, *i.e.* "offer" 340B-priced drugs with permissible conditions, *id.* § 256b(a)(1); what drugs are covered by the Program, *id.* § 256b(b)(2)(A); the prices manufacturers must offer, *id.* § 256b(a)(1)-(2); the specific types of entities to whom manufacturers must make the offer, *id.* § 256b(a)(4); and the legal requirements that attach to covered entities—including prohibitions against duplicate discounting and diversion, and the obligation to permit audits, *id.* § 256b(a)(5)(A)-(C). Thus, while obligating manufacturers to offer specific drugs at specific prices to

enumerated covered entities, the Program also limits manufacturers' obligations by requiring them to make only a "bona fide" offer—thus preserving for them the freedom and flexibility to impose reasonable terms.

Given the balance required, Congress centralized the Program's administration and enforcement. Congress granted the federal government exclusive authority to monitor compliance, with review by federal courts, and provided it with compliance mechanisms such as civil monetary penalties that "shall not exceed $5,000 for each instance of overcharging," when knowing and intentional, and expulsion from the Program. *See id.* § 256b(d). Congress also instructed HHS to create an ADR process for disputes between covered entities and manufacturers regarding diversion, duplicate discounting, and overcharges. *Id.* § 256b(d)(3). HRSA responded to those instructions in April 2024, implementing an ADR process. 89 Fed. Reg. 28,643 (Apr. 19, 2024); *id.* at 28,657 (providing that ADR includes "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, *including claims that a manufacturer has limited the covered entity's*

*ability to purchase* [the] drugs at or below the 340B ceiling price" (emphasis added)).

As the Supreme Court recognized, centralized administration and enforcement are necessary to ensure that the 340B Program is run "harmoniously and on a uniform, nationwide basis." 563 U.S. at 120. If the federal government does not keep the "control rein, the risk of conflicting adjudications would be substantial." *Id.* at 119-21. And the range of remedies for a violation was carefully calibrated to incentivize compliance without driving manufacturers away from participation in Medicaid and Medicare Part B.

#### 2. S.B. 325's No-Audits Provision Impermissibly Impedes The Use Of The Federal Enforcement Regime.

Against that backdrop, the district court first considered S.B. 325's No-Audits Provision, which bars manufacturers from "directly or indirectly" requiring a covered entity or a contract pharmacy "to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to," it "unless the claims or utilization data sharing is required by the United States Department of Health and Human Services." W. VA. CODE § 60A-8-6a(b)(2). That

provision clearly limits claims level data necessary to uncover statutorily prohibited diversion and duplicate discounting by covered entities and to utilize the federal ADR process. *See* 42 U.S.C. § 256b(d)(3). The district court thus correctly concluded that the No-Audits Provision was conflict preempted because "it stands as an obstacle to achieving the federal objective of preventing fraud in the 340B Program." JA779.

The statutory details are important. Claims data allows manufacturers to detect instances of diversion and duplicate discounting, for resolution via ADR. By limiting claims data collection, S.B. 325 frustrates that federal process. To use ADR, manufacturers must first audit a covered entity. *See* 42 U.S.C. § 256b(a)(5)(C), (d)(3). Congress required that HRSA set procedures for audits, and HRSA audit guidance permits manufacturers to conduct an audit only where they "ha[ve] documentation which indicates there is reasonable cause" to believe a covered entity violated 340B's prohibitions. 61 Fed. Reg. at 65,409; 89 Fed. Reg. at 28,644 (stating "manufacturers are required to audit a covered entity prior to filing an ADR claim"); *see also Novartis*, 2021 WL 5161783, at *7. "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the

prohibition on transfer or sale, or the prohibition on duplicate discounting. 61 Fed. Reg. at 65,409-10 (stating a manufacturer "must set forth a clear description of why it has reasonable cause … along with sufficient facts and evidence in support of the belief").

Accordingly, to access the audit process, manufacturers must first be able to gather information to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions—access that S.B. 325 cuts off. *See Novartis*, 102 F.4th at 463-64; *Novartis*, 2021 WL 5161783, at *8 (explaining that United Therapeutics "convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B"). To that end, manufacturers, including members of PhRMA, have conditioned their delivery of 340B-priced drugs to contract pharmacies on agreement to provide claims data for 340B-priced drugs. JA082-083, 086.

The court correctly concluded that S.B. 325's bar on these policies is preempted because it "create[s] an obstacle to twin federal purposes—providing discounts to covered entities only and prohibiting fraud

through duplicate discounts." JA777. After all, "[b]y restricting the very method by which data collection is made, S.B. 325 frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the alternative dispute resolution system." JA778.[1] In short, the No-Audits Provision seeks to close the door to manufacturers' statutory rights to audit and bring ADR proceedings against covered entities.[2]

---

[1] The U.S. District Court for the Southern District of Mississippi concluded that Mississippi's 340B law should be construed to avoid a conflict and not prohibit claims data collection. *PhRMA v. Fitch*, 2024 WL 3277365, at *10 (S.D. Miss. July 1, 2024). Likewise, numerous states, including Maryland, have seemingly recognized this conflict and contended their statutes should be construed as not covering claims data. *See* Mississippi Br. at 32, *PhRMA v. Fitch*, No. 24-60340 (5th Cir. Nov. 8, 2024), ECF No. 40; Maryland Br. at 29, *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. July 2, 2024), ECF No. 19-1.

[2] Restricting manufacturers' access to claims data also runs contrary to the recently enacted Medicare Drug Price Negotiation Program, under which HHS "negotiate[s]" with manufacturers "maximum fair price[s]" for selected drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide those drugs under these so-called maximum fair prices, *except when the 340B price is lower than the maximum fair price. Id.* § 1320f-2(d). To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug. The federal government places that responsibility on manufacturers. *See* CMS, Medicare Drug Pricing Negotiation: Final Guidance, at 59 (Oct 2, 2024), available at

The State has three counterarguments, none of which works. First, it asserts that the district court erred because, in its view, "broad swathes of claims data on demand aren't necessary to show reasonable cause." Br. 60. But the fact that manufacturers may get lucky enough to stumble upon some other information sufficient to meet the audit requirements is no answer to the direct obstacle that S.B. 325 erects. And even the sole sentence of "support" that the State points to undercuts its argument. It notes that "*[s]ignificant* changes in quantities of specific drugs by a covered entity and complaints from patients/other manufacturers … *may* be a basis for establishing reasonable cause." *Id.* (quoting 61 Fed. Reg. at 65,406) (emphasis added). Under the State's theory, covered entities could engage in unlawful conduct until the activity reaches a "significant change" in product purchases, with manufacturers footing the bill. This theory also assumes incorrectly that the current, baseline level of activity is compliant. Both aspects patently undermine manufacturers' rights to audit.

---

https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

Second, the State asserts that the No-Audits Provision does not erect an obstacle because manufacturers could conceivably obtain data via other means. *Id.* at 61. Tellingly, as below, the State avoids identifying those other viable means. JA778-779. That is unsurprising given the hostility many covered-entity groups have expressed to sharing claims data. As one example, *Amicus* 340B Health, which represents over 1,600 340B covered entity participants and filed in support of the State, responded to a 2020 manufacturer effort to gather this information on a voluntary basis by informing its members that they had "no legal obligation" to provide data and that "noncompliance" with the request was "unlikely to result in audits," in part because the manufacturer "could not feasibly audit the thousands of covered entities that received its letter." 340B Health, *Hospitals Should Consider Legal & Operational Burdens Imposed by Merck's Request for Data that there is No Legal Obligation under 340B to Provide*, at 1, 4-5 (July 2020), available at https://www.avitapharmacy.com/wp-content/uploads/2021/04/340B-Health.pdf. As the district court correctly concluded, the State's argument would mean that "covered entities—who may be engaging in the kind of fraud that the 340B Program's alternative dispute resolution

system is meant to prevent—will essentially be the ones determining whether or not they wish to give manufacturers" data. JA779. This would be equivalent to "the fox guard[ing] the hen house." *Id.*

Finally, the State asserts that the court erred by failing to construe S.B. 325 to not conflict with 340B. Br. 61-62 (citing *Fox v. Washington*, 236 U.S. 273, 277 (1915)). In support, the State cites the standard applicable to federal statutes, asserting that the statute can be "fairly … construed" to avoid the issue. *Id.* But the standard for state statutes is far higher: Federal courts are "without power to adopt a narrowing construction of a state statute unless such construction is reasonable and readily apparent." *Moshoures v. City of North Myrtle Beach*, __ F.4th __, 2025 WL 758025, at *5 (4th Cir. Mar. 13, 2025) (citation omitted). The State itself puts forward no alternative construction that could save the No-Audits Provision from preemption—because none exists. Certainly, there is no "readily apparent" construction that would save it.

The court correctly concluded the No-Audits Provision is preempted.

### 3. S.B. 325's Enforcement Provisions Are Preempted.

The court also correctly held that S.B. 325's Enforcement Provisions are conflict-preempted. S.B. 325 deputizes state authorities to impose civil penalties, levies additional fines of up to $50,000 per violation, and even threatens criminal penalties for manufacturers. W. VA. CODE § 60A-8-6a(c)(1)(A); W. VA. CODE § 46A-7- 101; W. VA. CODE § 33-11-1. Like the impermissible claims in *Astra*, S.B. 325 will upend the balance and national uniformity that Congress intended when it vested exclusive enforcement in HRSA. *See Astra*, 563 U.S. at 113; *see also Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 342-43, 349-50 (2001) (where agency had "a variety of enforcement options that allow it to make a measured response," greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives"). This conflict strikes at the heart of the federal government's ability to uniformly apply and enforce 340B across all states, ensuring equitable access to its benefits. *Arizona*, 567 U.S. at 406; *see also Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986).

a. S.B. 325 Threatens The Uniformity And Balance Of The Program.

Section 340B's compliance scheme reflects several of Congress's considered judgments. As *Astra* explained, 340B has a robust enforcement and remedial scheme, centralized within HHS. 563 U.S. at 113; *see also* Oral Argument at 0:41:49, *Novartis Pharms. Corp. v. Johnson*, No. 21-5304 (D.C. Cir. Jan. 20, 2023) (Federal Government attorney: 340B "represents a carefully calibrated scheme that entrusts HHS with oversight"). Congress also specifically delineated which tools the agency could use to ensure that participating manufacturers comply. 42 U.S.C. §§ 256b(d)(l)(B)(v), (d)(3). Congress gave HHS the power to levy civil monetary penalties on manufacturers *but* only at certain times, including after HHS considers several other steps first. 42 U.S.C. § 256b(d)(l)(B) (Secretary should "inquir[e]" into "pricing discrepancies," have manufacturers take "corrective action," and use audits). This nuanced approach reflects Congress's intent to foster compliance through corrective measures rather than punitive actions, a principle S.B. 325 disregards. Congress also mandated the creation of an ADR process to adjudicate pricing and other disputes between covered entities and

manufacturers. *Id.* § 256b(d)(3)(A); 42 C.F.R. § 10.21(a); *see Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984) (clarifying that federal regulations have the same preemptive force as federal statutes). The federal government has made clear that ADR is the exclusive mechanism for resolving disputes between covered entities and manufacturers. Br. for the United States as *Amicus Curiae*, at *10, *Astra,* No. 09-1273, 2010 WL 4717264 (U.S. Nov. 19, 2010) ("intended to be exclusive"); *Astra*, 563 U.S. at 122 ("proper remedy").

S.B. 325 upends all of that. As the court below recognized, it steals from the federal agency, superintended by federal courts, the authority to make exclusive discretionary judgments regarding enforcement and the limits of 340B's obligations—and ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid. *See id.* at 120; *see also* JA790 (holding it "should be apparent" that enforcement of S.B. 325 "cut[s] against the Supreme Court's holding in *Astra*").

To enforce S.B. 325, West Virginia will be required to address whether a federal obligation to provide the 340B price exists. This entails a variety of inquiries: (1) whether the units of drug denied 340B pricing

were actually eligible for it; (2) whether the manufacturer provided the 340B price for that same unit; (3) whether there has been diversion or duplicate discounting on the unit (which includes determining whether the unit was distributed to someone other than a covered entity's "patient"); (4) whether a covered entity is (and remains) an eligible covered entity; (5) whether that covered entity has properly "authorized" the contract pharmacy to receive the drugs, *e.g.* whether the pharmacy is an "agent" of the covered entity and the covered entity holds title to the drugs; and (6) whether the transfer is otherwise "prohibited" by HHS. Answering these questions requires West Virginia to grapple with how 340B is to be interpreted and applied, creating the "substantial" "risk of conflicting adjudications" that drove the decision in *Astra*. 563 U.S. at 120.

As one example, if the State were to seek its statutory $50,000-per-prescription penalties against a manufacturer, the manufacturer surely would assert that some or all of the subject patient prescriptions were not 340B-eligible. This would inevitably require the State to apply a federal definition for a 340B "patient," leading to disputes about its proper reach. JA787; *see also Astra*, 563 U.S. at 120. This overlap will result in the

patchwork of "dispersed and uncoordinated lawsuits" and "conflicting adjudications" condemned in *Astra*. 563 U.S. at 120.

*Astra*'s reasoning applies with equal force here, as the court correctly concluded. JA785-786. The State has repeatedly asserted that the pricing obligation comes from 340B—as the covered entities similarly argued in *Astra*. 563 U.S. at 119. And, as in *Astra*, the purported injury here is *not* that manufacturers refuse to provide the same drugs at all—there is no dispute that the same drugs are being delivered to the same pharmacies even in the statute's absence. The alleged harm is solely that manufacturers are not providing those same drugs *at the 340B price*. Just as it did not matter to the *Astra* Court that covered entities couched their injury as a "breach of contract," it does not matter here that the State is couching the injury as a purported violation of a state "delivery" obligation. *Id.* at 119-20. In sum and substance, the two circumstances are the same—and both equally threaten the Program's centralized administration and enforcement. Because S.B. 325 will require a state decisionmaker to undertake the same analysis as the federal government to determine if a 340B pricing obligation exists, its enforcement will

necessarily create the same risk of conflicting adjudications the *Astra* Court warned against.

S.B. 325 also authorizes state officers to bring new types of sanctions—including criminal penalties—that Congress did not empower even HHS to bring. W. VA. CODE § 60A-8-6a(c)(1), (3); W. VA. CODE §§ 46A-7-101, 33-11-6; *see Arizona*, 567 U.S. at 404-05 (finding conflict where a state imposed misdemeanor penalties for conduct that the federal government regulated with only civil consequences). Congress carefully circumscribed when penalties could be imposed and the amounts of those penalties to ensure compliance while encouraging program participation. S.B. 325, however, levies penalties far beyond those contemplated in 340B. 340B civil penalties are statutorily set at $5,000 per violation, while S.B. 325 specifies a penalty of *$50,000* per violation, defined in terms of the smallest saleable drug unit. So, if Appellees refuse to provide 340B pricing on drugs that they deliver to contract pharmacies, they now will face sanctions Congress did not want, in a state-court tribunal that Congress did not empower.

The Supremacy Clause does not permit West Virginia to enforce a regulatory scheme that destroys the uniformity Congress intended and

upsets the balance Congress struck in governing a federal benefits program. *See Buckman*, 531 U.S. at 350. This problem will only intensify as other states continue to adopt their own laws. Ultimately, this fragmentation threatens the very foundation of 340B, which relies on uniform application and enforcement to effectively serve its purpose. With 50 states separately enforcing their own visions of proper 340B compliance, the delicate equilibrium required to administer the Program will be destroyed. *See Gould*, 475 U.S. at 286 ("'[C]onflict is imminent' whenever 'two separate remedies are brought to bear on the same activity.'" (citation omitted)); *see also City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973) (recognizing danger of "fractionalized control").

#### b. The District Court Rightly Recognized S.B. 325 Governs Pricing

The State's primary counterargument is that the district court erred because S.B. 325 governs only delivery, not pricing. Br. 62-64. The court below rightfully rejected that argument, and this Court should too. JA783 (S.B. 325 is about "delivery *at a given price*, not delivery *per se*").

By its own terms, S.B. 325 regulates *who* can acquire drugs at the federal ceiling price. After defining "340B drug" by reference to that drug's reduced price, the statute forbids manufacturers from limiting "the *acquisition of a 340B drug* by, or delivery of a 340B drug to, a location authorized by a [covered entity] to receive such 340B drug," including contract pharmacies. W. VA. CODE § 60A-8-6a(b)(1). Under basic principles of statutory interpretation, courts may not read the word "acquisition" out of the statute or render it superfluous. *See United States v. Young*, 989 F.3d 253, 259 (4th Cir. 2021).

So, S.B. 325's reach necessarily extends beyond delivery requirements; it forces manufacturers to allow contract pharmacies to acquire their drugs at reduced prices by dictating terms of manufacturers' 340B offers. As the district court put it, "the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one." JA783.

A hypothetical illustrates the point. A manufacturer would face penalties under the law if it offered unlimited quantities of its drugs for

purchase to contract pharmacies, delivered direct to the pharmacy, but requested payment *above* the 340B ceiling price. A manufacturer would not face such liability if its offer included pricing at or below the ceiling price. In other words, the statute regulates *pricing* and *eligibility*, not methods of distribution. Imagine, by contrast, a state law requiring delivery of certain drugs by temperature-controlled trucks, or a law that required certain drugs be shipped in red boxes. *Those* may be delivery regulations. S.B. 325 is not.

On-the-ground practice also confirms that S.B. 325 regulates pricing. Most contract pharmacies use the "product replenishment model," meaning they dispense all drugs—340B or not—from the same undifferentiated inventory. *E.g.*, JA259-261 (¶¶ 6-12); JA299-302 (¶¶ 3-11); JA317-318; JA448-452. The only thing that changes for 340B drugs is the price paid on the back end for replenishment product. *See* JA259-260 (¶ 7); JA300 (¶¶ 4-6); JA632-634 (¶¶ 6a-d). Indeed, no one disputes that manufacturers will—and already do—*deliver* their drugs to any pharmacy that wants them, subject to other federal laws. West Virginia's law only targets the price that manufacturers demand for those deliveries. JA076; JA082-083. "Put another way," concluded the district

court, S.B. 325 "is about delivery *at a given price*, not delivery *per se*." JA783.

At bottom, West Virginia's "delivery" framing is a purely semantic exercise. But "[p]re-emption is not a matter of semantics"; states cannot "evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A.*, 568 U.S. 627, 636 (2013). "[A] proper [preemption] analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it." *Id.* at 637.

This Court's *PPL EnergyPlus* decision shows how to handle West Virginia's tactics. *See* 753 F.3d at 476-77. *PPL EnergyPlus* concerned a Maryland policy that encouraged the construction of a new power plant by guaranteeing a fixed revenue stream to the builder. *Id.* at 473. Other power-plant companies claimed that Maryland's policy intruded on the federal government's regulation of interstate energy markets. *Id.* at 474. Not so, assured Maryland. The federal scheme foreclosed rate-setting policies, it argued, but Maryland's policy was a mere internal "supply-side subsidy" with no direct effect on "the terms of any transaction in the

federal market." *Id.* at 476. Maryland lost: This Court rejected Maryland's "attempt to evade preemption" with "mere formal distinctions," instead focusing on the policy's "functional results." *Id.* at 476-77 (internal quotation marks omitted); *see also Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 161-66 (2016) (affirming *PPL EnergyPlus* and endorsing reasoning).

West Virginia is now attempting the same. But notwithstanding the state's "delivery" fiction, S.B. 325 functionally regulates the *price* at which contract pharmacies access manufacturers' drugs—and requires manufacturers to provide the federal price where federal law does not. The district court saw through West Virginia's charade, concluding that since "[p]rice regulation is exclusively controlled by the federal statute, … state enforcement of it would necessarily intrude on the federal [340B] scheme." JA787. This Court should affirm.

c. The State's Other Counterarguments Fail.

The State asserts that it will not be called upon to adjudicate questions of pricing and instead will merely decide whether manufacturers delivered 340B-priced drugs and/or demanded claims data information. Br. 65. But that makes no practical sense. Pursuant

to 340B, manufacturers may condition their offers to sell 340B-priced drugs on the acceptance of reasonable terms, including "delivery conditions." *Novartis*, 102 F.4th at 460, 462-64. If the federal offer with those terms is not accepted, there is no sale of 340B-priced drugs to which West Virginia could attach its purported "delivery" requirements. In other words, the State is compelling a sale at 340B prices that federal law does not require.

Second, the State suggests that the district court erred in applying *Astra* because *Astra* involved the ADR framework for adjudicating overcharges and violations of 340B's pricing requirements. Br. 65. But the federal government itself has taken the position that adjudication of "overcharging," *i.e.*, a term for when a manufacturer charges a covered entity more than the 340B price, is covered by ADR. *See, e.g.*, 89 Fed. Reg. at 28,657 (ADR includes "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase [the] drugs at or below the 340B ceiling price."); Gov't Reply Br. 5, *Am. Hosp. Ass'n v. HHS*, No. 20-cv-08806 (N.D. Cal. Feb. 17, 2021), ECF No. 82 ("The contract-pharmacy dispute must be resolved

through ADR" and stating "*Astra* left no doubt that 'Congress directed HRSA to create a formal dispute resolution procedure' in order 'to make the new adjudicative framework the proper remedy for covered entities' complaining of 340B violations, and that covered entities may not sue to enforce 340B Program requirements." (emphasis and citation omitted)). Covered entities have repeatedly taken the same position and have sought to use the ADR process to address the same issue that West Virginia attempts to control here.[3] S.B. 325 and the federal system thus address the same overlapping issues.

The district court correctly held that S.B. 325's No-Audits and Enforcement Provisions are preempted.

### B. S.B. 325 Is Field Preempted And Its No-Restrictions Provision Conflicts With 340B.

This Court can affirm on any ground apparent in the record. *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015). Here, the

---

[3] Petition for Damages and Equitable Relief, at 1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP,* ADR ID: 210112-1 (HHS ADR Bd. Jan. 13, 2021), available at https://strategichealthcare.net/wp-content/uploads/2021/01/340B-Petition.pdf ; *see also* Petition for Monetary Damages and Equitable Relief, at 35-37, *Univ, of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (HHS Bd. Sept. 29, 2023).

federal doctrines of field preemption and conflict preemption, as to the No-Restrictions Provision, also support the district court's conclusion.

### 1. S.B. 325 Is Field Preempted.

No state can regulate conduct "in a field that Congress … has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Intent to displace state law in a field is evident in a "framework of regulation so pervasive" that "Congress left no room for the States to supplement it," or a legislative program concerning a "federal interest" so "dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The 340B Program creates a quintessential federal field, on which S.B. 325 intrudes.

As discussed, 340B delivers a unique federal benefit to certain entities, with clearly established limits on participation, obligations, and enforcement. The Program is one component of the federal government's multifaceted healthcare regime that includes Medicare and Medicaid, with each program intertwined with the others. Given the programs' interdependence, "an adjudication of rights under one program must

proceed with an eye towards any implications for the other." *Astra*, 563 U.S. at 114, 120.

Although *Astra* did not involve a preemption claim, *Astra* "evoked the legal concepts underlying federal preemption." *Bauer v. Elrich*, 8 F.4th 291, 306 (4th Cir. 2021) (Quattlebaum, J., dissenting). It accordingly involved the same type of analysis appropriate for field preemption, concluding uniform national standards for administration and enforcement of the 340B Program are required. *Compare Astra*, 563 U.S. at 120 (need for uniformity), *with N.L.R.B. v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971) (need for uniform standards and danger that state standards could produce conflict). The Court also recognized the necessity for centralized enforcement to balance vital federal interests. *Compare Astra*, 563 U.S. at 119-121 (If "HHS [was] unable to hold the control rein, the risk of conflicting adjudications would be substantial."), *with Arizona*, 567 U.S. at 401-02 (state enforcement would diminish federal government's control), and *Buckman*, 531 U.S. at 350 (recognizing need for agency to police fraud consistently with the Administration's objectives). The Supreme Court held that these features of 340B precluded a suit outside of the delineated federal

system. *Astra*, 563 U.S. at 114, 119-22. In short, Congress left no room for states to interfere with its uniform 340B scheme or to impose additional state-law obligations as conditions of participation. *Arizona*, 567 U.S. at 400 (a "single integrated and all-embracing system" preempts the field (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941))).

Here, West Virginia has invaded the federal field by substantively *expanding* obligations under a federal program and adding stiff state-law penalties for violations. S.B. 325 obligates manufacturers participating in the 340B Program to provide their drugs at significantly reduced prices to a broader array of entities than federal law requires and under circumstances where federal law does not. W. VA. CODE § 60A-8-6a(b)(1). This skews the balance Congress struck. And in the face of the 340B program's exclusive enforcement regime, S.B. 325 further imposes its own set of penalties—including criminal sanctions—to punish violators. *Id.* § 60A-8-6a(c)(1). That subjects manufacturers to a plethora of enforcement actions and onerous restrictions and penalties not contemplated by Congress that will disincentivize manufacturer participation.

Like the law struck down in *McCulloch* attempting to tax only the Bank of the United States, *see* 17 U.S. at 435-36, S.B. 325 applies only to 340B drugs. *See* W. VA. CODE §§ 60A-8-6a(a)(1), (3), (7) (pegging operational terms to Section 340B). It regulates transactions undertaken pursuant to a federal program, governed by federal contracts between drug manufacturers and the United States. And, because 340B prescribes conditions for participation in other federal programs (Medicare Part B and Medicaid), what is *not* required is just as important as what *is* required. *See Novartis*, 102 F.4th at 460. That is, the 340B Program is an ostensibly voluntary scheme where manufacturers agree to a specific set of obligations in exchange for the opportunity to participate in Medicare Part B and Medicaid. By obliging those manufacturers to provide 340B-priced drugs to unlimited contract pharmacies, S.B. 325 changes the terms of Congress's deal. West Virginia has no authority to directly regulate what Congress has made. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995) ("[T]he states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government[.]"); *Gould*, 475 U.S. at 288-89.

Even if West Virginia tried to complement Congress's work, the *Arizona* decision illustrates that such a defense falls flat. There, the Court found preempted a state law that made it a misdemeanor to willfully fail to "complete or carry an alien registration document" in violation of federal law. 567 U.S. at 400. In that way, the state added a "state-law penalty for conduct proscribed by federal law." *Id.* In finding the state provision preempted, the Court explained that "federal statutory directives provide a full set of standards governing alien registration, including punishment for noncompliance," which Congress designed to be a "harmonious whole." *Id.* at 401. "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* *Arizona*'s logic applies here.

In arguing for the opposite conclusion, the State emphasizes Section 340B's purported "silence" about manufacturers' obligations concerning contract pharmacies and contends that, because drug manufacturers have "argued for years" that the "federal statute leaves

*them* free to impose[] conditions on delivery," it makes "little sense" to bar states from imposing their own conditions. Br. 36. But that "silence" does not do what the State says. Both the Third Circuit and D.C. Circuit have concluded the 340B Program "preserve[d]" manufacturers' ability to limit the use of contract pharmacies through their "bona fide" offers. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 704-05. That formulation reflects Congress's balancing act between safeguarding access to reduced-cost pharmaceuticals and avoiding overburdening drug manufacturers. By usurping this authority for themselves, states are upsetting the bargain struck by Congress.

**2. S.B. 325's No-Restrictions Provision Conflicts With The Federal 340B Program.**

S.B. 325's No-Restrictions Provision also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in creating the 340B Program. *Arizona*, 567 U.S. at 399 (quoting *Hines*, 312 U.S. at 67); *see also PPL EnergyPlus*, 753 F.3d at 478 (noting the "mutually reinforcing" nature of field and conflict preemption in some cases).

S.B. 325 conflicts with 340B because it expands manufacturers' obligations under 340B by compelling them to provide their drugs at reduced prices in circumstances not required by Congress. That imposition "upsets the balance struck" in the 340B Program, thereby creating an "obstacle to the federal plan of regulation and control." *Arizona*, 567 U.S. at 403.

Congress opted *not* to include any affirmative obligations concerning contract pharmacies in the 340B statute. *See Sanofi*, 58 F.4th at 704; *Novartis*, 102 F.4th at 462-64. That intentional policy choice reflects Congress's considered judgment. *See Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 238 (5th Cir. 2012) (holding state law preempted given Congress's use of "measured language," that language "reflects … calibration").

Several textual cues bear that out. ***First,*** Section 340B specifically enumerates the entities entitled to 340B pricing; that list does not include contract pharmacies. Analyzing 340B's text, the Third Circuit noted "Congress's use of the singular 'covered entity' in the [statute] suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies."

*Sanofi*, 58 F.4th at 704; *see also AstraZeneca*, 543 F. Supp. 3d at 60 ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."). This is confirmed by statutory context: Congress "expressly contemplate[d] drug makers selling discounted drugs through contract pharmacies" in a different drug-pricing statute enacted as part of the same legislation, but it did not do so in 340B. *Sanofi*, 58 F.4th at 704-05 (citing 38 U.S.C. § 8126). It is safe to presume that Congress acted "intentionally" when it left such language out of 340B. *Id.*[4]

***Second,*** Congress chose to implement the pricing obligation through an offer-and-acceptance framework. 340B requires only that a manufacturer "offer" certain drugs to covered entities at or below the applicable ceiling price. 42 U.S.C. § 256b(a)(1). As both the D.C. and Third Circuit have held, that offer can include limitations on the use of

[4] Congress also barred covered entities from "resell[ing] *or* otherwise transfer[ring]" 340B-priced drugs "to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B) (emphasis added). This prohibition evinces Congress's intent to limit manufacturers' subsidies to those drugs specifically prescribed and dispensed by the covered entity itself.

contract pharmacies, including claims data requirements. *See Sanofi*, 58 F.4th at 704; *Novartis*, 102 F.4th at 464. A covered entity must then "assent" to those terms or reject the offer. *Novartis*, 102 F.4th at 460. In the latter scenario, Congress chose for manufacturers to have no obligation to provide the 340B price. *Id.*; 42 U.S.C. § 256b(a)(1).

And 340B's legislative history further proves the point. Congress *rejected* a bill that would have required 340B-priced drugs to be distributed "under a contract entered into for on-site pharmacy services." S. Rep. No. 102-259 § 2141(b) (1992). Congress made the deliberate decision to omit that language from the statute. In other words, Congress specifically chose *not* to require manufacturers to provide 340B-priced drugs to contract pharmacies.[5]

West Virginia now undermines Congress's judgment by imposing its own contract pharmacy obligation on manufacturers participating in

---

[5] The State asserts that *Sanofi* and *Novartis* both acknowledged that Congress rejected a version of 340B that would have categorically prohibited the use of contract pharmacies. Br. 42. But as the Third Circuit explained, "Congress could have omitted the language about [contracted] on-site pharmacies because it did not want *any* contract pharmacy involved in the 340B program." *Sanofi*, 58 F.4th at 705.

the 340B Program, setting up a direct conflict. Whereas Congress chose not to include contract pharmacy obligations and only imposed a pricing obligation where there was a qualifying purchase, West Virginia has now stepped in and explicitly required the federal price even where no such purchase—following acceptance of a manufacturer offer—has occurred. W. VA. CODE § 60A-8-6a(a)(1)(B). West Virginia has done so to increase the subsidy that manufacturers must provide compared to if 340B was implemented as Congress wrote it. *See infra* at 34-35. That both sets up a direct conflict and dramatically enlarges the Program's burdens on participants, "skew[ing]" the finely-wrought balance that Congress struck. *Buckman*, 531 U.S. at 348.

The State largely avoids addressing the impact S.B. 325 will have on the balance Congress struck, instead contending that it can regulate manufacturers' relationships with covered entities and their contract pharmacies as to the "delivery" of 340B-priced drugs because Congress's decisions not to regulate a subject do not preempt state laws that do regulate on that same subject. Br. 41.

That principle is inapplicable here. S.B. 325 does not concern an issue of typical state regulation. Certainly, where federal law does not

touch on a subject traditionally within the heartland of state regulation, federal law cannot be said to preempt that subject. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011) (holding that a federal regulation giving carmakers a choice between two kinds of seat belts did not preempt *state tort suits* that would require one over the other). But this situation is different. 340B is a *federal* drug-pricing program, entirely separate and apart from any traditional topics of state regulation. S.B. 325 attempts to regulate that federal program by targeting *340B-priced* drugs only and the federal subsidy benefit that is to be provided under 340B. Indeed, apart from federal law, S.B. 325 would be meaningless.

West Virginia fundamentally misunderstands the nature of the 340B Program when it contends that Congress left the issue of unlimited contract pharmacy use untouched. 340B aims to incentivize manufacturers to participate without becoming so exploitative as to encourage their withdrawal. As such, the statute's "purposes" include not just the benefits it creates for covered entities, but also the limitations Congress set on the Program's scope and the protections against abuse it included for the benefit of manufacturers. *See Novartis*, 2021 WL

5161783, at *7 (rejecting suggestion that legal requirements of unlimited contract pharmacies is consistent with 340B's purpose because "no legislation pursues its purposes at all costs" and "Section 340B is no exception"); *see also Rapanos v. United States*, 547 U.S. 715, 752 (2006) ("[T]extual *limitations* upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." (emphasis added)). S.B. 325's overruling of those substantive limitations impermissibly upsets Congress's chosen balance.

Through 340B, the federal government "uses [its] market power to get drug makers to subsidize healthcare." *Sanofi*, 58 F.4th at 699. Crafting 340B involved balancing competing interests, and Congress chose not to impose on manufacturers an obligation regarding unlimited contract pharmacy use. West Virginia cannot now impose an obligation that Congress chose not to mandate.

### C. No Presumption Against Preemption Applies.

The State leans on the presumption that Congress does not intend to preempt state or local regulation of fields traditionally occupied by states. Br. 30-33. But that presumption does not apply to S.B. 325.

***First***, the Supreme Court has refused to extend the presumption against preemption to state laws when the regulated subject matter "is inherently federal in character" because it "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347-48. *Buckman* concerned state tort claims alleging that medical device manufacturers' misleading statements to a federal agency caused plaintiffs to suffer injuries from defective devices. But because the manufacturers' dealings with the agency "were prompted by" and "dictated by" a federal statute, no presumption applied. *Id.*

S.B. 325 likewise solely regulates conduct "prompted by" and "dictated by" Section 340B. It could not exist without the federal 340B Program, which imposes obligations that manufacturers accept (on an ostensibly voluntary basis) in exchange for other federal benefits. *Cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (holding that state tort claims implicated a "uniquely federal" interest because they involved liability arising from a manufacturer's contract with the federal government).

***Second***, S.B. 325 does not implicate states' traditional police powers. The question is not whether West Virginia may regulate public

health or the practice of pharmacy—S.B. 325 regulates neither. Instead, it barges into the federal field of 340B pricing and eligibility by requiring manufacturers to provide their products to commercial pharmacies at the federally reduced prices—in circumstances where the federal statute imposes no such requirement. 340B and its requirements are "hardly 'a field which the States have traditionally occupied.'" *Buckman*, 531 U.S. at 347 (quoting *Rice*, 331 U.S. at 230).

West Virginia cannot merely point to the words "drug" and "pharmacy" to label S.B. 325 a "health and safety" regulation. *Buckman* itself rejected such an approach: Even though the preempted tort claims involved injuries caused by defective medical devices, they did *not* implicate "the historic primacy of state regulation of [health and safety matters]." *Id.* at 341 (alteration in original). Rather, the claims policed "fraud against federal agencies"—something outside the states' traditional domain. *Id.* at 347-48; *see also United States v. Alabama*, 691 F.3d 1269, 1295-96 (11th Cir. 2012) (stating "a preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal" and holding that the state law under consideration "constitute[d] a thinly veiled attempt to regulate

immigration under the guise of contract law, and thus, we do not think the presumption against preemption applies").

S.B. 325 is not entitled to a presumption against preemption. And because the statute intrudes on an exclusively federal field—340B drug pricing and eligibility—and conflicts with 340B, it is preempted.

### D. *McClain* Does Not Control This Case.

The State also predictably relies on the Eighth Circuit's *Pharmaceutical Research & Manufacturers of America v. McClain* decision. 95 F.4th 1136 (8th Cir. 2024). Its reliance is misguided.

***First*****,** after evaluating West Virginia's restriction, the district court here correctly concluded that a prohibition on the collection of claims data was preempted because it stood "as an obstacle to achieving the federal objective of preventing fraud in the 340B Program." JA779. *McClain* did not consider or address the issue of claims data *at all*.

***Second*****,** *McClain* assumed that the Arkansas statute merely regulated drug "delivery" and the "practice of pharmacy"—areas traditionally left to state regulation. *McClain*, 95 F.4th at 1143-44, 1145. That is not true of S.B. 325.

West Virginia's law does not regulate traditional state areas but instead regulates drug pricing under a purely federal regime. The law instructs that manufacturers may not prohibit the "acquisition" of *340B-priced* drugs *by* commercial pharmacies. W. VA. CODE § 60A-8-6a(b)(1); *see id.* § 60A-8-6a(a)(1) (defining the drugs by reference to the federal 340B price). Put simply, West Virginia's law has everything to do with whether Appellants will provide their drugs at 340B prices and to whom, but nothing to do with how. *See supra* at 52-53.

The district court took the same view: it concluded that West Virginia's substantially similar state law regulates "price, not delivery"—in other words, "delivery *at a given price*, not delivery *per se*." JA783. On that basis, the court declined to accept *McClain*'s "rather brief rejection of an obstacle preemption argument." JA789. And it further rejected the conclusion of another decision—*AbbVie Inc. v. Fitch*, 2024 WL 3503965 (S.D. Miss. Jul. 22, 2024)—because that court "rather summarily concluded that" the state law in issue "addresses delivery and Section 340B does not." JA788.

***Third***, *McClain* couched its holding, that the Arkansas statute did not introduce contract pharmacies into 340B's closed system, on the

premise that covered entities—the only entities eligible for 340B pricing—retain title to 340B-priced drugs. *See* 95 F.4th at 1142, 1144. But that premise is faulty. The only evidence *McClain* cited in support was HRSA's 1996 prospective guidance describing how the 340B Program *should* work. *Id.* at 1142 (citing 61 Fed Reg. at 43,550-52) That guidance does not establish that covered entities *actually* retain title.

And the record demonstrates that covered entities do *not* retain title to 340B-priced drugs. *See, e.g.*, JA451-452; JA259 (¶ 6); JA260-261 (¶¶ 9, 11); JA634 (¶¶ 6e-f); JA302 (¶ 11). When a contract pharmacy receives a 340B-priced drug, that drug becomes "neutral inventory." JA302 (¶ 11); JA300 (¶ 4). In other words, at the time of sale to a patient, a particular unit of drug is owned by the pharmacy itself. JA261 (¶ 11). Pharmacies admit they do not maintain physically segregated inventories for 340B and non-340B drugs. JA259 (¶ 6); JA261 (¶ 11). Representatives of covered entities agree. JA451-452.

***Finally***, *McClain* also incorrectly assumed that each contract pharmacy acts as an agent of a covered entity. 95 F.4th at 1142. But that again is not true. Agency relationships require the principal to have "the right to control the conduct of his alleged agent." *Myrick v. Prime*

*Ins. Syndicate, Inc.*, 395 F.3d 485, 491 (4th Cir. 2005). Covered entities rarely, if ever, exercise that level of control over pharmacies. Rather, contract pharmacies often order 340B drugs from manufacturers themselves, using the covered entities' purchasing accounts, and sometimes even without the covered entities' knowledge. JA261 (¶ 12). And while *McClain* looked to HRSA's 1996 guidance, that guidance does not address what actually occurs on the ground.

## II. AbbVie's Takings Claim Is Also Likely To Succeed On The Merits.

S.B. 325 also effectuates an unconstitutional taking.[6] The law compels the transfer of AbbVie's property, at artificially low prices, to other private parties that will sell the drugs at regular prices and retain the profit for themselves. That kind of conduct is not allowed under the Fifth Amendment, which permits the taking of private property only for "public use." U.S. Const. amend. V; *see also Calder v. Bull*, 3 U.S. 386, 388 (1798). No amount of compensation can cure the constitutional harm that is inflicted by a taking for *private* use. And while S.B. 325 plainly

[6] While the district court did not address AbbVie's takings claim, this Court can and should do so. *Tuomey*, 792 F.3d at 375.

effectuates a *physical* taking of AbbVie's property, AbbVie's takings claim is likely to succeed even under the regulatory takings framework.

### A. S.B. 325 Effectuates a Physical Taking.

When the government acquires property for itself or a third party, it effects a "physical appropriation[ ]" that "constitute[s] the 'clearest sort of taking.'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* at 149. The "essential question" when deciding whether a taking is physical or "regulatory" is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* Whenever a law "results in a physical appropriation of property, a *per se* taking has occurred." *Id.* S.B. 325 does just that: it compels AbbVie to transfer its property to private parties.

S.B. 325's text confirms as much. The Act instructs that a manufacturer "shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to,

a location authorized by a 340B entity to receive such 340B drug …." W. VA. CODE § 60A-8-6a(b)(1). The ordinary meaning of "acquisition" is the "gaining of possession or control over something." Black's Law Dictionary (12th ed. 2024). So S.B. 325, in plain English, prohibits AbbVie from preventing any "location authorized by a 340B entity," including any commercial pharmacy so authorized, from taking possession of AbbVie's drugs at significantly discounted prices. That is a taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) (explaining that the "actual taking of possession and control" is "a taking as clearly 'as if the [receiving party] held full title and ownership'" (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 431 (1982)); JA261-262 (¶¶ 6, 11, 14, 16).[7]

To be sure, S.B. 325 plainly works a *physical* appropriation of AbbVie's property. Consider *Horne*, which involved a takings challenge to a federal regulation requiring raisin farmers to set aside a percentage of their crop for disposition by a federal agency. The agency could then

[7] That the drugs S.B. 325 targets are personal rather than real property is irrelevant to the takings analysis. *Horne*, 576 U.S. at 358.

do with the raisins what it wished: sell them, give them away, or dispose of them. *Horne*, 576 U.S. at 355. Though the raisin farmers retained an interest in any residual proceeds from sales of the raisins, the Court held this was a "clear physical taking," not merely a regulatory restriction on use, because the Government took "actual … possession and control" of the raisins. *Id.* at 360-62.

In a similar way, S.B. 325 does not merely affect the way that AbbVie uses its own property—it requires that AbbVie actually give up its property to for-profit pharmacies who wish to "acqui[re]" it. W. VA. CODE § 60A-8-6a(b)(1). If S.B. 325 stands, contract pharmacies will place orders for discounted drugs and AbbVie will have no choice but to accept and fulfill those orders. JA261 (¶¶ 12-13). That constitutes a physical taking even if the transfer occurs at the behest of a state law or under the fiction that a covered entity is the one really doing the ordering. Either way, S.B. 325 forces AbbVie to transfer its drugs to another private party.

The State says there is no physical taking because S.B. 325 does not "take[ ] any property or mandate[ ] a sale" but only "prohibits certain kinds of restrictions on sales that manufacturers were already making."

Br. 76. But in prohibiting manufacturers from including non-price limitations in their federally mandated offers, S.B. 325 *is* mandating those sales. The law bars manufacturers from "deny[ing], restrict[ing], or prohibit[ing] the *acquisition of* a 340B drug" by contract pharmacies. W. VA. CODE § 60A-8-6a(b)(1). Not to worry, says the State, because that is an innocuous "negative statute, not an affirmative one." Br. 76. That is a distinction without a difference. Requiring A to sell to B is the same as *preventing* A from *refusing* to sell to B.

**B. S.B. 325's Taking is Coercive.**

The State defends this clear physical taking by relying on the "voluntary participation" doctrine. But that doctrine does not apply here.

***First*****,** AbbVie does not voluntarily participate in West Virginia's confiscatory scheme. S.B. 325 is not Section 340B, as the State itself is at pains to emphasize. AbbVie's voluntary participation in the *federal* 340B Program does not mean that it has voluntarily chosen to participate in *West Virginia*'s compulsory regime. Nor does AbbVie receive anything from West Virginia in exchange for compliance. Through S.B. 325, West Virginia demands manufacturers sell discounted products to pharmacies or face exorbitant penalties. But AbbVie receives nothing from West

Virginia in return; there is no benefit that AbbVie can refuse in order to avoid the penalties that S.B. 325 carries.

One court has confronted an issue like this—and it agreed with AbbVie's position. *See Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633 (E.D. Va. 2023). There, Virginia law required hospitals participating in federal Medicare or Medicaid to obtain a certificate of public need before making certain updates to their facilities in excess of a specified dollar amount. *Id.* at 644. Hospitals sued both the federal and state governments under the Takings Clause. The court determined that the *federal* government had no takings liability, because the hospitals voluntarily participated in Medicaid and Medicare. But, as against the *state* government, the court concluded that Virginia compelled "any healthcare system with an acute care hospital in Virginia to participate in Medicare and Medicaid." That likely violated the Takings Clause: "Those *state law* [certificate] requirements have no

bearing on whether providers' participation in Medicaid and Medicare is voluntary as a matter of *federal* law." *Id.* at 666-67.[8]

The State says it "doesn't matter that the benefit comes from the federal government, not the State." Br. 78.[9] But it cites no case for that surprising proposition. The voluntary participation doctrine protects against a sovereign asserting a "unilateral claim of entitlement" to "alter property rights" without providing any valuable benefit in exchange. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987). And in the cases cited by the State, the regulated entity received some benefit from the challenged regulator—not a regulator-once-removed. *See Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 445-46 (8th Cir. 1984) (challenging state Medicaid regulations despite receiving state Medicaid funds); *Burditt v. HHS*, 934 F.2d 1362, 1376 (5th Cir. 1991) (challenging federal requirements under

---

[8] The court ultimately concluded the state was immune from suit under the Eleventh Amendment for reasons not arguably present here.

[9] Revealingly, the State's "voluntariness" arguments depend on reference to federal program requirements. That the State must draft off these federal programs to justify its law confirms that the State is inappropriately meddling in a wholly federal universe. *See supra* § I.B.

Emergency Medical Treatment and Active Labor Act despite hospital receiving federal Medicare payments); *Satellite Broad. And Commc'ns Ass'n v. FCC*, 275 F.3d 337, 368 (4th Cir. 2001) (challenging federal conditions on use of satellite broadcast license granted by federal government). The State can point to no similar benefit that AbbVie receives *from West Virginia* by virtue of its compliance with S.B. 325.

Neither is it an answer to say that AbbVie can simply withdraw from the entire 340B Program or from West Virginia itself. AbbVie's participation in Medicaid is already the predicate for its participation in the 340B Program—*i.e.*, West Virginia offers nothing over and above what AbbVie already receives from the federal government. *See Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) (no voluntary exchange where "the purported 'benefit' is illusory"). Distilled to its core, West Virginia's "offer" amounts to nothing more than the pharmaceutical market in the State. But participating in commerce is "not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Horne*, 576 U.S. at 366.

***Second***, even if S.B. 325 were treated as a voluntary exchange, the law would fail under the unconstitutional conditions doctrine, which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). When assessing conditions imposed by the government on the receipt of a benefit, courts consider (1) whether there is an "essential nexus" between the benefit's conditions and the governmental interest justifying those conditions and (2) whether the conditions bear a "rough proportionality" to the benefit's supposed impact on the governmental interest. *Sheetz v. Cnty. of El Dorado, Cal.*, 601 U.S. 267, 275 (2024).

S.B. 325 fails at both steps. As a "condition" of AbbVie agreeing to provide significant price concessions, West Virginia demands it must now agree to extend those discounts beyond 340B's original contours to for-profit pharmacies in the State. It is not clear what benefit, if any, West Virginia is conferring on AbbVie in exchange for this obligation. And even assuming West Virginia can stand in the shoes of the federal government, there is no nexus between AbbVie's participation in a

*federal* program that excludes for-profit pharmacies and West Virginia's insistence that AbbVie transfer drugs to those same pharmacies.

Even less so is there a rough *proportionality* between AbbVie's participation in federal healthcare programs and AbbVie's compelled-transfer demands. *Id.* at 276. Selling discounted medications through federal government programs does not negatively impact West Virginians. Yet the State seeks to extract even more from AbbVie by conditioning its involvement in those programs on participation in the State's compulsory regime and offering nothing in return. It is one thing for Congress to set certain conditions on a manufacturer's participation in Medicaid. It is something else altogether when a state leverages that participation to regulate constitutional rights "outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15, (2013).

### C. S.B. 325's Taking Serves No Public Use.

The Fifth Amendment permits the government to appropriate an individual's property, subject to the limitation that the property be put to a "public use." U.S. Const. amend. V. West Virginia's law requires that AbbVie transfer its products at significantly reduced prices to for-

profit pharmacies. It is thus a taking for *private* use, and "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005); *Calder*, 3 U.S. 386 at 388 (describing it as "against all reason and justice" for a law to "take property from A[] and give[] it to B").

By referring to S.B. 325 as serving a broad public "purpose" rather than a public "use," the State asks this Court to improperly extend the *Kelo* line of cases. The State argues that this Court's role in assessing what counts as a "public use" is an "extremely narrow one" while the West Virginia legislature's judgment should be "well-nigh conclusive." Br. 84. Neither argument works.

***First*,** there is no reason that *Kelo* and its predecessors in *Midkiff* and *Berman v. Parker*, 348 U.S. 26 (1954)—which exist only in the narrow context of land use and blight abatement for specific public purposes—should be extended to these circumstances. West Virginia's law compelling AbbVie to provide discounted drugs to for-profit pharmacies does not seek to rectify any kind of "blight" as in *Berman*, 348 U.S. at 32, or "land oligopoly" as in *Haw. Hous. Auth. v. Midkiff*, 467

U.S. 229, 242 (1984). Nor is the taking executed pursuant to a development plan as in *Kelo*. 545 U.S. at 483-84. Indeed, *Kelo* recognized that laws like S.B. 325 cross the constitutional line: while "a one-to-one transfer of property, executed outside the confines of an integrated development plan" was not at issue in the case, such an "unusual exercise of government power would certainly raise a suspicion that a private purpose was afoot." *Kelo*, 545 U.S. at 487. *See* also *D.A. Realestate Inv., LLC v. City of Norfolk*, 126 F.4th 309, 315 (4th Cir. 2025) ("In [*Kelo*], the Supreme Court concluded that … *private development* could, under certain circumstances, constitute a 'public use.'" (emphasis added)).[10] There is no factual overlap between the *Kelo* line of cases and this one.

***Second*,** the State is wrong to point to what it calls the Supreme Court's "longstanding policy of deference to legislative judgments" about what counts as a "public purpose." Br. 84 (quoting *Kelo*, 545 U.S. at 469).

[10] The State cites *Star Sci. Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002) for the unremarkable proposition that states enjoy a "police power to promote the public health, safety, welfare, and morals." *Id.* at 361 (citing *Berman*, 348 U.S. at 32). But *Beales* did not implicate the Public Use Clause; the appellants in that case included a takings claim below, but it was dismissed and not appealed. *Id.* at 347.

The Supreme Court recently clarified that there is no "special deference for legislative takings"; after all, legislation was the conventional way that governments exercised their eminent domain power." *Sheetz*, 601 U.S. at 277. Indeed, "[f]ar from supporting [the] deferential view" of legislative takings, "history shows that legislation was a prime target for scrutiny under the Takings Clause." *Id.* at 277-78. Accordingly, whether S.B. 325 furthers a public use or purpose is a legal question appropriate for disposition by this Court. And AbbVie's testimonial and documentary evidence shows that S.B.325 does *not* further any such public purpose. JA579; JA328.

Even if the *Kelo* precedents were stretched to apply here, S.B. 325 would still fail because it does not satisfy any broad "public purpose." The record demonstrates that discounted drugs are commonly sold at full price to 340B patients and non-patients alike irrespective of their financial status. JA300 (¶ 5); JA632-635 (¶ 6); JA516-517. The pharmacies then retain the arbitrage profit *for themselves*. And they generally do not pass any financial benefit on to needy patients, in any form. Instead, covered entities often use their profits to build satellite sites in affluent areas, where they continue to obtain 340B-priced drugs

while increasing the pool of "patients" with insurers capable of paying full price. JA385; JA415. Thus the profits and revenues of contract pharmacies and covered entities continue to balloon, at the expense of manufacturers and patients alike. JA322, JA326, JA332, JA337; JA357, JA361, JA363; JA428. None of that is "public use."

Were there any doubt that S.B. 325 is an unconstitutional taking under the modern doctrine, the original meaning and settled historical understanding of the Takings Clause place it beyond debate. The original meaning of "public use" limits takings to transfers to the government, or to a private entity that had "a legal obligation to allow the general public to use the land in question." Ilya Somin, *The Grasping Hand* (2015) at 36. Cases from the Founding and around the time of Reconstruction both reflect this understanding. *See, e.g.*, *Vanhorne's Lessee v. Dorrance*, 2 U.S. 304, 312 (C.C.D. Pa. 1795); *Memphis Freight Co. v. City of Memphis*, 44 Tenn. 419, 425 (1867); *Bankhead v. Brown*, 25 Iowa 540, 545 (1868). Legal thinkers from those eras also suggested that takings were limited to public "use" rather than any conceivably public "purpose," contrary to Appellant's framing. *See* John Locke, *Two Treatises of Government and A Letter Concerning Toleration,* ed. Ian Shapiro (Yale

University Press, 2003), § 138; William Blackstone*, Commentaries on the Laws of England* (Chicago: University of Chicago Press, 1979 [1765]), 1:135.

### D. Regulatory Takings Does Not Apply, But Even if it Does, AbbVie Prevails.

Even if analyzed as a regulatory taking, S.B. 325 is unconstitutional. Courts decide whether a regulation of property "goes too far" by considering (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

***First***, S.B. 325 has a significant impact on AbbVie's property. The law requires AbbVie to transfer millions of dollars in discounted drugs to commercial pharmacies or face significant penalties. "Because S.B. 325 requires AbbVie to provide its drugs at steeply discounted 340B prices to an unlimited number of contract pharmacy arrangements, AbbVie will face the threat of millions of dollars in forced unnecessary discounts each year as a result of [S.B. 325]." JA263 (¶ 20). The State argues that "diminution in value" is insufficient to show a regulatory taking and

opines that, in any event, S.B. 325's economic impact is "unlikely to be drastic." Br. 80-81. But the State's citations to land-use regulation cases are unhelpful for assessing a regulation of chattels. *Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 350-52 (4th Cir. 2021); *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, 862 F.3d 433, 442 (4th Cir. 2017). Instead, the question is whether S.B. 325's mandate that AbbVie fork over millions of dollars in discounted drugs imposes a "considerable, novel financial burden" on AbbVie. *U.S. Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412, 416-17 (5th Cir. 2000). It plainly does.

***Second***, S.B. 325 interferes with AbbVie's investment-backed expectations. AbbVie invests in developing and manufacturing lifesaving drugs; when a drug makes it to market (a relative rarity), its sales generate profits that enable further investment into more lifesaving and life-improving products. *See* JA262 (¶ 18). S.B. 325 compels AbbVie to transfer its drugs to non-covered entities for pennies on the dollar. That necessarily inhibits AbbVie's ability to invest in the development of new drugs that improve patients' lives.

The State maintains that AbbVie, as a major pharmaceutical manufacturer, should anticipate significant government regulation. Br.

82. But there is regulation, and then there is expropriation. While regulated industries may expect some regulatory shifts over time, "that does not mean that all regulatory changes are reasonably foreseeable or that regulated businesses can have no reasonable investment-backed expectations whatsoever." *Cienega Gardens v. United States*, 331 F.3d 1319, 1350 (Fed. Cir. 2003). And as should be readily apparent, S.B. 325 is no ordinary state regulation. It fundamentally alters the obligations for manufacturers under the federal 340B program by mandating the transfer of discounted drugs to entities that were never intended to benefit from Section 340B.

The State also points to Section 340B's silence on delivery, insisting that AbbVie should have been on notice to state attempts to fill this "well-known" "gap." Br. 82. In fact, recent history confirms that manufacturers were in the business of filling that "gap," not various state governments. AbbVie's preexisting policy of limiting transfer of 340B drugs to contract pharmacies was consistent with HRSA's longtime guidance, which recommended only one contract pharmacy per covered entity. JA277-278; 61 Fed. Reg. 43,549, 43,550-43,555 (Aug. 23, 1996). When HRSA attempted to expand manufacturers' obligations by

requiring manufacturers to serve an unlimited number of contract pharmacies, courts of appeals uniformly rejected that effort and upheld manufacturer policies similar to AbbVie's. *See Sanofi*, 58 F.4th at 706; *Novartis*, 102 F.4th at 463-64. In context, S.B. 325 marks a sharp departure from historical practice and controlling federal precedent.

***Third***, the character of the government action here counsels in favor of finding a regulatory taking because it does far more than simply "adjust[ ] the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). The State contends that S.B. 325 does not "permanently appropriate" AbbVie's assets, Br. 83, but that is not accurate. Once AbbVie hands its drugs over to contract pharmacies, the contract pharmacies do not give the drugs back. They sell them to customers. That is a permanent appropriation of AbbVie's property if nothing else. And the more "permanent" an invasion of property rights, the more likely that invasion is a taking. *Cf. Loretto*, 458 U.S. at 434-35 (noting that "permanent" occupations are more likely to be takings than "temporary and limited" invasions of property interests).

## III. ALL OF S.B. 325'S PROVISIONS FALL TOGETHER.

The district court correctly deemed S.B. 325's invalid enforcement mechanism inseverable from the Act's other provisions. JA790-792. So even if this Court opts against addressing the constitutionality of S.B. 325's substantive obligations, it should nonetheless affirm.

State law governs this severability analysis. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 788 n.21 (4th Cir. 1996). West Virginia courts ask "whether the invalid portion [of a law] is so important to the general plan and operation of the law in its entirety as reasonably to lead to the conclusion that it would not have been adopted if the legislature had perceived the invalidity of the part held to be unconstitutional." *Robertson v. Hatcher*, 135 S.E.2d 675, 686 (W. Va. 1964). If so, the State concedes, "the whole statute will be declared invalid." Br. 93 (quoting *Louk v. Cormier*, 622 S.E.2d 788, 804 (W. Va. 2005)).[11]

---

[11] The relevant chapter of West Virginia's code contains a general severability clause. W. VA. CODE §60A-6-605. But the presence (or absence) of a severability clause is not conclusive. *See State v. Tennant*, 732 S.E.2d 507, 519 (W. Va. 2012); *see also Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 625-26 (2016) (rejecting State's reliance on severability clause because a "severability clause is an aid merely; not an inexorable command" (quoting *Reno v. ACLU*, 521 U.S. 844, 884-85, n.49 (1997)) (overruled on other grounds).

Under that framework, this case is open-and-shut. S.B. 325's enforcement scheme and substantive provisions are "so connected and interdependent" that neither can reasonably stand without the other. *Robertson*, 135 S.E.2d at 686. As the district court observed, the contract pharmacy obligation imposed by S.B. 325 "has essentially no operation" absent its enforcement sections. JA792; *see State v. Tennant*, 732 S.E.2d 507, 519 (W. Va. 2012) (explaining that severability turns on whether the remaining provisions are "capable of being executed independently of the rejected portion"). That leaves one conclusion: West Virginia "would not have passed" S.B. 325 without those enforcement sections. *Lemke v. Farmers' Grain Co.*, 258 U.S. 50, 60 (1922) (striking down entire state statute and refusing to sever invalid provisions because "[w]ithout their enforcement the plan and scope of the act fails of accomplishing its manifest purpose"); *see also Robertson*, 135 S.E.2d at 686-87.

The State argues that its legislature might have wanted a toothless contract pharmacy provision to remain on the books as "encouragement" to drug manufacturers. Br. 94. Not so. For one, "[i]t is always presumed that the legislature will not enact a meaningless or useless statute." *Hammons v. W. Va. Off. of Ins. Comm'r*, 775 S.E.2d 458, 465 (W. Va.

2015) (citation omitted). For another, S.B. 325 would be useless without its draconian enforcement provisions. West Virginia knows that—it enacted S.B. 325 in response to drug manufacturers' successful legal challenge to HHS's "advisory opinion" seeking to do the same thing. *See* Br. 17. The coercive nature of S.B. 325 is the whole point.

What is more, ornamenting the West Virginia Code with unenforceable "requirements" would be inconsistent with the State's self-described goal of establishing "broad access" to 340B-priced drugs "despite drugmakers' resistance." Br. 20, 58. So while legislatures can purposefully enact symbolic or nonbinding legislation, *see* Br. 93-94 (citing non-mandatory federal laws encouraging respect for the American flag, nutritious diets, and overseas charity), West Virginia plainly did not want to do so here.

In sum, S.B. 325's enforcement mechanism cannot be separated from the Act's other provisions. If the former is unlawful, the latter must be enjoined, too.

## IV. THE DISTRICT COURT CORRECTLY FOUND THAT APPELLEES SATISFIED THE REMAINING INJUNCTION FACTORS.

Having concluded that S.B. 325 is likely unconstitutional, the district court then found that Appellees demonstrated "irreparable harm" in the absence of an injunction and that the balance of the equities and the public interest favor enjoining S.B. 325. JA793-798. "Because these [equitable] determinations involve findings of fact," this Court reviews the district court's judgment only for abuse of discretion. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985); *Roe v. Dep't of Def.*, 947 F.3d 207, 228-30 (4th Cir. 2020) (affirming district court's equitable findings under clear error standard). The district court's findings were well supported by the record.

### A. Enforcement Of S.B. 325 Would Irreparably Harm Appellees.

Appellees will suffer irreparable harm absent an injunction. As the district court correctly found, Appellees' showing of unrecoverable compliance costs and threats of enforcement backed by draconian penalties. JA794-795 (also noting that "Defendants do little to contest the existence of irreparable harm").

Appellees would remain subject to a state regime that unconstitutionally requires them to provide vast quantities of heavily reduced-price drugs. The deprivation of constitutional rights generally constitutes irreparable harm. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). And once taken, possession of Appellees' drugs resides with for-profit pharmacies until they are dispensed. There is no possible "just compensation" for a private taking like S.B. 325—such takings are *per se* unconstitutional. *Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 80 (1937). Moreover, the prospect that West Virginia will enforce a likely preempted state law against Appellants "supplies the necessary irreparable injury" to justify injunctive relief. *See Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)).

In addition, Appellees will suffer significant financial harm because of S.B. 325. In complying with Arkansas's similar law, for example, AbbVie will incur approximately $15.3 million in compliance costs between May and December 2024. JA635 (¶ 7). "[C]omplying with a regulation later held invalid almost *always* produces the irreparable

harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part). That is in addition to the millions of dollars in forced unnecessary reduced pricing Appellees will incur because of S.B. 325. JA263 (¶ 20). Even if Appellees are ultimately successful, Appellees would be unable to recover damages from West Virginia. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (Eleventh Amendment shields states from attempts to recover wrongfully withheld funds). The law also carries financial penalties of $50,000 per violation—defined, remarkably, to mean $50,000 for *every package* of drugs in violation. *See supra* § IV; W. VA. CODE § 60A-8-6a(c)(1)-(2). These sanctions promise to drain Appellees ability to invest in research and development and frustrate their ability to continue manufacturing life-saving drugs. JA794.

The district court considered all of these factors in finding that Appellees met their burden to show likelihood of harm absent a preliminary injunction. JA793-796. Also central to the court's reasoning was the "imminent" nature of the harm. Indeed, the State acknowledged to the district court that there were a "growing number of complaints pending before the Board of Pharmacy" following S.B. 325's enactment,

and advised that the Board was processing those complaints. JA796. The district court correctly found that Appellees will suffer irreparable harm absent an injunction.

### B. Enjoining S.B. 325 Is In The Public Interest.

Appellees also demonstrated that the public interest would be served by enjoining S.B. 325. *See* JA797-798. Because the State is the opposing party, the equities and public interest merge. *Nken*, 556 U.S. at 434-35. West Virginia "is in no way harmed by issuance of a preliminary injunction which prevents [its officers] from enforcing restrictions likely to be found unconstitutional." *Beautiful Struggle*, 2 F.4th at 346 (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc)).

The State contends that enjoining S.B. 325 would negatively affect disadvantaged patients' access to drugs.[12] *See* JA797-798; Br. 90-91.[13] But this argument is a mirage, as the district court correctly concluded. JA798. Section 340B's reduced pricing regime benefits *covered entities*, not patients, "as acknowledged by all parties." JA798. Patients largely do not see any price difference at the point of sale. And the manufacturer policies S.B. 325 targets do not deny access to drugs. Manufacturers provide drugs to the same pharmacies at issue here, at commercial prices, and patients are unlikely to be paying reduced prices for drugs. *See*

---

[12] On appeal, West Virginia also suggests that enjoining S.B. 325 might negatively affect charity care. Br. 90. West Virginia never advanced that contention below. West Virginia should not be permitted to rely on an alleged harm that it never briefed. Even if this Court were to consider it, the State provides no actual support on appeal for its contention that West Virginia covered entities are passing on 340B discounts through increased charity care, beyond a single sentence quoted from a newspaper op-ed that itself cites no support. Br. 90. West Virginia's argument that *it* suffers harm where it is denied the ability to take property from private parties to give to other private parties turns the irreparable harm analysis on its head.

[13] West Virginia also asserts that the mere fact of an injunction will cause it irreparable harm. Br. 89 (citing *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)). This, too, is a new argument on appeal. And *Perez* itself said only that blocking a state statute may constitute irreparable harm "[u]nless th[e] statute is unconstitutional." 585 U.S. at 602.

JA077 (¶ 10); JA083 (¶ 10); *see also* JA432, JA440 (discussing that even on discounted drugs, the discounts are rarely passed on to patients). The true beneficiaries of S.B. 325 are commercial pharmacies. Enjoining S.B. 325 will merely limit the ability of those for-profit pharmacies to line their pockets at manufacturers' expense. *See, e.g.*, JA579; JA587-588; JA324; JA439-441.

Finally, the district court correctly concluded that a "preliminary injunction does nothing to upset the federal program." JA798. Enjoining S.B. 325 in no way interferes with the federal government's ability to enforce the requirements of Section 340B—including against drug manufacturers if need be. *See Astra*, 563 U.S. at 120. On the other hand, "the enforcement of S.B. 325 likely would" alter the 340B landscape, given its restrictions on manufacturers' ability to detect diversion and duplicate discounts and seek claims data from covered entities to avail themselves of the federal enforcement scheme. JA798; *see supra* § I.A. The district court's order merely "protect[s] the status quo" prior to S.B. 325's enactment and "prevent[s] irreparable harm during the pendency of [the] lawsuit," which is the "traditional office of a preliminary

injunction." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted).

## CONCLUSION

The district court's order granting a preliminary injunction should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Fourth Circuit Rule 34(a), Appellees respectfully request oral argument. This consolidated appeal presents complex and important constitutional questions about the about the extent to which state legislatures may rework the federal 340B scheme to their own ends—questions courts and legislatures are grappling with nationwide. Appellees respectfully submit that oral argument will assist the Court in resolving this matter.

Dated: March 27, 2025

Respectfully submitted,


/s/ Philip J. Perry

PHILIP J. PERRY
ANDREW D. PRINS
ABID R. QURESHI
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

TIMOTHY M. MILLER
BABST, CALLAND, CLEMENTS, ZOMNIR, P.C.
300 Summers Street, Suite 1000
Charleston, WV 25301
(681) 205-8888
tmiller@babstcalland.com


*Counsel for Plaintiff – Appellee Pharmaceutical Research and Manufacturers of America*


/s/ Matthew S. Owen, P.C.

MATTHEW S. OWEN, P.C.
MEREDITH M. POHL
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

STEVEN R. RUBY
CAREY DOUGLAS KESSLER & RUBY PLLC
707 Virginia Street901 Chase Tower
Charleston, WV 25301
(304) 345-1234
sruby@cdrklaw.com


*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

/s/ Catherine E. Stetson

CARTE P. GOODWIN
BLAKE N. HUMPHREY
FROST BROWN TODD
500 Virginia Street East
Charleston, WV 25301
(304) 345-0111
cgoodwin@fbtlaw.com
bhumphrey@fbtlaw.com

CATHERINE E. STETSON
SUSAN M. COOK
ALEKS SVERDLOV*
MARLAN J. GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com
aleks.sverdlov@hoganlovells.com
marlan.golden@hoganlovells.com

*Not Admitted in D.C.

*Counsel for Plaintiff – Appellee*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fourth Circuit Rule 32(b), as modified by this Court's Order Granting Motion to Exceed Length Limitations (ECF 50), because it contains 19,223 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century font 14-point type face.

/s/ Matthew S. Owen
Matthew S. Owen, P.C.

## CERTIFICATE OF SERVICE

This is to certify that the foregoing brief has been served via the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on March 27, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

/s/ Matthew S. Owen
Matthew S. Owen, P.C.