# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,

*Defendants-Appellants.*

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00271 (Johnston, T.)

## No. 25-1055

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation; PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs-Appellees,*

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy.

*Defendants-Appellants.*

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00272 (Johnston, T.)

## No. 25-1056

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellee,*

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his

official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy.

*Defendants-Appellants.*

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00298 (Johnston, T.)

## APPELLANTS' REPLY BRIEF

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*
*Counsel of Record*

CALEB A. SECKMAN
SPENCER J. DAVENPORT
*Assistant Solicitors General*

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Table of Authorities ................................................................... ii

Introduction .............................................................................. 1

Argument .................................................................................. 4

   I.    Plaintiffs' Preemption Claims Are Unlikely To Succeed ................... 4

       A.    The Presumption Against Preemption Applies ........................ 4

       B.    The Act Is Not Field-Preempted ................................................. 7

            1.    The Act Occupies A Different Field From 340B ............. 8

            2.    None Of Plaintiffs' Counterarguments Succeed ............ 10

       C.    The Act Is Not Conflict-Preempted .......................................... 14

            1.    The Act Helps Further 340B's Objectives ..................... 15

            2.    The Act Is Not An Obstacle To 340B ............................. 17

   II.    AbbVie's Claim Is Unlikely To Succeed ..................................... 34

       A.    The Act Does Not Effectuate A Per Se Physical Taking ........ 34

       B.    The Voluntary Participation Doctrine Applies ........................ 36

       C.    The Act Does Not Violate The Unconstitutional
            Conditions Doctrine ................................................................... 38

       D.    The Act Does Not Effect A Regulatory Taking ...................... 40

       E.    The Act Serves A Public Purpose Under Any
            Framework .................................................................................. 43

   III.  The Other Factors Favor The State .................................................. 45

   IV.  The Injunction Sweeps More Broadly Than Necessary ................... 46

Conclusion ............................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Fitch*,
No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965
(S.D. Miss. July 22, 2024) ........................................................................9

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) .................................................................15, 33, 39

*Am. Hosp. Ass'n v. DHHS*,
No. 4:20-cv-08806-YGR, 2021 WL 616323
(N.D. Cal. Feb. 17, 2021) ........................................................................15

*Andrus v. Allard*,
444 U.S. 51 (1979) ...................................................................37, 40, 41

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................8, 9, 12, 21

*Armstrong v. United States*,
364 U.S. 40 (1960) ...................................................................................43

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) ...............................................11, 12, 25, 34

*AstraZenca Pharms. LP v. Becerra*,
1:21-cv-00027-LPS (D. Del. July 9, 2021) ........................................25

*AstraZeneca Pharms. LP v. Beccera*,
543 F. Supp. 3d 47 (D. Del. 2021) .............................................13, 29

*Berman v. Parker*,
348 U.S. 26 (1954) ...................................................................................43

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .............................................................................4, 5

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ...............................................................................34

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .............................................................14, 17, 29

ii

# TABLE OF AUTHORITIES
*(continued)*

*Cyberworld Enter. Techs., Inc. v. Napolitano,*
602 F.3d 189 (3d Cir. 2010) ...................................................13

*Davies Warehouse Co. v. Bowles,*
321 U.S. 144 (1944)...............................................................24

*Di Biase v. SPX Corp.,*
872 F.3d 224 (4th Cir. 2017).................................................45

*Dolan v. City of Tigard,*
512 U.S. 374 (1994)...............................................................39

*English v. Gen. Elec. Co.,*
496 U.S. 72 (1990).................................................................11

*Farm Lab. Org. Comm. v. Stein,*
56 F.4th 339 (4th Cir. 2022) ...................................................6

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000)...............................................................38

*FERC v. Mississippi,*
456 U.S. 742 (1982)...............................................................13

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963)...............................................................13

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000)...............................................................14

*Genesis Health Care, Inc. v. Becerra,*
No. 4:19-cv-01531-RBH, 2023 WL 7549156
(D.S.C. Nov. 3, 2023)..............................................................15

*Guthrie v. PHH Mortg. Corp.,*
79 F.4th 328 (4th Cir. 2023) ...........................................17, 25

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006)...............................................................30

*Haw. Hous. Auth. v. Midkiff,*
467 U.S. 229 (1984)...............................................................44

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Hillsborough County v. Automated Med. Labs., Inc.,*
471 U.S. 707 (1985)........................................................6, 9, 10

*Horne v. Department of Agriculture,*
576 U.S. 350 (2015).............................................................38, 42

*Hughes v. Talen Energy Mktg., LLC,*
578 U.S. 150 (2016)....................................................................28

*J.R. v. Walgreens Boots All., Inc.,*
No. 20-1767, 2021 WL 4859603 (4th Cir. Oct. 19, 2021)...............26

*Kansas v. Garcia,*
589 U.S. 191 (2020)....................................................................15

*Kelo v. City of New London,*
545 U.S. 469 (2005).............................................................44, 45

*Koontz v. St. Johns River Water Mgmt. Dist.,*
570 U.S. 595 (2013)....................................................................39

*Leachco, Inc. v. Consumer Prod. Safety Comm'n,*
103 F.4th 748 (10th Cir. 2024) ....................................................45

*Lingle v. Chevron USA Inc.,*
544 U.S. 528 (2005)....................................................................43

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992).........................................................40, 41, 42

*Magwood v. Patterson,*
561 U.S. 320 (2010)....................................................................23

*Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy,*
34 F.4th 190 (3d Cir. 2022)...........................................................5

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) ......................................................12

*Md. Shall Issue, Inc., v. Hogan,*
963 F.3d 356 (4th Cir. 2020)........................................................42

*Mead Corp. v. Tilley,*
    490 U.S. 714 (1989)............................................................30

*Meisel v. Tri-State Airport Auth.,*
    64 S.E.2d 32 (W. Va. 1951).............................................46

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of*
    *Pub. Welfare,*
    742 F.2d 442 (8th Cir. 1984)..........................................36

*Minor v. Bostwick Lab'ys, Inc.,*
    669 F.3d 428 (4th Cir. 2012)..........................................14

*Moshoures v. City of N. Myrtle Beach,*
    131 F.4th 158 (4th Cir. 2025) .........................................20

*N. Va. Hemp & Agric., LLC v. Virginia,*
    125 F.4th 472 (4th Cir. 2025) ......................................8, 45

*N.Y. State Dep't of Soc. Servs. v. Dublino,*
    413 U.S. 405 (1973)............................................................7

*Nollan v. Cal. Coastal Comm'n,*
    483 U.S. 825 (1987)..........................................................39

*Norfolk S. Ry. Co. v. City of Alexandria,*
    608 F.3d 150 (4th Cir. 2010)..........................................22

*Novartis Pharm. Corp. v. Johnson,*
    102 F.4th 452 (D.C. Cir. 2024)..................6, 13, 23, 30, 31, 32

*Novartis Pharms. Corp. v. Bailey,*
    No. 2:24-CV-04131-MDH, 2025 WL 595189
    (W.D. Mo. Feb. 24, 2025).................................................25

*Novartis Pharms. Corp. v. Espinosa,*
    No. 21-cv-1479 (DLF), 2021 WL 5161783
    (D.D.C. Nov. 5, 2021).......................................................32

*Oklahoma v. Castro-Huerta,*
    597 U.S. 629 (2022)..........................................................29

*Penn Cent. Transp. Co. v. City of New York,*
438 U.S. 104 (1978)................................................................41, 44

*Penn. Coal Co. v. Mahon,*
260 U.S. 393 (1922)......................................................................43

*Perry v. Sindermann,*
408 U.S. 593 (1972)......................................................................38

*Pharm. Rsch. & Mfrs. of Am. v. McClain,*
645 F. Supp. 3d 890 (E.D. Ark. 2022) ........................................28

*Pharm. Rsch. & Mfrs. of Am. v. McClain,*
95 F.4th 1136 (8th Cir. 2024) .................................9, 10, 11, 24, 33

*Pharm. Rsch. & Mfrs. v. Bailey,*
No. 2:24-CV-04144-MDH, 2025 WL 644281
(W.D. Mo. Feb. 27, 2025)............................................................18

*Pharm. Rsch. & Mfrs. v. Fitch,*
No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365
(S.D. Miss. July 1, 2024)...........................................18, 20, 21, 22

*Pharm. Rsch. and Mfrs. of Am. v. Walsh,*
538 U.S. 644 (2003)...................................................................7, 33

*Pinney v. Nokia, Inc.,*
402 F.3d 430 (4th Cir. 2005)..........................................................2

*PPL EnergyPlus, LLC v. Nazarian,*
753 F.3d 467 (4th Cir. 2014).....................................................28, 29

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.,*
131 F.4th 205 (4th Cir. 2025) .......................................................23

*Ruckelhaus v. Monsanto Co.,*
467 U.S. 986 (1984).................................................................37, 38

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum.
Servs.,*
58 F.4th 696 (3d Cir. 2023)........................6, 8, 9, 13, 23, 30, 31

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Satellite Broad. & Commc'ns. Ass'n v. FCC,*
  275 F.3d 337 (4th Cir. 2001)..................................................36

*Sheetz v. County of El Dorado,*
  601 U.S. 267 .............................................................................39, 40

*South Dakota v. Wayfair,*
  585 U.S. 162 (2018)....................................................................37

*State ex rel. Loughry v. Tennant,*
  732 S.E.2d 507 (W. Va. 2012)..............................................46, 47

*Stoddard v. W. Carolina Reg'l Sewer Auth.,*
  784 F.2d 1200 (4th Cir. 1986)...................................................30

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
  535 U.S. 302 (2002)....................................................................40

*U.S. Fid. & Guar. Co. v. McKeithen,*
  226 F.3d 412 (5th Cir. 2000)......................................................41

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012)....................................................6

*Va. Hosp. & Healthcare Ass'n v. Roberts,*
  671 F. Supp. 3d 633 (E.D. Va. 2023) ....................................36, 37

*Va. Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019)....................................................................30

*West Virginia v. EPA,*
  597 U.S. 697 (2022)....................................................................13

*Williamson v. Mazda Motor of Am., Inc.,*
  562 U.S. 323 (2011).........................................................14, 29, 31

*Wyeth v. Levine,*
  555 U.S. 555 (2009)....................................................................4, 6

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Statutes**

42 U.S.C. § 256b ...........................................................................8, 16, 26

42 U.S.C. § 1320f-3.................................................................................22

W. Va. Code § 51-1A-3.............................................................................27

W. Va. Code § 60A-8-6a......................................8, 16, 17, 18, 21, 34

**Regulations**

61 Fed. Reg. 43,549 (Aug. 23, 1996) ....................................................16

61 Fed. Reg, 65,406 (Dec. 12, 1996) ....................................................19

**Other Authorities**

HRSA, *Office of Pharmacy Affairs 340B OPAIS*,
     https://tinyurl.com/4jbdz7nd (last visited Apr. 15, 2025) ...........................23

S. Rep. No. 102-259 (1992) ....................................................................30

## INTRODUCTION

There's something curious about Plaintiffs' briefing. Plaintiffs say they are challenging a West Virginia law that regulates delivery terms in contracts between drug manufacturers and purchasers of 340B-discounted drugs. Yet their attacks mostly target the federal 340B Program itself. Plaintiffs deride dispensed drugs as "supposed 340B prescriptions," Resp. 14, criticize eligibility determinations as employing a "black-box algorithm," Resp. 17, allege a scheme of "elaborate accounting fiction" by covered entities, Resp. 17, and complain that "340B hospitals provide less charity care … than ordinary hospitals," Resp. 19. Their Amici say the same: 340B is said to be "a virtual ATM cash machine for for-profit entities," Community Oncology Amicus Br. 5, so the Court should "pause the implementation of [the Act] to permit … 340B reform to occur at the federal level." Pioneer Amicus Br. 4.

This misdirected focus is the tell that Plaintiffs aren't objecting to West Viginia's law. After all, the question *should* be whether the 340B program forecloses West Virginia from regulating the distribution of certain pharmaceuticals. But by devoting so much time to the federal program's alleged faults, Plaintiffs have revealed their real mission: limiting the federal program's reach.

The 340B Program isn't at issue here. Whatever faults that program might have, the briefs confirm that Plaintiffs are wrong to also take issue with *West Virginia*'s law. For one, Plaintiffs err in refusing to apply "the basic assumption that Congress did not intend to displace state law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453-54 (4th Cir. 2005) (cleaned up). This initial misstep taints the rest of their implied-preemption arguments.

Plaintiffs are then forced to rewrite the law they're challenging to justify their complaints. But 340B and the Act occupy different fields. 340B regulates price, not delivery. The Act regulates delivery, not price. Plaintiffs concede that Section 340B is "silen[t] on delivery." Resp. 90. They even suggest that the "manufacturers were in the business of filling that 'gap,'" *id.*—claiming a power for themselves that they in turn deny to the State. That admission is enough to defeat any field-preemption claim.

Plaintiffs also fail to show any genuine conflict between the Act and 340B, as the two are complementary. By ensuring covered entities can effectively maintain access to and dispense covered drugs, the Act aligns with 340B Program's text and purpose. In arguing otherwise, Plaintiffs seem to press an even more sweeping (and misguided) conception of federal

preemption than the district court did—one that would shut States out from applying *any* law that in *any* way touches on the 340B drug program.

AbbVie goes it alone in also trying to mount a Takings Clause claim, but that solo effort is even more dubious. The Act does not effect a taking. Rather, it is the sort of run-of-the-mill economic regulation that is well within the State's police power.

Things go no better when Plaintiffs parse the remaining injunction factors. They seek to recast purported commercial harm into personal constitutional violations—an effort without precedent. And they ignore how covered entities provide essential services that could be undermined if manufacturers are allowed to limit the distribution of essential medications or burden providers with extra-legal data demands.

Altogether, the district court based its injunction on a flawed understanding of 340B and the Act. Plaintiffs, meanwhile, base their defense of that decision on frustration with the federal statute, a rewrite of West Virginia's law, and some revisionist history about the decisions of other courts. Unsurprisingly, then, the court below is the only one to have found fault with a law like West Virginia's. This Court should vacate the injunction.

**ARGUMENT**

I.  **Plaintiffs' Preemption Claims Are Unlikely To Succeed.**

Plaintiffs primarily argue that the Act is preempted by the federal 340B Program.  To accept that argument, the Court would need to rewrite the Act from a delivery statute to a price statute.  It can't.  Maybe more importantly, the Court would also have to reshape some of preemption's central principles, including the presumption against preemption.

A.  **The Presumption Against Preemption Applies.**

A "cornerstone[]" of federal "pre-emption jurisprudence" is that courts must "start with the assumption that the historic police powers of the States [a]re not to be" preempted by federal law "unless that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Plaintiffs engage with this presumption only at the *end* of their preemption work.  Once there, Plaintiffs insist the Court should ignore the presumption because the Act's subject matter is supposedly "inherently federal in character" and "does not implicate states' traditional police powers."  Resp. 69 (cleaned up).  Plaintiffs are wrong on both counts.

Plaintiffs first misapply *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).  *Buckman* involved state tort-law claims based on a theory

4

that the defendant made "fraudulent representations to the FDA as to the intended use" of its medical devices to obtain "market clearance," and the plaintiffs then "used [the products] to [their] detriment." *Id.* at 347. Thus, the question was whether there could be state-law liability for conduct occurring exclusively in a federal regulatory scheme before a federal regulator. In declining to apply the presumption against preemption to these "fraud-on-the-FDA" claims, the Supreme Court recognized that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id.* (cleaned up). And further, the state-law claims conflicted with "the federal statutory scheme [that] amply empower[ed] the FDA to punish and deter fraud against" the federal government. *Id.* at 348.

Unlike the FDA's medical device approval process in *Buckman*, the 340B Program does not create a "comprehensive scheme" regarding the *delivery* of discounted drugs. *Buckman*, 531 U.S. at 348. Nor does the Act regulate conduct directly before a federal agency. So 340B does not "amply empower[]" the federal government to regulate delivery such that preemption should be presumed. *Buckman*, 531 U.S. at 348; *cf. Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy*, 34 F.4th 190, 198 (3d Cir. 2022) (rejecting the

suggestion that drug distribution accreditation implicated a "uniquely federal interest").

The only remaining question is whether the Act operates in an area of traditional state power. It does. "[M]atters related to health and safety" are fields that have "been traditionally occupied by the States." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985). And "public health law[s]" include those that—like the Act—regulate the "manufactur[ing]" or "*shipment*" of drugs. *Wyeth*, 555 U.S. at 566 (emphasis added). Plaintiffs are quick to label the law a "ruse" that's not a health law at all, Resp. 4, but that contention runs into yet another presumption: "[T]he presumption that legislators and legislatures act in good faith." *Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 353 (4th Cir. 2022).

Trying to evade the Act's clear purpose, Plaintiffs turn to *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), which addressed Alabama's attempt to "enforce the requirements of federal regulations through its own statutory scheme." 691 F.3d at 1297 (cleaned up). Here, West Virginia isn't trying to enforce federal law. The 340B Program is silent on delivery. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023); *Novartis Pharm. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024).

6

Ultimately, Plaintiffs are wrong to suggest that any state law that "could not exist without" a federal law, Resp. 69, must face a reversed preemption burden. *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973) (upholding a New York law imposing employment conditions for federal benefits that went beyond federal requirements). Rather, "[t]he presumption against federal pre-emption of a state statute designed to foster public health … has special force when it appears" to be pursuing a "common purpose" with the federal law. *Pharm. Rsch. and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003). Both 340B and the Act pursue public health via drug regulation. And consider the import of Plaintiffs' bold "could not exist" statement: state criminal charges for fraud could not be brought if they stemmed from a Medicaid payment. State traffic laws would not apply to federal vehicles travelling their roads. And on and on.

This Court should stay the ordinary course and apply the presumption against preemption.

## B.    The Act Is Not Field-Preempted.

The Act does not intrude on an exclusive federal field. Even the district court seemed to recognize this, as it chose not to address the claim. That was right. This Court should likewise find no field preemption.

### 1. The Act Occupies A Different Field From 340B.

Plaintiffs ignore that this Court is skeptical of finding field preemption. "[R]arely does Congress legislate so comprehensively in a particular field that there is no room for supplementary state legislation." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025) (cleaned up). So Plaintiffs face an uphill climb.

Plaintiffs' burden is intensified because Section 340B and the Act occupy separate fields. While Section 340B addresses the drug-pricing field as it relates to prices, diversion, and compliance, *see* 42 U.S.C. §§ 256b(a)(1), (a)(5)(A)-(B), (a)(5)(D), the Act regulates only the delivery and distribution of drugs, W. VA. CODE § 60A-8-6a(b)(1).

Section 340B's framework does not regulate—let alone "pervasive[ly]" regulate—drug delivery or contract-pharmacy distribution. *Arizona v. United States*, 567 U.S. 387, 399 (2012). Section 340B's text is "silent about delivery." *Sanofi*, 58 F.4th at 703 (emphasis omitted); *see Novartis*, 102 F.4th at 460 (Section 340B is "silent about delivery conditions."). And "[n]owhere does Section 340B mention contract pharmacies." *Sanofi*, 58 F.4th at 703. Nor does 340B's compliance framework address delivery or contract-pharmacy distribution. In fact, even though Congress "knew how to impose delivery-

related requirements" and regulate "distribution" by "contract pharmacies," *id.* at 704, Congress "chose not to" require drug manufacturers to deliver their drugs to contract pharmacies. *Id.*

Congress's silence confirms that Section 340B's regulatory framework "does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" but rather "contemplates concurrent state regulation." *AbbVie Inc. v. Fitch* (*Fitch II*), No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965, at *15 (S.D. Miss. July 22, 2024); *see also Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024) ("[T]he 340B Program is not so pervasive … that Congress left no room for the States to supplement it." (cleaned up)), *cert. denied*, 145 S. Ct. 678 (2024). Indeed, drug manufacturers have long argued that 340B leaves *them* free to "fill[]" the delivery "gap." Resp. 90. It makes little sense to assume that States cannot then place conditions of their own.

Finally, consider the "federal interest" in drug delivery. *Arizona*, 567 U.S. at 399 (cleaned up). That interest is not "dominant," *id.*, and does not have "special features," such as the federal government's constitutional "power" over "foreign affairs." *Hillsborough County*, 471 U.S. at 719. Instead, because States "primarily, and historically" regulate "health and

safety matters," it's safe to presume Congress intended concurrent state regulation. *Id.*; *see McClain*, 95 F.4th at 1143 ("[T]he practice of pharmacy is an area traditionally left to state regulation.").

### 2. None Of Plaintiffs' Counterarguments Succeed.

Plaintiffs insist that the statute intrudes on the exclusive federal field of "340B drug pricing and eligibility." Resp. 71. They say the Act invades this federal field by expanding the scope of drug manufacturers' 340B obligations and by creating its own scheme of oversight and enforcement. Resp. 59. But Plaintiffs give away the game when they try to analogize West Virginia's regulation of certain private commercial activities to efforts to meddle in immigration enforcement (one of the strongest federal interests imaginable), the operation of the Bank of the United States (a direct regulation of a federal instrumentality), the qualifications of a member of Congress (qualifications defined by the Constitution), and industrial relations (an area famously displaced by the National Labor Relations Act). Resp. 58-61. Their arguments stretch too far.

Two points help level set. *First*, the Act does not expand the scope of the drug manufacturers' 340B obligations: the Act regulates only drug delivery, not drug prices. It does not expand the list of covered entities or

change the prices to be paid. Nor does it expand the universe of 340B-eligible patients. *Second*, the Act does not create its own oversight and enforcement scheme for Section 340B. Here again, Plaintiffs conflate the Act with the 340B Program itself. The Act does not oversee and enforce compliance regarding "pricing, overcharges, refunds, and diversion," which the 340B Program covers. *McClain*, 95 F.4th at 1144. Instead, the Act allows the State to oversee and enforce compliance with state-law duties on a matter outside 340B's field. And "ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 89 (1990) (cleaned up).

With those principles in mind, Plaintiffs' cases hurt them.

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), for instance, didn't involve a preemption claim. Resp. 58. Yet Plaintiffs maintain *Astra* applies because the Supreme Court "conclud[ed] uniform national standards for administration and enforcement of the 340B Program [were] required." Resp. 58. But *Astra* involved a covered entity suing drug manufacturers for overcharges on covered drugs—essentially a third-party beneficiary claim that sought to impose liability based on federal law alone. *Astra*, 563 U.S. at 118. The Court in *Astra* thus focused on drug prices and

duties under Section 340B. *See id.* at 122 (explaining that 340B's "adjudicative framework" covers complaints about "overcharges and other violations of the discounted pricing requirements" (cleaned up)). But the Act doesn't speak to either. West Virginia is not trying to redirect part of the federal system to its own courts, as in *Astra*.

Plaintiffs also mistakenly liken their case to *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). There, Maryland tried to "control … the operations of [federal] laws enacted … to carry into execution the powers vested in the general government." *Id.* at 436. The Act, however, does not "control" anything in Section 340B's drug-pricing framework, let alone direct the federal government. West Virginia is not trying to tax HHS or the like.

*Arizona* is also no help; it dealt with Congress's "comprehensive" immigration "regime," which "foreclose[d] any state regulation" on punishment. 567 U.S. at 401. Unlike the Arizona law, the Act does not invade the field of 340B pricing and eligibility because it only regulates drug delivery and distribution—neither of which is addressed in the 340B statute. Beyond that, *Arizona* uniquely implicated "the federal government's strong interest, which is not even [purportedly] shared with the states, in regulating

immigration." *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 199 (3d Cir. 2010).

Further, both *Sanofi* and *Novartis* are agnostic on why Congress left this "delivery" field blank. *See Sanofi*, 58 F.4th at 705; *Novartis*, 102 F.4th at 460-61. So if Section 340B "does not compel any particular outcome with respect to covered entities' use of pharmacies," *AstraZeneca Pharms. LP v. Beccera*, 543 F. Supp. 3d 47, 59 (D. Del. 2021), then Plaintiffs cannot insist that "Congress has unmistakably so ordained" that Section 340B displaces state law regulations on contract pharmacies, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

Plaintiffs' view has another fundamental problem. *Sanofi* and *Novartis* speak to what a federal agency thought the federal statute unambiguously required of it, and Plaintiffs seem to assume that the States carry no more authority to act in a given field than the federal agency might. That's misguided. "Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). States, on the other hand, have vast "power to make decisions and to set policy"—it's that power that "gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. 742, 761 (1982).

In the end, Plaintiffs agree that 340B doesn't regulate delivery, but they draw a negative inference from that omission and deem it Congress's conscious choice. Resp. 62. Yet they don't explain why this Court should stray from the conventional wisdom that a federal decision *not* to regulate doesn't preempt a state law that *does*. *See*, *e.g.*, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 608-09 (2011) (holding States could mandate participation in a voluntary federal program); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011) (holding a federal regulation that gave carmakers a choice between two kinds of seat belts didn't preempt state tort suits that would require one). Plaintiffs' preemption-through-silence argument cannot carry water. After all, "[i]naction … is a notoriously poor indication of congressional intent." *Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 436 (4th Cir. 2012).

The Act is not field-preempted.

### C.     **The Act Is Not Conflict-Preempted.**

The Act does not conflict with federal law, either. Like field preemption, conflict preemption is not to be assumed. "[A] court should not find preemption too readily in the absence of clear evidence of a conflict." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). Doubly so where, as here, the presumption against preemption applies. At bottom, Plaintiffs repeatedly

14

assume that any "overlap" between state and federal law dooms the state law. *See* Resp. 4, 47, 56. But "[t]he mere fact that state laws … overlap to some degree with federal … provisions does not even begin to make a case for conflict preemption." *Kansas v. Garcia*, 589 U.S. 191, 211 (2020).

### 1. The Act Helps Further 340B's Objectives.

Far from conflicting with 340B, the Act furthers the federal program's purposes.

Congress passed 340B to ensure that covered entities have broad access to discounted drugs. These discounts are intended to "subsidize other services provided by 340B hospitals" and other covered entities that "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730, 738 (2022); *see also Genesis Health Care, Inc. v. Becerra*, No. 4:19-cv-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023) ("[T]he purpose of the 340B program was to provide a means to make 340B entities profitable."). The discounts also help patients "to afford costly medications" while providing the convenience of outpatient access. *Am. Hosp. Ass'n v. DHHS*, No. 4:20-cv-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021). As HRSA recognizes: "[i]t would defeat the purpose of the 340B program if these

covered entities could not use their affiliated pharmacies in order to participate in the 340B program." 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996). "Otherwise," they would have "to expend precious resources to develop their own in-house pharmacies (which for many would be impossible) or forego participation in the program altogether." *Id.*

Objectives aside, just comparing the two laws' provisions dispels any theoretical conflict. Section 340B has three features to achieve its objectives. First, it caps prices drug manufacturers can charge for certain drugs. *See* 42 U.S.C. § 256b(a)(1). Second, it restricts the healthcare providers that can buy those price-capped drugs. *Id.* §§ 256b(a)(1), (4), (5). Third, it adopts a compliance framework to enforce the price caps and the provider restrictions. *Id.* §§ 256b(d)(1)-(2). Now consider the Act. When a covered entity buys discounted drugs from a manufacturer, the Act prohibits the manufacturer from conditioning that sale on the entity's agreement not to contract with multiple pharmacies or demanding certain data. W. VA. CODE § 60A-8-6a(b). For violations of that prohibition, the Act adopts the State's standard consumer-protection remedies. *Id.* § 60A-8-6a(c)(1)(A).

The two laws do not conflict. The Act does not alter or affect the price caps that Section 340B imposes. Nor does the Act change the restrictions that

Section 340B imposes on the covered entities who can buy drugs under the price caps. Indeed, the Act explicitly respects the federal definition of "340B entity." W. VA. CODE § 60A-8-6a(a)(2). And it does not touch any of the restrictions involving duplicate discounts, diversion, or auditing. Finally, the Act does not affect Section 340B's compliance framework because it does not enforce any rights or duties under the 340B Program. Instead, the Act imposes new duties under a complementary state law and carries penalties for "[t]he commission of any act prohibited by" the state law. *Id.* § 60A-8-6a(c). So both before and after the Act, the same purchasers (covered entities) can procure the same 340B drugs at the same prices and pursue the same federal rights in the same way.

### 2. The Act Is Not An Obstacle To 340B.

Plaintiffs can't cross the "high threshold," *Whiting,* 563 U.S. at 607, needed to show that the Act "stands as an obstacle to the accomplishment of a significant federal regulatory objective." *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 338 (4th Cir. 2023) (cleaned up).

Plaintiffs maintain three parts of the Act conflict with 340B. First, a provision that prevents drug companies from demanding providers' claims data as a condition of providing 340B drugs. Second, a set of enforcement

provisions.  And third, a no-restrictions provision, which tells drug manufacturers not to limit covered entities' ability to contract with outside pharmacies.  But none presents true conflicts.

A. The data-demand provision is not an obstacle.  The Act doesn't prevent drug manufacturers from conducting the audits needed to start Section 340B's dispute-resolution process.  Nothing in the Act blocks a manufacturer from seeking or requiring from covered entities the claims data to which federal law entitles them.  The Act says only that drug manufacturers "shall not … require a 340B entity to submit any claims or utilization data *as a condition* for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is *required* by" HHS.  W. VA. CODE § 60A-8-6a(b)(2) (emphasis added).  So drug manufacturers can still get claims data when tied to a 340B-related audit. That's why other courts have rejected conflict-preemption claims to similar data-demand prohibitions.  *Pharm. Rsch. & Mfrs. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *2 (W.D. Mo. Feb. 27, 2025); *Pharm. Rsch. & Mfrs. v. Fitch* (*Fitch I*), No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *10 (S.D. Miss. July 1, 2024).

Plaintiffs acknowledge that they can still audit covered entities too, but they say the Act limits their ability to strong-arm covered entities like normal. Resp. 41. Ignoring their vast resources, Plaintiffs portray themselves as unsophisticated actors who "may get lucky enough to stumble upon some other information sufficient to meet the audit requirements." Resp. 41. Despite their faux modesty (a troubling posture given their obligations to identify diversion in many contexts), the audit standard is a low one: manufacturers just need to show "reasonable cause," defined broadly to mean a reasonable person could believe that a covered entity may have violated a requirement of Section 340B. *See* 61 Fed. Reg, 65,406, 65,409 (Dec. 12, 1996). Significant changes in quantities of drugs ordered by covered entities or even unverified complaints from patients or other manufacturers about the covered entity is enough. *See id.*

Plaintiffs further complain about an example HRSA offered showing what information might meet the standard, Resp. 41—but that's a non-exclusive example; manufacturers can meet the standard in various ways. And Plaintiffs cannot show a single instance of HRSA rejecting a manufacturer's audit plan due to a lack of claims data. More to the point, Plaintiffs' complaints

about meeting the "reasonable cause" standard are issues with Section 340B and HRSA's application of it, not the Act.

Plaintiffs also invoke a 2020 effort by covered entities to not voluntarily disclose information to manufacturers. Resp. 42-43. But once again, Plaintiffs' complaint is with the 340B statute. The Act doesn't change Section 340B's auditing process. Rather, as HRSA itself recently explained, it is Plaintiffs' pre-audit demands for data that constitute "a change to how the 340B program has operated for more than thirty years." Defs.' Mem. In Support Of Their Cross Motion for Sum. Judg. at 22, *Sanofi-Aventis US, LLC v. Kennedy*, No. 1:24-cv-03496-DLF (D.D.C. Mar. 27, 2025), ECF No. 41-1.

Finally, Plaintiffs say the State uses the wrong standard for how courts should construe the Act to avoid any preemption issue. They maintain that any "narrowing construction" must be "reasonable and readily apparent." Resp. 43 (quoting *Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 166 (4th Cir. 2025) (cleaned up)); *but see Fitch I*, 2024 WL 3277365, at *10 (applying the "fairly … construed" standard to a similar Mississippi law (cleaned up)). But construing the Act to not conflict with federal law is "reasonable and readily apparent," so their standard complaint is immaterial.

For one, the Act does not prevent Plaintiffs from accessing the federal audit process or change that process at all. And despite what Plaintiffs say, Resp. 43, the Act's data-demand provision is appropriately read to go only as far as federal law by prohibiting manufacturers from conditioning 340B offers on information disclosures not required under federal law.

For another, the Act expressly provides that "[n]othing" in its terms should "be construed or applied to be in conflict with … [a]pplicable federal law and related regulations." W. VA. CODE § 60A-8-6a(d). So even if there were some ambiguity about how far the data-demand provision goes, the provision cannot be construed to deny a manufacturer any information it is entitled to under federal law. *See Fitch I,* 2024 WL 3277365, at *10 (finding that a similar Mississippi statute should not be construed to conflict with federal law because the "obvious point" of the law "is to prevent manufacturers from refusing to deliver 340B drugs … to contract pharmacies"); *Arizona,* 567 U.S. at 413-15 (declining to "assume" that statutory provision requiring state officers to determine the immigration status of any person they stop "will be construed in a way that creates a conflict with federal law").

Plaintiffs also muster a half-hearted (and unpreserved) argument that the Act conflicts with the recently enacted Medicare Drug Price Negotiation

Program, under which HHS is to "renegotiate" with manufacturers the "maximum fair price[s]" for certain drugs, 42 U.S.C. § 1320f-3(a). *See* Resp. 40 n.2. Plaintiffs' theory has two problems. First, it's unclear that Plaintiffs have "standing to claim a regulation of healthcare insurers or other third-party payors is preempted." *Fitch I*, 2024 WL 3277365, at *11. Second, the Act has an exception for federal law and related regulations. *See id.* Either way, this argument fails.

When a court can interpret a state law to avoid constitutional concerns, including preemption concerns, it should. *See*, *e.g.*, *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010) ("The *Ashwander* doctrine of constitutional avoidance—which applies with equal force to preemption claims—cautions against any such endeavor."). At a minimum, the district court erred when it failed to do so with the Act's data-demand provision.

**B.** The Act's enforcement provisions are no genuine obstacle to Section 340B, either. Plaintiffs envision 340B as a "carefully calibrated" program that prevents the State from having a drug-delivery compliance framework. Resp. 34, 44-54. But the State's compliance framework does not conflict with 340B because the Act regulates different conduct and enforces different duties. The Act does not impose penalties for "diversion, duplicate discounting, and

overcharging." Resp. 36. The Act instead imposes penalties on drug manufacturers who refuse to deliver 340B drugs to a contract pharmacy. Nothing about that "strikes at the heart of the federal government's ability to uniformly apply and enforce" Section 340B. Resp. 44. And that's why Plaintiffs' complaint that the Act imposes "sanctions Congress did not want" also fails. Resp. 49. Congress left room for state compliance frameworks for different conduct like delivery of drugs. *See Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460; *Magwood v. Patterson*, 561 U.S. 320, 334 (2010); *cf. Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 230 (4th Cir. 2025) (noting how Congress's choice to provide a federal mechanism for certain violations does not foreclose all other avenues of relief).

The Act also doesn't create a "substantial risk of conflicting adjudications." Resp. 47 (cleaned up). All the Act tasks State officials with deciding is whether (1) manufacturers delivered the drugs to where covered entities (who are listed in a federal database, *see* HRSA, *Office of Pharmacy Affairs 340B OPAIS*, https://tinyurl.com/4jbdz7nd (last visited Apr. 15, 2025)) wanted them delivered (that is, contract pharmacies that are also listed in that same federal database) or (2) manufacturers demanded certain information as a condition precedent to delivery. So any determinations on the Act's

enforcement will concern activity that "falls outside the purview of [Section] 340B." *McClain*, 95 F.4th at 1145. And if a manufacturer believes that a covered entity is ineligible for the 340B Program or that diversion is occurring, those are ultimately questions for HRSA.

Plaintiffs further pose an irrelevant hypothetical where a manufacturer says that "some or all of the subject patient prescriptions were not 340B-eligible." Resp. 47. Plaintiffs claim that this will "require the State to apply a federal definition for a 340B 'patient,' leading to disputes about its proper reach." Resp. 47. It's unclear why that's the case; if a 340B drug couldn't be delivered to a covered entity, then it couldn't be delivered to a contract pharmacy. And again, any dispute about reimbursement on prices is solely a matter for HRSA. But even spotting Plaintiffs this point, it doesn't follow that a State applying a federal definition would "lead[] to disputes." Resp. 47. State courts and officials address federal questions of law every day without problems. *See Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 155 (1944) ("[U]niform operation of a federal law is a desirable end, … [b]ut in no case … did we achieve uniformity at the cost of establishing overlapping authority over the same subject matter in the state and in the Federal Government.");

*Guthrie*, 79 F.4th at 339 (rejecting preemption argument despite acknowledging state and federal laws "overlap[ped] closely").

The rest of Plaintiffs' arguments on the enforcement provisions hinge on the district court's flawed interpretation of the Act as a pricing statute rather than a delivery statute. *But see, e.g., Novartis Pharms. Corp. v. Bailey*, No. 2:24-CV-04131-MDH, 2025 WL 595189, at *2 (W.D. Mo. Feb. 24, 2025) (noting how a similar statute did "not control the price [at] which 340B drugs are sold" "by its pla[i]n language").

For instance, because Plaintiffs misread the Act to regulate pricing, they believe *Astra* should apply. Resp. 48. But in *Astra*, the covered entities were trying to enforce Section 340B and combat alleged "overcharg[es]." 563 U.S. at 113, 116. Plaintiffs confirm *Astra*'s narrow holding that the federal dispute resolution scheme covers overcharging. Resp. 55. Exactly. The State isn't concerned about squabbles over price; it only cares about the delivery of drugs.

Plaintiffs point out that certain covered entities have tried to use the ADR process to challenge a manufacturer's failure to cover 340B drugs to contract pharmacies. Resp. 56 & n.3. But the petition they cite relied on HHS's 2020 advisory opinion for jurisdiction. Compl. ¶ 105, *AstraZenca*

*Pharms. LP v. Becerra*, 1:21-cv-00027-LPS (D. Del. July 9, 2021) ("To justify subjecting AstraZeneca to the ADR Panel's jurisdiction, the ADR petitioners uniformly invoked the Advisory Opinion."). Of course, both *Sanofi* and *Novartis* rejected the 2020 advisory opinion, and there's no sign that these petitions went anywhere. A few petitions mistakenly sent through the federal process have no bearing on how these claims are handled today.

Next, Plaintiffs ignore federal law by claiming that the Act regulates pricing. They focus on the Act's use of "acquisition" to suggest that the Act "extends beyond delivery" to "allow[ing] contract pharmacies to acquire their drugs at reduced prices." Resp. 51. But that ignores the context of the Act and its limited application to drugs purchased by covered entities and drugs that would have been purchased by covered entities but for manufacturers' delivery restrictions to contract pharmacies. What's more, federal law allows only covered entities to purchase 340B drugs. 42 U.S.C. § 256b; *J.R. v. Walgreens Boots All., Inc.*, No. 20-1767, 2021 WL 4859603, at *2 (4th Cir. Oct. 19, 2021). So the Act cannot—and does not—regulate transactions involving drug purchases by pharmacies. Plaintiffs' hypothetical about a drug

manufacturer's direct sales to a contract pharmacy does not apply for the same reasons.[*]  Resp. 51-52.

Plaintiffs ask this Court to ignore *McClain* because the Eighth Circuit purportedly "incorrectly assumed that each contract pharmacy acts as an agent of a covered entity."  Resp. 73.  That's because, Plaintiffs say, "contract pharmacies often order 340B drugs from manufacturers themselves, using the covered entities' purchasing accounts."  Resp. 73.  But if a covered entity has entered into a contract with a pharmacy or authorized a pharmacy to take delivery of its 340B drugs, then the pharmacy *is* acting as its agent when it places the order on the covered entity's behalf.  And Plaintiffs know that pharmacies can't directly purchase 340B drugs, so an authorized relationship must exist.

Plaintiffs next set their sights on the product replenishment model, which they say shows that the Act "only targets the price that manufacturers demand for those deliveries."  Resp. 52.  That's because Plaintiffs say they already deliver drugs to any pharmacy that wants them.  Resp. 52.  But Plaintiffs *won't* send 340B drugs to contract pharmacies beyond the single

---

[*] If the Court had any doubt about this pure question of state law, then it should certify the question to the Supreme Court of Appeals of West Virginia. *See* W. Va. Code § 51-1A-3.

contract pharmacy they allow under their current arrangements with covered entities.

And there's no evidence that shows a pharmacy will dispense a 340B drug on behalf of a covered entity if the pharmacy knows that the manufacturer will refuse to replenish. In other words, the replenishment process is a separate delivery transaction that the manufacturers are refusing to complete. The replenishment model doesn't change a delivery question into a price one. *See Fitch II,* 2024 WL 3503965, at *13-14 (holding that state law's intersection with the replenishment model did not give rise to preemption); *Pharm. Rsch. & Mfrs. of Am. v. McClain,* 645 F. Supp. 3d 890, 900 (E.D. Ark. 2022) (same). And any incidental, downstream effect from the Act on price does not give rise to preemption. *See, e.g.*, *Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150, 164 (2016) ("States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain.").

Plaintiffs then turn to *PPL EnergyPlus, LLC v. Nazarian,* 753 F.3d 467 (4th Cir. 2014), Resp. 53-54, even though this Court emphasized "the limited scope" of its holding there, 753 F.3d at 478. In any event, Maryland's program there failed because it struck "at the heart of the agency's statutory power to

establish rates for the sale of electric energy in interstate commerce by adopting terms and prices set by Maryland, not those sanctioned by FERC." *Id.* (cleaned up). In contrast, the Act does not intrude on Section 340B's drug-price caps or invade Section 340B's enforcement framework. So *PPL EnergyPlus* isn't relevant.

**C.** Finally, Plaintiffs say that the Act broadens drug manufacturers' obligations under Section 340B. Resp. 62-63. But nothing about that is unlawful. Congress chose not to regulate delivery conditions, which leaves room for states to regulate.

Plaintiffs agree that Congress chose not to regulate contract pharmacies in Section 340B. Resp. 63. But they say that Congress's choice not to act also forecloses state regulation. Longstanding principles of federalism say otherwise. *See, e.g.*, *Whiting*, 563 U.S. at 608-09; *Williamson*, 562 U.S. at 336; *see also AstraZeneca*, 543 F. Supp. 3d at 59 (recognizing that Section 340B's "silen[ce]" on "contract pharmacies" indicates that the statute "does not compel any particular outcome with respect to [their] use"). And the "fundamental problem" with Plaintiffs' "implicit intent argument is that the text of [340B] says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Doubly so given that the State is regulating in a traditional state

area, so courts presume the Act is proper absent "clear and manifest congressional purpose" to preempt the law. *Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1207 (4th Cir. 1986).

Continuing their search for legal footing, Plaintiffs turn to legislative history, arguing a failed bill that "would have required 340B-priced drugs to be distributed under a 'contract entered into for on-site pharmacy services'" shows Congress intended for no regulation on delivery to contract pharmacies. Resp. 65-66 (quoting S. Rep. No. 102-259 (1992)). But failed legislation is not a "reliable indicator[] of congressional intent." *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989). Especially in the preemption context, the Supremacy Clause cannot "be deployed … to elevate abstract and unenacted legislative desires above state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion). Even *Sanofi*, which Plaintiffs rely on, emphasizes that "drawing inferences from unenacted drafting history is perilous," and that the omission could support the "opposite inference." 58 F.4th at 705 (cleaned up).

If any meaning can be gleaned from Congress's failure to enact legislation that would have "categorically prohibited" off-site "contract pharmacies," *Novartis*, 102 F.4th at 462, it should be that Congress intended to permit delivery of 340B drugs to off-site contract pharmacies. *See Hamdan*

*v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result [urged] here weighs heavily against [the plaintiffs'] interpretation.")  But at minimum, the bill's failure shows that allowing manufacturers to decline to deliver to contract pharmacies was not a "significant objective."  *Williamson*, 562 U.S. at 330 (cleaned up).

Plaintiffs are also wrong to think that the Act is preempted because "Section 340B requires only that a manufacturer 'offer' certain drugs to covered entities at … the applicable ceiling price."  Resp. 64; *see* Br. 68. Section 340B's silence means that it does not, *standing alone*, "abrogate[]" the default rule that a seller can impose "some delivery conditions" in an offer— so long as those conditions are "otherwise lawful."  *Novartis*, 102 F.4th at 460; *see Sanofi*, 58 F.4th at 706 (holding that Section 340B does not itself "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies"). The State agrees that Section 340B "does not" by its own force "categorically prohibit" drug manufacturers "from imposing conditions on the distribution of covered drugs," nor does it grant an affirmative right to impose conditions. *Novartis*, 102 F.4th at 464.  But that position of federal neutrality doesn't address whether States can act against certain conditions or declare certain

conditions to be "otherwise [un]lawful." *Id.* at 460. State law remains the backdrop, like always.

Plaintiffs offer no meaningful response. They say the State "has now stepped in and explicitly required the federal price even where no such purchase [of 340B drugs] has occurred." Resp. 66. Plaintiffs know better. They know that no price is offered to a covered entity if no purchase by that entity occurs. All the Act does is prevent drug manufacturers from including certain restrictions on *where* the drugs go.

Making no inroads there, Plaintiffs wade into the murky waters of legislative intent. They suggest that Section 340B aims to incentivize manufacturers to participate in the Program "without becoming so exploitive as to encourage their withdrawal." Resp. 67. But the lone scrap of authority Plaintiffs cite for that proposition, *Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479 (DLF), 2021 WL 5161783 (D.D.C. Nov. 5, 2021), was talking about the statutory provision prohibiting diversion and other anti-fraud provisions. *See id.* at *7. Those provisions remain on the table. More importantly, even *Novartis* recognized that Section 340B is "silent as to what distribution requests *manufacturers* must accept." *Id.* at *6. And Plaintiffs are wrong about Section 340B's purpose: protecting manufacturers from the burden of

higher volumes of sales of discounted drugs to covered entities was not Congress's objective in enacting the 340B program. *See Walsh*, 538 U.S. at 668 (observing that the "impact on manufacturers" of a Maine prescription drug law "is not relevant because any transfer of business to less expensive products will produce savings for the Medicaid program" and holding that the Maine law was not preempted). So Plaintiffs' claim that the Act undermines Section 340B is unsupported.

Congress's objective in enacting Section 340B was to ensure a covered-entity's eligible patients could easily access discounted drugs. *Am. Hosp. Ass'n*, 596 U.S. at 730, 738; *see* Resp. 67 (conceding 340B "creates [benefits] for covered entities"). The Act promotes this objective by precluding the imposition of delivery restrictions on certain entities; it eliminates a roadblock to the completion of drug sales to covered entities at federally mandated discounted prices. *See McClain*, 95 F.4th at 1144-45 (rejecting conflict-preemption claim where state law "assist[ed] in fulfilling the purpose of [section] 340B").

Plaintiffs have failed to show that the Act conflicts with federal law.

## II. AbbVie's Claim Is Unlikely To Succeed.

The only remaining argument offered is AbbVie's claim, which it alone advances. But it bases its claim on faulty premises about the Act's effect and purpose, and it cannot support a preliminary injunction (as even the district court seemed to see). The Act is not a physical taking, a regulatory taking, or an unconstitutional condition.

### A. The Act Does Not Effectuate A Per Se Physical Taking.

A per se physical taking occurs only "[w]hen the government physically acquires private property" for itself or a third party. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). AbbVie declares the Act does this by "compel[ling] AbbVie to transfer its property to private parties." Resp. 75. Not so. The Act doesn't force any sale. It sets two conditions that must be followed for sales that manufacturers voluntarily choose to make. W. VA. CODE § 60A-8-6a(b).

AbbVie admits the Act only "prohibit[s] manufacturers from including non-price limitations." Resp. 78. But it believes that *anything* pertaining to those offers must be "federally mandated." Resp. 78. For one thing, these "federally mandated" offers are voluntarily made by AbbVie's participation in the 340B Program. *See Astra*, 563 U.S. at 113 ("Drug manufacturers opt into

the 340B Program.").  But even if those sales were federally mandated, this problem would be an argument against the 340B Program, not the Act.

AbbVie stops just short of admitting this, arguing that "[r]equiring A to sell to B is the same as preventing A from refusing to sell to B."  Resp. 78 (cleaned up).  That might be right conceptually (though it comes perilously close to the fallacy of denying the antecedent).  But it is completely divorced from 340B's reality.  For one thing, the Act does not "prevent" AbbVie from refusing to sell anything; it says if AbbVie chooses to sell to a covered entity, it cannot place certain conditions on that sale.  For another, AbbVie is unclear about B's identity.  If B is the contract pharmacy, the hypothetical does nothing here, as a sale between AbbVie and contract pharmacies *never* occurs.  The only sale that could take place is between the manufacturer and the covered entity.  But if B is the covered entity in AbbVie's hypothetical, any gripes about selling to covered entities are issues with the 340B Program, not the Act. The Act does not compel sales to any party, including covered entities.  AbbVie's argument conflates the Act's regulatory conditions with 340B's transfers.

## B. The Voluntary Participation Doctrine Applies.

The voluntary participation doctrine does apply. *Contra* Resp. 78. After all, the presence of "conditions on … use of a benefit … the government need not have conferred" is not a taking. *Satellite Broad. & Commc'ns. Ass'n v. FCC*, 275 F.3d 337, 368 (4th Cir. 2001). And AbbVie doesn't claim that its participation in the 340B Program isn't voluntary. Instead, the manufacturer argues only that it hasn't "voluntarily chosen to participate" in the Act's scheme because it does not "receive anything from West Virginia in exchange." Resp. 78.

But none of the cases AbbVie cites, Resp. 80-81, stand for the idea that States must give an additional benefit to impose conditions on a voluntary federal program. *See*, *e.g.*, *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (explaining that the "voluntariness" of "participat[ion] in Medicaid" "foreclose[d] the possibility that the [state] statute could result in an imposed taking of private property"). In fact, *Minnesota* expressly said that "the privilege or benefit involved [wa]s participation in the Medicaid program." *Id.* Meanwhile, *Virginia Hospital & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633 (E.D. Va. 2023), did not address this issue at all. *Roberts* said only that a Virginia

law "necessarily mandate[d] … participation in Medicare, and as a result, participation in EMTALA," which might give rise to a takings claim under *state* law. *Id.* at 666-67. AbbVie does not argue that the Act compels participation in the 340B Program though, so *Roberts* has no bearing here.

Still, the State does offer something in return. As AbbVie recognizes, compliance with the Act comes with the benefit of participating in a part of "the pharmaceutical market in the State." Resp. 81. AbbVie says this isn't enough. But "[s]tate laws that regulate even-handedly to effectuate a legitimate local public interest … will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). And pharmaceuticals are an area "that has long been the source of public concern and the subject of government regulation." *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984). So especially in that field, state regulation is a necessary burden in exchange for "the advantage of living and doing business in a civilized community." *Andrus v. Allard*, 444 U.S. 51, 67 (1979). Thus, "as long as [AbbVie] is aware of the conditions … and the conditions are rationally related to a legitimate Government interest," the "economic advantage" of market

participation is enough such that the Act "can hardly be called a taking." *Monsanto*, 467 U.S. at 1007.

And AbbVie's preferred case, *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), only confirms this understanding. In *Horne*, the Supreme Court was clear that the sale of property in that case, raisins, was basic "interstate commerce" that could not have heavy conditions on market participation because of the product's innocuous nature. *Id.* at 366. In doing so, the Supreme Court observed that sales of more volatile products such as "hazardous chemicals" or "dangerous pesticides" would permit much greater regulatory burdens in exchange for the ability to sell these sorts of products. *Id.* And while raisins "are a healthy snack," *id.*, "virtually every drug … poses dangers under certain conditions," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 (2000). Thus, the Act's conditions are permissible in exchange for the benefit of market participation in a heavily regulated field.

## C. The Act Does Not Violate The Unconstitutional Conditions Doctrine.

AbbVie makes another, similar argument that the Act violates the unconstitutional conditions doctrine. That doctrine says that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597

38

(1972). But a government may constitutionally condition receipt of a governmental benefit if an "essential nexus and rough proportionality" exists between the government interest and the condition. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). Just as it is not a taking, neither does the Act impose unconstitutional conditions.

On the nexus requirement, the State must only be "acting to further its stated purpose, not leveraging its" power "to exact … property without paying for it." *Sheetz v. County of El Dorado*, 601 U.S. 267, 275. Here, the nexus is clear: the Act serves the purpose of promoting health by ensuring 340B drugs reach patients. In any event, the State here is not "obtaining" anything, anyway. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987). Likewise, the benefits are the same as those in the physical takings analysis: federal program benefits and market participation in the State.

As for rough proportionality, the Court need only make "some sort of individual determination" that the benefit is proportional to the burden. *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994). That factor is met here as "340B hospitals perform valuable services for low-income and rural communities." *Am. Hosp. Ass'n*, 596 U.S. at 738. The program aids their financial viability. And by ensuring that eligible patients can receive their

drugs, the Act serves that same goal without requiring AbbVie "to give up more than is necessary." *Sheetz*, 601 U.S. at 276.

**D.    The Act Does Not Effect A Regulatory Taking.**

AbbVie goes to great lengths to avoid examining the Act through the lens of the regulatory takings doctrine.  And for good reason: "government regulation—by definition—involves the adjustment of rights for the public good." *Andrus*, 444 U.S. at 65.  Thus, a per se regulatory taking occurs only in "the relatively rare situations where the government has deprived a [property owner] of all economically beneficial uses" of their property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018 (1992).  Yet AbbVie says that the Act will merely have a "significant impact on [its] property."  Resp. 88.  Even assuming AbbVie is right about that, experiencing a significant impact is different from being "permanently deprive[d] … of all value." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002).

AbbVie brushes these notions aside and declares that "citations to land-use regulation cases are unhelpful for assessing a regulation of chattels."  Resp. 89.  The Supreme Court disagrees: "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation

might even render his property economically worthless." *Lucas*, 505 U.S. at 1027. So if anything, the State's "citations to land-use regulation cases," Resp. 89, provided AbbVie *more* protection than it was owed.

AbbVie maintains personal property is more sacred by looking to a single out-of-circuit case. Resp. 89 (citing *U.S. Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412 (5th Cir. 2000)). But *McKeithen* went "out of its way to emphasize the fact-specific nature" of its decision. 226 F.3d at 419. The law there was retroactive, and the "mantra that insurance is a regulated industry will not cover all sins of retroactivity." *Id.* at 418. The Act is not retroactive, and AbbVie does not claim otherwise. Thus, this Court should stick with the normal approach and find the Act is not a per se regulatory taking.

Just as it's not a per se regulatory taking, neither is the Act a regulatory taking under the *Penn Central* factors. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

On economic impact, AbbVie says that the Act will have "a significant impact on" AbbVie's property. Resp. 88. But a significant impact is far from sufficient, as the Supreme Court has "uniformly reject[ed] the proposition that diminution in property value, standing alone, can establish a taking." *Penn Central*, 438 U.S. at 131 (cleaned up); *see also Andrus*, 444 U.S. at 67-68

(upholding a complete "prohibition" on the sale of certain Native American artifacts and explaining that "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim"). So "[a] regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central*." *Horne*, 576 U.S. at 364; *see also Lucas*, 505 U.S. at 1027-28 (same).

AbbVie fares no better on whether the regulation interfered with investment-backed expectations. On this point, AbbVie claims that the Act is "no ordinary state regulation." Resp. 90. Put aside the many other States with similar laws. Even if the Act made AbbVie's "personal property economically worthless, owners are aware of that possibility in areas where the State has a traditionally high degree of control." *Md. Shall Issue, Inc.*, *v. Hogan*, 963 F.3d 356, 367 (4th Cir. 2020) (cleaned up). And there are "few types of personal property that are more heavily regulated than the" pharmaceuticals affected here, thus rendering the Act's regulations foreseeable. *Id.*

Finally, AbbVie is wrong that the Act's character "permanent[ly] appropriate[es]" AbbVie's property. Resp. 91. The Act doesn't physically seize any property and instead "merely affects property interests" by limiting

conditions on the sale of that property and thereby "adjusting the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 539 (2005). That effect does not amount to a taking either, as "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922). And in the public-health field, it's right that drug manufacturers such as AbbVie might bear this cost. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) (explaining that the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

## E. The Act Serves A Public Purpose Under Any Framework.

Under any of these frameworks, the Act's purpose is the same: to promote the "public health"— one "of the more conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 26, 32 (1954). None of AbbVie's arguments change that.

For instance, AbbVie quibbles with the State's reference to the Act's "purpose" rather than how the Act allegedly "use[s]" AbbVie's property. Resp. 84. But no physical taking happened in the first place, so the Act doesn't

"use" the manufacturer's property at all. Rather, the Act merely places regulations on the distribution of certain pharmaceuticals in the State, which is well within the State's power. *See Penn Central*, 438 U.S. at 124 (explaining that "in a wide variety of contexts," the government "may execute laws or programs that adversely affect recognized economic values").

Even if the Act somehow did "use" AbbVie's property, it would still be doing so to advance the public health—an area under the State's traditional police power. And "the public use requirement is … coterminous with the scope of a sovereign's police powers." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984). Indeed, the Supreme Court has long "embraced the broader and more natural interpretation of public use as 'public purpose.'" *Kelo v. City of New London*, 545 U.S. 469, 480 (2005). Thus, AbbVie's semantic argument accomplishes nothing.

Linguistic nitpicks aside, AbbVie's main argument against the Act's public health purpose is just that AbbVie doesn't think the Act will "satisfy" that purpose. *See* Resp. 86. Thus, AbbVie implicitly concedes that the Act is intended to serve the public health. And rather than saying what impermissible purpose the Act allegedly serves, the company just complains about the 340B Program itself, concluding that under *that* program, "the

profits and revenues of contract pharmacies and covered entities continue to balloon, at the expense of manufacturers and patients alike." *Id.* at 87. Any problems that AbbVie has with the 340B Program should be directed at that statute, not the Act. They certainly don't override the "great respect" owed to "state legislatures … in discerning local public needs." *Kelo*, 545 U.S. at 482.

### III. The Other Factors Favor The State.

Plaintiffs' arguments on the remaining injunction factors hinge on their assumption that their merits arguments are correct. That assumption is baseless. Plaintiffs' "failure to show a likelihood of success on the merits dooms their request for a preliminary injunction." *N. Va. Hemp*, 125 F.4th at 497. Even apart from that, Plaintiffs tout commercial injuries over the interest of a State in its validly enacted laws. *Cf. Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."). Little authority endorses that balance—not the cases speaking to deprivation of a constitutional right as a *per se* irreparable harm. Rather, "cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government." *Leachco, Inc. v.*

*Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024). Although preemption issues implicate the Supremacy Clause, Plaintiffs cannot earnestly suggest that they have a constitutional right to distribute drugs in the manner of their choosing.

## IV. The Injunction Sweeps More Broadly Than Necessary.

Even if they are correct about some of their claims, Plaintiffs fail to show that the entire Act must be discarded. This starts with a threshold problem: though Plaintiffs rightly agree that "State law governs th[e] severability analysis," Resp. 92, they skip over a key aspect of West Virginia's severability analysis. Under the State's law, it is "presumed that the Legislature intended to enact a valid, effective, and permanent statute." *Meisel v. Tri-State Airport Auth.*, 64 S.E.2d 32, 42 (W. Va. 1951). And "[u]nless there is a provision in" a statute "specifying that the provisions thereof shall *not* be severable, the provisions … *shall* be severable." *State ex rel. Loughry v. Tennant*, 732 S.E.2d 507, 519 (W. Va. 2012) (emphasis added). So when part of a statute is stricken … as being unconstitutional," West Virginia law presumes that "the remainder of the Act will remain intact as being a constitutional legislative enactment." *Meisel*, 64 S.E.2d at 43 (noting this "general rule" is especially

salient when, like here, there is a "severability provision[]").  Plaintiffs don't engage with, let alone overcome, this presumption.

Here, removing any single part of the statute "does not defeat the purpose" of the Act.  *State ex rel. Loughry*, 732 S.E.2d at 519.  For instance, if—as the district court found—the data-collection proscription was unlawful but the contract-pharmacy proscription was not, the latter requirement would function fine absent the former.  Even without enforcement, the Act would still indicate the State's policy belief that wider access to 340B drugs is good for the State's citizens.  That alone is sufficient not to enjoin it in full.

## CONCLUSION

The Court should vacate the preliminary injunction.

Respectfully submitted,

JOHN B. MCCUSKEY
   ATTORNEY GENERAL

/s/ Michael R. Williams
 Michael R. Williams
   *Solicitor General*
   *Counsel of Record*

Caleb A. Seckman
Spencer J. Davenport
   *Assistant Solicitors General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov

Dated: April 17, 2025      *Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

1.      This reply brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 9,737 words.

2.      This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams
