**No. 25-1054 (L)**
**(*Additional captions and signature blocks on inside cover*)**

# United States Court of Appeals
# for the Fourth Circuit

---

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff - Appellee,*

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,

*Defendants - Appellants.*

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
CASE NO. 2:24-CV-00271 (Johnston, T.)

---

**APPELLEES' RESPONSE IN OPPOSITION TO APPELLANTS'
PETITION FOR REHEARING EN BANC**

---

## No. 25-1055

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation; PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs - Appellees*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants - Appellants*.

————————————

On Appeal From The United States District Court
For The Southern District Of West Virginia
CASE NO. 2:24-CV-00272 (Johnston, T.)

## No. 25-1056

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff - Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West

Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,
*Defendants - Appellants.*

––––––––––––––

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00298 (Johnston, T.)

––––––––––––––

ERIN. E. MURPHY
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellee*
*Pharmaceutical Research and Manufacturers of America*

MATTHEW S. OWEN, P.C.
MEREDITH M. POHL
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000

matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

CARTE P. GOODWIN
FBT GIBBONS
500 Virginia Street East
Charleston, WV 25301
(304) 348-2422
cgoodwin@fbtgibbons.com

JESSICA ELLSWORTH
SUSAN M. COOK
MARLAN J. GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
susan.cook@hoganlovells.com
marlan.golden@hoganlovells.com

*Counsel for Plaintiff – Appellee*
*Novartis Pharmaceuticals Corporation*

April 27, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

INTRODUCTION ........................................................................................... 1

BACKGROUND............................................................................................. 2

ARGUMENT.................................................................................................. 9

I.    The Panel Decision Is Correct ......................................................... 10

II.   This Court Should Not Repeat the Fifth and Eighth Circuits'
      Errors ............................................................................................... 17

CONCLUSION ............................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*AbbVie Inc. v. Drummond,*
808 F.Supp.3d 1266 (W.D. Okla. 2025)...............................6, 16, 17, 20

*AbbVie, Inc. v. Brown,*
809 F.Supp.3d 1341 (D. Utah 2025)....................................................17

*AbbVie, Inc. v. Fitch,*
152 F.4th 635 (5th Cir. 2025) .....................................................17, 18

*AbbVie, Inc. v. Murrill,*
166 F.4th 528 (5th Cir. 2026) .....................................................17, 18

*Astra USA, Inc. v. Santa Clara Cnty.,*
563 U.S. 110 (2011) .........................................................................3, 4

*AstraZeneca Pharms. LP v. McClain,*
2025 WL 4092197 (E.D. Ark. Sep. 30, 2025) .....................................20

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ....................................................................11, 13

*GenBioPro, Inc. v. Raynes,*
144 F.4th 258 (4th Cir. 2025) .....................................................11, 18

*Geo Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) .............................................................11

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1,*
469 U.S. 256 (1985) ...........................................................................11

*McCulloch v. Maryland,*
17 U.S. 316 (1819)..............................................................................11

*Novartis Pharms. Corp. v. Johnson,*
102 F.4th 452 (D.C. Cir. 2024) .......................................................3, 7

*PhRMA v. McClain,*
95 F.4th 1136 (8th Cir. 2024) ................................................17, 18, 19

*Sanofi Aventis U.S. LLC v. HHS,*
  58 F.4th 696 (3d Cir. 2023) .............................................................5, 6, 7

*United States v. Locke,*
  529 U.S. 89 (2000) ...............................................................................18

*Wyeth v. Levine,*
  555 U.S. 555 (2009) .............................................................................15

**Statutes**

42 U.S.C. §256b(a)(4) ................................................................................3

42 U.S.C. §256b(a)(5) .......................................................................3, 4, 16

42 U.S.C. §256b(d)(1) ................................................................................4

42 U.S.C. §256b(d)(2) .............................................................................3, 4

42 U.S.C. §256b(d)(3) ................................................................................4

W. Va. Code §60A-8-6a(a)(1) .....................................................................7

W. Va. Code §60A-8-6a(b) ..........................................................................7

W. Va. Code §60A-8-6a(b)(1) ...................................................................19

W. Va. Code §60A-8-6a(b)(2) ...................................................................19

**Rules**

42 C.F.R. §10.21(a)(1) .....................................................................4, 14, 20

61 Fed. Reg. 43,549 (Aug. 23, 1996) ........................................................5

82 Fed. Reg. 1,210 (Jan. 5, 2017) .............................................................4

89 Fed. Reg. 28,643 (Apr. 19, 2024) .......................................................14

**Other Authorities**

*340B ADR Decision Summaries,* HRSA (Mar. 9, 2026),
  https://tinyurl.com/ae3yekwb ...........................................................20

Order, *AbbVie Inc. v. Lopez,*
      No. 1:25-cv-00230 (D. Haw. Feb. 19, 2026), Dkt.81 ........................... 17

Order, *AbbVie Inc. v. Wrigley*,
      No. 1:25-cv-00081 (D. N.D. Apr. 27, 2026), Dkt.83 ........................... 20

Brief for the United States, *AbbVie, Inc. v. Murrill*,
      No. 24-30645 (5th Cir. Apr. 7, 2026), Dkt.217 ................................... 21

**INTRODUCTION**

West Virginia recently enacted a statute ("S.B. 325") that imposes onerous burdens on only those private parties who choose to participate in a federal spending-power program in which Congress gave states no role. As the panel explained in holding that law likely preempted, S.B. 325 not only "specifically target[s] … for unfavorable treatment" just those pharmaceutical manufacturers that participate in the federal 340B Drug Pricing Program, but "alters the 340B program's fundamental bargain." Op.25-26. Congress also established a uniform enforcement system for the 340B Program when it enacted the Program, and S.B. 325 "likely interferes operationally with multiple aspects of the 340B program." Op.24-28. Specifically, S.B. 325 intrudes on exclusive federal enforcement of the Program's requirements and impairs manufacturers' ability to collect data practically necessary to initiate the Program's audit mechanism. *Id.* Those are not things states have license to do—as the United States has explained in the multiple amicus briefs it has now filed arguing that laws like S.B. 325 violate the Supremacy Clause for much the same reasons the panel identified here.

Notably, neither circuit that has rejected preemption challenges to similar laws confronted the threshold problem that these laws exclusively regulate participants in a federal spending-power program in which Congress gave states no role. Indeed, neither court even acknowledged that these laws directly target a federal program. Nor did either court have before it the United States' views that laws like these intrude on federal prerogatives for the same reasons the panel identified. Both will have an opportunity to consider those views in proceedings that remain ongoing, and it is far from clear that they will reach the same results once they do. Indeed, it is hard to see how they could, as the majority was entirely correct: States simply do not have the power to rewrite the terms of participation in or interfere with the operation of federal programs in which Congress has given them no role. This Court should deny the petition.

## BACKGROUND

1. West Virginia's breezy discussion of the federal 340B Program elides how it actually works. The Program "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113

2

(2011).  But Congress did not and could not compel that result outright.
It instead offered manufacturers a deal.  If a manufacturer wants the
federal government to reimburse its drugs when they are furnished to
Medicaid or Medicare Part B beneficiaries, then it must agree to "offer"
to sell them to certain providers at steeply reduced prices—often as low
as a penny per unit.  *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th
452, 456 (D.C. Cir. 2024).  In particular, a manufacturer must extend
that offer to "covered entit[ies]," a statutorily defined universe of
healthcare providers.  *See* 42 U.S.C. §256b(a)(4).

While covered entities typically serve low-income patients, they are
not required to pass on to their patients the cost-savings they achieve by
purchasing reduced-price drugs under the 340B Program.  Op.8.  They
are instead free to sell those drugs to patients and their insurers at full
price, pocketing the difference.  Recognizing the powerful incentive
covered entities would have to maximize full-price sales of drugs
purchased at deeply discounted 340B prices, Congress imposed two
critical safeguards.  First, covered entities "shall not resell or otherwise
transfer the drug to a person who is not a patient of the entity"—a
prohibition on "diversion."  42 U.S.C. §256b(a)(5)(B), (d)(2)(A).  Second,

Congress forbade "duplicate discounts," meaning that manufacturers cannot be required to provide Medicaid rebates and 340B pricing on the same unit of a drug. *Id.* §256b(a)(5)(A).

Congress tasked HHS with administering and enforcing the 340B Program, *see id.* §256b(d)(2)(B)(v), and instructed it to create an administrative dispute resolution ("ADR") process, *see id.* §256b(d)(3). HHS's ADR regime covers all 340B-related disputes between manufacturers and covered entities. That includes "overcharge" claims, *i.e.*, claims "that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). Consistent with Congress's decision to task HHS with "administer[ing] both Medicaid and §340B harmoniously and on a uniform, nationwide basis," *Astra*, 563 U.S. at 120, the agency's jurisdiction to oversee disputes over 340B discounts is exclusive, *see* 42 U.S.C. §256b(d)(1)(B)(vi); 82 Fed. Reg. 1,210, 1,220 (Jan. 5, 2017) (providing for direct enforcement by HHS); Dkt.129, Ex.1 (Brief of the United States as Amicus Curiae, *AbbVie v. Weiser*, No. 25-1439 (10th Cir. Feb. 25, 2026)) (hereinafter "U.S.Amicus") at 15-16.

4

2. The 340B Program began as a relatively small star in the federal healthcare constellation. But it has become an enormous part of prescription-drug spending. In 2024, covered entities bought more than *$80 billion* worth of drugs via 340B. U.S.Amicus.5; *see* Op.12 n.3. Much of that growth stems from covered entities' use of so-called "contract pharmacies" like CVS and Walgreens.

West Virginia claims that these for-profit pharmacies "have always been important participants" in the 340B Program. Pet.5. That is misleading in the extreme. Congress designed 340B to operate only through covered entities; it assigned contract pharmacies no role in the 340B Program. Early on, though, HHS announced that a covered entity with no in-house pharmacy should be able to contract with *one* outside pharmacy to dispense 340B-priced drugs, so that the covered entity would not be excluded from 340B. 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996).

In 2010, HHS changed course, asserting that covered entities could contract with "an unlimited number of contract pharmacies," whether across the street or across the country. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 700 (3d Cir. 2023). The number of contract pharmacies

5

exploded, increasing "twentyfold." *Id.* "What was once a modest payday became a jackpot for covered entities" and contract pharmacies alike. Op.12. But this contract-pharmacy free-for-all dramatically increased the risk of fraud and abuse in the 340B Program, as multiple federal-government reports document. *See, e.g.*, JA588.

Many manufacturers individually responded by setting conditions on their 340B offers. Under many such policies (including those of AbbVie, Novartis, and many individual PhRMA members), covered entities must designate either their in-house pharmacy or, if they lack one, a single contract pharmacy for 340B purposes. If a covered entity refuses to comply with that policy, the manufacturer will not sell to that covered entity at the 340B price. Manufacturers also began requiring covered entities to provide claims data or utilization data to help confirm that individuals that covered entities say were 340B-eligible actually were. *See AbbVie Inc. v. Drummond*, 808 F.Supp.3d 1266, 1271-73 (W.D. Okla. 2025).

HHS initially tried to prevent manufacturers from imposing such conditions. Litigation ensued, and it ended with both the Third and D.C. Circuits unanimously holding that the 340B statute leaves

6

manufacturers free to impose those kinds of reasonable conditions on their offers to sell 340B-priced drugs to covered entities. *See Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703-04.

3. Contract pharmacies' allies responded by enacting state laws that forbid manufacturers that participate in the 340B Program from doing exactly what the Third and D.C. Circuits held federal law allows— namely, conditioning their offers to sell drugs at 340B prices on the covered entity's agreement to limit its use of contract pharmacies and to provide claims data. Op.14. West Virginia's S.B. 325 is one such law.

S.B. 325 makes it illegal for a manufacturer, "either directly or indirectly," to (1) "deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug," or (2) "require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity." W. Va. Code §60A-8-6a(b). Each provision applies only to "340B drugs," *i.e.*, drugs that have "been subject to any offer for reduced prices by a manufacturer under 42 U.S.C. § 256b(a)(1)." *Id.* §60A-8-6a(a)(1)(B). S.B.

7

325 thus applies only to manufacturers participating in the 340B Program.

AbbVie, Novartis, and PhRMA each challenged S.B. 325 on several grounds. After consolidating their cases, the district court granted preliminary relief. Op.16. The panel affirmed, 2-1. As the majority explained, S.B. 325 is likely preempted because it "directly changes the terms of drug manufacturers' federally created 340B relationships with covered entities" and "interferes operationally with multiple aspects of the 340B program." Op.25-31. And the majority found no "abuse of discretion" in the district court's conclusion that, "absent an injunction," Appellees "would suffer … irreparable harm." Op.32. Finally, while it gave "serious consideration" to West Virginia's "claim[] that enjoining S.B. 325 'could result' in the 'reduction or elimination of services' to the State's most vulnerable patients," the majority found that "bare assertion" insufficient to change the equitable calculus, particularly since enjoining S.B. 325's enforcement would not impede patients' access to any drugs. Op.33-34.

8

## ARGUMENT

The panel correctly concluded that S.B. 325 "is likely preempted" under both field- and conflict-preemption principles. Op.25-31. In reaching that preliminary conclusion, the panel did nothing "novel," "unconventional," or inconsistent with the parties' arguments. *Contra* Pet.1-2. It instead drew from cases Appellees invoked and binding Circuit precedent the common-sense rule that states' ability to directly regulate federal programs in which Congress has given them no role is constrained. It then concluded that West Virginia's unusual law likely intrudes on a federal field by "directly alter[ing] the terms of a federal bargain," Op.25-28, and conflicts with federal law by "interfer[ing] operationally with multiple aspects of the 340B program," Op.28-31.

West Virginia's efforts to find fault with those narrow conclusions mischaracterize both the majority's analysis and the state's law. The majority made abundantly clear that it was not making broad pronouncements about all state laws touching on federal spending-power programs, but was instead confining itself to the particulars of West Virginia's effort to "inject[]" itself "into the relationship between a federal agency and the entity it regulates." Op.19. And though the majority

acknowledged that it was parting ways with two circuits, it explained why those courts failed to appreciate critical legal principles and key details about how laws like S.B. 325 actually work. Op.31 n.12. The United States agrees; it has urged the Fifth Circuit to reconsider its precedent for exactly those reasons. And even district courts in the Eighth Circuit have been loath to follow its decision in *McClain*. This Court should not grant rehearing to address a split that may well resolve itself once other courts consider critical points that they overlooked the first time around.

## I. THE PANEL DECISION IS CORRECT.

West Virginia accuses the majority of creating an "adventuresome new preemption theory unique to the Spending Clause context." Pet.10. The majority did no such thing. It instead relied on settled Supremacy Clause principles to explain why state laws that directly target federal programs raise serious constitutional concerns, and why S.B. 325 is not the rare such law that passes constitutional muster.

1. The majority began with the unremarkable observation that "the type of [state] interference matters" when assessing a Supremacy Clause claim. Op.17. Drawing on cases ranging from *McCulloch v. Maryland*,

10

17 U.S. 316 (1819), to *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985), to *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), it identified "[t]he common thread … that the more directly the State targets federal functions, the less Congress needs to say for the state law to give way." Op.18. In so doing, the majority correctly noted that there is no "rigid demarcation" between the "concerns animating" intergovernmental immunity and preemption. Op.17-20; *see Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc). Recognizing that they all flow from the Supremacy Clause, the court then explained that those mutually reinforcing principles "counsel skepticism" here because S.B. 325 "facially '*targets* a federal domain.'" Op.19-20 (quoting *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 272 (4th Cir. 2025)). And it concluded that S.B. 325 likely impermissibly intrudes on that federal domain not "[b]ecause S.B. 325 references 340B," *contra* Pet.16, but because "S.B. 325 directly changes the terms of drug manufacturers' federally created 340B relationships with covered entities," Op.25.

West Virginia never seriously grapples with any of that. It instead accuses the majority of ignoring the health-and-safety context in which

11

S.B. 325 purportedly operates and holding that Congress preempts state laws whenever it exercises its spending power. Pet.16. Not so. The majority acknowledged that states "have a long history of regulating drugs," Pet.11, and that such laws typically enjoy a presumption against preemption even in the spending-power context, Op.18-19. It highlighted, for instance, that "the analysis would look different" had West Virginia "incidentally touch[ed] the 340B program" via a generally applicable health-and-safety regulation, like a law that "required the use of refrigerated trucks when delivering certain covered drugs." Op.26. It also emphasized that states have greater leeway to regulate "cooperative federalism" spending-power programs, in which Congress "forge[s] bargains with States" and "*invit[es]* States to supplement federal conditions with state laws that address local variations and fill gaps." Op.20.

The majority just recognized that *this law* is not "a traditional health-and-safety regulation," Op.19, because it "targets *only* manufacturers that participate in the 340B program"—a program in which Congress gave states no role—and "imposes restrictions *only* on drug manufacturers when they *comply* with their end of the 340B

12

bargain," Op.24. This particular law, the majority reasoned, is likely preempted because "West Virginia chose to directly alter the terms of a federal bargain" that Congress struck with private parties, not the states. Op.26. That is not an "adventuresome new preemption theory" (let alone "one that no party proposed").[1] *Contra* Pet.10. It is a straightforward application of settled principles to West Virginia's anomalous effort to "inject[] the State into 'the relationship between a federal agency and the entity it regulates,'" Op.19 (quoting *Buckman*, 531 U.S. at 347).

2. West Virginia's cursory attack on the majority's independent holding that S.B. 325 "likely interferes operationally with multiple aspects of the 340B program," Op.28, fares no better.

The state accuses the majority of holding "that S.B. 325's enforcement mechanisms 'intrude[] on HHS's enforcement authority'

---

[1] Appellees' briefing and argument emphasized how "S.B. 325 changes the terms of Congress's deal." Appellees.Br.60; *see, e.g., id.* at 1, 62; Dkt.112 at 1. Indeed, at oral argument (and in the immediately preceding argument involving Maryland's analogous law), Appellees repeatedly invoked the spending power and emphasized that it matters that 340B operates as a spending-power bargain between private parties and the federal government. *See* No. 24-1939, Oral.Arg.at.2:50, 20:05, 59:20; No. 24-1054, Oral.Arg.at.4:45 (panel returning to issue).

13

because they could require the State to answer antecedent questions relating to 340B.'" Pet.17. But the majority actually held that S.B. 325 intrudes on HHS's authority because, as the Supreme Court held in *Astra*, "Congress made HHS the 340B program's sole enforcer," and as the Third and D.C. Circuits held in *Sanofi* and *Novartis*, "HHS maintains the power to enforce *bona fide* offers to covered entities" and to "mediate[] disputes relating to pharmacy delivery policies." Op.28-29.

The latter point is critical. HHS has made clear that private-party claims that a manufacturer has unlawfully limited a covered entity's ability to acquire 340B-priced drugs belong in one place: the ADR tribunal. Even West Virginia concedes that "HHS has exclusive authority over disputes arising under the 340B program." Pet.13. That concededly exclusive authority encompasses "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price," 42 C.F.R. §10.21(a)(1), "includ[ing]" "claims" that a manufacturer imposed "unduly restrictive contract pharmacy policies," Op.29 (citing 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024)); U.S.Amicus.15-16.

14

West Virginia barely acknowledges *Astra*, let alone explains how S.B. 325 coheres with Congress's judgment that HHS must "administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis." 563 U.S. at 120. And West Virginia never mentions §10.21(a)(1), even though federal regulations "pre-empt" state law. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). The majority recognized what that means here: By empowering state courts to "provid[e] their own answers" to whether conditions on 340B offers are permissible, S.B. 325 "necessarily intrudes upon the uniform system of enforcement" Congress envisioned. Op.28-29.

As for the holding that S.B. 325's bar on claims-data conditions "likely interferes with manufacturers' ability to conduct audits," Op.29, West Virginia complains that the majority did not "explain what particular provision of the audit program entitled manufacturers to demand claims data," Pet.17. But conflict-preemption principles are not confined to situations where federal law expressly permits what state law forbids. As the state admits, the question is whether "'the state law stands as an obstacle' to congressional purposes." Pet.13.

15

The majority detailed how S.B. 325 does just that, as manufacturers are practically unable to conduct the audits of covered entities that Congress empowered them to conduct, *see* 42 U.S.C. §256b(a)(5)(C), if they cannot secure the claims data necessary to document reasonable cause for an audit, Op.29-30. West Virginia suggests "[m]anufacturers remain free to obtain this data through the 340B audit process" itself. Pet.14. But the "very data" S.B. 325 prevents manufacturers from requiring "is necessary" to secure an audit in the first place. JA779; *see Drummond*, 808 F.Supp.3d at 1278 ("[C]laims data … would be *the* way to detect possible diversion or double-dipping on discounts."). By impeding manufacturers' access to audits, S.B. 325 frustrates Congress's decision to task manufacturers with helping HHS police abuse in the 340B Program.

\* \* \*

In short, the majority did not reach any novel or sweeping holdings. It instead engaged in a detailed analysis of exactly how West Virginia's peculiar law interacts with the federal 340B statute. And it relied on settled preemption and intergovernmental-immunity principles that have featured both in Appellees' briefing and arguments and in the

16

United States' multiple amicus briefs arguing that laws like this violate the Supremacy Clause for largely the same reasons the majority identified. None of that begins to warrant full-court review.

## II.  THIS COURT SHOULD NOT REPEAT THE FIFTH AND EIGHTH CIRCUITS' ERRORS.

With little to say about what the majority actually held, Appellants rely heavily on the fact that two circuits have rejected preemption challenges to similar state laws. *See PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024); *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025) (per curiam); *AbbVie, Inc. v. Murrill*, 166 F.4th 528 (5th Cir. 2026).[2]  But the majority was correct not to follow those cases. Each failed to confront the problem that such laws target a federal program; none had the benefit of the United States' views; and all rest on critical misunderstandings of how such laws function.

---

[2] The state claims, "[t]his case aside, every district court except one has found that similar state laws are not preempted."  Pet.7.  That is incorrect. *See, e.g.*, *Drummond*, 808 F.Supp.3d at 1274-79; *AbbVie, Inc. v. Brown*, 809 F.Supp.3d 1341, 1356 (D. Utah 2025); *AbbVie Inc. v. Lopez*, No. 1:25-cv-00230 (D. Haw. Feb. 19, 2026), Dkt.81.

To start, neither *McClain* nor either of the Fifth Circuit's decisions even mentioned the fact that the laws they were considering "facially '*target*[] a federal domain.'" Op.19. Each instead reflexively applied the presumption against preemption, simply because the state's law touched on health and safety. But this Court has squarely held that "the presumption against preemption 'is not triggered when' … the state law *targets* a federal domain." *GenBioPro*, 144 F.4th at 272 (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). Those cases are thus out of step with this Court's precedent.

The Eighth and the Fifth Circuits also failed to appreciate how laws like S.B. 325 actually work. *McClain*, for instance, accepted Arkansas' representation that its law regulated only the "delivery" of drugs, not when they must be sold at 340B prices. 95 F.4th at 1143-45. The Fifth Circuit likewise maintained that Louisiana's and Mississippi's laws do not require manufacturers "to sell larger quantities of their drugs at discounted prices than Section 340B requires." *Fitch*, 152 F.4th at 643; *Murrill*, 166 F.4th at 539 ("*Fitch* controls here."). Here, West Virginia repeatedly insists that its law governs only delivery. *E.g.*, Pet.2, 14, 17.

18

But, as the district court determined, "S.B. 325 regulates price, not delivery." JA782.

On its face, S.B. 325 prohibits manufacturers from using contract-pharmacy and claims-data conditions to "directly or indirectly" limit covered entities' "acquisition" of "340B drugs"—*i.e.*, units of drugs sold at 340B prices. W. Va. Code §60A-8-6a(b)(1) & (2). Put differently, S.B. 325 prohibits manufacturers from refusing to sell drugs at the 340B price unless the covered entity agrees to those conditions. Indeed, that is the whole point; West Virginia wants to force manufacturers to sell drugs at 340B prices even when covered entities refuse to agree to conditions that federal law permits manufacturers to impose. And because manufacturers provide the same drugs at commercial prices, the only question is whether manufacturers must provide those drugs at the deeply discounted 340B price—a question of pricing, not delivery. Had the Eighth Circuit appreciated that fact, it may well have reached a different conclusion, as it *agreed* that the 340B Program governs "pricing." 95 F.4th at 1145.

Moreover, while *McClain* acknowledged that HHS has "exclusive 340B" jurisdiction over overcharge claims, 95 F.4th at 1144, it did not

19

address HHS's subsequently adopted position that the ADR framework covers "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). And *McClain*, of course, could not have considered that the agency today actively adjudicates complaints about contract-pharmacy limitations in ADR. *340B ADR Decision Summaries*, HRSA (Mar. 9, 2026), https://tinyurl.com/ae3yekwb. Nor did *McClain* analyze a claims-data restriction; Arkansas' law lacked one. Courts have thus distinguished *McClain* on multiple grounds. *See* Op.31 n.12; JA789; *Drummond*, 808 F.Supp.3d at 1275. Even district courts in the Eighth Circuit have not followed *McClain* when there are plausible allegations that its premises were mistaken. *See AstraZeneca Pharms. LP v. McClain*, 2025 WL 4092197, at *6-7 (E.D. Ark. Sep. 30, 2025); Order at 16-18, *AbbVie Inc. v. Wrigley*, No. 1:25-cv-00081 (D. N.D. Apr. 27, 2026), Dkt.83; JA35-36.

More fundamentally, both courts failed to recognize the critical interplay between the 340B Program, Medicare, and Medicaid. As the United States has explained, "the federal interest in determining the costliness of Medicare and Medicaid participation could hardly be

20

stronger," U.S.Amicus.22, for "[i]f the costs of participating in these programs outstrip the benefits … rational manufacturers can be expected to withdraw from them," U.S.Amicus.17. And when manufacturers withdraw from 340B, as one already has, "dozens of drugs" become unavailable to Medicaid patients *nationwide. Id.* Both circuits gave exceedingly short shrift to those strong federal interests—perhaps because they lacked briefing from the United States. But the United States has now made abundantly clear that laws like S.B. 325 work impermissible and intolerable interference with not only the 340B Program, but Medicare and Medicaid too. The United States recently urged the Fifth Circuit to go *en banc* for exactly those reasons. U.S. Br., *AbbVie, Inc. v. Murrill*, No. 24-30645 (Apr. 7, 2026), Dkt.217. This Court should reject West Virginia's invitation to grant rehearing just to exacerbate threats to critical federal programs the United States is actively urging other courts to fix.

## CONCLUSION

The Court should deny the petition.

21

Dated:  April 27, 2026                    Respectfully submitted,

/s/Erin E. Murphy
ERIN. E. MURPHY
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellee*
*Pharmaceutical Research and Manufacturers of America*

/s/Matthew S. Owen
MATTHEW S. OWEN, P.C.
MEREDITH M. POHL
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata*
*Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.;*
*Pharmacyclics LLC; Allergan Sales, LLC*

/s/Jessica Ellsworth
CARTE P. GOODWIN                  JESSICA ELLSWORTH
FBT GIBBONS                       SUSAN M. COOK

22

23

500 Virginia Street East
Charleston, WV 25301
(304) 348-2422
cgoodwin@fbtgibbons.com

MARLAN J. GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
susan.cook@hoganlovells.com
marlan.golden@hoganlovells.com

*Counsel for Plaintiff – Appellee*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fourth Circuit Rule 32(b), because it contains 3,897 words, excluding the parts of the response exempted by Federal Rule of Appellate Procedure 32(f).

This response also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

/s/ Erin E. Murphy

Erin E. Murphy

## CERTIFICATE OF SERVICE

This is to certify that the foregoing response has been served via the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on April 27, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

/s/ Erin E. Murphy

Erin E. Murphy