**No. 25-1054(L)**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,

*Defendants-Appellants*.

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00271 (Johnston, T.)

**No. 25-1055**

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation;

PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs-Appellees*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants-Appellants*.

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00272 (Johnston, T.)

---

**No. 25-1056**

---

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a

member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants-Appellants*.

---

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:24-cv-00298 (Johnston, T.)

---

**APPELLANTS' SUPPLEMENTAL BRIEF**

---

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov
cdavid@wvago.gov
cseckman@wvago.gov
eahlstrom@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*

CALEB B. DAVID
*Deputy Solicitor General*

CALEB A. SECKMAN
EMILY C. AHLSTROM*
*Assistant Solicitors General*

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS


Table of Contents ..... i

Table of Authorities ..... ii

Introduction ..... 1

Summary of the Argument ..... 4

Argument ..... 6

I. S.B. 325 is not preempted. ..... 6

A. Recent authority confirms the Act is not preempted. ..... 8

B. 340B's Spending Clause roots only heighten the presumption against preemption ..... 16

C. HHS regulations don't make delivery part of 340B ..... 19

II. The intergovernmental immunity doctrine has no bearing here ..... 24

A. The doctrine does not apply ..... 25

B. The Act does not "regulate the United States" ..... 28

C. The Act does not discriminate against the federal government ..... 29

Conclusion ..... 37

Certificate Of Compliance ..... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) ....................13, 24

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) ....................8, 9, 10, 11, 12, 13, 19, 20, 21, 28

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011)....................11, 12, 18

*AstraZeneca Pharms. LP v. Lopez*,
No. CV 25-00369, 2026 WL 497141 (D. Haw. Feb. 23, 2026) ....................35

*Blum v. Yaretsky*,
457 U.S. 991 (1982)....................29

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014)....................33

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)....................26, 27, 30, 31, 35

*Dawson v. Steager*,
586 U.S. 171 (2019)....................26, 31, 33, 35, 36

*Dep't of Emp. v. United States*,
385 U.S. 355 (1966)....................28, 29

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)....................32

*Gilbert v. Residential Funding LLC*,
678 F.3d 271 (4th Cir. 2012)....................23

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) ....................4, 7, 8, 13, 14, 15, 33

*Kisor v. Wilkie*,
588 U.S. 558 (2019)....................23

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....................20

*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) ....................8, 16, 17, 18

*M.L. by Leiman v. Smith*,
867 F.3d 487 (4th Cir. 2017) ....................24

*Managed Pharmacy Care v. Sebelius*,
716 F.3d 1235 (9th Cir. 2013) ....................29

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ....................25, 26, 27

*Memphis Bank & Tr. Co. v. Garner*,
459 U.S. 392 (1983) ....................30, 36

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
156 F.4th 68 (2d Cir. 2025) ....................36

*Moyle v. United States*,
603 U.S. 324 (2024) ....................8, 17

*N.Y. Tel. Co. v. N.Y. State Dep't of Lab.*,
440 U.S. 519 (1979) ....................15

*North Dakota v. United States*,
495 U.S. 423 (1990) ....................30, 31, 33, 34, 36

*Novartis Pharms. Corp. v. Brown*,
No. 3:26-CV-05302-DGE, 2026 WL 1660347
(W.D. Wash. June 9, 2026) ....................36

*Novartis Pharms. Corp. v. Fitch*,
No. 24-60342, 2026 WL 963504 (5th Cir. Apr. 9, 2026) ....................13

*Novartis Pharms. Corp. v. Hanaway*,
180 F.4th 1097 (8th Cir. 2026) ....................12, 13

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ....................20, 23

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*,
No. 24-60340, 2026 WL 963501 (5th Cir. Apr. 9, 2026) ....................13

*Pharm. Rsch. & Mfrs. of Am. v. Frey*,
No. 1:25-CV-00469, 2026 WL 184504 (D. Me. Jan. 23, 2026) ....................33

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136 (8th Cir. 2024) ....................4, 12, 13, 19

*Pharm. Rsch. & Mfrs. of Am. v. McCuskey*,
171 F.4th 675 (4th Cir. 2026) .......... 3, 6, 16, 24

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
361 U.S. 376 (1960) .......... 30, 32, 35

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .......... 20

*Travis v. Reno*,
163 F.3d 1000 (7th Cir. 1998) .......... 24

*United States v. Boyd*,
378 U.S. 39 (1964) .......... 29

*United States v. New Mexico*,
455 U.S. 720 (1982) .......... 26, 27, 28, 29

*United States v. Washington*,
596 U.S. 832 (2022) .......... 25, 28, 30, 31, 33, 34, 35

*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955) .......... 37

**Constitutional Provision**

U.S. CONST. art. I, § 8, cl. 3 .......... 16

**Statutes**

4 U.S.C. § 111 .......... 35

42 U.S.C. § 256b .......... 21, 22

**Other Authorities**

42 C.F.R. § 10.21 .......... 21, 22, 23

*340B Drug Pricing Program; Administrative Dispute Resolution Regulation*, 85 Fed. Reg. 80,632 (Dec. 14, 2020) .......... 21

*340B Drug Pricing Program; Administrative Dispute Resolution Regulation*, 89 Fed. Reg. 28,643 (Apr. 19, 2024) .......... 21

OFF. OF THE GEN. COUNS.,
DEP'T OF HEALTH & HUM. SERVS., ADVISORY OPINION 20-06 ON CONTRACT PHARMACIES UNDER THE 340B PROGRAM (2020) .......... 34

## INTRODUCTION

This case is far from unique. Twenty-two States have passed materially identical laws requiring 340B drug manufacturers to deliver drugs to contract pharmacies. Invoking preemption, manufacturers have sued. And with rare exceptions, courts have rejected those challenges. These courts recognized that 340B tells manufacturers what price to offer—not where to ship—so state laws filling that silence pose no Supremacy Clause issues.

But here, the district court and panel decision lost their way, each in a different direction. The district court found a conflict only by recharacterizing much of what West Virginia's drug-delivery law actually does, most notably by misconstruing its delivery requirement as price regulation. The panel majority eschewed the district court's approach, preferring a novel Spending Clause theory—one not even the manufacturers raised—to justify preemption. Now the United States wants to inject still another forfeited argument—the intergovernmental immunity doctrine—into the mix.

Altogether, those who maintain that West Virginia's law is preempted cannot even agree on *how*. That discord is a silent tell that the law isn't preempted at all.

The well-worn (and already extensively briefed) preemption analysis confirms that S.B. 325 stands. The presumption against preemption applies because West Virginia's law regulates in an area of historic state power. The state law is not field preempted because the 340B program is not so comprehensive that States cannot supplement it. Nor is the state law conflict-preempted. The Act regulates only delivery; 340B, a price-cap statute, doesn't address delivery at all. And the Act's data-claims provision respects the 340B audit process. Thus, West Virginia's law operates harmoniously alongside the federal program. This Court need only follow the path taken by every other circuit court to find the law constitutional.

Neither of the two late-appearing arguments here calls for a different result.

First, West Virginia's law doesn't offend any Spending-Clause-specific brand of preemption. The Supreme Court has never said that the preemption analysis turns on which Article I power Congress relied on to pass legislation. And if one were to take anything from the Spending Clause's involvement, it's that such legislation is usually narrower in scope and weaker in force than other types of laws. So if anything, 340B's Spending Clause roots make it even less likely to preempt state law.

Second, the intergovernmental immunity doctrine "does not control here," as even the panel majority recognized. *Pharm. Rsch. & Mfrs. of Am. v. McCuskey*, 171 F.4th 675, 689 (4th Cir. 2026). That immunity bars States from treating the federal government and those with whom it deals—that is, its employees and contractors—worse than others. And it keeps States from interfering with the federal government's operations. But these drug manufacturers do not "deal" with the federal government in a constitutional sense, and West Virginia's law does not affect the federal government's operations. So the Act does not offend the intergovernmental immunity doctrine, either.

At bottom, enjoining the State Defendants from enforcing the Act frustrates 340B's and S.B. 325's shared goal of assisting rural healthcare providers and other covered entities in serving the patients Congress designed 340B to reach—and to what end? No federal law requires that result. The many courts that have tackled this issue have gotten it right: This type of legislation is not preempted. This Court should join them in saying so and vacate the injunction.

## SUMMARY OF THE ARGUMENT

The State Defendants set out their preemption arguments in their prior briefing, so they don't repeat them at length here. This brief addresses what has changed since, and each development confirms that S.B. 325 is not preempted.

Start with the tally. The Fifth and Eighth Circuits have now upheld two more laws materially identical to West Virginia's. Those decisions add to the Fifth Circuit's earlier rejection of parallel challenges to Mississippi's law and to the Eighth Circuit's decision in *McClain*, which the Supreme Court declined to review. Put plainly, those courts found that States regulate pharmacies and drug distribution every day, and laws like the Act fit comfortably within that tradition. That count leaves the vacated panel decision as the only court of appeals decision holding such a law preempted—and one of the few decisions at *any* level to do so.

*Hencely* points the same direction. There, the Supreme Court vacated and remanded a preemption decision from this Court. The Court held that the broader rule lacked any constitutional basis and ignored the requirement that there be an actual conflict between what the state law targeted and what the federal government directed. *Hencely v. Fluor Corp.*, 146 S. Ct. 1086 (2026).

That lesson governs here. A preemption rule untethered to statutory text is not sound just because a court finds it structurally appealing.

A properly circumscribed view of preemption also helps dispose of the panel majority's Spending Clause theory. The Spending Clause confers no power to regulate. Rather, it authorizes Congress to attach conditions to federal funds, which bind only those who accept them. Legislation enacted under it is therefore narrower and weaker than legislation enacted under Congress's regulatory powers. So 340B's Spending Clause roots make it less likely to carry any preemptive force. While the United States tries to recast 340B as a delivery statute, that misreads the law (and would create yet another circuit split).

The United States's suggestion that HHS regulations trigger a conflict preemption problem is also unavailing. Regulations cannot exceed an agency's statutory authority, and two appellate courts have rightly held that 340B says nothing about delivery. And the HHS regulation the United States mentions addresses pricing disputes, not drug delivery—so the regulation is irrelevant here, anyway.

The argument on the intergovernmental immunity doctrine fails for a simpler reason: The doctrine does not apply. It protects the federal

government and those with whom it closely deals from discriminatory state treatment that burdens federal interests. Drug manufacturers are not the federal government, and they are not the sort of close federal dealers the doctrine reaches. And S.B. 325 burdens no federal interest and no federal dollar. So the Act poses no intergovernmental immunity problem either.

## ARGUMENT

### I. S.B. 325 is not preempted.

As Appellants have explained at length, S.B. 325 is not preempted. Begin with the proper baseline: The Act triggers the presumption against preemption because it regulates health and safety—an area of traditional state power. Op. Br. at 30-33; Reply Br. at 4-7; En Banc Pet. at 9-11. From there, the drugmakers face an uphill climb on both preemption arguments.

First, their field preemption theories aren't viable. The 340B framework is not "so pervasive that Congress left no room for the States to supplement" it. *McCuskey*, 171 F.4th at 705-06 (Benjamin, J., dissenting) (cleaned up); Op. Br. at 33-50; Reply Br. at 7-14; En Banc Pet. at 11-13. The Act also does not regulate in an area with a dominant federal interest—quite the opposite. Op. Br. at 33-50; Reply Br. at 7-14; En Banc Pet. at 11-13.

Second, Appellees' conflict preemption argument fares no better. The Act peacefully coexists alongside the 340B program: 340B deals only with price, and the Act regulates only delivery. Op. Br. at 50-73; Reply Br. at 14-33. The claims-data component of the Act also presents no conflict, as it bars manufacturers only from demanding data as a condition precedent to delivery—honoring their entitlement to the data through the 340B audit process itself. Op. Br. at 58-61; Reply Br. at 18-21. Even if some sliver of the Act did conflict with the federal statute (it doesn't), the law's severability clause would dictate that the rest of the Act stand. Op. Br. at 92-95; Reply Br. at 46-47. West Virginia's law is not preempted.

Recent developments confirm that these bottom-line conclusions still hold. More circuits have now said that state legislation like West Virginia's presents no issues under the Supremacy Clause. More generally, the Supreme Court has also reaffirmed that the preemption doctrine must be narrowly construed. *Hencely*, 146 S. Ct. at 1093. And new arguments the manufacturers never made, purportedly resting on the Spending Clause, intergovernmental immunity, and federal regulations, go nowhere.

**A. Recent authority confirms the Act is not preempted.**

The law has only moved further in the State Defendants' favor since the panel's decision. Two more circuit decisions have held that analogous state laws are not preempted. And the Supreme Court's decision in *Hencely* makes clear that preemption is the exception—not the rule.

**1.** The Fifth Circuit recently held Louisiana's similar statute not preempted. *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 757 (5th Cir. 2026). Louisiana's law, like the Act, bars manufacturers from refusing to "deliver [340B] drugs [to] contract pharmacies." *Id.* at 753. The Fifth Circuit's analysis provides a sound path for this Court to follow.

The Fifth Circuit started by recognizing that the presumption against preemption applied because the law regulated a matter of "[p]ublic health and consumer protection"—two "areas of law traditionally reserved to the states." *Murrill*, 180 F.4th at 758 (cleaned up).

The court also held that 340B's status as Spending Clause legislation did not change the presumption's applicability. For one, the Fifth Circuit noted that it was an open question whether Spending Clause legislation could ever preempt state law. *Murrill*, 180 F.4th at 762 n.68 (citing *Moyle v. United States*, 603 U.S. 324 (2024), and *Landor v. La. Dep't of Corr. & Pub. Safety*,

146 S. Ct. 1931, 1948 (2026)). That unresolved question counseled for applying "the presumption … with at least the same force it carries elsewhere." *Id.* For another, the Spending Clause preemption argument failed even on its own flawed terms: A state law that simply filled in details about which the federal law was silent "d[id] not disrupt [any] bargain." *Id.*

The Fifth Circuit also rejected a dressed-up version of the intergovernmental immunity argument. *Murrill*, 180 F.4th at 758 & n.38. The manufacturers argued that the presumption against preemption did not apply because the law "regulate[d] the 340B Program itself." *Id.* at 758. Not so. The law regulated delivery and the role of contract pharmacies, "areas left free … for state supplementation." *Id.* And state legislation that supplements a federal scheme private parties voluntarily opt into is categorically different from state legislation that targets "the Federal Government or those with whom it deals." *Id.* at 758 n.38 (quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)).

The Fifth Circuit then found that the Louisiana law presented no field or conflict preemption problems.

On field preemption, the state law addressed things that 340B "conspicuously *does not* regulate: … the distribution of drugs to patients [and]

the role of pharmacies in this distribution." *Murrill*, 180 F.4th at 759 (cleaned up). Matters that Congress left open are "presumably left subject to the disposition provided by state law." *Id.* (cleaned up). The court also rejected the manufacturers' argument that the federal government's inability to fill the delivery gap also tied the State's hands. *Id.* at 759-60. "[T]he limits of a federal agency's delegated power" say nothing about "the limits of a State's police power." *Id.* Indeed, "[t]he two run on separate tracks." *Id.* And nothing in our Constitution or federalist structure justifies "convert[ing] congressional silence into an implied prohibition" on historic state power. *Id.*; *contra* U.S. Br. at 12-13.

The Fifth Circuit also held the law was not conflict preempted. The manufacturers argued that the law "impermissibly expand[ed] the universe of covered entities." *Murrill*, 180 F.4th at 760 (cleaned up). But that argument "ignore[d] the basic mechanics of the 340B Program." *Id.* The law did not turn contract pharmacies into covered entities; it addressed only their supporting role in delivering drugs to "covered entities' patients." *Id.* (cleaned up). The manufacturers also alleged that the state law's independent enforcement mechanism "clashe[d] with Congress's [340B] enforcement scheme." *Id.* But that framing was wrong because it "present[ed] a false

conflict." *Id.* Only 340B's enforcement mechanism could address potential duplicate discounting, and only the state law's enforcement mechanism could "provide recourse … if a manufacturer refuse[d] to deliver [340B] drugs to a contract pharmacy." *Id.* So the "enforcement Venn Diagram" had no overlap "and thus no conflict." *Id.* at 761.

The obstacle preemption theory also fell flat. "Far from frustrating § 340B's objectives, the two laws work in tandem to advance Congress's central aim," *Murrill*, 180 F.4th at 762, "preserv[ing] [vulnerable communities'] access to medicine[]," *id.* at 753.

The Fifth Circuit's reasoning applies with equal force to the law here. The Act regulates the same areas of traditional state power, addresses the same gap Congress left open, and forwards 340B's objectives. Op. Br. at 30-73; Reply Br. at 4-33; En Banc Pet. at 9-13. This type of legislation is not preempted.

The Fifth Circuit's conflict preemption analysis further refutes the district court's central rationale below: The Act and 340B impose distinct, non-overlapping enforcement mechanisms. The lower court here read *Astra* to forbid state enforcement because Congress created a "centralized enforcement in the government." JA787 (quoting *Astra USA, Inc. v. Santa*

*Clara Cnty.*, 563 U.S. 110, 119 (2011)). But *Astra* barred a covered entity from suing to recover overcharges—in other words, to enforce 340B's price ceiling itself. S.B. 325 enforces no price ceiling. It enforces a delivery obligation that 340B does not create and HHS cannot police, leaving the federal enforcement scheme exactly where Congress put it. *Murrill*, 180 F.4th at 759-60.

And as the Fifth Circuit rightly found, neither 340B's Spending Clause roots nor the intergovernmental immunity argument change that preemption analysis. This Court should follow the same course.

**2.** The Eighth Circuit also recently upheld a similar law passed in Missouri. *Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097, 1102 (8th Cir. 2026). This law, too, imposes delivery-refusal prohibitions materially identical to the Act. *See id.* So the Eighth Circuit's analysis also proves instructive.

Following its earlier decision in *Pharmaceutical Research & Manufacturers of America v. McClain*, 95 F.4th 1136 (8th Cir. 2024), the court found that Missouri's delivery law was not preempted. *Hanaway*, 180 F.4th at 1111-14. First, 340B did not field preempt the state law. In passing 340B, Congress had not regulated "so comprehensively that it … left no room for supplementary state legislation." *Id.* at 1112 (cleaned up). So the state law could fill up gaps Congress chose to leave empty. *Id.* And the state law also

was not conflict preempted. *Id.* at 1113-14. "Because [that law] regulate[d] the delivery of 340B drugs in a manner consistent with federal law and [did] not stand as an obstacle to the drug pricing objectives of Section 340B," it presented no conflict preemption problems. *Id.* at 1114.

That brings the number of circuit-court decisions finding similar laws not preempted to six. *McClain*, 95 F.4th at 1139, *cert. denied*, 145 S. Ct. 768 (2024) (Arkansas); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 639 (5th Cir. 2025) (Mississippi); *Novartis Pharms. Corp. v. Fitch*, No. 24-60342, 2026 WL 963504 (5th Cir. Apr. 9, 2026) (per curiam) (Mississippi); *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 24-60340, 2026 WL 963501 (5th Cir. Apr. 9, 2026) (per curiam) (Mississippi); *Murrill*, 180 F.4th 747 (Louisiana); *Hanaway*, 180 F.4th 1097 (Missouri). Aside from the vacated panel decision, no circuit has found this type of legislation preempted. A decision holding the Act preempted would create a circuit split and defy this—now even stronger—consensus.

**3.** *Hencely*, 146 S. Ct. 1086, underscores that the preemption doctrine must be narrowly construed. That case, too, supports the conclusion that the Act is not preempted.

*Hencely* involved a lawsuit against a military contractor. 146 S. Ct. at 1091. The petitioner there had been "seriously injured in a Taliban suicide

attack." *Id.* He brought a state tort-law claim alleging that the contractor's negligence was to blame for the injury he suffered. *Id.* at 1092-93. This Court held that the state tort law was preempted. *Id.* at 1093. It reasoned that the Federal Tort Claims Act's explicit "combatant-activities exception … reflect[ed] a congressional intent to bar all tort suits against contractors connected with those combatant activities." *Id.*

The Supreme Court rejected that sweeping view of preemption. *Hencely*, 146 S. Ct. at 1093. "Neither the Constitution nor any federal statute supports [such a] … broad rule." *Id.* *Hencely*'s facts presented at least a colorable argument for preemption: The case involved a military contractor operating on an active military base, located in a warzone—implicating federal-seeming interests. *See id.* at 1092. And Congress had enacted a statutory provision that at least gestured towards preemption in that space. *Id.* at 1097. Yet the Supreme Court held that none of that was enough to preempt the state law. Absent an actual conflict between federal and state law duties, the mere existence of a federal statute and federal interest did not preempt state law. *Id.*

Appellees' view of preemption is even more sweeping than the broad—and rejected—view in *Hencely*. Unlike in *Hencely*, 340B does not touch any

unique federal interest like military operations. And Appellees cannot point to even a partial statutory foothold to support their preemption argument. They ask this Court to find preemption from an opt-in federal drug pricing statute that remains silent on hosts of key issues—such as contract pharmacies and drug delivery—and does not purport to displace state law in any way. Indeed, Appellees' theory rests largely on 340B's silence. But inferring preemption from statutory silence is even more tenuous than inferring preemption from a statutory command. *See, e.g.*, *N.Y. Tel. Co. v. N.Y. State Dep't of Lab.*, 440 U.S. 519, 540 (1979) ("Far from the compelling congressional direction on which pre-emption in this case would have to be predicated, the silence of Congress … actually supports the contrary inference that Congress intended to allow the States to make this policy determination for themselves."). And if the preemption argument failed under the stronger facts in *Hencely*, it fails here, too.

* * *

These developments have only tipped the scales further in the State Defendants' favor. The Act is not preempted.

### B. 340B's Spending Clause roots only heighten the presumption against preemption.

The panel majority introduced a theory no party had raised: that because Congress enacted 340B under the Spending Clause, the statute operates as a bargain between manufacturers and the federal government, and state law that alters the terms of that bargain is preempted. *McCuskey*, 171 F.4th at 689-90, 692-93. But if the source of congressional power changes the calculus at all, it makes it even *less likely* that the Act is preempted, not more.

Remember what the Spending Clause does. "Under the Spending Clause, Congress's power to spend money does not include the power to regulate." *Landor*, 146 S. Ct. at 1948. That limit follows from the text. The Commerce Clause expressly grants Congress power to "regulate [interstate] Commerce." U.S. CONST. art. I, § 8, cl. 3. By contrast, the Spending Clause gives Congress power only to "lay and collect" taxes, "pay" debts, and "provide for the common [defense] and general [w]elfare of the United States." *Id.* art. I, § 8, cl. 1. So Spending Clause legislation has a modest sweep compared to other federal statutes, as it can bind only those who voluntarily accept the terms in exchange for federal money. *Landor*, 146 S. Ct. at 1940-41.

The Spending Clause's regulatory limitations pose real questions for preemption. Whether Spending Clause legislation can preempt state law at all remains unresolved, and six Justices have said so. *Moyle*, 603 U.S. at 334 (Barrett, J., concurring) (joined by Roberts, C.J., and Kavanaugh, J.); *id.* at 358 (Alito, J., dissenting) (joined by Thomas, J., and Gorsuch, J.). That uncertainty matters because the "federal government's ability to supplant state law is 'an extraordinary power in a federalist system' that radically alters the balance of state and federal authority." Op. Br. at 31 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). A court should hesitate before finding preemption under any statute. It should hesitate even more where Congress legislated under one of its narrowest powers.

Applied here, 340B's Spending-Clause origin cuts against both field *and* conflict preemption. Congress exercised no regulatory power in enacting 340B, so the statute cannot have regulated a field so pervasively as to exclude the States. *See Landor*, 146 S. Ct. at 1943 n.4 (stressing that nothing in the Spending Clause legislation at issue there "prevent[ed]" a state from "acting on its own initiative" to supplement the federal law). And legislation that binds only by consent is a poor candidate to displace state law—especially because it affects parties outside the bargain, like covered entities and contract

pharmacies, that never agreed to anything. *Landor* rejected the contrary logic, refusing to read Spending Clause authority to let Congress "regulate directly the conduct of countless nonconsenting individuals" in "spheres … traditionally reserved to the States." *Id.* at 1947. And make no mistake: Medicaid, Medicare, the Elementary and Secondary Education Act, the Religious Land Use and Institutionalized Persons Act and more are all Spending Clause programs that States supplement, so the panel's reasoning would have an expansive effect. If Spending Clause enactments carry heightened preemptive force because they are "bargains," a great deal of ordinary state law would wrongly become vulnerable. The presumption *against* preemption should thus apply with added force in the Spending Clause context.

Even on the majority's own expansive framing, the contract reasoning doesn't hold up. "Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA)." *Astra*, 563 U.S. at 113. Far from "transactional, bargained-for contracts," PPAs are "uniform agreements." *Id.* The "form agreements, composed by HHS, contain no negotiable terms" and simply "record the manufacturers' agreement to abide by" the statute's fixed terms. *Id.* at 118. So 340B isn't really a bargain at all.

Even assuming a bargain existed, the Act leaves it undisturbed. The Act speaks only to delivery; 340B speaks to price. Op. Br. at 33-50. A state law that fills a gap Congress left open "does not disrupt [any part of the] bargain" between manufacturers and the federal government. *Murrill*, 180 F.4th at 762 n.68. Manufacturers have always sold into a market governed by state distribution law. And contract "pharmacies have always been important participants in delivering 340B drugs to patients." *McClain*, 95 F.4th at 1142. So the manufacturer still gets exactly what it bargained for (Medicaid and Part B coverage) at the 340B ceiling price. And at the end of the day, any "bargain" is still voluntary; a manufacturer can always exit the program if it so chooses.

* * *

The Spending Clause—if it bears on the preemption analysis at all—only raises the bar.

### C. HHS regulations don't make delivery part of 340B.

The United States, as amicus, asks this Court to throw itself headfirst into another circuit split. Though nothing in the statute has changed, the United States suggests that a recent HHS rulemaking on dispute resolution brings drug delivery into the agency's alternative dispute resolution process—

and thus, indirectly, within the reach of 340B. U.S. Br. 16. That proposition is wrong for at least two reasons.

*First*, the Third and D.C. Circuits have already addressed HHS's role (or lack thereof) when it comes to delivery. Because 340B "is silent about delivery," *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023) (emphasis removed), HHS lacked statutory authority to enforce its guidance about delivery to contract pharmacies, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460-61 (D.C. Cir. 2024). A statute that is "silent about delivery conditions," *id.* at 460, and "nowhere … mention[s] contract pharmacies," *Sanofi*, 58 F.4th at 703, cannot grant an agency rulemaking authority on those topics. And the limits on an agency's delegated power say nothing about the limits of a State's police power, anyway. *Murrill*, 180 F.4th at 759-60. After all, "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). 340B leaves delivery unaddressed—and that's why West Virginia may address it while HHS can't.

Yet the United States seemingly argues that rulemaking from the U.S. Department of Health and Human Services expanded the agency's role—and

by extension, the statute. U.S. Br. 16. HHS's Alternative Dispute Resolution rule addresses overcharge claims: It allows a covered entity to lodge claims "that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Without coming out and saying it, the United States hints that this process for overcharge claims encompasses delivery disputes, which West Virginia's law then somehow impedes. U.S. Br. 16.

HHS hasn't claimed that sweeping power. Neither its 2020 rulemaking nor its 2024 rulemaking even so much as mentions "delivery." *340B Drug Pricing Program; Administrative Dispute Resolution Regulation*, 85 Fed. Reg. 80,632 (Dec. 14, 2020); *340B Drug Pricing Program; Administrative Dispute Resolution Regulation*, 89 Fed. Reg. 28,643 (Apr. 19, 2024). For good reason: Congress empowered "the Secretary" only "to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs." 42 U.S.C. § 256b(d)(3). So reading HHS's ADR regulations broadly to cover delivery defies 340B's text and two courts of appeals' holdings. *See Murrill*, 180 F.4th at 761 n.60 (finding a manufacturer's reliance on the ADR rules "surprising" because "the

federal scheme allows HHS to enforce covered entities' ability to purchase 340B drugs" while the state law "provides the mechanism by which" a state "can enforce" the "distinct matter[s]" of "the delivery of the 340B drugs to the contract pharmacies").

*Second*, interpreting the ADR regulations to include delivery disputes would also contort the regulatory text.

The text is unambiguous. Covered entities may bring claims alleging they were "overcharged" after a purchase or weren't given the "ability to purchase … drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). That language ensures covered entities have recourse before and after buying drugs. Such protection tracks 340B's text requiring manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1). If a manufacturer fails to offer discount drugs, then it limits a covered entity's "ability to purchase" them. And if a manufacturer sells drugs at a higher price than the statute permits, then it overcharged the covered entity. In either event, the ADR process provides a covered entity an avenue for relief. But neither circumstance involves delivery to contract pharmacies.

Nor can "ability to purchase … drugs at or below the 340B ceiling price," 42 C.F.R. § 10.21(a)(1), be understood to mean "ability to have drugs shipped to contract pharmacies." "[I]f the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (cleaned up); *see Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (explaining that courts need not defer to the government when an agency regulation is unambiguous). This regulation has such a plain meaning: as used in the 340B text, "purchase" means "[t]o obtain in exchange for money or its equivalent; buy." *Johnson*, 102 F.4th at 460 (cleaned up). And "price" means "[t]he amount ... of money ... asked for or given in exchange for something else." *Id.* (cleaned up). There's no reason to believe the Secretary intended those terms to mean something different in the regulatory text (even assuming it could reinterpret them that way).

Because the statutory text is "silent about delivery conditions," *Johnson*, 102 F.4th at 460, the regulatory text is, too. The Act is not preempted.

## II. The intergovernmental immunity doctrine has no bearing here.

Like the Spending Clause twist, the intergovernmental immunity doctrine also made a late entrance into this litigation. The drugmakers never raised the argument, so in truth, it has been forfeited. *See Travis v. Reno*, 163 F.3d 1000, 1006 (7th Cir. 1998) (Easterbrook, J.) (holding that a party had forfeited the intergovernmental immunity argument). And the reason they never raised it is simple: Manufacturers have shown a sustained resistance to 340B, so they wouldn't be eager to claim an immunity that requires a close relationship with the federal government in running the program. *See Fitch (AbbVie)*, 152 F.4th at 640-41 (describing manufacturers' coordinated efforts to "combat" contract pharmacies, 340B's core distribution mechanism). The vacated panel decision was the first to mention the idea, but even it acknowledged that the "doctrine does not control here." *McCuskey*, 171 F.4th at 689. The United States has sought to breathe life into the theory, but that's an impossible lift given that the Court generally doesn't consider arguments raised only by an amicus. *See M.L. by Leiman v. Smith*, 867 F.3d 487, 499 n.11 (4th Cir. 2017).

Anyway, the argument is dead on arrival, as the intergovernmental immunity doctrine simply does not apply. The doctrine's core purpose is to

protect the dual sovereignty of States and the federal government. In application, the immunity "prohibit[s] state laws that either [(1)] regulate the United States directly or [(2)] discriminate against the Federal Government or those with whom it deals (e.g., contractors)." *Washington*, 596 U.S. at 838 (cleaned up).

The problems with this argument start at the foundation. The Act does not implicate the United States, and the drug manufacturers are too far removed from the federal government to claim the doctrine applies to them. That distance is likely why the drugmakers never raised the immunity in the first place. The two-prong test also does the manufacturers no favors. The Act does not "[(1)] regulate the United States directly or [(2)] discriminate against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (cleaned up).

**A. The doctrine does not apply.**

The intergovernmental immunity doctrine has no application here. From top to bottom, the doctrine simply doesn't match this case.

**1.** Intergovernmental immunity derives from the Supremacy Clause and our federalist structure of government. *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819). The doctrine "is based on the need to protect each sovereign's

governmental operations from undue interference by the other." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814 (1989). So it's intended to "forestall[] clashing sovereignty by preventing the States from laying demands directly on the Federal Government." *United States v. New Mexico*, 455 U.S. 720, 735 (1982) (cleaned up). If States could tax the federal bank, for example, that power could destroy the federal entity altogether. *McCulloch*, 17 U.S. at 427; *Dawson v. Steager*, 586 U.S. 171, 173-74 (2019). So States lack power to "impede" or "control" the federal government and its operations. *McCulloch*, 17 U.S. at 436.

For the doctrine to apply, a private party must either "stand in the Government's shoes" or be "so closely connected to the Government that the two cannot realistically be viewed as separate entities." *New Mexico*, 455 U.S. at 735-36 (cleaned up). In the tax context, the Supreme Court has said that "immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *Id.* at 735. As the United States aptly points out, "the principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity

doctrine." U.S. Br. 15 (cleaned up). So a private party has no claim to the federal government's immunity if it interacts with the government only at arm's length.

**2.** The concerns animating the doctrine are wholly absent here. Limiting the Act's reach is in no way necessary to protect the federal government's operations "from undue [state] interference," *Davis*, 489 U.S. at 814, because no application of the Act could "impede" or "control" the federal government's work, *McCulloch*, 17 U.S. at 436.

Any burden the Act imposes falls on the manufacturers' shoulders alone. The manufacturers are not federal employees, contract workers, suppliers, or instrumentalities of the United States. *See New Mexico*, 455 U.S. at 735-36. They do not sell drugs to the government, are not paid by the government, and the government does not direct their operations. Drug manufacturers providing drugs to private citizens through a voluntary program are not "so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Id.* So this case falls entirely outside the intergovernmental immunity doctrine.

Even in a world where the United States and the manufacturers were so interconnected as to be functionally one entity, the immunity still would not

apply. The Act does not impede the federal government's work; if anything, the opposite is true. The purpose of the 340B program was to make medication more accessible to America's most vulnerable communities and to provide financial assistance to critical-care providers. *Murrill*, 180 F.4th at 762. The Act and 340B work hand in hand to pursue that same goal. *See id.*

This dispute—between a State and private drug manufacturers participating in a voluntary program—is about the furthest situation possible from a "clash[]" between two sovereigns. *New Mexico*, 455 U.S. at 735 (cleaned up). The federal government's immunity simply does not apply to the drug manufacturers.

**B. The Act does not "regulate the United States."**

Remember that, even where the immunity applies, the first prong of the doctrine bars only state laws that "regulate the United States directly." *Washington*, 596 U.S. at 838 (cleaned up). The Act does no such thing.

A private party can claim the shelter of immunity under the first prong in only rare circumstances. The immunity exempts a private party from nondiscriminatory state laws if the entity functions "virtually as an arm of the Government." *Dep't of Emp. v. United States*, 385 U.S. 355, 359-60 (1966). But even government contractors executing the government's work receive no

immunity if they're not "so assimilated [into] the Government as to become one of its constituent parts." *United States v. Boyd*, 378 U.S. 39, 47 (1964) (cleaned up).

The Act does not regulate the federal government—and not even the United States makes that argument. *See* U.S. Br. at 13-16. For good reason: No one can reasonably claim that drug manufacturers, as 340B participants, function "virtually as an arm of the Government," *Dep't of Emp.*, 385 U.S. at 359-60, or "stand in the Government's shoes." *New Mexico*, 455 U.S. at 736 (cleaned up). Manufacturers join 340B as a condition of Medicaid coverage—and "participation in Medicaid is voluntary." *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1252 (9th Cir. 2013). Their eventual receipt of Medicaid funds does not transform their work into governmental action. *Cf. Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (holding nursing homes were not state actors under the Fourteenth Amendment despite receipt of Medicaid funds).

The Act thus does not regulate the United States.

**C. The Act does not discriminate against the federal government.**

The second prong forbids States only from "discriminat[ing] against the Federal Government or those with whom it deals (e.g., contractors)."

*Washington*, 596 U.S. at 838 (cleaned up). Here too, the Act does nothing of the sort.

**1.** A state law does not "discriminate against the Federal Government or those with whom it deals" merely because it treats two parties differently. Instead, the law must "treat[] someone else better than it treats" the federal government or its contractors. *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (cleaned up).

The quintessential example of impermissible discrimination is a state law targeting the federal pocketbook. For example, a Texas tax proved unconstitutional because it "discriminat[ed] against the United States *and* its lessee"; the law imposed a "heavier tax burden" in a way that impermissibly undermined the "Government's interests." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 382, 385 (1960) (emphasis added; cleaned up). Similarly, a Tennessee bank tax "impermissibly discriminate[d] against federal obligations" when it taxed interest on the bank's federal, but not state or local, bonds. *Memphis Bank & Tr. Co. v. Garner*, 459 U.S. 392, 397 (1983). Laws singling out federal employees for worse treatment sometimes work in a similar way—unconstitutionally trying to make the federal government foot the State's bill. *Davis*, 489 U.S. at 815 n.4; *Washington*, 596 U.S. at 836. That

targeted, cost-shifting concern drives the application of the constitutional doctrine.

The discrimination prong of the intergovernmental immunity doctrine protects private parties only when necessary to protect federal interests. *Washington*, 596 U.S. at 838; *Davis*, 489 U.S. at 814. The linchpin is whether the state law "disfavor[s] the Federal Government." *North Dakota*, 495 U.S. at 438. A "regulation imposed on one who deals with the Government" is thus unconstitutional only if it "obstruct[s] governmental functions" in the same way a "regulation imposed on the Government" would. *Id.*

Even when the State draws distinctions between governmental and non-government entities, those distinctions may be permissible. *North Dakota*, 495 U.S. at 435. "A state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory" at all. *Id.* at 438. So for example, state action is constitutional if it treats two groups differently but the "differences between the two classes justify the differential treatment." *Dawson*, 586 U.S. at 175 (cleaned up).

The "harm to the government" throughline keeps intergovernmental immunity from becoming a backdoor around equal protection's far more

forgiving standard. Ordinarily, "the State's power to classify is, indeed, extremely broad." *Phillips Chem.*, 361 U.S. at 385. So most often, state action that treats two groups differently can be challenged under the Equal Protection Clause. And when the State discriminates based on something other than a protected characteristic, its actions are constitutional if there exists "any reasonably conceivable state of facts that could provide a rational basis for" its actions. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). But under the intergovernmental immunity doctrine—discrimination against the federal government is per se unconstitutional. *Phillips Chem.*, 361 U.S. at 385. A party bringing an immunity argument thus must show harm to the federal government, or else they could wrongly ratchet a classification up from rational-basis review to per se unconstitutionality.

Fundamentally, the intergovernmental immunity doctrine prevents States from obstructing the federal government's operations or targeting federal dollars. The immunity extends to private parties only so far as necessary to prevent harm to the federal government.

**2.** The Act does not discriminate against the federal government or those with whom it deals.

To start, it's dubious that 340B drug manufacturers count as "those with whom [the federal government] deals." *North Dakota*, 495 U.S. at 438. The United States assumes that premise—but it's no given. The cases on which it relies involve States discriminating against people with a close nexus to the federal government, like federal employees or federal contractors. *See* U.S. Br. at 13-16; *see also Dawson*, 586 U.S. at 175 (federal employee); *Washington*, 596 U.S. at 839 (federal contractor); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014) (federal contractor). The relationship between the federal government and drug manufacturers in a voluntary program is a far cry from those examples. Even Fluor's position in *Hencely* illustrates the distance. A federal contractor, working on a United States military base, in a war zone, 146 S. Ct. at 1092-93—and the state law reached its conduct all the same, because the government had not directed it, *id.* at 1095. Manufacturers who sign a form pricing agreement and sell to private covered entities stand nowhere near even that insufficient relationship. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-CV-00469, 2026 WL 184504, at *6 (D. Me. Jan. 23, 2026) (holding that 340B manufacturers "do not fall within any of the recognized categories ... with whom the government 'deals'").

The classic intergovernmental immunity problems—singling out federal employees for worse treatment or raiding the federal pocketbook—only underscore how far the Act is from raising similar concerns. The Act does not deal with federal employees. And it imposes no costs on the government, in contrast to a case like *Washington* (where the state law shifted actual costs onto the federal government, which paid certain workers' compensation claims under a contract). It's hard to imagine how requiring manufacturers to deliver to contract pharmacies could have any cost on the federal government at all. And recall that HHS spent years trying to institute the same requirements at the federal level, *see* OFF. OF THE GEN. COUNS., DEP'T OF HEALTH & HUM. SERVS., ADVISORY OPINION 20-06 ON CONTRACT PHARMACIES UNDER THE 340B PROGRAM 1 (2020), underscoring that the Act advances a federal interest and in no way affects the taxpayer dime.

West Virginia's law also does not present one of those rare scenarios where granting drugmakers an immunity they never asked for is necessary to protect federal interests. Again, the Act does not "disfavor the Federal Government" or "obstruct [any] governmental functions." *North Dakota*, 495 U.S. at 438. Instead, it accomplishes through state power what the federal government tried but lacked power to do itself—because the federal statute

never reached the issue. "[W]hen states regulate manufacturers' efforts to do what federal law does not instruct them to do, the state laws are not regulating any act compelled or directed by the federal government, but instead the private conduct (and choices) of the manufacturers themselves." *AstraZeneca Pharms. LP v. Lopez*, No. CV 25-00369, 2026 WL 497141, at *15 (D. Haw. Feb. 23, 2026).

*Dawson* can't bear the weight the United States places on it. That case addressed a claim of discrimination arising under Section 111—a statutory analogue to the constitutional doctrine of intergovernmental immunity. *Dawson*, 586 U.S. at 173-74. Despite their common roots, the statute's evidentiary threshold can be easier to meet than the one imposed by its constitutional cousin. *See* 4 U.S.C. § 111(a). Section 111 makes it per se illegal for States to give discriminatory tax treatment to federal employees. *Id.* So claims arising under the statute need only show the State violated the statute's prohibition against discriminatory taxes. *See Dawson*, 586 U.S. at 173-74. By contrast, discrimination claims arising under the *Constitution* are viable only if the federal government has suffered some harm itself. *See Davis*, 489 U.S. at 815 n.4; *Washington*, 596 U.S. at 836; *Phillips Chem.*, 361 U.S. at 382, 385;

*Memphis Bank*, 459 U.S. at 397. The Act does not touch taxes or federal employees. So the United States's reliance on *Dawson* is misplaced.

Even if the doctrine applied—if Appellees' 340B participation established a close enough relationship with the federal government such that applying the Act would harm the government's operations—the argument would still fail. The Act, situated "in its broader regulatory context," is not discriminatory. *North Dakota*, 495 U.S. at 438; *Novartis Pharms. Corp. v. Brown*, No. 3:26-CV-05302-DGE, 2026 WL 1660347, at *13 (W.D. Wash. June 9, 2026). True enough, the Act treats manufacturers participating in the 340B program differently than other manufacturers. But that difference is justified. *Dawson*, 586 U.S. at 175. "[N]on-340B manufacturers [have no reason] to impose delivery conditions on contract pharmacies," so there's "no reason for the state law to target them." *Brown*, 2026 WL 1660347, at *13. Appellees also can't show how "someone else is being treated better than them." *Id.* If anything, the Act is meant to level the playing field among all manufacturers so they all deliver to contract pharmacies; only 340B manufacturers have any incentive to exile contract pharmacies. *See Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 84 (2d Cir. 2025) ("By jointly adopting a policy that largely denied covered entities the ability to purchase Section 340B Drugs

for delivery to contract pharmacies, Defendants … increas[ed] their profits and reduc[ed] competition."). States may constitutionally address the part of the "problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955).

In truth, the intergovernmental immunity argument here is little more than an equal protection claim in disguise. It's not hard to see why a party may find that approach appealing. Tether oneself close enough to the federal government, tell a story of how the state statute's application would harm the government, and voila—the otherwise valid classification is per se unconstitutional. But intergovernmental immunity is not meant as a way to short-circuit the ordinary requirements for an equal-protection claim—requirements that could not be met here.

* * *

The intergovernmental immunity doctrine is not relevant here. Drug manufacturers have no legitimate claim to the federal government's immunity, and applying the Act would cause no harm to the government.

## CONCLUSION

For these reasons, this Court should reverse the district court's order granting a preliminary injunction and vacate the injunction against S.B. 325.

Respectfully submitted,

JOHN B. MCCUSKEY
ATTORNEY GENERAL

*/s/ Michael R. Williams*
Michael R. Williams
*Solicitor General*

Caleb B. David
*Deputy Solicitor General*

Caleb A. Seckman
Emily C. Ahlstrom*
*Assistant Solicitors General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
mwilliams@wvago.gov
cdavid@wvago.gov
cseckman@wvago.gov
eahlstrom@wvago.gov

*admitted in the District of Columbia; practicing under supervision of West Virginia attorneys

Dated: July 31, 2026

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1. This supplemental brief complies with the Court's briefing order because it contains 7,500 words.

2. This supplemental brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams