**No. 25-1054 (L)**
**(*Additional captions and signature blocks on inside cover*)**

# United States Court of Appeals for the Fourth Circuit

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*Plaintiff - Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner,
*Defendants - Appellants*.

On Appeal from the United States District Court
for the Southern District of West Virginia
NO. 2:24-CV-271 (Johnston, J.)

## APPELLEES' SUPPLEMENTAL BRIEF

**No. 25-1055**

---

ABBVIE, INCORPORATED, a Delaware corporation; ALLERGAN, INCORPORATED, a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS LLC, a Georgia limited liability company; APTALIS PHARMA US, INC., a Delaware corporation; PHARMACYCLICS LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs - Appellees*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,

*Defendants - Appellants*.

---

On Appeal from the United States District Court
for the Southern District of West Virginia
NO. 2:24-CV-272 (Johnston, J.)

---

**No. 25-1056**

NOVARTIS PHARMACEUTICALS CORPORATION,
*Plaintiff - Appellee*,

v.

JOHN B. MCCUSKEY, in his official capacity as Attorney General of West Virginia; JOHN BERNABEI, in his official capacity as a member of the West Virginia Board of Pharmacy; JAMES RUCKER, in his official capacity as a member of the West Virginia Board of Pharmacy; JENNA MISITI, in her official capacity as a member of the West Virginia Board of Pharmacy; SAM KAPOURALES, in his official capacity as a member of the West Virginia Board of Pharmacy; DAVID BOWYER, in his official capacity as a member of the West Virginia Board of Pharmacy; DENNIS LEWIS, in his official capacity as a member of the West Virginia Board of Pharmacy; ROBERT DUNCAN, in his official capacity as a member of the West Virginia Board of Pharmacy; ALLAN MCVEY, in his official capacity as Insurance Commissioner, MICHAEL GOFF, in his official capacity as the Executive Director of the West Virginia Board of Pharmacy,
*Defendants - Appellants*.

On Appeal from the United States District Court
for the Southern District of West Virginia
No. 2:24-CV-298 (Johnston, J.)

ERIN E. MURPHY
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellee*
*Pharmaceutical Research and Manufacturers of America*

MEREDITH M. POHL
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.,
Suite 900,
Washington, D.C. 20006
(202) 737-0500
mpohl@kslaw.com

MATTHEW S. OWEN, P.C.
RUSSELL BALIKIAN
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8616
mowen@gibsondunn.com
rbalikian@gibsondunn.com

*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

CARTE P. GOODWIN
FBT GIBBONS
500 Virginia Street East
Charleston, WV 25301
(304) 345-0111
cgoodwin@fbtgibbons.com

JESSICA ELLSWORTH
SUSAN M. COOK
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com
susan.cook@hlc.com

*Counsel for Plaintiff – Appellee Novartis Pharmaceuticals Corporation*

July 31, 2026

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

BACKGROUND .......... 5

ARGUMENT .......... 10

I. S.B. 325 Violates the Supremacy Clause. .......... 10

A. The Supremacy Clause Forecloses West Virginia's Effort To Target The Federal 340B Program For Unique Regulations. .......... 10

B. The Panel Majority Correctly Held That S.B. 325 Is Field-Preempted. .......... 16

C. The Panel Majority Correctly Recognized That S.B. 325 Operationally Interferes With The 340B Program. .......... 25

1. S.B. 325's Claims-Data Prohibition Frustrates Manufacturers' ADR Access. .......... 26

2. S.B. 325 Supplants ADR And Disrupts 340B's Nationwide Uniformity. .......... 31

II. S.B. 325 Violates the Takings Clause. .......... 35

CONCLUSION .......... 39

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AbbVie Inc. v. Brown*,
809 F.Supp.3d 1341 (D. Utah 2025) .......... 36

*AbbVie Inc. v. Drummond*,
808 F.Supp.3d 1266 (W.D. Okla. 2025) .......... 8, 19, 29, 33, 36, 38

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) .......... 36, 37

*Anderson v. Sara Lee Corp.*,
508 F.3d 181 (4th Cir. 2007) .......... 34

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991) .......... 18

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 31

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .......... 2, 3, 5, 26, 31, 33, 34

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .......... 11

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) .......... 11, 14, 20

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......... 14, 16, 34

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .......... 36

*Chamber of Com. of the U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .......... 26, 28

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .......... 15

*City of Burbank v. Lockheed Air Terminal*,
411 U.S. 624 (1973) .......... 20

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*,
310 F.3d 155 (4th Cir. 2002) .......... 31

*Columbia Venture, LLC v. Dewberry & Davis, LLC*,
604 F.3d 824 (4th Cir. 2010) .......... 20, 31

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .......... 11

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) .......... 23

*Dawson v. Steager*,
586 U.S. 171 (2019) .......... 15

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) .......... 11, 14, 15, 21, 22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .......... 17

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) .......... 26

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 15, 16

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .......... 35, 36

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 14

*Landor v. La. Dep't of Corr.*,
146 S.Ct. 1931 (2026) .......... 12, 20, 23, 25, 37

*Lawrence County v. Lead-Deadwood School District No. 40-1*,
469 U.S. 256 (1985) .......... 21

*Maine Forest Prods. Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022) .......... 26

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 11

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 2, 10

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) .......... 12

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)
.......... 1, 2, 7, 18, 23, 24, 25, 28, 35, 38

*OPM v. Richmond*,
496 U.S. 414 (1990) .......... 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 12

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir.), *reh'g en banc granted*, 176 F.4th 830 (4th Cir. 2026) ........ 3, 9, 10, 13, 15, 16, 17, 19, 20, 22, 24, 25, 29

*PhRMA v. Walsh*,
538 U.S. 644 (2003) ........ 13

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016) ........ 19, 31

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 19

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) ........ 7, 24, 25, 35, 38

*Shao v. Link Cargo (Taiwan) Ltd.*,
986 F.2d 700 (4th Cir. 1993) ........ 31

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ........ 14

*United States v. Locke*,
529 U.S. 89 (2000) ........ 15

*United States v. Washington*,
596 U.S. 832 (2022) ........ 3, 11

*Univ. of Wash. Med. Ctr. v. Kennedy*,
No. 24-CV-2998 (D.D.C. Dec. 20, 2024), Dkt.22-1 ........ 29

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023) ........ 38

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,
539 F.3d 1159 (9th Cir. 2008) ........ 25

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........ 32

**Statutes**

42 U.S.C. § 256b ........ 9, 30

42 U.S.C. § 256b(a)(1) ........ 5, 18

42 U.S.C. § 256b(a)(5)(A) ........ 5, 33

42 U.S.C. § 256b(a)(5)(B) ........ 5, 33

42 U.S.C. § 256b(d)(2)(A) ........ 5

42 U.S.C. § 256b(d)(2)(B)(iii) ..................... 5

42 U.S.C. § 256b(d)(3) ..................... 5

42 U.S.C. § 256b(d)(3)(A) ..................... 31

42 U.S.C. § 256b(d)(3)(B)(iv) ..................... 26

W. Va. Code § 33-51-3 ..................... 17

W. Va. Code § 46A-7-101 *et seq.* ..................... 10

W. Va. Code § 60A-8-6a(a)(1) ..................... 9, 16, 17

W. Va. Code § 60A-8-6a(a)(1)(B) ..................... 9, 32

W. Va. Code § 60A-8-6a(a)(1)(C) ..................... 36

W. Va. Code § 60A-8-6a(a)(2) ..................... 17

W. Va. Code § 60A-8-6a(b) ..................... 32

W. Va. Code § 60A-8-6a(b)(1) ..................... 9, 17, 23, 35

W. Va. Code § 60A-8-6a(b)(2) ..................... 9

W. Va. Code § 60A-8-6a(c)(1)(A) ..................... 10

## Other Authorities

Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program* 3 (USC Schaeffer Ctr. for Health Pol'y & Econ., White Paper Series, 2025), https://tinyurl.com/2zf6y5sc ..................... 6

U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3 ..................... 8, 32

## Regulations

42 C.F.R. §§ 10.20-.25 ..................... 5

42 C.F.R. § 10.21(a)(1) ..................... 6, 32

42 C.F.R. §10.21(a)(2) ..................... 6

59 Fed. Reg. 25,110 (May 13, 1994) ..................... 28

59 Fed. Reg. 25,112 (May 13, 1994) ..................... 28

61 Fed. Reg. 65,406 (Dec. 12, 1996) ..................... 6

61 Fed. Reg. 65,409 (Dec. 12, 1996) ..................... 6, 27

82 Fed. Reg. 1,210 (Jan. 5, 2017) .......... 5
82 Fed. Reg. 1,215 (Jan. 5, 2017) .......... 5
89 Fed. Reg. 28,643 (Apr. 19, 2024) .......... 29
89 Fed. Reg. 28,644 (Apr. 19, 2024) .......... 29

## INTRODUCTION

This case is about forbidden state intrusion into a program created by federal law and exclusively overseen by the federal government. Congress created the 340B Drug Pricing Program to provide reduced-priced medicines to certain nonprofit healthcare providers called "covered entities." Because Congress cannot force private parties to give their products to other private parties at bargain-bin prices, Congress used its spending power to make a deal with pharmaceutical manufacturers: The federal government spends federal dollars reimbursing their drugs under Medicaid and Medicare Part B; manufacturers offer to sell drugs to covered entities at heavily reduced prices—sometimes pennies per pill.

As with any deal, Congress carefully defined manufacturers' obligations under that bargain. Critically, Congress "preserve[d]—rather than abrogate[d]—the ability of" manufacturers to attach reasonable conditions on covered entities' ability to acquire drugs at 340B prices. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). And unlike "cooperative federalism" programs between states and the federal government, 340B is purely federal: Congress assigned HHS

exclusive power to administer and enforce it, and gave states no role in defining or enforcing manufacturers' obligations under it.

Nevertheless, some states have enacted laws that do nothing more than expressly alter manufacturers' 340B obligations and circumvent HHS's exclusive enforcement power. West Virginia's S.B. 325 is one such effort. S.B. 325 prohibits manufacturers from attaching to their 340B offers the very same conditions that Congress "preserve[d]" manufacturers' "ability" to impose. *Novartis*, 102 F.4th at 460. If a manufacturer exercises its federal right to attach such conditions to its federal 340B offers, state officials can punish manufacturers with civil penalties and injunctions. That means state law requires manufacturers to sell their drugs at 340B prices even where federal law authorizes them to decline a sale and creates a parallel enforcement regime to police conduct that Congress placed in HHS's exclusive bailiwick. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-20 (2011).

Because none of that is consistent with the Supremacy Clause, this Court should affirm the district court's preliminary injunction. There are several paths to doing so. The *en banc* Court can reaffirm the longstanding principle, dating back to *McCulloch v. Maryland*, 17 U.S.

316 (1819), that the Constitution forecloses state laws exclusively targeting federal creations for regulation or singling out "for less favorable treatment" those who partner with the federal government. *United States v. Washington*, 596 U.S. 832, 838-39 (2022) (quotation omitted). The Court can, as the panel majority correctly did, find S.B. 325 field-preempted, as "S.B. 325 targets *only* manufacturers that participate in the 340B program" for additional requirements, even though "Congress has ousted States" from the field of "340B program requirements." *PhRMA v. McCuskey*, 171 F.4th 675, 691-92 (4th Cir.), *reh'g en banc granted*, 176 F.4th 830 (4th Cir. 2026). Or the Court can find S.B. 325 conflict-preempted because it "interferes operationally with multiple aspects of the 340B program," *id.* at 693, by outlawing conduct federal law purposely permits and supplanting 340B's "unitary administrative and enforcement scheme," *Astra*, 563 U.S. at 120.

Under any of these principles, S.B. 325 violates the Supremacy Clause. The United States agrees, explaining in its amicus brief that S.B. 325 is unconstitutional because it "requires manufacturers who participate in the 340B Program—and only those manufacturers—to

bear additional burdens imposed not by Congress but by West Virginia." U.S. Br.1-2.

S.B. 325 violates the Takings Clause too. States may not compel physical transfers of property for private use. Yet that is exactly what West Virginia tries to do. S.B. 325 forces manufacturers to sell their property, at confiscatory prices, solely for the benefit of state-favored hospitals and pharmacies, under circumstances where federal law would allow manufacturers to decline the sale. Every time S.B. 325 forces a manufacturer to make a sale it would otherwise decline, the manufacturer suffers a physical taking of its property. Manufacturers do not receive just compensation. Nor are S.B. 325's takings put to a public use. S.B. 325 does not lower patients' drug costs or expand patients' access to medications. The Takings Clause does not condone that kind of private-to-private wealth transfer. Indeed, that is why Congress crafted 340B as a spending-power bargain.

Regardless of which legal doctrine this Court prefers, the answer is the same. West Virginia cannot undo the bargain that Congress created by imposing state-law conditions on participation in the federal 340B Program. The *en banc* Court should affirm.

## BACKGROUND

For pharmaceutical manufacturers, access to Medicaid and Medicare Part B comes with strings attached. One is participation in the 340B Program.

Under the 340B Program, manufacturers execute a contract with the federal government known as a Pharmaceutical Pricing Agreement, or "PPA." The PPA obligates a manufacturer to "offer" drugs to covered entities "at or below the applicable ceiling price," which can go as low as a penny. 42 U.S.C. §256b(a)(1); 82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017). Covered entities, for their part, cannot transfer 340B-purchased drugs to anyone but their patients; that is unlawful "diversion." 42 U.S.C. §256b(d)(2)(A); *id.* §256b(a)(5)(B). Covered entities must also ensure that Medicaid rebates are not based on any drug unit bought at the 340B price; those are forbidden "duplicate discounts." *Id.* §256b(a)(5)(A), (d)(2)(B)(iii).

Congress vested HHS with exclusive authority to administer the 340B Program. *Astra*, 563 U.S. at 113. HHS created an administrative dispute resolution ("ADR") process for 340B disputes. 42 U.S.C. §256b(d)(3); 42 C.F.R. §§10.20-.25. ADR is the exclusive forum for claims

"that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). It is also the only forum for manufacturers' diversion and duplicate-discount claims against covered entities. *Id.* §10.21(a)(2). Before bringing ADR claims, however, a manufacturer must audit the covered entity, which requires that the manufacturer first establish "reasonable cause" to suspect 340B violations. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). In practice, manufacturers usually cannot meet that standard without prescription-level "claims data" from 340B orders. *E.g.*, JA674-76, JA281, JA85-86, JA54-55.

Despite Congress's careful calibration of the 340B Program, covered entities have partnered with for-profit pharmacies to turn it into a massive arbitrage scheme. They buy, often at penny prices; re-sell to pharmacy customers at the market price; and pocket the "spread." The more 340B-priced units they buy, the more they profit. *See* JA218-20; Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program* 3 (USC Schaeffer Ctr. for Health Pol'y & Econ., White Paper Series, 2025), https://tinyurl.com/2zf6y5sc. To increase 340B-priced transactions, covered entities retroactively claim 340B discounts on

drugs previously dispensed by for-profit pharmacies like CVS and Walgreens. Covered entities work with pharmacies and "third-party administrators" to find instances where a pharmacy sold drugs to a customer that shares a name with a covered entity's patient. JA34-39, JA219-20. The covered entity and pharmacy retroactively deem the dispensed drugs 340B-eligible and divvy the spread between the 340B price and the price the patient (and/or insurer) paid at the time of sale. *Novartis*, 102 F.4th at 457-58; JA260-61. The covered entity then places a new 340B-priced "replenishment" order and transfers it to the pharmacy, where it will be later sold at full price. JA37, JA219-20.

The federal government has long observed that these "contract-pharmacy" arrangements increase the risk of diversion and duplicate discounting. *E.g.*, JA588-89. And federal law allows manufacturers to impose reasonable limits on such arrangements to reduce that risk. Those reasonable limits include recognizing only one contract pharmacy per covered entity and requiring covered entities to provide certain data for contract-pharmacy dispensed drugs for which 340B pricing is claimed. *Novartis*, 102 F.4th at 463-64; *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 701, 704-06 (3d Cir. 2023).

Many manufacturers (including AbbVie, Novartis, and many PhRMA members) have individually implemented such policies. *E.g.*, JA177, JA257-58, JA277-81. These policies are conditions on a manufacturer's *offer* of 340B pricing and thus operate pre-sale: If a covered entity refuses to comply with a manufacturer's terms, the manufacturer will not sell to that covered entity at the 340B price. *See* JA257-58, JA262-63, JA86; *AbbVie Inc. v. Drummond*, 808 F.Supp.3d 1266, 1271-73 (W.D. Okla. 2025). Importantly, these policies do not eliminate covered entities' access to 340B pricing. Manufacturers continue to offer the 340B price for drugs purchased through an in-house pharmacy or a single recognized contract pharmacy. *See*, *e.g.*, Appellees' Br.19-21. Nor do these policies increase patients' costs or decrease their access to any drug. Again, covered entities are claiming 340B pricing based on past transactions—so the drugs are available regardless of these policies, and the patient has already paid at the pharmacy counter. Manufacturers' policies have been upheld as permissible under federal law not only by the Third and D.C. Circuits but also in ADR challenges brought by covered entities. *See* U.S. Dep't of Health & Hum. Servs.,

Health Res. & Servs. Admin., *340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3.

"Dissatisfied with the scale of drug discounts required by Congress in the 340B program, West Virginia enacted S.B. 325, which imposes additional conditions on drug manufacturers by virtue of their participation in the 340B program." *McCuskey*, 171 F.4th at 682. West Virginia's law is expressly predicated on "42 U.S.C. §256b," the federal 340B statute. W. Va. Code §60A-8-6a(a)(1). It parasitically applies only to manufacturers who participate in the federal 340B Program.

Under S.B. 325, manufacturers cannot "deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such 340B drug." *Id.* §60A-8-6a(b)(1). Nor can they "require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity." *Id.* §60A-8-6a(b)(2). Each provision applies only to "340B drug[s]"—drugs that have "been subject to any offer for reduced prices by a manufacturer under 42 U.S.C. §256b(a)(1)." *Id.* §60A-8-6a(a)(1)(B). S.B. 325 thus applies only to manufacturers' participation in the 340B Program, prohibiting

manufacturers from having a one-contract-pharmacy or claims-data policy and requiring manufacturers to sell at the 340B price when the federal 340B Program does not. And to enforce its extra 340B requirements, West Virginia empowered state officials to sue in state court and punish manufacturers with civil penalties, injunctive relief, and other state-law remedies. *Id.* §§60A-8-6a(c)(1)(A), 46A-7-101 *et seq.*

AbbVie, Novartis, and PhRMA challenged S.B. 325 on several constitutional grounds. The district court found that S.B. 325 is likely preempted and granted preliminary injunctive relief. A divided panel affirmed, concluding S.B. 325 impermissibly "alters the 340B program's fundamental bargain" and "interferes operationally with multiple aspects of the 340B program," including by "intrud[ing] on HHS's enforcement authority." 171 F.4th at 692-93.

## ARGUMENT

### I. S.B. 325 VIOLATES THE SUPREMACY CLAUSE.

#### A. The Supremacy Clause Forecloses West Virginia's Effort To Target The Federal 340B Program For Unique Regulations.

More than two centuries ago, the Supreme Court made clear that the Supremacy Clause deprives states of any power "to retard, impede, burden, or in any manner control, the operations of the constitutional

laws enacted by congress to carry into execution the powers vested in the [national] government." *McCulloch*, 17 U.S. at 436. Ever since, the Court has consistently invalidated state action that violates that hierarchy. And it has treated with particular disapprobation state laws that single out for special regulation not just "the Federal Government" itself, but "those with whom it deals." *Washington*, 596 U.S. at 838.

That principle applies to state laws that target inherently federal relationships. *See, e.g.*, *Forest Park II v. Hadley*, 336 F.3d 724, 730-34 (8th Cir. 2003); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025). When a state "regulates … the effective terms of [a] federal contract," "mandat[ing] the ways in which [parties] rende[r] services" for which "the federal government" has contracted, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014), it is ultimately regulating the federal government itself. But, again, "the activities of the Federal Government [must be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Simply put, because federal contractual relationships are "governed exclusively by federal law," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988), states cannot add or alter the obligations the federal government has imposed.

Such is the case here, as manufacturers that have agreed to carry out federal ends by entering into federal contractual relationships via PPAs with HHS fit this mold perfectly. JA108-17. Indeed, the 340B Program's nature as a spending-power bargain makes the constitutional problem with S.B. 325 particularly acute. The Spending Clause does "not 'endow Congress with [any] power to regulate conduct.'" *Landor v. La. Dep't of Corrs.*, 146 S.Ct. 1931, 1940 (2026) (alteration in original) (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 370-71 (2025)). Accordingly, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

"The legitimacy of" such laws "thus rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* So, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*; *see also Landor*, 146 S.Ct. at 1941. Regardless of whether the recipient of federal funds is a state or a private party, if Congress wants federal-funds recipients to be subject to obligations or prohibitions *because of their spending-power relationship*

*with the federal government*, it must "clearly and unambiguously alert" them of that intention. *Landor*, 146 S.Ct. at 1941.

Participants in federal spending-power programs thus cannot be subjected to state-law restrictions on conduct occurring entirely within the confines of the program unless Congress put them on clear notice that states may impose such restrictions.[1] But S.B. 325 does nothing other than regulate the terms of participation in a federal program—and in ways that make program participation more onerous than Congress saw fit to demand. "West Virginia's law requires manufacturers who participate in the 340B Program—and only those manufacturers—to bear additional burdens imposed not by Congress but by West Virginia." U.S.Br.1-2. But "a State cannot intercede in the execution of the laws Congress enacts." U.S.Br.12; *accord McCuskey*, 171 F.4th at 688 (drawing on principles of both intergovernmental immunity and traditional preemption as reinforcing that "federal interests edge out

---

[1] Sometimes Congress does so. In "cooperative federalism" programs, for instance, Congress typically gives states an explicit role in regulating and administering the program. *See, e.g.*, *PhRMA v. Walsh*, 538 U.S. 644 (2003) (Medicaid). But unless Congress explicitly assigns states that role in a federal spending program, the Supremacy Clause forbids them from claiming it.

state interests when federal and state law 'clash'"). S.B. 325's exclusive focus on the 340B Program is thus sufficient to establish its unconstitutionality, as the United States has explained in its amicus brief.

Participants in a federal spending-power program are not immune from state regulation; they typically must comply with generally applicable and neutrally applied state laws (unless Congress preempts them), because compliance with those laws is not conditioned on participation in a federal program. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920). That kind of *indirect* regulation as a "consequence of a broad, neutrally applicable [state-law] rule" is sometimes an unavoidable incident of our federal system. *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). But state laws that "specifically target" federal-program participants' federal-program participation, *id.*—and thus *directly* "interfere with the implementation of a federal program by a federal agency," *Forest Park II*, 336 F.3d at 732—are impermissible.

That is true regardless of label. Nondiscrimination and direct-regulation principles are commonly articulated in both intergovernmental-immunity cases and preemption cases. *See, e.g.*,

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001); *Boyle*, 487 U.S. at 504-08; *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 639 (6th Cir. 2025); *Forest Park II*, 336 F.3d at 730-32. Indeed, the Supreme Court has long drawn "on principles of intergovernmental immunity" when conducting preemption analyses in cases involving state regulation of intrinsically federal areas. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) (collecting cases). And as the United States explains, intergovernmental immunity protects *all* "those who deal with the federal government" from being targeted because of their federal relationship. *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (quotation omitted). Appellees thus agree both with the United States that the intergovernmental-immunity doctrine applies here and resolves this case, *see* U.S.Br.18-20, and with the panel majority's conclusion that the principles underlying it yield the same result under field- and conflict-preemption analyses, *see McCuskey*, 171 F.4th at 688-89.

At the very least, that S.B. 325 does nothing other than regulate participation in a federal program forecloses any argument that the presumption against preemption applies. "No artificial presumption"

applies when states legislate "in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). The federal presence in determining manufacturers' 340B obligations is beyond significant, which even S.B. 325 recognizes by expressly incorporating those federal-law obligations. *See* W. Va. Code §60A-8-6a(a)(1)-(2). As the panel majority explained, S.B. 325 changes the terms of relationships between manufacturers and covered entities that are "inherently federal in character" because they "originate[] from, [are] governed by, and terminate[] according to federal law." *McCuskey*, 171 F.4th at 689 (quoting *Buckman*, 531 U.S. at 347). While that alone suffices to render S.B. 325 unconstitutional, it at a minimum means that West Virginia must rebut a presumption of unconstitutionality. *See Geo Grp., Inc.*, 50 F.4th at 761-62.

### B. The Panel Majority Correctly Held That S.B. 325 Is Field-Preempted.

**1.** It is beyond dispute that S.B. 325 expressly and exclusively regulates the federal 340B Program. If Congress repealed 340B tomorrow, S.B. 325 would become a nullity. Under S.B. 325, "[a] manufacturer … shall not, either directly or indirectly," (1) "deny, restrict, or prohibit the acquisition of a *340B drug* by, or delivery of a

*340B drug* to, a location authorized by a *340B entity* to receive such *340B drug*," or (2) "require a *340B entity* to submit any claims or utilization data as a condition for allowing the acquisition of a *340B drug* by, or delivery of a *340B drug* to, a *340B entity*." W. Va. Code §60A-8-6a(b)(1)-(2) (emphases added). "340B drug" is defined as "a drug that … [i]s a covered outpatient drug within the meaning of 42 U.S.C. §256b," "[h]as been subject to any offer for reduced prices by a manufacturer under 42 U.S.C. §256b(a)(1)," and "[i]s purchased by a covered entity within the meaning of 42 U.S.C. §256b." *Id.* §60A-8-6a(a)(1). And "340B entity" is defined as "an entity participating in the federal 340B drug discount program, as described in 42 U.S.C. §256b, including its pharmacy or pharmacies, or any pharmacy or pharmacies, contracted with the participating entity to dispense drugs purchased through such program." *Id.* §60A-8-6a(a)(2); *see id.* §33-51-3.

The sole field in which S.B. 325 operates, then, is the field of "340B program requirements." *McCuskey*, 171 F.4th at 691. All S.B. 325 does is change manufacturers' 340B obligations. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) (defining the field by examining the "impact" of state law "on the federal scheme"). Congress's

condition for accessing Medicaid and Medicare Part B is that a manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the [340B] price," 42 U.S.C. §256b(a)(1), subject to reasonable limitations, *Novartis*, 102 F.4th at 462-63. S.B. 325, however, says manufacturers must make a different offer to covered entities—one without the reasonable limitations federal law permits. As the state acknowledges, Dkt.140 at 20, S.B. 325 would require manufacturers to make many millions of dollars of additional 340B sales each year. By overriding the limited 340B obligations manufacturers accepted when they agreed to join Congress's program, S.B. 325 intrudes upon this federal field. But states cannot "take over a federal program just because they think they can do it better." *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991).

As the panel majority correctly explained, the 340B Program's spending-power origins reinforce that conclusion. Again, a spending-power bargain works like a contract. Fashioning the terms of that contract is purely a matter of federal law. State efforts to rewrite that bargain not only force Congress's counterparties to take on obligations to which they never agreed, *see supra* pp. 11-16, but hurt the federal

government itself. Generally, such efforts strip Congress of its power (and duty) to "define the limits" of federal spending programs, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), and to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good," *OPM v. Richmond*, 496 U.S. 414, 428 (1990). And in the 340B context specifically, laws like S.B. 325 disincentivize manufacturers from participating in Medicaid and Medicare by increasing the "price of admission" to those healthcare programs. *Drummond*, 808 F.Supp.3d at 1277. But, as the United States explains, "[o]nly the federal government can determine the extent to which it will tolerate the risk of manufacturer withdrawal" from Medicaid and Medicare. U.S.Br.21.

Accounting for that critical context is not applying a "more stringent" standard. *Contra McCuskey*, 171 F.4th at 701 (Benjamin, J., dissenting). Rather, doing so is applying ordinary, longstanding preemption principles. "Preemption of all varieties is ultimately a question of congressional intent." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016). To discern that intent, courts must

evaluate all "the peculiarities and special features of the federal regulatory scheme." *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 638 (1973). The spending-power bargain is a critical feature of the 340B scheme because it reveals the constraints Congress was under when it set out to incentivize private parties' voluntary participation. And a court cannot reasonably conclude that Congress intended to silently empower states to upset 340B's incentive structure when settled spending-power doctrine requires Congress to make such intentions clear and unambiguous. *See Landor*, 146 S.Ct. at 1940-41.

That analysis fits neatly within this Court's preemption precedents. In *Columbia Venture, LLC v. Dewberry & Davis, LLC*, the Court held preempted state-law claims against federal contractors that would have made it costlier and more difficult for the government to administer a federal program through private parties. 604 F.3d 824, 831-32 (4th Cir. 2010) (citing *Boyle*, 487 U.S. at 507-08). Because Congress chose to subject those private parties to only a limited federal appeals process, the extra liability those state-law claims sought to impose would have destroyed Congress's "careful balancing of [competing] interests" in designing the federal program. *Id.* at 831. Analyzing the federal 340B

statute with a view toward its spending-power origins is no different. Doing so underscores that Congress made a series of policy choices concerning what burdens to impose on manufacturers and what benefits to offer covered entities, and that S.B. 325 consciously rebalances this incentive structure to the federal government's detriment. *See* U.S.Br.20-22.

Both the Supreme Court and other courts have used similar reasoning to hold state laws preempted. For instance, the panel majority correctly relied on *Lawrence County v. Lead-Deadwood School District No. 40-1*, where South Dakota tried to impose additional conditions on the use of funds that Congress gave to a local government for "any governmental purpose." 469 U.S. 256, 258-59 (1985). By adding terms to Congress's spending deal, the state ran afoul of "the freedom and flexibility" Congress intentionally preserved for the recipients of federal dollars. *Id.* at 263-64. And in *Forest Park II*, the Eighth Circuit rejected Minnesota's effort to restrict the ability of private housing developers who agreed to participate in a federal program to subsidize low-income housing to exit the program on Congress's terms. 336 F.3d at 728-30. Like S.B. 325, that law interfered with the "incentive" Congress used to

attract developers in the first place by imposing "additional requirements on federal program participants [and] restrict[ing] the exercise of the participants' federally granted rights."[2] *Id.* at 733-34.

Thus, once Congress has calibrated the costs and benefits needed to attract and sustain participation in a wholly federal program, states cannot second-guess its judgment.

**2.** The panel dissent side-stepped all of this, concluding that the federal 340B statute is "silen[t] on the delivery of 340B drugs" and thus leaves the door open for state legislation. *McCuskey*, 171 F.4th at 706 (Benjamin, J., dissenting). That reasoning is both irrelevant and wrong.

At the outset, even assuming the dissent were correct that the 340B statute is "silent" on "delivery," that would not mean that states are free to impose their own "delivery" conditions. In the spending-power context, states do not have authority to impose their own conditions on program participation unless Congress clearly informs participants that states may do so. If "statutory silence" left a gap in the program that could later

---

[2] After holding that the Supremacy Clause itself displaced the challenged state law, the court "also" held that "the federal statutes and regulatory scheme" at issue there "impliedly preempt the state statutes because the state statutes conflict with the federal law." *Forest Park II*, 336 F.3d at 731-33.

be filled by any state, "funding recipients" would never have "the requisite clear notice" of their obligations. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 220 (2022) (quotation omitted). "And if someone has not agreed to be bound" by a condition in a spending power statute, "he cannot be." *Landor*, 146 S.Ct. at 1944.

That said, S.B. 325 does not regulate delivery. S.B. 325 is not about getting drugs where they need to go; AbbVie, Novartis, and PhRMA's members already deliver the same drugs to the same pharmacies throughout West Virginia. *See, e.g.*, JA76, JA631 ("AbbVie will deliver its drugs to any pharmacy, anywhere."). What S.B. 325 controls is the price of those same units: It does this by prohibiting manufacturers from exercising their authority under federal law to "restrict" contract pharmacies' "acquisition of a 340B drug," W. Va. Code §60A-8-6a(b)(1), defined as a drug offered for "reduced prices" under the 340B program, *id.* § 60A-8-6a(a)(1). Thus, when covered entities demand retroactive discounts on an unlimited number of contract pharmacy purchases of drugs that have already been dispensed, S.B. 325 forbids manufacturers from refusing to let them "acqui[re]" the drugs on those terms. The

practical consequence is a change in the *price* of a drug that was already delivered and dispensed.

Regardless, federal law is not "silent" in the way the dissent suggested. To ensure that manufacturers would participate in 340B, Congress "preserve[d] … the ability of sellers to impose" some conditions on their offers to sell drugs to covered entities at 340B prices. *Novartis*, 102 F.4th at 460. That the statutory (and contractual) text does not enumerate every permissible condition is not silence—it is a "preserv[ation]" of discretion, bounded by the requirement that a manufacturer's offer remain bona fide. *Id.* at 460-64; *see Sanofi*, 58 F.4th at 704-07. That is a substantive federal-law standard: A contract-pharmacy policy so restrictive or burdensome as to negate a manufacturer's obligation to extend a bona fide offer of 340B pricing would violate the federal statute. *Novartis*, 102 F.4th at 462-64; *Sanofi*, 58 F.4th at 704, 707. If a manufacturer crosses that line, a federal ADR panel (not a state court) resolves the issue by applying federal (not state) law. *See McCuskey*, 171 F.4th at 693-94 ("HHS maintains the power to enforce *bona fide* offers to covered entities.").

Thus, even if "silence" could help the state, it does not exist here, as federal law provides both the substantive standard of conduct (make a bona fide offer) and the mechanism through which HHS is enforcing that standard (ADR). Again, silence cannot help the state because in the spending power context, Congress must impose conditions clearly and unambiguously. *Landor*, 146 S.Ct. at 1941.

### C. The Panel Majority Correctly Recognized That S.B. 325 Operationally Interferes With The 340B Program.

S.B. 325 is also obstacle-preempted because it "interferes operationally with multiple aspects of the 340B program." *McCuskey*, 171 F.4th at 693-694; *accord* JA774-90.

S.B. 325 impermissibly curtails manufacturers' federal rights to impose reasonable conditions on 340B offers. Federal law undisputably allows manufacturers to limit the number of contract-pharmacy arrangements they will recognize and require covered entities to submit claims data as a condition of receiving 340B pricing. *Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 701, 703-06. West Virginia even concedes that Congress left these requirements out of the 340B statute "intentionally." Dkt.33 at 20, 42 (quoting *Sanofi*, 58 F.4th at 705). Yet it is also undisputed that S.B. 325 outlaws at least some of the same

policies Congress allows manufacturers to implement. *Id.* at 23. West Virginia cannot alter "the federally-approved operation" of a federal program. *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1167 (9th Cir. 2008); *see also e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 865 (2000); *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022); *Chamber of Com. of the U.S. v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010).

S.B. 325's interference with Congress's methods creates two stark operational impediments that render the state law preempted: (1) prohibiting manufacturers from obtaining claims data hinders manufacturers' ability to bring ADR claims, and (2) creating a parallel state forum to resolve 340B disputes undermines Congress's goal of uniform, nationwide 340B administration, *see Astra*, 563 U.S. at 120.

#### 1. S.B. 325's Claims-Data Prohibition Frustrates Manufacturers' ADR Access.

The federal 340B statute expressly contemplates that manufacturers will bring potential violations to HHS's attention through ADR. *See* 42 U.S.C. §256b(d)(3)(B)(iv). And Congress designed a sequential process for doing so. First, a manufacturer identifies potential 340B violations. Then, the manufacturer audits the covered entity.

Next, the manufacturer brings a claim in ADR. To initiate an audit, a manufacturer must provide "documentation" to HHS establishing "reasonable cause" to believe that a covered entity has engaged in diversion or duplicate discounting. 61 Fed. Reg. at 65,409. HHS requires specificity: A manufacturer must produce a detailed audit plan that "set[s] forth a clear description of why [the manufacturer] has reasonable cause" and that identifies "sufficient facts and evidence in support of the belief." *Id.* at 65,410. S.B. 325's ban on claims-data conditions would severely hamper manufacturers' ability to obtain the substantive information necessary to identify potential 340B violations, initiate audits, and bring ADR claims. It would also hurt HHS, as it would deprive the agency of manufacturers' identification of potential program abuse.

To audit for duplicate discounts, a manufacturer must assess whether a 340B discount and Medicaid rebate have been sought for the same drug unit. To audit for diversion, a manufacturer must assess whether a 340B-priced drug was transferred to someone who is not a patient of the covered entity. Neither assessment is possible without knowing what prescriptions the covered entity believes qualify for 340B

pricing. Claims data provides that information. It is "standard information" that is readily available to covered entities, and manufacturers' policies requiring provision of such data accord with widespread and longstanding "business practices." *Novartis*, 102 F.4th at 463. By prohibiting manufacturers from requiring covered entities to provide that data, S.B. 325 prevents manufacturers from securing the "documentation" that is essential to initiate an audit, thereby frustrating their ability to access ADR. *See* JA774-75; JA779.

West Virginia posits that manufacturers may be able to demonstrate reasonable cause for an audit without claims data. Dkt.33 at 58-62; Dkt.66 at 18-20. That argument fails for three reasons.

***First***, Congress "intentionally excluded" any prohibition on requiring 340B claims data. *Chamber of Com.*, 594 F.3d at 769; Dkt.33 at 42. Federal law allows manufacturers to condition 340B pricing on receiving claims data, *Novartis*, 102 F.4th at 463, and HHS has long recognized that manufacturers may require covered entities to provide "standard information," 59 Fed. Reg. 25,110, 25,112 (May 13, 1994). HHS continues to apply this rule in ADR proceedings. *E.g.*, No. 24-1949, Dkt.75-2 at 1-2 (rejecting challenge to Novartis's data requirement).

West Virginia's policy disagreement with that federal rule is beside the point.

***Second***, West Virginia's conjecture that it is easy to audit covered entities without claims data clashes with the record (and reality). Between November 2022 and April 2024—before many manufacturers implemented data requirements—only two manufacturer-led audits were finalized across the entire 340B Program. 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024). HHS has approved just 37 audit plans in over a decade, only 18 of which were completed. Decl. of Chantelle Britton ¶15, *Univ. of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. Dec. 20, 2024), Dkt.22-1. Those numbers are not the product of manufacturer indifference. They reflect the difficulty of establishing reasonable cause without the very data S.B. 325 prevents manufacturers from obtaining.

The state also skips a step by jumping straight to reasonable cause. Manufacturers receive such little information about covered entities' demands for 340B pricing that they often cannot tell which entities might be violating their compliance obligations. JA36-37. Without data from covered entities, they generally cannot "know to ever *ask* for an audit." *Drummond*, 808 F.Supp.3d at 1278 (emphasis added). It is thus a

mistake to focus on whether HHS would deny any particular audit request. *McCuskey*, 171 F.4th at 712-13 (Benjamin, J., dissenting). Manufacturers may be unable to make those requests in the first place. S.B. 325 makes it harder for them to do so.

***Third***, making it harder for manufacturers to secure the claims data that enables them to identify potential 340B violations does not just harm manufacturers; it harms the federal government itself. By allowing covered entities to partner with as many contract pharmacies as they wish, S.B. 325 effectively adds thousands of entities to the HRSA enforcement scheme. And by prohibiting manufacturers from securing claims data, S.B. 325 impedes their ability to aid in identifying diversion and duplication as Congress contemplated when it created the audit system. HRSA is not even getting that job done with manufacturers' assistance, so S.B. 325 inevitably means more fraud and abuse. Plus, S.B. 325 dramatically increases the number of transactions at the 340B price, rendering those same units ineligible for Medicaid rebates that otherwise would inure to the federal government.

Even if S.B. 325 does not make auditing covered entities impossible in all circumstances, it indisputably makes doing so far more difficult,

weakening the audit rights Congress gave manufacturers, *see* 42 U.S.C. §256b(a)(5)(C), and leaving the federal enforcement regime a dead letter in practice for manufacturers. The Supremacy Clause protects "the *full* purposes and objectives of Congress"—not merely some diluted version of them that a state arbitrarily imposes. *Columbia Venture*, 604 F.3d at 829-30 (emphasis added).

#### 2. S.B. 325 Supplants ADR And Disrupts 340B's Nationwide Uniformity.

When Congress intends federal law to operate the same way nationwide, state law must yield. *See Arizona v. United States*, 567 U.S. 387, 401-02 (2012) (emphasizing the "comprehensive and unified" nature of federal alien-registration requirements in finding a supplementary state law invalid); *see also, e.g.*, *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 705 (4th Cir. 1993); *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 177 (4th Cir. 2002); *PPL EnergyPlus*, 753 F.3d at 477. The Supreme Court concluded in *Astra* that Congress designed the 340B Program to operate as a single, nationally uniform program. 563 U.S. at 113, 121-22. And to ensure that uniformity, Congress decided that the 340B Program would have a sole federal agency decisionmaker and enforcer. *Id.*

S.B. 325 disrupts Congress's pursuit of uniformity by empowering West Virginia officials and state courts to decide the circumstances under which a 340B-participating manufacturer must sell its drugs at the 340B price. The federal 340B statute obligates "the Secretary" of HHS to "promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under [340B]." 42 U.S.C. §256b(d)(3)(A). Those regulations have "the force of law"—and thus "pre-empt" state law. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). And, crucially, they reflect HHS's view that the exclusive jurisdiction of the federal ADR tribunal encompasses claims that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1).

Yet West Virginia wants its own state courts to decide those exact questions—even as HRSA is resolving them in ADR claims brought by covered entities. *See 340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3. In an S.B. 325 enforcement action, the question will not be whether the manufacturer delivered drugs to a contract pharmacy; manufacturers are more than willing to do so—if

pharmacies pay non-340B prices. *See, e.g.*, JA631; JA783 (district court explaining that S.B. 325 requires "delivery *at a given price*, not delivery *per se*"); *Drummond*, 808 F.Supp.3d at 1277. The question will be whether a manufacturer "restrict[ed]" a covered entity's ability to obtain 340B pricing for those drugs. *See* W. Va. Code §60A-8-6a(a)(1)(B), (b). West Virginia cannot explain how an ADR claim under 42 C.F.R. §10.21(a)(1) would differ ***in substance*** from a state-court suit brought under S.B. 325. That is because there would be no difference. The only difference is the ***result***: The same conduct that is lawful under federal law (such that manufacturers prevail in ADR, *see* No. 24-1949, Dkt.75-1 to 3) would expose manufacturers to penalties and punishment in West Virginia's courts.

Additional examples of conflict abound. If a manufacturer were sued for violating S.B. 325, that state-court suit would inevitably require answering a number of federal questions, including whether: the drugs for which 340B pricing is sought are actually going to patients of covered entities; the covered entity and/or contract pharmacy is engaged in duplicate discounting, *see* 42 U.S.C. §256b(a)(5)(A); the contract pharmacy that dispenses the 340B-priced drugs could lawfully receive

them, *see id.* §256b(a)(5)(B); and any violations under federal law disqualify the covered entity from participating in 340B, *see Astra*, 563 U.S. at 120. Indeed, the state admitted below that S.B. 325 creates federal-law questions that overlap with those in the federal program. *See* JA781, JA787-88. This overlap between federal and state law "inevitably conflict[s] with" HHS's exclusive "responsibility to police" the same subject matter "consistently with [its] judgment and objectives." *Buckman*, 531 U.S. at 350; *see also, e.g.*, *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) (state claims that "merely duplicate[]" federal claims subject to an exclusive "enforcement scheme … are precluded under a theory of obstacle preemption").

Just as in *Astra*, "the risk of conflicting adjudications" threatens Congress's vision for a uniform federal program. *See* 563 U.S. at 120. If West Virginia (and every other state) can revamp the program's obligations, then the program will cease to be either federal or uniform. This Court should not permit such a 50-state-free-for-all approach, which would make it impossible for HHS "to administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis." *Id*

## II. S.B. 325 VIOLATES THE TAKINGS CLAUSE.

AbbVie's Takings Clause claim provides an independent basis to affirm. The Takings Clause prohibits governments from forcing property to be transferred from its owner to another without just compensation. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015). S.B. 325 does just that. AbbVie's contract-pharmacy policy is a set of federally lawful conditions attached to AbbVie's pre-sale 340B offer. So, when covered entities do not accept AbbVie's offer conditions, they reject AbbVie's 340B offer, and AbbVie thus has no federal obligation to complete 340B-priced sales. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 704. West Virginia creates new state-law obligations in that void: offer the 340B price unconditionally and complete more 340B-priced sales.

Although AbbVie is not required to make—and would not make—340B-priced sales to covered entities that reject AbbVie's offer under the federal 340B Program, West Virginia's law nonetheless compels AbbVie to allow covered entities to "acqui[re]" its drugs at the 340B price. W. Va. Code §60A-8-6a(b)(1); No. 25-1054, Dkt.33 at 53 (West Virginia agreeing that "when a covered entity buys discounted drugs from a drug maker, [S.B. 325] prohibits the drug manufacturer from conditioning that sale

on the entity's agreement" to AbbVie's offer conditions). Absent S.B. 325, AbbVie would not sell in those circumstances and would retain title to its property. *See* JA257-58, JA262-63, JA286; *Drummond*, 808 F.Supp.3d at 1279-80; *AbbVie Inc. v. Brown*, 809 F.Supp.3d 1341, 1360-62 (D. Utah 2025). Because S.B. 325 forces AbbVie to complete 340B-priced sales that federal law does not demand, it destroys AbbVie's ability to "control [the] disposition" of its property and thus takes AbbVie's property. *Horne*, 576 U.S. at 364.

To avoid that conclusion, states like West Virginia (and the Fifth Circuit in *Murrill*) resort to a handful of unpersuasive arguments.

***First***, West Virginia's attempt to avoid the Takings Clause by casting its takings as "negative obligation[s] of non-interference," *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 763 (5th Cir. 2026) (quotation omitted); No. 25-1054, Dkt.33 at 76, is untenable. The Supreme Court squarely rejected the substance of that negative-obligation argument in *Cedar Point Nursery v. Hassid* by invalidating a negatively phrased law that punished "[***i***]***nterference*** with organizers' right of access" to private property. 594 U.S. 139, 144 (2021) (emphasis added).

***Second,*** West Virginia cannot rely on the proposition that S.B. 325 compels no sales and instead applies to delivery only *after* AbbVie "chooses to sell." No. 25-1054, Dkt.66 at 35; *see Murrill*, 180 F.4th at 763. Such an interpretation would mean West Virginia's law has no effect; manufacturers like AbbVie could simply continue to enforce their pre-sale offer conditions and refuse to sell 340B-priced drugs to covered entities that decline their offer terms. In that scenario, no "340B drug" exists for S.B. 325 to regulate. *See* W. Va. Code §60A-8-6a(a)(1)(C) ("340B drugs" include only those "purchased by a covered entity" at the 340B price). The only way S.B. 325 can have meaning is if it forces manufacturers to complete the sale in the first instance.

***Third***, West Virginia is wrong that its *state-law* taking is rendered "voluntary" by AbbVie's participation in the *federal* 340B Program. *See* No. 25-1054, Dkt.66 at 34. Congress's spending power includes the power only to impose conditions that Congress "clearly and unambiguously" identifies. *Landor*, 146 S.Ct. at 1941. Congress clearly laid out the terms of participation—*i.e.*, make a bona fide offer of discounted pricing to covered entities—and did not obligate manufacturers to comply with West Virginia's (or any other state's) tack-on regulations.

West Virginia's confiscations of AbbVie's property must therefore be accompanied by a new, state-provided benefit. *See Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023). Otherwise, West Virginia could force Medicare-participating hospitals to provide free treatment, grocery stores that accept SNAP benefits to give away food, and private universities that administer Pell Grants to provide extra scholarships. But West Virginia "isn't giving the drug manufacturers anything they don't already have (i.e., access to the federal market) as compensation for forcing them to make discounted sales." *Drummond*, 808 F.Supp.3d at 1279. Put simply, AbbVie never accepted a "carrot" from West Virginia that would justify S.B. 325's "stick."

West Virginia blurs where federal law ends and S.B. 325 begins. West Virginia argues that Appellees seek to "limit[] the federal program's reach." No. 25-1054, Dkt.66 at 1, 34. But although West Virginia may have preferred a broader 340B Program, the one Congress enacted allows manufacturers to condition their 340B offers even if doing so reduces the total number of 340B discounts. *Novartis*, 102 F.4th at 464; *Sanofi*, 58 F.4th at 704.

West Virginia cannot navigate the tension between its preemption and takings arguments. When it comes to preemption, West Virginia argues that it employed its traditional police powers to regulate a topic—340B delivery—that is purportedly beyond the 340B Program's contours. *See* No. 25-1054, Dkt.66 at 37-38. Yet, when it comes to takings, West Virginia knits 340B and S.B. 325 together, openly conceding that S.B. 325 "places conditions on the use of a [federal] benefit" and "address[es] requirements for Medicare and Medicaid participants." No. 25-1054, Dkt.33 at 77-78. The state cannot have it both ways. If Congress did not regulate 340B sale terms regarding delivery (as West Virginia supposes on preemption), then participation in the 340B Program cannot manifest consent to West Virginia's supposed delivery restrictions (as West Virginia requires on takings). By the same token, if S.B. 325 really is just an attempt to impose conditions on the 340B Program itself (as it plainly is), then S.B. 325 impermissibly intrudes on that federal program. West Virginia cannot resolve this tension at the core of its defenses, and that failure dooms S.B. 325.

## CONCLUSION

This Court should affirm.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Erin E. Murphy*
Erin E. Murphy
Matthew D. Rowen
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellee*
*Pharmaceutical Research and Manufacturers of America*

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.
Russell Balikian
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8616
mowen@gibsondunn.com
rbalikian@gibsondunn.com

Meredith M. Pohl
King & Spalding LLP
1700 Pennsylvania Avenue
N.W., Suite 900,
Washington, D.C. 20006
(202) 737-0500
mpohl@kslaw.com

*Counsel for Plaintiffs – Appellees AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

/s/ *Jessica Ellsworth*

CARTE P. GOODWIN
FBT GIBBONS
500 Virginia Street East
Charleston, WV 25301
(304) 345-0111
cgoodwin@fbtgibbons.com

JESSICA ELLSWORTH
SUSAN M. COOK
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com
susan.cook@hlc.com

*Counsel for Plaintiff – Appellee*
*Novartis Pharmaceuticals Corporation*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's June 18, 2026 Order (Dkt. 172) because it contains 7,500 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This response also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

/s/ *Matthew S. Owen*
Matthew S. Owen

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. All counsel of record are registered CM/ECF users, and service will therefore be accomplished by the CM/ECF system.

/s/ *Matthew S. Owen*
Matthew S. Owen